# Exhibit A

to Complaint

*State of Alabama Dept. of Human Resources et al. v. U.S. Dept of Health and Human Services et al.*

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

## Appellate Division

SUBJECT: Alabama Department of Human
        Resources
        Docket No. A-04-45
        Delaware Department of Health and
        Social Services
        Docket No. A-04-46
        District of Columbia Office of the
        Corporation Counsel
        Docket No. A-04-47
        Hawaii Department of the Attorney
        General
        Docket No. A-04-48
        Kansas Department of Social and
        Rehabilitation Services
        Docket No. A-04-49
        Louisiana Department of Social
        Services
        Docket No. A-04-50
        New Hampshire Department of Health
        and Human Services
        Docket No. A-04-51
        New Mexico Human Services Department
        Docket No. A-04-52
        Rhode Island Department of Human Services
        Docket No. A-04-53

        Decision No. 1989

DATE: July 28, 2005

## DECISION

The nine States listed above jointly appeal determinations by the Administration for Children and Families (ACF), dated November 14, 2003, that they were subject to penalties on the grounds that they failed to demonstrate that their child support enforcement programs, operated pursuant to title IV-D of the Social Security Act (Act) met required performance standards during fiscal years (FYs) 2001 and 2002. The penalties consist of one-percent reductions in the amount of funding that each State received for

2

FY 2001 under the Temporary Assistance for Needy Families program (TANF) established by title IV-A of the Act.[1]

The States raise several issues common to all or several States, as well as issues affecting individual States. We address the common issues first, then issues pertaining to individual States. As discussed below, we find in favor of ACF and sustain ACF's determinations that the States are subject to penalties.

Four other states have individually appealed determinations that they are subject to penalties, also announced in letters from ACF dated November 14, 2003. Those appeals, which were assigned Docket Nos. A-04-40, A-04-43, A-04-56 and A-04-61, present issues similar to the common issues in these appeals, as well as issues particular to the four individual States. These appeals will be the subject of separately issued decisions.

Six states, including four of the joint States here, have also appealed determinations that they are subject to penalties for violations during FY 2002 continuing in FY 2003, which ACF announced in letters dated in February 2005. Those appeals have been assigned Docket Nos. A-05-43, A-05-44, A-05-46, A-05-47, A-05-50, and A-05-51. They have been stayed pending our decision in the appeals of penalties for FYs 2001 and 2002. As we explain in this decision, we find that Rhode Island, one of the states appealing a determination that it is subject to a penalty continuing in FY 2003, may in that appeal address particular issues raised here that were not dispositive to our decision in this appeal.

Summary of the IV-D performance penalty system

Before proceeding to the facts and issues raised by the appeals, we describe the statute and regulations for assessing penalties based on the performance of a state's child support enforcement

---

[1]  The amounts of the penalties appealed are:

| | |
|---|---:|
| Alabama Department of Human Resources | $ 532,692 |
| Delaware Department of Health and Social Services | 293,489 |
| District of Columbia Office of the Corporation Counsel | 701,495 |
| Hawaii Department of the Attorney General | 921,048 |
| Kansas Department of Social and Rehabilitation Services | 807,487 |
| Louisiana Department of Social Services | 1,096,723 |
| New Hampshire Department of Health and Human Services | 385,213 |
| New Mexico Human Services Department | 946,877 |
| Rhode Island Department of Human Services | 945,007 |

3

program. This summary omits some specific provisions that we later provide when relevant to our analysis. Additionally, this summary necessarily reflects our conclusions on some contested legal issues.

Title IV-D of the Act provides federal funding for child support enforcement programs that seek child support on behalf of minor children receiving public assistance. Titles IV-A and IV-D and regulations at 45 C.F.R. Part 305 create a system of incentives and penalties under which federal TANF funds are awarded to or withheld from states based on the performances of their state IV-D programs. The Act and regulations establish five performance measures that are used to award incentives, of which three are also used to assess penalties. This appeal concerns the penalty performance measures. The performance measure at issue in most of these appeals is called the "paternity establishment percentage" (PEP). It measures a state's performance at establishing the paternity of children born out of wedlock. There are two types of PEPs, one based on children in a state's IV-D caseload, the other based on all children in the state. States may select either measure and may change their selection from year to year. The two other penalty performance measures assess a state's performance at establishing orders of support for minor children in IV-D cases, and at collecting support in IV-D cases. States are assessed on their performances for each federal fiscal year (FY or FFY), which runs from October 1 through September 30.

