20

the cautionary language in the *Federal Register*, and the information about data reliability timely provided to the States, it cannot be credibly asserted that the States had no knowledge of their data reliability because of the single cited sentence in the DRA reports.[7]

We also find it significant that section 409 of the Act withholds from a state some of the opportunities to avoid a IV-D penalty that it affords with respect to the penalties for some of the other, mostly title IV-A violations listed in section 409(a). For those other violations, not at issue here, section 409(b) forbids the Secretary from imposing a penalty if he finds that there was reasonable cause for the violation, and section 409(c) grants the state the opportunity to enter into a corrective compliance plan prior to suffering a penalty. However, section 409 states that those ameliorative measures do not apply to any penalty under section 409(a)(8). Sections 409(b)(2), (c)(4) of the Act.[8] That they do not apply here underscores the

---

[7] The States characterize the November 14, 2003 letters as suggesting that the DRA reports and other correspondence from ACF fulfilled the notice requirements of 45 C.F.R. § 305.66. The States argue that the DRA reports and other communications were insufficient for that purpose. Since we reject the States' argument that the regulation required notice of performance or data failures prior to the time that a state is subject to a penalty, we need not address this argument. Nevertheless, as we explained above, the draft and final DRA reports did provide the States notice of their data reliability problems during the corrective action year.

[8] States formerly had the opportunity to submit a corrective action plan with respect to IV-D penalties under former section 403(h)(1) of the Act. As amended by the Child Support Enforcement Amendments of 1984, Public Law No. 98-378, that section mandated reductions in federal funding for a state's AFDC program if the state was found not to have complied substantially with IV-D requirements. Rather than directing the immediate imposition of a penalty on a state that failed an audit for the first time, the statute provided that the penalty could be suspended while the state was given an opportunity to bring itself into compliance through a corrective action plan approved by OCSE. Former section 403(h)(2)(A)-(C) of the Act. If a follow-up review of a state's performance during the corrective action period showed that the state still had not achieved substantial compliance, a penalty of one to two percent would be

(continued...)

21

self-implementing nature of the IV-D penalty process.  Unlike the penalties for which a corrective compliance plan may be submitted, the operation of the IV-D penalty process is not dependent on any intermediate action by ACF, such as approving a corrective compliance plan, or providing a state notice of its performance failures, before the commencement of the automatic corrective action year, after which a state must be penalized for its failure to correct any performance or data failures that occurred during the previous year.

The States cite a statement by the Assistant Secretary in the November 14, 2003 letters, recognizing that states did not have a full year to correct deficiencies following the release of the final DRA reports, as acknowledging that the States had been denied the full period for corrective action to which they were entitled.  In that letter, the Assistant Secretary stated that—

> I recognize that states do not have a full year to correct deficiencies following the release of final DRA reports.  I have been discussing a possible solution with those working on the TANF reauthorization bill.  In September, the Senate Finance Committee approved a bill which contains a technical fix to the Federal statute to ensure that states receive a full year for corrective action following notice of a deficiency.  However, until Congress enacts the bill that includes this technical change, I have no recourse but to comply with the current statute and to proceed with the penalty process.

The referenced bill was apparently the Personal Responsibility, Work, and Family Promotion Act of 2003, H.R.4, as reported in Senate on October 3, 2003.  Section 321 of that bill, "Timing of corrective action year for State noncompliance with Child Support Enforcement program requirements," according to the Senate Report, would have "change[d] the corrective action year to the fiscal year following the fiscal year in which the Secretary makes a finding of noncompliance and recommends a corrective action plan."  The reason for this change was that "[c]urrent language does not recognize the time necessary to conduct federal audits and that those audits now occur during what is, under current law, a state's corrective action year.  This technical

---

[8](...continued)
imposed.  Former section 403(h)(1)(A) of the Act; see former 45 C.F.R. § 305.99 (1998).

22

correction will give states a full year to correct identified deficiencies." S. Rep. No. 108-162, at 53-54 (Oct. 3, 2003). The bill was apparently never brought to a vote. 150 Cong. Rec. S3520, S3529, S3538 (Apr. 1, 2004).

Rather than supporting the States, this statement in the legislative history acknowledges, consistent with our decision here, that under the law as currently written the corrective action year commences automatically after the performance year, without any action by ACF in the form of audit reports or notices.

The States also argue that specific notice that they were at risk for penalties based on their FY 2001 failures was needed to alert their State TANF agencies that TANF funding was jeopardized by actions of their IV-D agencies. States Joint Br. at 17. They assert that it is highly unusual to penalize one state agency for the actions of another, and that the November 14, 2003 letters came as a surprise to their TANF agencies. Id. at 5, 13. This argument is unavailing, as the Board has long held that a state as a whole must be viewed as a single unit responsible for the administration of federal grant programs and funds. See, e.g., Colorado Dept. of Personnel & Administration, DAB No. 1872 (2003); Alabama Dept. of Finance, DAB No. 1635 (1997).[9] Section 409 of the Act notified states that failure to correct the IV-D violations listed therein would result in the reduction of the funding for their entire TANF programs. The preamble to the regulations that we cited above emphasizes that states are responsible for monitoring their own performances and the

_____

[9] The Board held that this principle was apparent from the definition of "grantee" then at former 45 C.F.R. § 74.3. That principle is still applicable in the current Part 74, which defines the comparable term "recipient" as—

> the government to which an HHS awarding agency awards funds and which is accountable for the use of the funds provided. The recipient in this case is the entire legal entity even if only a particular component of the entity is designated in the award document.

