41

II.  Individual State appeals

Alabama Department of Human Resources, Docket No. A-04-45

The Alabama Department of Human Resources (Alabama) appeals a
penalty of $532,692.  ACF determined that Alabama is subject to a
penalty on the grounds that Alabama's PEP for FY 2001 was 58%,
meeting neither the minimum 90% level nor the required increase
of 3% over Alabama's FY 2000 PEP of 57%, and that Alabama's PEP
data for FY 2002 did not meet the data reliability standard.  Ex.
AL-4.

Alabama argues that it did not suffer from the same deficiency in
two consecutive years and is thus not subject to a penalty,
because the first deficiency was a performance failure, and the
second a data failure.  Alabama cites Part 305 and its preamble
as imposing a penalty only for failure to meet the same
"criterion" in two consecutive years, and not for non-identical
deficiencies, or identical deficiencies in non-consecutive years.
45 C.F.R. § 305.66(e); 65 Fed. Reg. 82,190, 82,192.  Alabama
argues that its deficiencies were not identical.

Alabama argues further that ACF blurred the distinction between
the two types of deficiency by asserting in the November 14, 2003
adverse action letter that Alabama "failed for a second
consecutive year to *demonstrate with reliable data* the specified
minimum level of performance in PEP or to improve over the
previous year's performance."  Alabama Supp. Br. at 5 (emphasis
added by Alabama).  This language, Alabama argues, means that a
single failure, unreliable data, could be viewed as all three
types of failure that can subject a state to a penalty:  failure
to submit reliable data, failure to meet the required level of
performance, and failure to substantially comply with federal
IV-D program requirements, since paternity establishment is a
IV-D requirement.  If each data deficiency were intended to
trigger "concomitant unreliability, performance level, and
substantial compliance penalties," Alabama argues, there would
have been no need for three separate penalty categories, in
violation of the principle against interpreting a statute in a
manner than renders any of its parts mere surplusage.  Alabama
Supp. Br. at 7.

Alabama's position is contrary to design of the system of
incentives and penalties as explained in the Part 305 preamble
and confirmed by the statute and regulations.

States must meet specified levels of performance on the IV-D
performance measures to earn incentives, and failure to meet

42

minimum required performance levels for two consecutive years on the same measure subjects a state to a penalty. A state must demonstrate that it met performance levels with reliable data. A penalty is appropriate for a state's failure in two consecutive years to demonstrate that it met the required performance level for a performance measure, regardless of whether that failure is because the data for the performance measure are unreliable or because reliable data shows that the state did not achieve the required performance level for that performance measure.

This design of the penalty system under which a state is subject to a penalty for consecutive failures of either data reliability or performance with respect to the same performance measure is apparent from the following two statements in preamble to Part 305:

> Two consecutive years of failure (either poor data or poor performance) in the same performance measure criterion will trigger a penalty imposition.

65 Fed. Reg. 82,192.

> When data is incomplete or unreliable, it will be impossible to accurately determine the State's level of performance to either pay incentives or to assess performance. In such cases, a State's data must be complete and reliable by the end of the succeeding fiscal year and must demonstrate that the submitted data meets the performance measures in order to avoid the imposition of a penalty. Correcting incomplete or unreliable data within the automatic one-year corrective action period is not enough; the data must also show that the State performed at a high enough level during the corrective action year to avoid a financial penalty. For example, say a State is determined to have unreliable current collection performance data for FY 2001 and the State corrects the unreliable data for FY 2001 during FY 2002. The State must still have reliable FY 2002 data and meet the current collection performance standard for FY 2002 or incur a penalty in FY 2003.

65 Fed. Reg. 82,190.

ACF's position that a state is subject to a penalty for consecutive failures to demonstrate with reliable data that it met the same performance measure is consistent with the statute

43

and the regulations, both of which impose penalties for consecutive failures to either submit reliable data **or** meet the required performance level.  The statute in relevant part imposes penalties if the Secretary determines—

> (i)(I) . . . that the State program failed to achieve the paternity establishment percentages . . . or to meet other performance measures that may be established by the Secretary;
> (II) . . . the State data submitted pursuant to section 454(15)(B) is incomplete or unreliable; **or**
> (III) on the basis of the results of an audit or audits conducted under section 452(a)(4)(C) that a State failed to substantially comply with 1 or more of the requirements of part D  . . . **and**
> (ii) **that, with respect to the succeeding fiscal year—**
> > (I) the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance as described in subparagraph (A)(i);
> > (II) the data submitted by the State pursuant to section 454(15)(B) is incomplete or unreliable . . .

Section 409(a)(8)(A) of the Act (emphasis added).  This language is consistent with ACF's determination that Alabama is subject to a penalty for failing to achieve the required PEP performance level in FY 2001, followed by failure to submit reliable PEP data in FY 2002.  As discussed, Alabama's submission of unreliable FY 2002 data meant that it failed to demonstrate that it attained the required PEP performance level for FY 2002.  ACF's determination is also consistent with the regulation, under which a state is subject to a penalty if it failed to achieve the required PEP, or to meet the Support Order Establishment and Current Collections performance measures; or if it did not submit reliable data, and, "[w]ith respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels **or** compliance **or** the data submitted by the State are still incomplete and unreliable."  45 C.F.R. § 305.61(a) (emphasis added).