ACF assesses a state's performance based on data that the state submits on a form prescribed by ACF. States must submit complete and reliable data on their performances during each fiscal year by December 31 following the end of the fiscal year. ACF audits each state's annual data submission to determine if the data reported are complete and reliable. ACF is authorized to accept a state's unreliable data if it determines that the unreliability is of a technical nature that does not affect calculation of the state's performance measures. (For convenience, in this decision we refer to the complete and reliable data that states must submit simply as reliable data.)

As we conclude below, a state is penalized if, for two consecutive years, with respect to the same performance measure, it fails to demonstrate with reliable data that it met the required level of performance. Thus, a state is penalized if for two consecutive years it fails the same penalty performance measure or submits unreliable data on the same performance measure, or if it fails the performance measure in one year and submits unreliable data on that performance measure in the other

4

year. A state that has failed to achieve the required level of performance may still pass the performance measure if its level of performance increased over the previous year's level by a specified amount. A state that has failed a performance measure or failed to submit reliable data in one year is not penalized if it corrects the failure with respect to the following year, which the regulations refer to as the corrective action year. (A third basis for a penalty, in addition to failing the IV-D penalty performance measures and failing to submit reliable data, is failure to substantially comply with the requirements of the IV-D program. That basis is not at issue in these appeals, where the penalties were all based on failures to meet performance measures or to submit reliable data, or some combination of the two.)

The penalties consist of reductions in the annual TANF funding that a state receives under title IV-A of the Act, called the State Family Assistance Grant (SFAG). The penalties range from one to five percent, depending on the number of failures and on how many years a state continues to have failures. A state may appeal a decision imposing penalties to the Board. Title IV-A of the Act also imposes TANF funding reductions as penalties for various failures to satisfy requirements related to a state's administration of its TANF program which, coupled with the IV-D penalties, could increase the amount of the reduction in a state's TANF funding. Those other penalty provisions are not at issue here.

ACF notified the States of its determinations that they are subject to penalties in letters to each State from the Assistant Secretary for Children and Families dated November 14, 2003. The letters informed each State that it had failed one or more penalty performance measures and/or submitted unreliable data for FYs 2001 and 2002, and that it was thus subject to a reduction in funding equal to one percent of its adjusted SFAG for the TANF program for FY 2001, "imposed quarterly, beginning with first quarter of FFY 2004, for the four quarters of FFY 2003 . . ." States' Notice of Appeal, Exhibits (Exs.) 1-9 (November 14, 2003 letters).

All nine States make one joint argument questioning whether ACF's process for notifying the States of their performance failures and penalties complied with the applicable regulations. Seven and eight of the States make joint arguments concerning, respectively, ACF's method for determining the reliability of a state's paternity establishment data, and whether ACF should have disregarded data errors that tended to make a state's performance appear worse than it actually was. Seven States make arguments that apply to their appeals only. Below, we first describe the

5

general legal framework of the penalty process, followed by an analysis that first addresses the joint arguments, and then each State's appeal. As the applicable legal provisions are lengthy and extensively cross referenced, we present them when necessary for a particular portion of our decision.

Legal Background

Title IV-A of the Act (sections 401-419; 42 U.S.C. §§ 601-619), "Block Grants to States for Temporary Assistance for Needy Families" (the TANF program), provides grants to eligible states that have approved programs for providing assistance to needy families with children, and for providing their parents with job preparation, work and support services to enable them to leave the program and become self-sufficient. Sections 401, 402 of the Act. To receive TANF funds, a state must operate a child support enforcement program consistent with title IV-D of the Act. Section 402(a)(2) of the Act. Title IV-D (sections 451-469B; 42 U.S.C. §§ 651-669b) is a cooperative federal-state program that aims at increasing the effectiveness of child support collection by such measures as locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support be available to all children for whom such assistance is requested. Maryland Dept. of Human Resources, DAB No. 1875 (2003), citing section 451 of the Act. States operate their child support enforcement programs subject to oversight by ACF's Office of Child Support Enforcement (OCSE). We refer in this decision to ACF as the respondent federal agency; the IV-D regulations refer to OCSE.