45 C.F.R. § 74.2. This definition applies to entitlement programs listed at 45 C.F.R. §§ 92.4(a)(3), (a)(7), and (a)(8), including the Child Support Enforcement Program. Id.; see also 45 C.F.R. § 301.15(e), applying provisions of Part 74 to title IV-D programs.

23

reliability of their data.  65 Fed. Reg. 82,192, 82,205.  Thus,
the assignment of TANF and IV-D functions to different state
agencies provides no basis to ignore the self-implementing nature
of the IV-D penalty system.

3.  <u>Statements in federal auditing standards do not
provide a basis to reverse the penalties.</u>

The States cite language from a publication by the U.S. General
Accounting Office (GAO, now the Government Accountability
Office), "Government Auditing Standards," in support of their
argument that they should have been notified of their performance
and/or data reliability failures during FY 2001 before the start
of FY 2002, the corrective action year, or at least, they argue,
soon enough after the start of the corrective action year to
grant them sufficient time to take corrective action.  The
publication in question states that one of the reporting
standards for performance audits is timeliness, and contains
language emphasizing the importance of delivering timely audit
reports.  The States note the Single Audit Act, 31 U.S.C. § 7501
<u>et seq.</u>, requires federal agencies to conduct all audits of state
governments receiving federal funds under standards published by
the GAO.

The Part 305 regulations do provide that ACF will audit state
IV-D programs "in accordance with standards promulgated by the
Comptroller General of the United States in 'Government Auditing
Standards.'"  45 C.F.R. § 305.60(d).  However, general timeliness
provisions in the auditing standards do not override the self-
implementing nature of the penalty process in which the
corrective action year begins upon the end of the performance
year and is not conditioned on notice from ACF, as established by
the statute and regulations and confirmed by the subsequent
legislative history quoted above.  While it is incumbent on ACF
to complete the audits as quickly as possible, that goal is
constrained by the requirements of the audit process.

The audit provisions of Part 305 require ACF to conduct an
entrance conference prior to each audit and an exit conference at
its conclusion, at which ACF must discuss preliminary audit
findings and a state "may present any additional matter it
believes should be considered in the audit findings."  45 C.F.R.
§ 305.64.  ACF must then provide an interim audit report and
receive written state comments which must be noted and
incorporated in the final report.  <u>Id</u>.  The audit may entail
review of state records or other supporting documentation as well
as any contact with state personnel needed to conduct or complete
the audit.  45 C.F.R. § 305.65.  As discussed earlier, the States

24

utilized their ability to comment on the draft audit reports and
ACF made changes to its audit findings in response to those
comments. ACF's ability to issue audit reports promptly is thus
dependent on state circumstances beyond ACF's control. And as
noted earlier, this process cannot begin until after a state
submits its data, which is not due until 90 days after the start
of the corrective action year. The States have not shown that
anything in the GAO audit standards would provide a basis to
disregard the self-implementing structure of the IV-D performance
penalty system or require reversal of the penalties here.

    4.  <u>The States' claim that ACF failed to comply with
the law requiring 5-day notice of an adverse action
does not provide a basis to reverse the penalties.</u>

The Act's only requirement of notice regarding the penalties
imposed by section 409(a) is at section 410(a):

> Within 5 days after the date the Secretary takes any
> adverse action under this part with respect to a
> State, the Secretary shall notify the chief
> executive officer of the State of the adverse
> action, including any action with respect to the
> State plan submitted under section 402 or the
> imposition of a penalty under section 409.

Sections 410(b) and (c) provide for Board and judicial review of
adverse actions taken under section 410(a).[10]

---

[10]  Section 410(b) of the Act provides that the Board will
decide an appeal "not less than 60 days after the date the appeal
is filed." The States acknowledge that provision, but note that
the legislative history of section 410 describes it as requiring
a decision *within* 60 days. The States request a "prompt
determination," based on their belief that the penalties were not
assessed in accordance with law. States Joint Br. at 3. While
the Board seeks to act as promptly as its resources permit, the
legislative history the States rely on does not bind us to any
time frame since it conflicts with the plain language of the
statute. Additionally, the regulation governing these appeals
makes issuance of a decision within 60 days unfeasible, as it
provides 45 days for ACF to submit its brief after receipt of an
appeal, and 21 days for the appellant state to submit its reply
after receipt of ACF's brief (the States here submitted a joint
reply). 45 C.F.R. § 262.7(c), (d). The regulations provide no
time frame for issuance of the Board's decision, but do provide

(continued...)

25

The States argue that the November 14, 2003 letters did not comply with section 410 because ACF took "adverse actions" more than five days prior to those letters, at some earlier, unspecified time, when ACF accepted the audit findings supporting the penalties, notably the findings in the DRA reports that State data for a given FY were not complete and reliable. The States thus argue that the adverse action addressed in section 410 of the Act occurs prior to an appealable determination that a state is subject to a penalty, and that the notice required by section 410 is a critical component of a state's ability to make full use of the corrective action year. ACF argues that the Secretary supplied the notice required by section 410, in the form of the November 14, 2003 letters.