ACF's interpretation does not render any of this statutory language superfluous since a penalty may be based on failure to submit reliable data in two successive years, as well as on failure to demonstrate with reliable data that the performance requirements were met.

44

On the other hand, Alabama's reading of the statute and regulation is unreasonable. As ACF notes, Alabama's position would enable a state with one year of failing performance to avoid a penalty by declining to submit any data for the second year. This would undercut the whole statutory scheme which recognizes that it is not sufficient to require states to meet performance standards if they cannot demonstrate that they have done so with reliable data.

Alabama cites an example in the preamble language quoted above, in which a finding of unreliability occurred first and the state is given an opportunity to submit reliable data in the succeeding year, and argues that Alabama should be given the same opportunity to correct its unreliable FY 2002 data. Alabama Supp. Br. at 8, citing 65 Fed. Reg. 82,190. Alabama argues that under 409(a)(8)(A)(ii), a state may incur a penalty only if it has failed to take adequate corrective action in the immediately succeeding fiscal year. Nothing in the cited language supports delaying the penalty here. The full preamble statement quoted above and its example make clear that a state is obliged to both submit reliable data on a performance measure and meet the required level of performance, and that consecutive failures of either obligation result in a penalty. In Alabama's case, the corrective action year for the purposes of the penalty being appealed was FY 2002, not FY 2003. Alabama may avoid continuation of the penalty in FY 2003 by demonstrating with reliable data that it met the PEP performance level in that year.

Alabama also argues that its position is supported by the first of the two preamble statements quoted above, which provides that "[t]wo consecutive years of failure (either poor data or poor performance) in the same performance measure criterion will trigger a penalty imposition." 65 Fed. Reg. 82,192. Alabama argues that "criterion" refers not to the particular performance measure (i.e., PEP or Support Order Establishment), but instead to the numerical standards against which state performance or data are judged, the 95% data reliability standard and the 90% PEP. As these criteria are different for data and performance, Alabama argues, a year of data failure followed by a year of performance failure are not two consecutive years of failure in the "same performance measure criterion" for purposes of the preamble language.

While we agree that the term "performance measure criterion" may refer to a numerical standard rather than to the performance measure itself, this does not mean that the 95% data reliability standard should be considered a performance measure criterion. The 95% data reliability standard is not exclusive to any single

45

IV-D performance measure.  Moreover, the parenthetical referring
to "either poor data or poor performance" modifies the term
"failure," not the term "performance measure criterion."  When
the provisions are read as a whole, the only reasonable reading
is that the "failure . . . in the same performance measure
criterion" refers to a state's failure to demonstrate that it has
attained the required level of performance on any specific
measure, such as the PEP, regardless of whether that failure is
due to poor performance or to poor data needed to establish that
the required performance level was met.  In context, the preamble
language that Alabama cites means that consecutive failures with
respect to the same criterion can be failures with respect to
either data or performance.  Alabama's argument ignores the fact
that a state must submit reliable data in order to establish that
it has met the required performance measure criterion.  Moreover,
these arguments fail to counter the plain meaning of section
409(a)(8)(A) of the Act and 45 C.F.R. § 305.61(a) and are
strained interpretations of the cited provisions.  Alabama's
argument is also inconsistent with other preamble statements
warning that fixing data reliability in the second or corrective
action year is not sufficient to avoid a penalty if the data do
not show that the state has achieved the required level of
performance.

Accordingly, we sustain the determination that Alabama is subject
to a penalty.

   <u>Delaware Department of Health and Social Services, Docket
   No. A-04-46</u>

The Delaware Department of Health and Social Services (Delaware)
appeals a penalty of $293,489.  ACF determined that Delaware is
subject to a penalty on the grounds that the PEP and Current
Collections data that Delaware submitted for FYs 2001 and 2002
did not meet the data reliability standard.  Ex. DE-2.

Delaware disputes ACF's determination that Delaware's PEP data
were unreliable.  Delaware's argument concerns children in the
IV-D caseload who were born in wedlock that Delaware included in
its report of the total number of children in the IV-D caseload
who were born out of wedlock.  Delaware argues that because
Delaware law prior to 2004 raised only a rebuttable presumption
of paternity of children born in wedlock, a defendant male in a
support action could deny paternity of children born during his
marriage to the mother, and Delaware would thus have had to
establish or verify the paternity of children in IV-D cases,
regardless of whether they had been born in wedlock.  Delaware
argues that any data unreliability resulting from the inclusion

46

of children born in wedlock should have been disregarded as
technical in nature because the State had to devote the same
level of effort to those cases as to cases involving children
born out of wedlock.  ACF does not dispute Delaware's assertion
that if Delaware's reporting of these born-in-wedlock children
had not been deemed erroneous, Delaware's PEP data would have
passed the reliability standard for at least FY 2001 and possibly
FY 2002.[20]