I.    IV-D Penalties — Section 409(a)(8) of the Act and 45
      C.F.R. Part 305

Titles IV-A and IV-D of the Act impose various requirements on states, including performance standards or measures that states must achieve in the operation of their TANF and Child Support Enforcement programs. Section 409(a) of the Act, "Penalties," provides for financial penalties against states, in the form of reductions in a state's federal TANF grant or SFAG, for some 14 categories of noncompliance with various requirements imposed by title IV. At issue here is section 409(a)(8) of the Act, which provides for penalties related to the performance of a state's child support enforcement program under title IV-D. As noted above, these penalties, as relevant here, address a state's failure, for two consecutive years, to meet the same IV-D performance measure and/or submit reliable data needed to calculate performance. Section 409(a)(8) provides in relevant part as follows:

6

(8) NONCOMPLIANCE OF STATE CHILD SUPPORT
ENFORCEMENT PROGRAM WITH REQUIREMENTS OF PART D.—
(A) IN GENERAL.—If the Secretary finds, with
respect to a State's program under part D, in a
fiscal year beginning on or after October 1,
1997—
(i)(I) on the basis of data submitted by a
State pursuant to section 454(15)(B), or on
the basis of the results of a review
conducted under section 452(a)(4), that the
State program failed to achieve the paternity
establishment percentages (as defined in
section 452(g)(2)), or to meet other
performance measures that may be established
by the Secretary;
(II) on the basis of the results of an
audit or audits conducted under section
452(a)(4)(C)(i) that the State data submitted
pursuant to section 454(15)(B) is incomplete
or unreliable; or
(III) on the basis of the results of an
audit or audits conducted under section
452(a)(4)(C) that a State failed to
substantially comply with 1 or more of the
requirements of part D (other than paragraph
(24) or subparagraph (A) or (B)(i) of
paragraph (27), of section 454); and
(ii) that, with respect to the succeeding
fiscal year—
(I) the State failed to take sufficient
corrective action to achieve the
appropriate performance levels or
compliance as described in subparagraph
(A)(i); or
(II) the data submitted by the State
pursuant to section 454(15)(B) is
incomplete or unreliable; the amounts
otherwise payable to the State under this
part for quarters following the end of
such succeeding fiscal year, prior to
quarters following the end of the first
quarter throughout which the State
program has achieved the paternity
establishment percentages or other
performance measures as described in
subparagraph (A)(i)(I), or is in
substantial compliance with 1 or more of
the requirements of part D as described

7

in subparagraph (A)(i)(III), as
appropriate, shall be reduced by the
percentage specified in subparagraph (B).

The Act's IV-D penalty and incentive provisions are implemented
by regulations at 45 C.F.R Part 305. Section 305.61 of 45 C.F.R
reflects the penalty provisions of section 409(a)(8) of the Act,
and also refers to the two other penalty performance measures,
which assess a state's performance at establishing orders of
support and at collecting support in IV-D cases:

§ 305.61  Penalty for failure to meet IV-D
requirements.

(a) A State will be subject to a financial
penalty and the amounts otherwise payable to the
State under title IV-A of the Act will be reduced in
accordance with § 305.66:
(1) If on the basis of:
(i) Data submitted by the State or the results
of an audit conducted under § 305.60 of this part,
the State's program failed to achieve the paternity
establishment percentages, as defined in section
452(g)(2) of the Act and § 305.40 of this part, or
to meet the support order establishment and current
collections performance measures as set forth in
§ 305.40 of this part; or
(ii) The results of an audit under § 305.60 of
this part, the State did not submit complete and
reliable data, as defined in § 305.1 of the part; or
(iii) The results of an audit under § 305.60 of
this part, the State failed to substantially comply
with one or more of the requirements of the IV-D
program, as defined in § 305.63; and
(2) With respect to the immediately succeeding
fiscal year, the State failed to take sufficient
corrective action to achieve the appropriate
performance levels or compliance or the data
submitted by the State are still incomplete and
unreliable.
(b) The reductions under paragraph (c) of this
section will be made for quarters following the end
of the corrective action year and will continue
until the end of the first quarter throughout which
the State, as appropriate:
(1) Has achieved the paternity establishment
percentages, the order establishment or the current

8

collections performance measures set forth in
§ 305.40 of this part;
    (2) Is in substantial compliance with IV-D
requirements as defined in § 305.63 of this part; or
    (3) Has submitted data that are determined to be
complete and reliable.

In the preamble to the Part 305 regulations, which was forwarded
to the states as part of Action Transmittal AT-01-01, ACF
referred to the first of the two consecutive years as the
performance year.  65 Fed. Reg. 82,178, 82,186, 87,189 (Dec. 27,
2000).  In these appeals the performance year was FY 2001, and
the corrective action year was FY 2002.