The States' argument is not supported by section 410 or its implementing regulations. Section 410(b) provides that a state may appeal an adverse action to the Board, and seek review of the Board's decision in federal district court. The appeal rights that section 410 provides for adverse actions do not apply to data reliability findings or other intermediate determinations made prior to the determination that a state is subject to a penalty. Instead, the regulations implementing section 410 in the TANF program permit states to appeal determinations that a state is subject to a penalty but do not provide any right to appeal intermediate determinations short of that determination, such as a determination that a state's data for a given year are unreliable. 45 C.F.R. §§ 262.1(a), 305.66(b)(2). The TANF penalty regulations of Part 262 that are referenced in the IV-D regulations at Part 305 interpret section 410 of the Act, stating that ACF will formally notify the governor and the state agency of an adverse action within five days after ACF determines that "a State is subject to a penalty under parts 261 through 265 of this chapter." 45 C.F.R. § 262.7(a)(1). As discussed above, a state is not subject to a penalty, triggering the notice requirement, until after two consecutive years of failing performance and/or unreliable data with respect to the same performance measure. While the statute requires the Secretary to impose penalties on a state following two consecutive years of failing performance and/or unreliable data with respect to the same performance measure, neither it nor the regulations specify a time frame within which ACF must take adverse action following

---

[10](...continued)
that the Board may seek additional information (including at a hearing) and must conduct a thorough review of the record. 45 C.F.R. § 262.7(f). This decision resolves multiple appeals which raise many significant issues of first impression.

26

completion of its review of a state's data for a corrective action year.

Additionally, Part 305 affords states the opportunity to comment on draft audit reports, and requires that their comments be included in the final audit report along with the auditors' responses. This suggests that those comments and responses will be reviewed by ACF prior to a final decision on data reliability or performance being made, which supports a finding that the DRAs were not adverse actions triggering the notice requirement of section 410 of the Act.

Thus, we conclude that ACF complied with the applicable notice requirements in determining that the States were subject to penalties.

B. <u>ACF in determining data reliability was not required to disregard errors that understated PEP performance.</u>

Eight of the nine States argue that ACF's findings that they submitted unreliable data for at least one of the two fiscal years should be reversed because ACF, in determining whether data were reliable, counted data errors that lowered their PEP scores. The States argue that such errors increase the likelihood that a state will be assessed a penalty or denied incentives and thus hurt only the state itself, and that ACF should have disregarded those errors pursuant to the Secretary's authority to disregard data unreliability of a technical nature that does not adversely affect the determination of the state's performance. The States argue that the previous use of this authority, to accept unreliable FY 2000 data submitted by all 23 states that submitted unreliable FY 2000 data, created a precedent for accepting unreliable data. In addition, some States argue that ACF should have accepted unreliable data based on circumstances particular to their appeals, arguments that we address in the portions of the analysis addressing individual States.

We first set out the applicable legal provisions requiring states to submit reliable IV-D performance data, and authorizing the Secretary to accept unreliable data.

1. <u>Reliable data: applicable legal provisions and background</u>

As noted earlier, states must submit data used to determine incentives and penalties, following instructions and formats as required by HHS, by December 31st after the end of the fiscal year; only data submitted as of December 31st will be used to

27

determine the state's performance for the prior fiscal year.[11]
45 C.F.R. § 305.32.  States report data to ACF using form
OCSE-157, the Child Support Enforcement Annual Data Report; ACF
has issued this form and instructions for completing it through a
series of Action Transmittals.  See, e.g., AT-98-20 (July 10,
1998); AT-99-15 (Dec. 22, 1999).  ACF conducts data reliability
audits (DRAs) to determine if data are complete and reliable for
incentive and penalty purposes.  45 C.F.R. § 305.60; 65 Fed. Reg.
82,181.

The regulations at 45 C.F.R. § 305.1 define the terms complete
and reliable data:

>    (i) The term *reliable data*, means the most recent
>    data available which are found by the Secretary to
>    be reliable and is a state that exists when data are
>    sufficiently complete and error free to be
>    convincing for their purpose and context.  State
>    data must meet a 95 percent standard of reliability
>    effective beginning in fiscal year 2001.  This is
>    with the recognition that data may contain errors as
>    long as they are not of a magnitude that would cause
>    a reasonable person, aware of the errors, to doubt a
>    finding or conclusion based on the data.
>    (j) The term *complete data* means all reporting
>    elements from OCSE reporting forms, necessary to
>    compute a State's performance levels, incentive base
>    amount, and maximum incentive base amount, have been
>    provided within timeframes established in
>    instructions to these forms and § 305.32(f) of this
>    part.

As noted earlier in the decision, for the sake of simplicity we
refer to complete and reliable data as reliable data.

---

[11]  Although data for a year are due by December 31st
following the end of the fiscal year, the preamble to Part 305
provides that states may submit reliable data beyond that
deadline, when those data are needed in reliable form to
calculate performance in a subsequent year, such as when a state,
to avoid a penalty, must show an improvement in its PEP in the
second of two consecutive years, but submitted unreliable data
for the first year, or to calculate the PEP, which requires data
from two consecutive years.  65 Fed. Reg. 82,184.