This argument provides no basis to reverse the penalty or to
disregard the data errors.  The relevant materials that define or
describe the PEP do so in terms of children born out of wedlock.
These include the statute, the Part 305 regulations, the December
1999 instructions for completing form OCSE-157 (e.g., "[r]eport
the number of children in the IV-D caseload in cases open at the
end of the fiscal year who were born out of wedlock"), and the
OCSE-157 forms that Delaware completed and submitted for FYs 2001
and 2002.  Section 452(g)(2) of the Act; 45 C.F.R. § 305.2(a)(1);
AT-99-15 (Dec. 22, 1999); Exs. DE-8, DE-13.  States that select
the IV-D PEP measure, such as Delaware, are further instructed to
report in-wedlock births on a different line of the form 157, not
applicable here.  The preamble to Part 305 indicates that a child
born in a state where the law "presume[s] that a child born
within a marriage is legitimate" could be counted as having been
born out of wedlock.  However, the preamble limited this
exception by allowing the child to be counted "only if allowable
under State law and then only if a court determined the presumed

_____

[20]   ACF's final DRA report of the data that Delaware
reported on its OCSE-157 for FY 2001 shows that ACF examined a
sample of records relating to 152 children, and determined that
data regarding 27 sample children were deemed to be in error,
because Delaware wrongly reported these children in, or omitted
them from, the number of children that Delaware reported on line
5, "Children in IV-D Cases Open at the End of the Fiscal Year Who
Were Born Out of Wedlock."  Ex. DE-10, at 4.  This resulted in an
efficiency rate of 82%, with a 95% confidence interval of 75-88%,
below the required 95% data reliability standard.  Of those 27
children, 24 were categorized as "Children Born in Wedlock in a
State with a Presumptive Paternity Law."  Id.  Not counting those
24 children as errors would have meant that there were only 3
errors out of 152 sample children, for a passing data efficiency
rate of approximately 98%.  The final FY 2002 DRA report shows
that for line 5, of 129 sample children reviewed, 9 out of 14
errors (efficiency rate 89%) were "Children Born in Wedlock."
Not counting those children as errors would have resulted in an
efficiency rate of approximately 96%.  Ex. DE-5, at 4.

47

father could not have been the child's biological parent." 65
Fed. Reg. 82,200. Delaware did not argue or show that these
conditions were met for the children that it seeks to include in
its data.

Indeed, Delaware does not deny ACF's report that the case files
of the particular in-wedlock children at issue contained no
indication that paternity for any child had been challenged by
the mother's spouse or former spouse. Delaware also does not
dispute ACF's assertion that Delaware was not required to
undertake any particular effort to establish the paternity of
those children. This appears to undermine Delaware's rationale
for including them among its IV-D PEP data.

Additionally, as ACF notes, these errors in Delaware's data
affected calculation of Delaware's PEP performance and were thus
not proper subjects to be disregarded as technical in nature,
where that action depends on a finding that the unreliability
"does not adversely affect the determination of the level of the
State's paternity establishment or other performance measures
percentages." 45 C.F.R. § 305.62.

Finally, Delaware also does not dispute that its Current
Collections performance data did not meet the reliability
standard for FYs 2001 and 2002, which alone rendered Delaware
subject to a penalty.

Accordingly, we sustain the determination that Delaware is
subject to a penalty.

### District of Columbia Office of the Corporation Counsel, Docket No. A-04-47

The District of Columbia Office of the Corporation Counsel (DC)
appeals a penalty of $701,495. ACF determined that DC is subject
to a penalty on the grounds that DC's data for the Support Order
Establishment (SOE) and Arrearage Collections performance
measures for FY 2001 did not meet the data reliability standard,
and that for FY 2002, DC failed to meet the required level of SOE
performance or the required increase over the previous year's
level, and its Arrearage Collections data did not meet the data
reliability standard. Ex. DC-2.

DC argues that ACF should have accepted DC's SOE data for FY 2001
because the unreliability was due solely to DC having submitted
data applicable to FY 2000 and DC later submitted the correct
data, and that ACF could not impose a penalty based on DC's SOE
performance because its SOE score for FY 2001, as established by

48

the correct data, increased sufficiently over its FY 2000 SOE
score to constitute a passing score. As to the latter argument,
DC argues that the required increase, five percent, means five
percent of the prior year's score, and not five absolute
percentage points. Under the latter reading, the increase in
DC's SOE performance was not sufficient to avoid a penalty. DC
also argues that ACF could not impose a penalty based on
unreliable Arrearage Collections data because that performance
measure is used only to award incentives and not to impose
penalties.

We address these arguments below.

A. ACF was not required to accept DC's corrected SOE data
    for FY 2001.

DC reports that ACF determined that DC's FY 2001 SOE data were
not reliable because DC had provided ACF with data applicable to
FY 2000. Ex. DC-10, at 4. DC says that it discovered this error
during the ACF audit ending in March 2002 but that the auditors
denied DC's request to submit data from the correct time period,
and completed the audit using the incorrect data. DC later
submitted a corrected OCSE-157 for FY 2001 to ACF in December
2002, but reported that ACF audited only those lines related to
DC's PEP for FY 2001, which it found to be reliable. Exs. DC-3,
DC-6.