The funding reduction penalties range from one to two percent of
a state's SFAG for the first finding of two consecutive years of
violations, from two to three percent for the second consecutive
finding, and from three to five percent, for the each subsequent
consecutive finding.  Section 409(a)(8)(B) of the Act; 45 C.F.R.
§ 305.61(c).  A state must expend additional state funds to
replace any reduction in the SFAG resulting from penalties.[2]
Section 409(a)(12) of the Act; 45 C.F.R. § 262.1(e).

As noted above, section 409(a) of the Act also imposes penalties
for violations of various other requirements, principally related
to the TANF program at title IV-A.  For some of those other
violations, not at issue here, the Secretary may not impose a
penalty if he finds that there was reasonable cause for the
violation, and must afford a state the opportunity to enter into
a corrective compliance plan prior to imposing a penalty.
Notably, however, section 409 withholds those ameliorative
measures from the title IV-D penalties at issue here.  Section
409(b),(c) of the Act.

_____

    [2]  The States each argue that the requirement to replace
federal IV-A penalty funding reductions with state funds doubles
the fiscal impact of the penalties.  See, e.g., DC Supplemental
Brief (Supp.  Br.) at 2.  This may be true, but is required by
the statute and regulation, by which we are bound.  The States
provided no basis to ignore this requirement, and do not
challenge ACF's determination of the amount of penalties, which
are the minimum one percent provided in the statute.

9

II.    The "Paternity Establishment Percentage" (PEP) — section
       452(g)(2) of the Act

The performance measure at issue in most of these appeals, the
paternity establishment percentage, is essentially the percentage
of children born out of wedlock for whom paternity has been
established or acknowledged; it is "commonly known as the PEP."
45 C.F.R. § 305.2(a)(1).

Section 452(g)(2) defines two versions of the PEP, one based on
children in a state's IV-D caseload, the other based on all
children in the state:

> (A) the term "IV-D paternity establishment
> percentage" means, with respect to a State for a
> fiscal year, the ratio (expressed as a percentage)
> that the total number of children—
>      (i) who have been born out of wedlock,
>      (ii)(I) except as provided in the last
> sentence of this paragraph, with respect to whom
> assistance is being provided under the State
> program funded under part A in the fiscal year
> or, at the option of the State, as of the end of
> such year, or (II) with respect to whom services
> are being provided under the State's plan
> approved under this part in the fiscal year or,
> at the option of the State, as of the end of
> such year pursuant to an application submitted
> under section 454(4)(A)(ii), and
>      (iii) the paternity of whom has been
> established or acknowledged,
> bears to the total number of children born out of
> wedlock and (except as provided in such last
> sentence) with respect to whom assistance was being
> provided under the State program funded under part A
> as of the end of the preceding fiscal year or with
> respect to whom services were being provided under
> the State's plan approved under this part as of the
> end of the preceding fiscal year pursuant to an
> application submitted under section 454(4)(A)(ii);
>      (B) the term "statewide paternity establishment
> percentage" means, with respect to a State for a
> fiscal year, the ratio (expressed as a percentage)
> that the total number of minor children—
>      (i) who have been born out of wedlock, and
>      (ii) the paternity of whom has been established or
> acknowledged during the fiscal year,

10

        bears to the total number of children born out of wedlock
        during the preceding fiscal year; . . .

We present the regulatory definitions of the two PEP measures
below when relevant to our analysis.

III.    <u>PEP performance levels required to avoid a penalty</u>

To avoid a penalty, a state must maintain a PEP of 90% or more.
A PEP lower than 90% may lead to a penalty unless the state has
increased its PEP over the previous year by the percentages
specified in the following table from the regulation:

| PEP | Increase required over previous year's PEP | Penalty FOR FIRST FAILURE if increase not met |
| --- | --- | --- |
| 90% or more | None | No Penalty. |
| 75% to 89% | 2% | 1-2% TANF Funds. |
| 50% to 74% | 3% | 1-2% TANF Funds. |
| 45% to 49% | 4% | 1-2% TANF Funds. |
| 40% to 44% | 5% | 1-2% TANF Funds. |
| 39% or less | 6% | 1-2% TANF Funds. |

45 C.F.R. § 305.40(a)(1), Table 4.

IV.    <u>Other performance measures established by regulation</u>

The Act authorizes the Secretary to establish other IV-D penalty
performance measures, in addition to the PEP.  The Part 305
regulations establish two additional IV-D penalty performance
measures, the Support Order Establishment Performance Level,
essentially the percentage of the total number of IV-D cases
during the fiscal year that have support orders, and the Current
Collections Performance Level, essentially the percentage of
current child support owed in IV-D cases that has been collected.