28

Section 409(a)(8) authorizes the Secretary to accept a state's otherwise unreliable data, and to find a noncompliant state to be in substantial compliance with IV-D requirements:

> (C) DISREGARD OF NONCOMPLIANCE WHICH IS OF A TECHNICAL NATURE.—For purposes of this section and section 452(a)(4), a State determined as a result of an audit—
>> (i) to have failed to have substantially complied with 1 or more of the requirements of part D shall be determined to have achieved substantial compliance only if the Secretary determines that the extent of the noncompliance is of a technical nature which does not adversely affect the performance of the State's program under part D; or
>> (ii) to have submitted incomplete or unreliable data pursuant to section 454(15)(B) shall be determined to have submitted adequate data only if the Secretary determines that the extent of the incompleteness or unreliability of the data is of a technical nature which does not adversely affect the determination of the level of the State's paternity establishment percentages (as defined under section 452(g)(2)) or other performance measures that may be established by the Secretary.

Section 409(a)(8)(a)(C) of the Act.  The implementing regulation provides—

> 45 C.F.R. § 305.62  Disregard of a failure which is of a technical nature.
>
> A State subject to a penalty under § 305.61(a)(1)(ii) or (iii) of this part may be determined, as appropriate, to have submitted adequate data or to have achieved substantial compliance with one or more IV-D requirements, as defined in § 305.63 of this part, if the Secretary determines that the incompleteness or unreliability of the data, or the noncompliance with one or more of the IV-D requirements, is of a technical nature which does not adversely affect the performance of the State's IV-D program or does not adversely affect the determination of the level of the State's paternity establishment or other performance measures percentages.

29

The authority to accept unreliable IV-D data was applied to all
of the 23 states that submitted unreliable data for FY 2000.  ACF
announced the determination in substantively identical letters
to all states from the OCSE Commissioner dated December 19 or 27,
2001.[12]  The letters stated that the basis for that determination
was that the new incentive system was being phased in during FY
2000, and that penalties based on state performance would not
apply prior to state performance in FY 2001.  See, e.g., Ex.
NH-14.

    2.  Arguments and analysis

The States argue that the authority to disregard data
unreliability should have been applied in the case of those
States whose data were found to be unreliable due to errors that
understated PEP performance.  As an example of such an error, the
States cite the definition of the PEP, essentially the percentage
of children born out of wedlock for whom paternity has been
established.  See 45 C.F.R. § 305.2(a)(1).  Any error that lowers
the number of children born out of wedlock whose paternity has
been established, such as omitting children whose paternity has
actually been established, or that increases the number of
children born out-of-wedlock, such as mistakenly reporting
children that were actually born in wedlock, will lower the
state's PEP, making it more likely that the state will be subject
to a penalty, and less likely that the state will earn an
incentive.  States Joint Br. at 27, citing Ex. RI-9, at 4-5
(Rhode Island's FY 2001 DRA report).  The States note that ACF's
definition of reliable data says that data must be "sufficiently
complete and error free to be convincing for their purpose and
context," and argue that the purpose and context here is to
determine a state's performance on the various performance
measures that determine incentives and penalties.  45 C.F.R.
§ 305.1(i).  They maintain that ACF should concentrate on errors
that overstate performance and which might result in a state
avoiding penalties it deserves, or earning incentives it does
not.  The parties agree that data inaccuracies are often due to a
state converting its IV-D data to a new computerized record-
keeping system that contains data elements that did not exist in

_____

    [12]  The Assistant Secretary for Children and Families (and
thus ACF) has been delegated the Secretary's authority to
administer the TANF and child support enforcement programs at
titles IV-A and IV-D of the Act.  62 Fed. Reg. 52,133 (Oct. 6,
1997); 56 Fed. Reg. 42,332, 42,350 (Aug. 27, 1991).  Thus, we
refer to ACF as sharing the Secretary's authority to determine
that data unreliability is of a technical nature.

30

its previous manual or automated system in a readily available
format, and to clerks or caseworkers in a state's IV-D office
incorrectly entering information from source documentation into
the computer system. ACF Br. at 40-41; States Joint Reply Br. at
15.

The States' arguments provide no basis to ignore or reverse ACF's
findings that data failed to meet the required standards for
reliability specified in the regulations. At no place do the
statute or regulations distinguish among unreliable data based on
whether data errors improperly increase or decrease a state's
score on the penalty and incentive performance measures. The
statute's exception for unreliability of a technical nature
encompasses only those errors that "do not adversely affect the
determination of" the performance measure levels. The errors
here resulted in inaccurate PEP scores and thus failed to satisfy
that standard. Moreover, the States have not shown that the
errors were so de minimis that they resulted in misstating the
States' performance percentages by a only few hundredths or
thousandths of a percent.