DC argues that ACF should disregard any noncompliance with IV-D
requirements resulting from the initially unreliable SOE data on
the grounds that it was technical in nature and did not adversely
impact DC's IV-D program, or that ACF should hold the penalty in
abeyance until it completes an audit of the corrected FY 2001 SOE
data. 45 C.F.R. § 305.62. ACF's finding that DC's FY 2002 SOE
data and its resubmitted FY 2001 PEP data were reliable suggests
that its resubmitted FY 2001 SOE data were also reliable, DC
argues, noting that no major changes in SOE data collection and
reporting took place between FY 2001 and 2002.

We conclude that ACF was justified in finding that DC's failure
to submit reliable FY 2001 data by the applicable deadline was
not merely technical noncompliance. States must submit
performance data for a fiscal year by no later than December 31st
following the end of the fiscal year and only data submitted by
that time may be considered in determining a state's IV-D
performance measures. 45 C.F.R. § 305.32(f). The regulations
contain no provisions for extending that deadline. DC's FY 2002
data unreliability resulted essentially because DC failed to
submit data actually attributable to FY 2001 by the deadline for

49

submitting FY 2001 data, instead submitting data applicable to FY
2000. The FY 2001 SOE data that DC later submitted were untimely
and could not be used to determine whether DC met required
performance levels for FY 2001. As ACF points out, enforcement
of the deadline is necessary to assure timely determination of
incentives payments to states. State eligibility for incentives
is based on a state's performance relative to all other states,
determinations which could not be made if state performances were
subject to ongoing recalculations based on revised data submitted
after the applicable December 31st deadline.

In the Part 305 preamble, ACF explained that states may submit
reliable data beyond the deadline for a given fiscal year for two
limited purposes, not including passing the performance measure
in the given year: to determine whether the following year's
performance increased sufficiently to pass the performance
measure in the following year, and to establish the number of
children born out of wedlock during or as of the end of the given
year, information that is needed to calculate the following
year's PEP. 65 Fed. Reg. 82,184, 82,190. However, DC did not
seek to have its late FY 2001 data accepted for the limited
purpose of determining FY 2002 performance, but sought instead to
establish its SOE performance level for FY 2001, and to show that
it attained the required performance level based on improvement
over FY 2000. The data were untimely for that purpose.[21]

Given that the regulations establish a deadline for data
submission but do not provide for extensions, and that the
permissible uses of late data do not include permitting a state
to meet performance measures in the year with respect to which
the data were late or were originally submitted in unreliable
form, ACF could reasonably decline to conclude that DC's untimely
submission of data was not mere noncompliance of a technical

---

[21] ACF accepted DC's late, resubmitted FY 2001 PEP data
for the purpose of showing improvement in the PEP in FY 2002, and
did not find DC subject to a penalty based on its PEP for FYs
2001 and 2002. Exs. DC-2, DC-3. While ACF could have accepted
late FY 2001 SOE data for the purpose of determining whether
there was sufficient improvement in FY 2002 for DC to have met
the performance level requirement, DC's unaudited data do not
appear to show sufficient improvement for DC to avoid a penalty.
DC asserts that its late FY 2001 SOE data established an SOE
performance level for FY 2001 of 29.9%, and its FY 2002 SOE
performance level was 30%, less than the five percent increase
over FY 2001 required to avoid a penalty. Ex. DC-2; 45 C.F.R.
§ 305.40(a)(2).

nature.  It is also not clear that the "technical nature" determination would apply here in any event.  The regulations require that performance determinations be made using data submitted by the applicable deadline.  Those data here were from the wrong year, and their use would clearly have an adverse effect on the calculation of performance for the correct year, rendering a technical nature determination inapplicable. Granting a technical nature exception for late submission of correct data would lessen states' incentives to submit correct data in a timely manner.  Additionally, as discussed below, even the late SOE data for FY 2001 did not show that DC had met the SOE performance measure.

  B.  <u>DC's SOE performance did not increase enough to avoid a penalty.</u>

To avoid a penalty, a state must attain an SOE performance level that is at least 40% or five percent more than its SOE level for the immediately preceding year.  DC asserts that it is not subject to a penalty for SOE performance because its SOE performance level for FY 2001, as established by its late data, was 29.9%, an increase of more than five percent of its 26.2% SOE performance level for FY 2000.  ACF argues, and we agree, that the required increase is five absolute percentage points, which was not satisfied by DC's 3.7% increase (29.9% minus 26.2%).