(In all, there are five IV-D performance measures for determining
incentives, three of which may also subject a state to penalties
and are thus referred to here as the penalty performance
measures.  The two performance measures that are used to
determine performance only for the purpose of awarding incentives
are the Arrearage Collections Performance Level and the
Cost-Effectiveness Performance Level.  They are relevant here in
that the penalty against one of the States, the District of
Columbia, was based partially on two consecutive years of failure
to submit reliable data needed to calculate one of the
incentive-only measures, the Arrearage Collections Performance
Level.)

11

Sections 262.1(b) through (e) of 45 C.F.R. outline the process for assessing penalties against states, including the assessment of multiple penalties, and the process for assessing penalties that exceed a 25% limit on the total reduction in the subject state's quarterly SFAG. (The SFAG is the amount of the basic block grant allocated to each eligible state under the formula at section 403(a)(1) of the Act. 45 C.F.R. § 260.30.) Section 262.7 provides for five-day notice and for a right to appeal an adverse action reducing funding to the Board.

The Act and the Part 305 regulations also contain requirements for the submission of reliable data, authorize the Secretary to accept unreliable data in certain circumstances, and provide a process for notifying states of data audit findings and determinations that that they are subject to penalties. We include these provisions in detail at relevant points in our analysis.

Analysis

I.    Common issues

      A.    ACF complied with applicable notice requirements.

The States' principal overarching argument is that ACF failed to comply with the notice requirements of Part 305. The applicable regulation provides:

> **45 C.F.R. § 305.66  Notice, corrective action year, and imposition of penalty.**
>
> (a) If a State is found by the Secretary to be subject to a penalty as described in § 305.61 of this part, the OCSE will notify the State in writing of such finding.
> (b) The notice will:
> (1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the finding; and
> (2) Specify that the penalty will be assessed in accordance with the provisions of 45 C.F.R. § 262.1(b) through (e) and 262.7 if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective action year (i.e., the succeeding fiscal year following the year with respect to which the deficiency occurred.)

12

(c) The penalty under § 305.61 of this part will be assessed if the Secretary determines that the State has not corrected the deficiency or deficiencies cited in the notice by the end of the corrective action year.

(d) Only one corrective action period is provided to a State with respect to a given deficiency where consecutive findings of noncompliance are made with respect to that deficiency. In the case of a State against which the penalty is assessed and which failed to correct the deficiency or deficiencies cited in the notice by the end of the corrective action year, the penalty will be effective for any quarter after the end of the corrective action year and ends for the first full quarter throughout which the State IV-D program is determined to have corrected the deficiency or deficiencies cited in the notice.

(e) A consecutive finding occurs only when the State does not meet the same criterion or criteria cited in the notice in paragraph (a) of this section.

The States argue that ACF did not properly notify them that they had failing data or performances and would be penalized if they did not correct those failures. They argue that the regulation required ACF to notify them either before or at some point during FY 2002, the corrective action year, that they had failed the performance or data standards in FY 2001, the performance year, and that they faced penalties (including the penalty amounts) unless they corrected their deficiencies during FY 2002. The only notices that ACF provided of those failures and of the specific penalties the States faced for failure to correct those problems in FY 2002, they argue, were ACF's November 14, 2003 letters announcing the determinations that the States are subject to penalties, which arrived too late for them to have avoided the penalties by taking corrective action during FY 2002.

For the reasons explained below, we conclude that the regulation did not require ACF to notify the States of their FY 2001 failures prior to or during FY 2002, the corrective action year. Rather, as explained below, we conclude that in the penalty process established by the regulations, penalties follow two consecutive years of failing performance or unreliable data relating to the same performance measure, and the start of the corrective action year is not conditioned upon notice from ACF. Neither the statute nor the regulation provide a specific time frame or deadline for ACF to notify a state of the possibility of

13

penalties raised by its performance-year scores.  Moreover, the structure of the system established by section 409 of the Act and the Part 305 regulations necessarily does not permit states a full year following notice of their performance-year failures before the imposition of penalties upon the end of the corrective action year.

We find that these provisions place on a state the ultimate responsibility for monitoring its own performance and that, in any event, the States here were aware of their own performances and moreover were informed of their data reliability problems during the corrective action year.