Congress signaled the importance of a state's responsibility for
providing reliable data when it enacted the current IV-D penalty
system. Former section 403(h) of the Act imposed penalties for a
state's failure to comply substantially with requirements of
title IV-D, which was then, as now, defined at section 452(g) as
encompassing a state's failure to attain specified PEP levels.
Section 403(h), however, did not separately impose penalties for
failure to submit reliable data needed to calculate the
performance levels. The current penalty system at section
409(a)(8) regards a state's failure to submit reliable data
needed to assess penalties and reward incentives as equivalent to
failing to achieve the required performance levels. A high
incidence of data errors, regardless of their type or effect on a
state's score, increases the likelihood that there may be other
errors that go undetected and calls into question the reliability
of the entire body of state data. Data containing enough errors
to render them unreliable are not convincing for the purpose of
assuring that the performance calculation may be relied upon as a
reasonably accurate measure of a state's performance, regardless
of whether the errors might overstate or understate performance.
The States' argument that ACF must consider the effect of the
errors could result in a state with unreliable data being treated
the same as a state that submits error-free data.

Additionally, the fact that errors resulted from clerical or
data-entry mistakes, or from converting data to newer automated
systems, provides no basis to reverse ACF's findings that the

31

States submitted unreliable data.  In explaining the selection of
the 95% standard for data reliability, ACF in the final rule
stated:

> This standard is consistent with the recognition
> that "data may contain errors as long as they are
> not of a magnitude that would cause a reasonable
> person, aware of the errors, to doubt a finding or
> conclusion made based on the data."  Part of this
> definition is lifted verbatim from Chapter 1,
> Introduction of the U.S. General Accounting Office,
> Office of Policy Booklet (Standards) entitled,
> Assessing the Reliability of Computer-Processed
> Data, dated September 1990.

65 Fed. Reg. 82,181.  Thus, the emphasis of the requirement that
data be sufficiently error-free is on the magnitude of the
errors, as opposed to the type of errors.  If clerical and
conversion errors evidence serious discrepancies between the
written documentation and the computer records, they would call
into question the reliability of the data for calculating the
state's performance.  Excusing "understating" errors would also
result in states being able to pass the PEP performance measure
in succeeding years based on reported increases in performance
greater than the improvement that the state actually achieved.

Finally, the States argue that the Secretary could have used the
"technical nature" exception to waive their penalties, "as he did
for all States in 2000."  States Joint Br. at 18 (emphasis in
original).  They cite the language from the November 14, 2003
letters about the possible "technical fix" to the statute,
discussed above, that would have delayed the corrective action
year until after determinations of performance-year data
reliability and performance, and argue that the letter's language
meant that their deficiencies were technical in nature.  However,
the determination for FY 2000 and the language regarding a
possible Act amendment do not support excusing the States'
failures for FYs 2001 and 2002, for the following reasons.

That ACF might have considered a statutory change delaying the
start of the corrective action year does not mean that waiver
under the "technical nature" exception in the statute is
appropriate for all states that have data reliability or
performance failures in the corrective action year under the
current statute.  The "technical nature" exception in the statute
applies only when the Secretary determines that a state has
submitted adequate data because "the incompleteness or
unreliability of the data is of a technical nature which does not

32

adversely affect the determination of the level of the State's
paternity establishment percentages . . . or other performance
measures."  Section 409(a)(8)(C)(ii) of the Act.  Thus, the
exception is limited to data reliability failures that have no
substantive effect on whether penalties are imposed (or
incentives are awarded) based on state performance in meeting
IV-D goals.

Contrary to what the States assert, moreover, ACF did not use the
"technical nature" exception to waive all penalties for FY 2000.
ACF invoked the provision when determining to disregard the
unreliability of data that 23 states had submitted for FY 2000.
Since, under the regulations, penalties for IV-D performance
would not be imposed for years prior to FY 2001, ACF had
determined that the identified data reliability problems did not
affect performance measures, for purposes of any penalty that
would have been based on unreliable data in FY 2000.  That is far
different from the determination that the States seek here — that
all failures after corrective action periods (whether poor data
or poor performance) be waived because of a perceived unfairness
in the existing statutory scheme.  Such a blanket determination
would surely be contrary to congressional intent.

We thus conclude that the States were not entitled to have data
unreliability disregarded as technical in nature merely because
the data errors understated their performance.

     C.  <u>ACF's use of different methods to select samples for
        audits of "State PEP" and "IV-D PEP" data was not
        arbitrary and capricious.</u>

Seven of the nine States argue that they were prejudiced by their
decisions to use the IV-D PEP measure to calculate their PEPs,
because ACF, without notice, employed a more stringent standard
for determining the reliability of IV-D PEP data than it did for
Statewide PEP data.

     1.  <u>Background</u>

As noted above, the PEP is essentially the percentage of children
born out of wedlock for whom paternity has been established or
acknowledged.  The IV-D PEP is based solely on births occurring
in the caseload of a state's IV-D program, and the Statewide PEP
is based on all births in a state.  The regulations define the
two PEP measures as the following ratios:

IV-D PEP:

33

> Total # of Children in IV-D Caseload in the Fiscal
> Year or, at the option of the State, as of the end
> of the Fiscal Year who were Born Out-of-Wedlock with
> Paternity Established or Acknowledged
> _____
> Total # of Children in IV-D Caseload as of the end
> of the preceding Fiscal Year who were Born
> Out-of-Wedlock

Statewide PEP:

> Total # of Minor Children who have been Born Out-
> of-Wedlock and for Whom Paternity has been
> Established or Acknowledged During the Fiscal Year
> _____
> Total # of Children Born Out-of-Wedlock During the
> Preceding Fiscal Year

45 C.F.R. § 305.2(a)(1). States may select either one as the
basis for calculating their PEPs and determining the reliability
of their PEP data.[13] Id.; section 452(g)(1) of the Act.