The SOE is the ratio of the number of IV-D cases with support orders during the fiscal year to the total number of IV-D cases during the fiscal year, expressed as a percent.  45 C.F.R. § 305.2(a)(2).  The regulations express the minimum SOE scores a state must achieve to avoid a penalty and qualify for an incentive:

    For purposes of the penalty with respect to this
    measure, there is a threshold of 40 percent, below
    which a State will be penalized unless an increase
    of 5 percent over the previous year is
    achieved—which will qualify it for an incentive.
    Performance in the 40 percent to 49 percent range
    with no significant increase will not be penalized
    but neither will it qualify for an incentive
    payment.  Table 5 shows at which level of
    performance a State will incur a penalty under the
    child support order establishment measure.

    TABLE 5—PERFORMANCE STANDARDS FOR ORDER
    ESTABLISHMENT (Use this table to determine the level

51

of performance for the order establishment measure
that will incur a penalty.)

| Performance level | Increase over previous year | Incentive/Penalty |
|---|---|---|
| 50% or more | ....no increase over previous year required | ...Incentive. |
| 40% to 49% | ....w/5% increase over previous year | .........Incentive. |
| | w/out 5% increase | .........................No Incentive/No Penalty. |
| Less than 40% | ...w/5% increase over previous year | ..........Incentive. |
| | w/out 5% increase | Penalty equal to 1-2% of TANF funds for the first failure, 2-3% for second failure, and so forth, up to a maximum of 5% of TANF funds. |

45 C.F.R. § 305.40(a)(2).

DC argues that it needed to increase its SOE score by only five
percent of its previous year's score, rather than by the larger
amount of five absolute percentage points, because the required
amount of increase needed to avoid a penalty is expressed in
percentages, and not in percentage points. DC argues that this
is a reasonable reading of the regulation, because parts of the
statute and Part 305 addressing performance increases needed to
earn incentives refer to increases in percentage points rather
than percentage increases. DC cites statutory language regarding
the determination of a state's PEP for incentive purposes that
uses percentage points. The cited provision is used to convert
the PEP ratio into a figure called the "applicable percentage,"
which is used to calculate incentives:

> Notwithstanding the preceding sentence [for
> determining the applicable percentage assigned to
> particular PEPs], if the paternity establishment
> performance level of a State for a fiscal year is
> less than 50 percent **but exceeds by at least 10
> percentage points** the paternity establishment
> performance level of the State for the immediately
> preceding fiscal year, then the applicable
> percentage with respect to the State's paternity
> establishment performance level is 50 percent.

Section 458(b)(6)(A)(ii) (emphasis added). (The statute contains
similar language regarding the determination of applicable
percentages relative to all five performance measures.)

52

DC argues that the explicit use of "percentage points" in the statute regarding the payment of incentives means that the use of simply "percent" in the section of the regulations addressing the imposition of penalties means that the latter requires only relative increases and not increases of absolute percentage points. This use of the term "percentage points" at other places, DC argues, shows that Congress and HHS are capable of articulating the distinction between a percentage increase and a percentage point increase and have done so when that distinction was intended.

DC's reliance on the use of different terms at places in the statute and regulation is misplaced. Here, the context and the weight of the evidence indicates that ACF was using percent as shorthand for percentage points. Viewing the required increases as relative amounts or fractions of the previous year's performance level conflicts with the statute and moreover is contrary to common sense.

First, DC's reading is inconsistent with the statute. Determining a state's eligibility for incentives based on its SOE performance requires converting its SOE ratio into an "applicable percentage." Section 458 contains a table for assigning applicable percentages to different SOE ratios. An SOE ratio of at least 50% but less than 51% is assigned an applicable percentage of 60%. Section 458(b)(6)(B)(ii) of the Act. An SOE of at least 0% but less than 50% is assigned an applicable percentage of zero (0). The text following the table states:

> Notwithstanding the preceding sentence [the table for determining applicable percentages], if the support order performance level of a State for a fiscal year is less than 50 percent **but exceeds by at least 5 percentage points the support order performance level of the State for the immediately preceding fiscal year**, then the applicable percentage with respect to the State's support order performance level is 50 percent.

Id. (emphasis added).

This language is significant because it and the table for determining applicable percentages mirror the regulation, quoted above, listing the SOE scores that will earn an incentive or warrant a penalty. The regulation and its "Table 5" provide that an SOE performance level less than 50% receives no incentive unless it increased over the prior year by 5%, in which case it earns an incentive. 45 C.F.R. § 305.40(a)(2). The statute

53

provides that an SOE performance level less than 50% is assigned
an applicable percentage of zero, meaning that it earns no
incentive, unless it exceeds "by at least 5 **percentage points**"
the SOE performance level for the immediately preceding fiscal
year, in which case the applicable percentage is 50%, qualifying
the state for an incentive payment.  Section 458(b)(6)(B)(ii) of
the Act.  Reading the "percent" increases required by Table 5 of
the regulation as relative increases would contradict the statute
because it would enable a state with an SOE ratio of less than
50% to qualify for an incentive based on an increase of less than
2.5 percentage points (5% of 50%), whereas the statute clearly
requires an increase of five percentage points.