      1.   <u>The regulation did not require notice prior to the end of FY 2002, the corrective action year.</u>

The States argue that 45 C.F.R. § 305.66 refers to the assessment of penalties as a conditional, future event, meaning that ACF must notify a state when it is at risk for a penalty, and not after the penalty has been calculated and is being assessed, as in the November 14, 2003 letters.  They cite language in the regulation that ACF's notice will "indicate the amount of the potential penalty" and state that a penalty "will be assessed . . . if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective action year." 45 C.F.R. § 305.66.  The States argue that "potential penalty" means a penalty that has yet to be determined or assessed.  The States cite language from the preamble to the notice regulation stating that the penalty "will be assessed if the Secretary determines that the State has not corrected the deficiency or deficiencies cited in the notice by the end of the corrective action year." 65 Fed. Reg. 82,192.

These statements, the States argue, demonstrate that the purpose of the notice required by section 305.66 is to afford a state the opportunity to make use of the corrective action period to avoid a penalty, to warn a state that it must correct the deficiencies cited in the notice or face penalties, and not to announce penalties as a fait accompli.  The November 14, 2003 letters, they argue, failed to fulfill that purpose because they assessed specific penalties whose amounts had been definitively determined.

The States misconstrue ACF's obligation to provide notice under the regulations.  The notice requirements of section 305.66 do not apply until a state "is found by the Secretary to be subject to a penalty as described in § 305.61 . . . ." Section 305.61 in turn provides that a state "will be subject to a financial

14

penalty," and the amounts otherwise payable to it under title
IV-A will be reduced, upon the completion of two consecutive
years of noncompliance or unreliable data relating to the same
performance measure.  A state is thus not subject to a penalty,
and the notice requirements of section 305.66 do not apply, until
the completion of two consecutive years of noncompliance, after
which a penalty must be assessed.

The conditional nature of some of the language in section 305.66,
such as the reference to potential penalties, is likely
attributable to its incorporation of selected regulations at 45
C.F.R. Part 262, specifically sections 262.1(b) through (e) and
262.7.  Part 262 outlines the procedures for assessing penalties
for some of the several violations listed in section 409(a) of
the Act, other than the noncompliance with IV-D performance
measures addressed at section 409(a)(8) that is at issue here.
Section 262.1(b) through (e) includes procedures for collecting
multiple penalties from a state found to have committed more than
one of the violations listed in section 409(a), the maximum
reduction that may be made in a state's SFAG regardless of the
number of penalties, and the requirement that penalties will be
taken by reducing the SFAG payable for the quarter that
immediately follows ACF's final decision.  Section 262.7 affords
states the right to appeal penalty determinations to the Board.
A penalty to which a state is subject under section 409(a)(8) and
Part 305 is thus a potential penalty in the sense that it is
still subject to these other provisions before the actual amount
of the reduction to be taken in a state's SFAG is determined.
The November 14, 2003 letters noted these other provisions,
stating that the announced penalty "will be imposed in accordance
with the provisions of 45 C.F.R. § 262.1(b) through (e) . . ."
States' Notice of Appeal, Exs. 1-9.  However, there is no
indication here that any penalties at issue are to be combined
with penalties under portions of section 409(a) other than
section 409(a)(8), or exceed the maximum reduction that may be
taken in a state's SFAG.  Since there were not multiple penalties
here, ACF could inform each State of the amount of its SFAG
reduction in the notice letters that ACF issued pursuant to
section 305.66 on November 14, 2003.

Part 262 also contains procedures for states found subject to
penalties for the other types of TANF violations that do not
apply to the IV-D penalties at issue here, including the
opportunity to present arguments, demonstrate reasonable cause,
and submit a corrective compliance plan, prior to ACF's decision
to impose a penalty that may be appealed to the Board.  45 C.F.R.
§ 262.4.  These procedural differences are another reason why ACF

15

was reasonable here in combining the notice in section 305.66 and
the notice in section 262.7.[3]

    2.  <u>A state's obligation to take corrective action is
self-implementing and not conditioned on the
receipt of notice from ACF.</u>

Section 409(a)(8) of the Act imposes penalties on a state that
fails to attain the required level of performance in the same
penalty performance measure, or to submit reliable data needed to
calculate performance, for two consecutive years.  The two years
follow one upon another automatically, and the statute does not
require or make any reference to notice being required to
commence the second of the two consecutive years.  This is
apparent from the relevant language in section 409(a)(8)(A)
(emphasis added):

    —If the Secretary finds . . .
        (i)(I) . . . that the State program failed to
achieve the paternity establishment percentages
. . . or to meet other performance measures
that may be established by the Secretary;
        (II) . . . the State data submitted pursuant
to section 454(15)(B) is incomplete or
unreliable; **or**
        (III) on the basis of the results of an audit
or audits conducted under section 452(a)(4)(C)
that a State failed to substantially comply with
1 or more of the requirements of part D . . .
**and**
    (ii) **that, with respect to the succeeding
fiscal year—**
        (I) the State failed to take sufficient
corrective action to achieve the appropriate
performance levels or compliance as described
in subparagraph (A)(i); **or**
        (II) the data submitted by the State
pursuant to section 454(15)(B) is incomplete
or unreliable; the amounts otherwise payable
to the State under this part . . . shall be
reduced . . .