States report data for the components of the two PEP ratios to
ACF at specific lines on the OCSE-157. Calculation of the PEP
for the current year requires data from the data reports for the
current and preceding fiscal years, because the denominator of a
given year's PEP ratio uses information on out-of-wedlock
children from the preceding fiscal year.

State data must meet a 95% standard of reliability. 45 C.F.R.
§ 305.1(i). In conducting DRAs, ACF examines a sample of state
records and data sources to determine if the state has reported
the data accurately. ACF calculates reliability based on the
findings for the sample using a 95% confidence interval, and data
are deemed reliable if the upper bound of the confidence interval
equals or exceeds 95%, the reliability standard.

To determine the reliability of PEP data submitted by a state
that has selected the IV-D PEP measure, ACF examines sample cases
to determine whether (1) the state reported data (i.e., children)
that should not have been included (for instance, if they were
not born out of wedlock, or if their paternity was not
established), so-called "inclusion errors," and (2) whether the
state failed to include children who should have been included,
so-called "exclusion errors." To determine the reliability of
PEP data submitted by a state using the Statewide PEP measure,

_____

    [13] The ratios in the regulations reflect the textual
definitions at section 452(g)(2) of the Act, quoted earlier.

34

however, ACF does not use a sampling technique that would enable it to determine if the state failed to include a child who should have been included (for instance, a child born out of wedlock). Instead, ACF's sampling method enables it to determine only if the state included data (i.e., children) that should not have been included.

The difference in the methods for auditing IV-D PEP and Statewide PEP data was noted in an ACF issuance, "Guide for Auditing Data Reliability," March 2002, that ACF sent to all state IV-D directors as an attachment to "Dear Colleague" letter DC-02-07, dated April 1, 2002. Under the heading "Selection of Sample Cases," the guide states, "One sample will be selected from the states' child support universe to evaluate performance indicator data reported on lines 1, 2, 5, 6, 24, 25, 28 and 29 of the OCSE-157 Report. . . . If a state chooses to use lines 8 and 9 for the paternity indicator [for reporting by states that selected the statewide PEP measure], these lines will be sampled separately."  A footnote to that last sentence states:

> Information on lines 8 and 9 may come from a combination of sources including, Vital Statistics, IV-D, and other state agencies.  Should this option be selected by the state, auditors will select a random sample of 50 cases from each source to determine if cases from each source appear to be correctly included.

Guide for Auditing Data Reliability, 2002, at 13, part of ACF Ex. 2.[14]

The footnote's statement that the auditors will determine if cases "appear to be correctly included" is different from the general instructions, on the subsequent page of the guide, for reviewing data from other lines on the OCSE-157.  These other lines, unlike lines 8 and 9 used to calculate the Statewide PEP, relate solely to the state's IV-D caseload.  Under the heading, "Review Process," the guide states:

--------

[14]   Lines 5 and 6 are used for reporting data for the calculation of the IV-D PEP ratio.  Lines 1, 2, 24, 25, 28 and 29 report other data related to a state's IV-D caseload, such as cases open at the end of the FY, cases open without support orders established, total amount of current support due for the FY, total amount of support distributed as current support, and cases paying towards arrearages during the fiscal year.  ACF Ex. 9.

35

1. Match the selected sample cases with each audit
trail provided by the state.

2. Review the matching cases for each line to see
if they should have been reported on that line.
If a case was included on a line but should not
have been included, count it as an error.

3. Also review the cases to determine if they were
excluded from any line being reviewed but should
have been included.  If incorrectly excluded,
count that as an error.

Id. at 14.

A copy of an earlier version of the Guide for Auditing Data
Reliability that ACF submitted, issued February 14, 2000, its
pages all stamped "draft," appears to contains no specific
instructions for reviewing data reported on lines 8 and 9.  2000
Guide, also part of ACF Ex. 2.  The 2000 Guide also contains no
statement that data reported on lines 8 and 9 (Statewide PEP
data) would be treated differently than data reported on lines 5
and 6.  ACF does not argue that the 2000 Guide provided notice of
the different methods that would be used to assess the
reliability of Statewide and IV-D PEP data.[15]

2.  <u>Arguments and analysis</u>

Seven States that chose the IV-D PEP measure and were found to
have submitted unreliable data in at least one of the two years
at issue argue that consideration of exclusion errors in auditing
IV-D data meant that they were more likely to fail the data
reliability test than states that chose the Statewide PEP
measure.[16]  They argue that use of the different auditing methods
was arbitrary and capricious because ACF provided no rationale

_____

[15]  A IV-D "case" is "a parent (mother, father, or putative
father) who is now or eventually may be obligated under law for
the support of a child or children receiving services under the
title IV-D program."  45 C.F.R. § 305.1(a).

[16]  The seven States are Alabama, Delaware, Hawaii,
Louisiana, New Hampshire, New Mexico and Rhode Island.  New
Mexico selected the Statewide PEP measure for FY 2001 but
switched to the IV-D PEP measure for FY 2002.  All seven States
were found to have submitted unreliable PEP data for FY 2002.
ACF Ex. 8.