Next, the statute consistently requires increases in absolute
percentage points for determining eligibility for incentives and,
more significantly, for assessing whether a state is in
substantial compliance with the requirements of title IV-D for
the purpose of imposing a penalty under section 409(a).  Sections
452(g)(1), 458(b)(6) of the Act.  DC provides no explanation of
why that practice would be abandoned when it came to prescribing
the increases needed to avoid a penalty based on failure to meet
IV-D performance measures.

DC's reading is also inconsistent with the logic of the
regulation.  One apparent purpose of the provision permitting a
state with a performance level below the required minimum to
avoid a penalty if its performance has increased sufficiently is
to reward significant improvement in performance by a state that
would otherwise be subject to a penalty.  ("State and Federal
partners and Congress recognized that perfect performance was not
possible and decided to focus on effective or significantly
improved performance."  65 Fed. Reg. 82,199-82,200.)  Under DC's
reading, the worse a state's score, the smaller the improvement
that would be needed to avoid a penalty.  A state that barely
missed attaining the minimum performance level would have to have
achieved a much larger increase over its previous year's
performance than a state with a much lower performance level, an
illogical result.  DC also points to no place where the statute
or regulations state that the required increase is a percentage
of the prior year's score.

Thus, we conclude that the regulation expresses the required
performance increases in absolute percentage points, and not as
relative fractions of the previous year's SOE ratio.  DC would
thus have to have increased its FY 2001 SOE performance level by
at least five percentage points above its FY 2000 performance
level, and the 29.9% SOE performance level that DC asserted it
attained for FY 2001 was not a large enough increase over the

54

26.2% SOE performance level that it reports having attained for
FY 2000 for DC to have avoided a penalty.

     C.  <u>DC is subject to a penalty for failure to submit
            reliable data on the Arrearages Collections performance
            measure.</u>

DC argues that it is not subject to a penalty for unreliable
Arrearages Collections data because the Arrearages Collections
performance measure is not one of the three performance measures
that states must meet to avoid a penalty.  Those three penalty
performance measures are the PEP, the SOE, and the Current
Collections Performance Level.[22]  DC does not dispute that states
are subject to penalties for failing performance on those three
measures.  45 C.F.R. § 305.61(a)(1)(i).  Two other measures are
used to determine a state's eligibility for incentives, along
with the three penalty performance measures, but not to assess
penalties:  the Arrearages Collections performance measure at
issue here, which measures the state's success at collecting
past-due child support, and the Cost-Effectiveness performance
measure.[23]

DC argues that since states that fail to submit reliable data on
the two incentive-only performance measures suffer the loss of
possible incentive payments, it was not reasonable to subject
them to further loss through penalties for unreliable data on
those performance measures, which are not used for imposing
penalties.  DC argues that under the principle of statutory
construction that provisions that are similar ("in pari materia")
should be construed in a similar manner, section 305.61(a)(1)(ii)
should not be read as imposing penalties for unreliable data
related to those two measures because it does not impose
penalties for performance on the two incentive-only performance
measures.

---

    [22]  We have already addressed the PEP and the SOE.  The
Current Collections Performance Level is the ratio of the number
of dollars collected for current support in IV-D cases to the
total dollars owed for current support in IV-D cases, expressed
as a percent.  45 C.F.R. § 305.2(a)(3).

    [23]  The Arrearages Collections Performance Level is the
ratio of the total number of eligible IV-D cases paying toward
arrears, to the total number of IV-D cases with arrears due, and
the Cost-Effectiveness Performance Level is the ratio of total
IV-D dollars collected, to total IV-D dollars expended; each
ratio is expressed as a percent.  45 C.F.R. §§ 305.2(a)(4),(5).

55

We concur with ACF that the plain language of the statute and regulation subjects states to penalties for the failure to submit reliable data, with no distinction between data used both for penalty and incentive performance measures and data used for incentive measures only.

Section 409(a)(8)(A)(i) of the Act holds a state liable for a penalty if, on the basis of an audit under 452(a)(4), the state's data submitted pursuant to 454(15)(B) are unreliable. Section 454(15)(B) requires that a state be able to provide data and calculations "concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 452(g) and 458; . . ." Section 458 in turn defines the five performance measures, authorizes incentives based on the states' performances on those measures, and requires that incentive determinations be made using reliable performance measure data. The language in section 409(a)(8)(A) imposing a penalty for unreliable data makes no distinction between data for incentive and penalty purposes. ACF's reading of section 409(a)(8)(A) as imposing penalties for the unreliability of *any* data that a state is required to submit, with no distinction between data for the performance measures used for penalties and incentives, and the performance measures used for incentives only, is fully supported by the plain language of those provisions. Consistent with the statutory language, section 305.61(a)(1)(ii) provides penalties for data reliability failures and does not limit those failures to only the three penalty performance measures.

The statutory provisions make the need for reliable data an important feature of the incentive process, and the threat of penalties is a further reason for states to submit reliable data on IV-D program performance in addition to the possible loss of incentive payments. Additionally, as ACF noted, the potential loss of incentives may be slim motivation in the case of a state with performance sufficiently poor that it is likely to earn little or no incentives. The motivation may also not be as great as DC suggests, because a state that submits unreliable data for one performance measure may still be eligible for incentives for its performance on the other measures. In the Part 305 preamble, ACF explained that "a State which has incomplete or unreliable data with respect to one (or more) performance measures may still qualify for incentive payments based on its performance levels for the remaining measures." 65 Fed. Reg. 82,201.