---

[3]  Part 305 does afford a state the opportunity to comment
on draft audit reports, giving the state some notice of problems
that may lead to a penalty and an opportunity to present its
views before a determination is made that the state is subject to
a penalty.  45 C.F.R. § 305.64.

16

The regulation mirrors the statute, providing that a state is subject to a penalty if it failed to achieve the paternity establishment percentages, or to meet the support order establishment and current collections performance measures; or if it did not submit reliable data, and, "[w]ith respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels **or** compliance **or** the data submitted by the State are still incomplete and unreliable." 45 C.F.R. § 305.61(a) (emphasis added).

The circumstances requiring penalties are thus, as relevant here, failing performance or unreliable data in one year, and failure to correct those shortcomings with respect to the succeeding year.

Significantly, the structure of the system of penalties that Part 305 implements necessarily does not permit the start of the corrective action year to be conditioned on notice from ACF of a state's performance or data reliability with respect to the performance year, and further does not afford a state a full year following notice to correct its deficiencies before being subject to penalties. A state has until December 31st to submit its data relating to performance in a given fiscal year, which ends on the previous September 30. 45 C.F.R. § 305.32(f). As this deadline is approximately 90 days into the immediately succeeding corrective action year, it does not permit review of the data and notification to the state of data or performance findings in time for the state to have a full year to take corrective action. Language from the preamble to the notice regulation that the states cite as describing the assessment of penalties as an event that follows notice to the states confirms that the decision that a state is liable for penalties is a determination that "will be made as soon as possible after the end of the corrective action year." 65 Fed. Reg. 82,192. This aspect of the penalty system also demonstrates the untenability of the States' reading of 45 C.F.R. § 305.66 as requiring notice of a state's deficiencies prior to the time that a state has failed to attain required performance levels, or has submitted unreliable data, with respect to the same performance measure, for two consecutive years. As we discussed above, the notice regulation is implicated only when a state is subject to a penalty, which, according to 45 C.F.R. § 305.61, does not occur until the passage of the two consecutive years.[4]

---

[4] Because we find that the States' interpretation of the
(continued...)

17

The States also cite language from the preamble to the notice of proposed rulemaking for Part 305 describing the phase-in of performance penalties, providing that states would be subject to the performance penalties based on data reported for FY 2001, that data reported for FY 2000 would be used as a base year to determine improvements in performance during FY 2001, and that penalties would be assessed and then suspended during the statutory one-year corrective action period. 64 Fed. Reg. 55,074, 55,089 (Oct. 8, 1999). This language is not inconsistent with the penalties here, which were not imposed until the end of the corrective action period. This language does not alter the self-implementing nature of the penalty system in which initiation of the penalty process is not conditioned on notice and states are "subject to" penalties only after two consecutive years of failing performance and/or data.

The States effectively acknowledge that the penalty system does not permit a full year for corrective action following notice from ACF, but argue that the regulations require notice "at some point" during the corrective action year, and they clarify that they are not arguing that notice was required to "trigger" the corrective action year. States Joint Br. at 19; Joint Reply Br. at 6, n.1. As we concluded above, such notice is nowhere required by statute or regulation. Nevertheless, even if we were to accept the States' argument that 45 C.F.R. § 305.66 requires that a state be given notice during the corrective action year of its performance or data reliability failures in the performance year (which it does not), the States here either received such notice or were in fact aware of their performances during the corrective action year.

As a state must report its performance data to ACF, it is aware, at the time it prepares the data, of whether it has met the required performance levels for the penalty performance measures.

---

[4](...continued)
regulations is not supportable, a federal court decision that the States cite addressing the consequences of a federal agency's failure to follow its own regulations is not applicable here. States Joint Br. at 20. The States also cite Supreme Court decisions to the effect that federal agencies must clearly state conditions for the receipt federal funding. States Joint Reply Br. at 2, 13. Those principles are not implicated here, where the Act and regulations clearly presented the conditions that states had to meet to avoid penalties and earn incentives.