36

for the difference, and no notice prior to the 2002 Data
Reliability Guide. They note that 10 out of 26 states that used
the IV-D PEP in FY 2002 failed to meet the data reliability
standard, compared to only one out of the 28 states using the
Statewide PEP measure.[17] See ACF Ex. 8. They argue that some of
them would have passed DRAs in at least one of the two years if
exclusion errors had not been counted in auditing IV-D PEP data.

The States cite a Board decision rejecting the use of different
methods to allocate hospital survey costs to Medicare and
Medicaid, where there was no rationale offered and the allocation
methodology was internally inconsistent and contrary to CMS
policy. Michigan Dept. of Social Services, DAB No. 872 (1987).
They cite a court decision for the proposition that an agency
acts arbitrarily and capriciously when it relies on factors
Congress had not intended to be considered and may not make
distinctions among similarly situated groups that are not
supported by statute. Motor Vehicle Mfrs. Ass'n of the United
States, Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43
(1983). Asserting that the Act and the legislative history of
section 452(g)(2) make no distinction between the IV-D and the
Statewide measures, the States argue that there is no indication
that Congress intended that states choosing the IV-D PEP measure
would be held to what the States call a higher standard.
Sections 409(a)(8)(A)(i)(I), 452(a)(5) of the Act; H.R. Conf.
Rep. 104-725 (July 30, 1996).[18] The States also cite preamble
language from the proposed Part 305 to the effect that the
assessment of data reliability underpins the fairness of the
incentive and penalty system and argue that using different
auditing methods undercuts the data audits' purpose of treating
states fairly. 64 Fed. Reg. 55,074, 55,076. They argue that ACF
should have provided timely explanation of the different methods
so that the States could, if necessary, have opted to use the
Statewide PEP formula.

ACF argues that differences between the two measures, such as the
size and number of their data sources, justified different

---

[17]    Under title IV-D, "state" means the several states, the
District of Columbia, the Commonwealth of Puerto Rico, the Virgin
Islands, Guam and American Samoa. 45 C.F.R. § 301.1. The cited
ACF exhibit did not list any findings for American Samoa.

[18]    These Act provisions hold a state noncompliant if it
fails to achieve the PEP percentages and require the Secretary to
establish uniform definitions; the legislative history describes
the two versions of the PEP as similar.

37

auditing methods. ACF argues that the IV-D PEP measure uses data limited to the IV-D caseload and under control of the state IV-D agency, whereas Statewide PEP data reflects all births in a state and is taken from many sources, such as public and private hospitals and birth facilities, making it impractical for federal auditors to determine if there were out-of-wedlock births that the state failed to report. ACF also argues that the IV-D universe is properly subject to greater scrutiny because it is within the control of the IV-D agency, and thus more potentially subject to manipulation (although ACF disclaims any suggestion that the States manipulated their IV-D data). Because Congress created two different types of PEP measurement and did not treat them as if they were the same, ACF argues, it was justified in developing different methodologies to assess the reliability of each type of PEP data. ACF also disputes that states were adversely affected by selection of the IV-D PEP measure, noting that when both DRA and performance failures were considered, the failure rates in each year were comparable for both measures (although ACF appears to acknowledge that states that used the IV-D measures were more likely to have had some kind of failure in both years, requiring a penalty). ACF Br. at 33.

The States dispute ACF's assertions of data source differences, on the grounds that the Statewide PEP measure by definition considers children born out of wedlock during one fiscal year only, while the IV-D PEP measure encompasses all out-of-wedlock children in the IV-D caseload, which would include children born over an 18-year period, and also on the grounds that states account for all registered births.

We conclude that differences in the auditing methods do not require reversing the penalties or reassessing the reliability of the States' PEP data.

In several decisions addressing whether a federal agency permissibly employed statistical sampling methods to recover federal funds (e.g., to calculate a disallowance or determine whether a state provided services in the required proportion of cases), the Board considered whether the findings resulting from the disputed techniques were reliable evidence of what they purported to show. Commonwealth of Puerto Rico Dept. of Social Services, DAB No. 1253 (1991); New Mexico Human Services Dept., DAB No. 1224 (1991); Ohio Dept. of Human Services, DAB No. 1202 (1990); Tennessee Dept. of Health and Environment, DAB No. 898 (1987). That analysis is appropriate here, where the Act and regulations require that state IV-D performance be measured using reliable data, that states maintain and report reliable data, and that ACF audit state data for reliability. Sections

38

458(b)(5)(B), 452(a)(4)(C), 454A(c)(2) of the Act; 45 C.F.R.
§§ 305.31(e), 305.34(c), 305.60, 305.61, 305.65(b).

We first note that ACF's sampling methods for evaluating data
reliability were very conservative methods. Rather than applying
the single most likely estimate to determine whether the data
reliability standard was met, ACF's methods for both the IV-D PEP
states and the Statewide PEP states gave the states the benefit
of the doubt by using the upper bound of the 95% confidence
interval. Second, the choice of sampling method may need to vary
according to the nature of what is being audited, since the
purpose of using sampling is to get a reliable result while
keeping the burden on the auditors and the entity being audited
to a minimum.