DC suggests that it could not have been the intent of Congress to impose penalties for unreliable data for the Arrearages

56

Collections and the Cost-Effectiveness performance measures,
because such penalties would have no purpose where there are no
penalties for failing performance and no standards by which to
impose penalties based on those measures.  DC, however, cites no
legislative history and nothing in the statutory language to
support its argument, and certainly nothing to override the clear
language of the statute requiring reliable data for both
incentive and penalty purposes and assessing penalties for
unreliable data.  By referencing the requirement for reliable
incentive data at section 454(15)(B) in the penalty statute at
section 409(a)(8), Congress clearly intended to include data
submitted for all of the five incentive performance measures
within the scope of data audited for reliability for penalty
purposes.

Accordingly, we sustain the determination that DC is subject to a
penalty.

### Hawaii Department of the Attorney General, Docket No. A-04-48

The Hawaii Department of the Attorney General (Hawaii) appeals a
penalty of $921,048.  ACF determined that Hawaii is subject to a
penalty on the grounds that PEP data that Hawaii submitted for
FYs 2001 and 2002 did not meet the data reliability standard.
Ex. HI-2.

Hawaii presented no arguments in addition to the States' general
arguments regarding notice and data reliability.  We addressed
these arguments in sections I.A through I.C of our analysis
above.

Accordingly, we sustain the determination that Hawaii is subject
to a penalty.

### Kansas Department of Social and Rehabilitation Services, Docket No. A-04-49

The Kansas Department of Social and Rehabilitation Services
(Kansas), appeals a penalty of $807,487.  ACF determined that
Kansas is subject to a penalty on the grounds that Kansas failed
to achieve the required PEP, or the required increase over the
previous year's PEP, for both FYs 2001 and 2002.  Ex. KS-3.

Kansas argues that correction of errors in its IV-D case records
and computerized data system caused its PEP to be lower than
expected, and that it lacked resources to undertake other
corrections that would have raised its PEP.  Kansas argues that

57

ACF should not assess a penalty, pursuant to the Secretary's authority to disregard failure to substantially comply with the requirements of title IV-D and to modify the standards for determining substantial compliance based on the PEP.

The portion of the statute authorizing the Secretary to disregard noncompliance with IV-D requirements, which we quoted earlier, provides that a state determined—

> to have failed to have substantially complied with 1 or more of the requirements of part D shall be determined to have achieved substantial compliance only if the Secretary determines that the extent of the noncompliance is of a technical nature which does not adversely affect the performance of the State's program under part D . . .

Section 409(a)(8)(C)(i) of the Act.  The regulation implementing this provision, 45 C.F.R. § 305.62, also quoted earlier, combines it with the provision permitting the disregard of unreliable data.

The section of the statute authorizing modification of the PEP standards used to determine whether a state has failed to comply substantially with title IV-D requirements states:

> The Secretary may modify the requirements of this subsection [452(g)] to take into account such additional variables as the Secretary identifies (including the percentage of children in a State who are born out of wedlock or for whom support has not been established) that affect the ability of a State to meet the requirements of this subsection.

Section 452(g)(3)(A) of the Act.

Kansas argues that its PEP failures should be disregarded based on these provisions.  Kansas argues that its FY 2001 data, while meeting the standard of reliability, still had errors due to the double counting of children born out of wedlock whose paternity had been established, and that correcting this problem lowered its PEP for FY 2002.  The double counting, which was noted in the FY 2001 DRA report, resulted from Kansas's IV-D agency and its

58

Office of Vital Statistics each reporting the same children for whom paternity had been established.[24] Ex. KS-8.

Kansas also argues that in the course of making programming changes to its automated IV-D system that were necessary to prevent the double counting, it discovered that its staff had incorrectly entered data for a significant number of IV-D cases, which caused paternity establishments to be under reported, decreasing Kansas's PEP. An affidavit of the Kansas Director of Child Support Enforcement indicates that because this data problem was discovered after the deadline for submitting FY 2002 data, Kansas was unable to take credit for all its paternity establishments. Ex. KS-1, at ¶ 3. Kansas reported that over 4,276 cases were identified for correction, with priority given to those to be included in the data report for FY 2003, but that budget restrictions affected Kansas's ability to train staff and limited the correction process to the entry of correct codes for out-of-wedlock births and paternity establishments as they occur. Id. at ¶¶ 4-6.