18

Section 454(15)(B) of the Act; 45 C.F.R. § 305.32.[5]  Language
from the preamble to Part 305 that ACF cites in its briefs
emphasizes that states are responsible for monitoring their own
performances and the reliability of their data.  The preamble
cautions that a state "should be continuously monitoring its own
performance and taking action to improve performance which its
own data shows may fail to achieve the performance measures.  The
State is also responsible for maintaining proper procedures and
controls to ensure data reliability and completeness."  65 Fed.
Reg. 82,192.  The preamble goes on to note that "the State should
not wait or rely upon the Secretary's determination of a data or
a performance deficiency in order to begin corrective action.
Two consecutive years of failure (either poor data or poor
performance) in the same performance measure criterion will
trigger a penalty imposition."  Id.  Elsewhere, the preamble
describes the automatic corrective action period as a "delay
which allows States to identify and to correct either reporting
or performance problems prior to being assessed a financial
penalty," and again warns states that they "should be diligent in
continuously monitoring their own performance and data
reliability."  65 Fed. Reg. 82,205.  In light of the States'
responsibility for monitoring their own performances on the
penalty performance measures, and the fact that it was they who
provided the performance data to ACF, they cannot assert that
they were not aware of their own performances and whether they
were at risk for penalties if deficient performance continued for
a second consecutive year.

The record also shows that ACF informed each of the States of
problems with the reliability of their FY 2001 data in time for
them to take corrective action before the deadline for submitting
their data for FY 2002, the corrective action year.  Between
April 15 and August 1, 2002, ACF sent reports of its audits of

---

[5]  Section 454(15)(B) requires that a state's IV-D plan
must have "a process of extracting from the automated data
processing system . . . and transmitting to the Secretary data
and calculations concerning the levels of accomplishment (and
rates of improvement) with respect to applicable performance
indicators (including paternity establishment percentages) . . ."
The regulation requires states to submit data used to determine
incentives and penalties, following instructions and formats as
required by HHS, by December 31st after the end of the fiscal
year, and provides that only data submitted as of December 31st
will be used to determine the state's performance for that fiscal
year.  45 C.F.R. § 305.32.  The States do not argue that they
were not aware of these requirements.

19

the data that states submitted for FY 2001 (called data reliability audits, or DRAs) to each of the States informing them of whether their FY 2001 data met the standard of reliability. ACF sent earlier draft DRA reports to eight of the nine appellant States between April 29 and June 20, 2002.[6]  States Exs. AL-9, AL-10; DE-10, DE-12; DC-9, DC-11; HI-10, HI-12; KS-8, KS-10; LA-11, LA-13; NH-12; NM-11, NM-13; RI-9, RI-11.  As performance data submissions for FY 2002 were not due until December 31, 2002, the States had time periods ranging from four to seven months following release of the FY 2001 DRA reports, and six to eight months after release of the draft reports, to correct any problems that may have caused their FY 2001 data to be found unreliable and thus avoid penalties for two years of unreliable data.

The States argue, however, that the DRA reports did not provide adequate notice of their data reliability problems because the reports, provided by the OCSE Office of Audit, each stated that the final determination as to the reliability of the State's reported performance data would be made by the appropriate ACF official.  See, e.g., Ex. AL-9, at 2.  That argument is not a basis for finding that any further notice was required from ACF to trigger the imposition of a penalty.  The record shows that eight of the nine appellant States received both draft and final FY 2001 DRA reports during FY 2002, the corrective action year. (The one State for which the record does not contain a draft DRA report was found to have submitted reliable data.)  States are permitted to submit comments on the draft reports, and the record shows that at least some of the States submitted comments and/or additional or revised data to ACF in response to the draft DRA report findings, and that ACF altered its findings as to the FY 2001 data for three of the States in response to comments or data they submitted.  45 C.F.R. § 305.64.  The States thus gave consideration to and utilized the information provided in the draft and final DRA reports.  The statute, the regulations, and ACF's correspondence informed the States of the self-implementing nature of the penalty process and the States' obligations for monitoring their own data and performance.  The statute moreover places great emphasis on the importance of reliable data submitted on a timely basis, as it penalizes not merely inadequate performance but also unreliable data, even where accurate data would have shown that the state had passed the applicable performance measure.  In light of these requirements,

---

[6]  The record does not contain a draft FY 2001 DRA report for New Hampshire, and its final FY 2001 DRA report, dated April 15, 2002, does not refer to a draft report for FY 2001.