ACF presented a reasonable rationale for choosing a methodology
for auditing Statewide PEP data different from its methodology
for auditing IV-D PEP data, even though the methodologies
resulted in differences in the types of errors that could be
identified. The source of data from which the IV-D PEP data are
drawn is the caseload of a state's IV-D agency and thus the
underlying records are readily available to that agency,
permitting ACF auditors to more easily examine the underlying
records. This enables the auditors to determine if the state has
failed to report any data that should have been reported, in
addition to determining if the state has reported data that did
not meet the criteria for being reported. By contrast, the data
reported by the IV-D agency of a state that has selected the
Statewide PEP measure comes from a multiplicity of sources,
rendering it difficult to audit underlying records at the
sources. For ACF to identify exclusion errors, it would have to
examine a sample of the underlying records from each source not
only for the data that were reported on the OCSE-157, but for
similar data that were not reported. This would have entailed
examination of a substantially larger data universe and either
the selection of a correspondingly larger sample or the use of a
larger confidence interval to account for the relatively larger
universe. Moreover, this would have been more burdensome, not
only for the auditors, but also for states since they have to
produce documentation needed for an audit. See 45 C.F.R.
§ 305.65. ACF determined, moreover, that data for Statewide PEPs
that came from sources other than a state IV-D agency may be less
likely to have deliberate exclusion errors than data for IV-D
PEPs. ACF Br. at 31-32.

The States' point that the IV-D PEP equation considers births of
minor children over a period of years does not alter the fact
that the equation is limited to only those data that come to the

39

state through the portal of its IV-D caseload, which necessarily is more limited in scope than all children born in a state in a year who may have no connection to a state's social services or public assistance programs.

While IV-D PEP states nationwide appear more likely to have submitted data found to be unreliable than the Statewide PEP states, the States have not demonstrated that the difference is necessarily attributable to the choice of auditing methods. The difference could be attributable to other factors.

ACF was thus reasonable in its choice of audit methodology for assessing the reliability of Statewide PEP data. Although a consequence of that choice was an inability to identify certain exclusion errors, this is not a situation where an agency applied different interpretations of what constitutes a data error to different states for the same data universe.

Nothing that the States cite requires that an agency employ identical methods to audit data from obviously different universes. Moreover, even if the data universes were sufficiently similar as to require the use of identical auditing methods, the remedy would be to expand the audits of Statewide PEP data, rather than to ignore a category of errors with respect to the IV-D PEP data, contrary to the congressional intent that PEPs be calculated using reliable data and that data errors be disregarded only when of a technical nature.

The States have also not shown that they were entitled to prior notice of the different sample selection methodologies. The States cite no authority showing a right to prior notice of different sample selection methodologies, and did not present any expert evidence that employing the different methodologies was not reasonable in light of the differences between the two universes from which the samples were drawn. Nor did the States establish that they were prejudiced by the different techniques. Although the States argue that some of them might have opted for the Statewide PEP measure, they do not argue and have not shown that their PEP data would have met the data reliability standard if they had selected the Statewide PEP measure. Instead, they argue that some States would have passed DRAs if exclusion errors had not been counted in assessing the reliability of IV-D PEP data.[19]

_____

[19] Alabama, Hawaii, Louisiana, New Hampshire and Rhode Island assert that their IV-D PEP data would have met the data
(continued...)

40

The court decision the States cite for the notion that an agency
acts arbitrarily and capriciously when it relies on factors that
Congress has not intended it to consider and may not make
distinctions among similarly situated groups that are not
supported by statute does not support their position here.  Here,
the statute creates the two different types of PEP measure, and
it is clear that Congress intended the agency to consider whether
data that states submit is reliable.  Nor does the Board's
Michigan decision support the States, since ACF here provided a
reasonable explanation for the differences in auditing methods,
and the consideration of exclusion errors was consistent with the
methodology for auditing other IV-D performance data.

Accordingly, we conclude that the States that selected the IV-D
PEP are not entitled to have their exclusion errors disregarded
merely because the audit samples of Statewide PEP data did not
permit identification of exclusion errors.

We thus conclude that common issues raised by the States
regarding notice and data reliability provide no basis to reverse
ACF's determination that the States were subject to penalties.
Next, we address the issues raised in the appeals of individual
States.

---

[19](...continued)
reliability standard in at least one of the two years at issue if
exclusion errors had not been counted.  ACF does not dispute
these assertions.  See, e.g., ACF Response to Louisiana Supp. Br.
at 2.  New Mexico asserts that it would have had far fewer data
errors in FY 2002 had exclusion errors not been counted, but
could not tell whether some other errors were exclusion errors
because they were not clearly described in the DRA report.  ACF
asserts that it reviewed those other errors and that disregarding
exclusion errors would not have made a difference.  Delaware
initially asserted that disregarding exclusion errors would have
caused its IV-D PEP data to be reliable, but later conceded that
disregarding exclusion errors would not have made a difference.

Alabama and New Hampshire assert that they would have passed the
PEP performance measure if exclusion errors had not been counted
and that there would have been no basis for a penalty.  Hawaii,
Louisiana, and Rhode Island assert that they would have passed
the DRA and would not have been subject to a penalty based on
unreliable data for both years, but do not allege that they would
also have met the required PEP performance levels for both years.
ACF does not dispute these assertions.