Kansas argues that its request to have its PEP failures disregarded as technical in nature is supported by ACF's statements in the Part 305 preamble that it is impossible to foresee all the circumstances under which a penalty might be assessed for technical noncompliance, and that technical non-compliance is defined in a broad way allowing it to be applied to unknown situations that may occur. 65 Fed. Reg. 82,207. Such relief, Kansas argues, should apply to a state that discovers that it was omitting paternity establishments from its data. "Given the agency's failure to provide proper notice and the availability of the technical noncompliance safeguards to the present situation," Kansas argues, the penalty should be set

───────────────

[24]    ACF auditors found that data for line 9 (the number of children born out of wedlock for whom paternity has been established) were not reported correctly. In the sample of 50 cases that ACF auditors selected in reviewing the line 9 data, comprising 45 cases from the Kansas Office of Vital Statistics and five cases from the Kansas IV-D agency, all five children that the IV-D office reported had already been reported by the Office of Vital Statistics. Ex. KS-8, at 4-5. These errors resulted in a data efficiency rate of 90% for line 9, which was below 95% and considered a "major deficiency." Id. at 1, 4. However, the upper end of the 95% confidence interval that ACF used to calculate the efficiency rate for that line was 97%, above the 95% standard for data reliability and thus a passing score. Id.

59

aside as an abuse of discretion. Kansas Supp. Br. at 4. By lack of notice, Kansas apparently refers to the States' argument that ACF failed to afford states the notice of their performances and data failures required by the regulation. In section I.A of the analysis above we discussed why we do not agree with the States on this point.

In effect, Kansas argues that its FY 2001 data, though found reliable, were not actually reliable, and that if it had had the resources to make systemic corrections, revised data reflecting those corrections would have elevated its PEP for FY 2002.

The statute does not afford the relief Kansas seeks. Section 409(a)(8)(A) of the Act provides three bases to assess a penalty: (I) failure to achieve the PEP or other penalty performance measures, (II) failure to submit reliable data, and (III) failure to substantially comply with one or more of the requirements of title IV-D of the Act. Section 409(a)(8)(C) permits the Secretary to disregard as technical in nature a state's failure to substantially comply with the requirements of title IV-D of the Act, and its submission of unreliable data, but does not mention a state's failure to attain the required performance levels, the basis of the penalty against Kansas. The regulation tracks the statute, authorizing the disregard of data unreliability or noncompliance with IV-D requirements but not failure to attain required performance levels. 45 C.F.R. § 305.62.

Even assuming that the disregard authority could be applied to a state's failure to attain the required PEP, it is not clear that Kansas would qualify for its application.

The affidavit from the Kansas Director of Child Support Enforcement explains that the programming changes to Kansas's IV-D automated data system made to prevent double counting of paternity establishments caused Kansas's PEP for FY 2003 to be much lower than expected. The affidavit further explains that data entry errors discovered during the programming changes, which were too costly to correct timely, caused paternity establishments to be under reported and lowered Kansas's PEP for FYs 2002 and 2003. Ex. KS-1.

Regarding the double counting, Kansas's explanation alleges only that correction of the double counting lowered its PEP. It does not address why the actual PEP, as established through correction of the double counting problem, failed to meet the required level. It does not establish the actual cause for the PEP performance failure, or why that failure would not adversely

affect the performance of the paternity establishment aspects of Kansas's IV-D program.  Additionally, the affidavit states that prior to discovery of the double counting Kansas had believed that its PEP would meet the required 90% level for FY 2003, a year not at issue here.

As to the data entry errors that caused the under reporting of paternity establishments, the affidavit does not allege that Kansas would have attained the required PEP level in the absence of those errors.  Instead, the affidavit presents Kansas PEP figures to illustrate the difficulty of achieving annual PEP improvements in light of increases in out-of-wedlock births.  These figures seem to indicate that the actual PEP, even with the corrected data, would not meet either the required minimum standard to avoid a penalty or the required level of improvement.  Id.  Thus, Kansas has not established that it would have qualified for the "technical nature" provision in any event.

Kansas also seeks relief from the penalty under section 452(g)(3)(A) of the Act, which authorizes the Secretary to modify the requirements of section 452(g) "to take into account such additional variables as the Secretary identifies (including the percentage of children in a state who are born out of wedlock or for whom support has not been established) that affect the ability of a state to meet the requirements [of section 452(g)]."  The additional variables that Kansas cites were an increase in the number and percentage of children born out of wedlock, in conjunction with state budget deficits, both nationally and in Kansas, which it describes as unforeseeable and uncontrollable circumstances that have made compliance with the federal PEP requirements increasingly difficult.  Kansas states that it would have petitioned the Secretary for relief under section 452(g)(3)(A) if ACF had notified Kansas of the possibility of a penalty at the time that the States argue that ACF was required to provide notice.

First, as we discussed with respect to the technical nature exception for failure to comply substantially with the requirements of title IV-D, the Secretary's authority is limited to such noncompliance and does not by its terms extend to failure to meet the performance measure levels.  Second, the statute authorizes but does not require the Secretary to modify the title IV-D requirements; the Secretary, through ACF, did not implement this provision in the Part 305 regulations and has not identified additional variables that would support waiver of the PEP standards.  Finally, and most significantly, Kansas does not demonstrate or allege that budget deficits or increases in the number and percentage of out-of-wedlock births were greater in