61

Kansas than in other states or were of such magnitude as to
warrant relaxing the requirements by which all states were bound.
Indeed, Kansas implies that its experience is not unique,
referring to these trends as nationwide occurrences.

Accordingly, we sustain the determination that Kansas is subject
to a penalty.

### Louisiana Department of Social Services, Docket No. A-04-50

The Louisiana Department of Social Services (Louisiana) appeals a
penalty of $1,096,723. ACF determined that Louisiana is subject
to a penalty on the grounds that PEP data that Louisiana
submitted for FYs 2001 and 2002 did not meet the data reliability
standard. Ex. LA-2.

Louisiana presented no arguments in addition to the States'
general arguments regarding notice and data reliability. We
addressed these arguments in sections I.A through I.C of our
analysis above.

Accordingly, we sustain the determination that Louisiana is
subject to a penalty.

### New Hampshire Department of Health and Human Services, Docket No. A-04-51

The New Hampshire Department of Health and Human Services (New
Hampshire) appeals a penalty of $385,213. ACF determined that
New Hampshire is subject to a penalty on the grounds that New
Hampshire failed to provide information needed to establish its
PEP for FY 2001, and that the PEP data that New Hampshire
submitted for FY 2002 did not meet the data reliability standard.
Ex. NH-4.

ACF determined that New Hampshire failed to provide information
needed to establish a PEP for FY 2001 because calculation of New
Hampshire's PEP for FY 2001 required data from FY 2000, but that
these FY 2000 data had failed to meet the data reliability
standard and New Hampshire did not resubmit corrected, reliable
FY 2000 data by the deadline for submitting data for FY 2001.
The data in question are the total number of children in the IV-D
caseload as of the end of FY 2000 who were born out of wedlock,
reported at line 5 of the OCSE-157 for FY 2000; the total
reported at line 5 is the denominator of the PEP ratio for FY
2001.

62

New Hampshire argues that its FY 2000 data could be used to calculate its PEP for FY 2001 because ACF determined to disregard the unreliability of FY 2000 data, which meant that the unreliability was of a technical nature that did not adversely affect the calculation of New Hampshire's PEP. New Hampshire also argues that ACF's communications in response to New Hampshire's inquiries led New Hampshire to believe that it needed to resubmit corrected, reliable FY 2000 data only to earn incentives but not to avoid penalties.

We conclude that ACF's decision to disregard the unreliability of FY 2000 data for the purpose of state performances during FY 2000 did not render those data reliable for FY 2001 nor relieve New Hampshire of its responsibility to submit reliable data to the extent needed to calculate performance for FY 2001. We also find that New Hampshire could not reasonably have concluded, based on ACF's communications, that it did not need to submit reliable FY 2000 PEP data to avoid a penalty. In our analysis below, we provide some background on the use of a year's data in calculating performance in a subsequent year, and the decision to disregard the unreliability of data submitted for FY 2000.

A. The decision to disregard the unreliability of FY 2000 data did not render those data reliable for the calculation of performance for FY 2001.

1. Background

The numerator of the PEP for a given fiscal year is the number of children in the IV-D caseload as of the end of the preceding fiscal year who were born out of wedlock (or, for the Statewide PEP, the number of children born out of wedlock during the preceding fiscal year). 45 C.F.R. § 305.2(a). Calculation of a state's PEP thus requires data from two consecutive fiscal years. Since the OCSE-157 that a state submits for a given fiscal year reports numbers of paternity establishments and out-of-wedlock children relative to that year only, calculation of a state's PEP for a given year requires data for that year and the immediately preceding year. Similarly, the OCSE-157 that a state submits for a given fiscal year is generally used to calculate the PEP for that year and for the next year.[25] If a state submits unreliable

---

[25] A state that has selected the IV-D PEP uses line 6 of the OCSE-157 to report the number of children in IV-D cases open during or at the end of the fiscal year with paternity established or acknowledged (the numerator of the PEP for the

(continued...)

63

data on the number of out-of-wedlock children, data that are used to calculate the following year's PEP, then it follows that its PEP for the following year cannot be determined, unless, as discussed below, it resubmits the data in reliable form by the deadline for submitting the following year's data.

As noted earlier, a state must submit data for a fiscal year no later than December 31st following the end of the fiscal year, and only data submitted by that time may be considered in determining a state's IV-D performance **for that year**.  45 C.F.R. § 305.32(f).  However, in the preamble to Part 305, ACF stated that reliable data from a prior year may be submitted after the prior year's deadline when needed to calculate the current year's PEP, or when needed to establish prior year performance for the purpose of demonstrating an improvement in the current year.  65 Fed. Reg. 82,184.

At issue are data that New Hampshire submitted on its OCSE-157 for FY 2000 that are needed to calculate its IV-D PEP for FY 2001.  ACF determined that data New Hampshire submitted at line 5 (and line 6) of its OCSE-157 for FY 2000 (IV-D PEP data) did not meet the data reliability standard.  Ex. NH-19.  The unreliability was due to a coding error in some of New Hampshire's IV-D case records that caused some children to be wrongly excluded from the totals of children born out of wedlock that New Hampshire reported at those lines of the OCSE-157.  Id.; Exs. NH-24, NH-25.

However, as noted in section I.B of our analysis above, ACF determined to disregard the unreliability of FY 2000 data submitted by all 23 states that submitted unreliable data, including New Hampshire.  ACF announced this decision in substantively identical letters to the states from the OCSE Commissioner dated December 19 and 27, 2001.  The letter informed states that this determination was made because incentives were being phased in during FY 2000, and because the system of

---

[25](...continued)
current year), and line 5 to report the number of out-of-wedlock children in IV-D cases open at the end of the fiscal year (the denominator of the next year's PEP).  A state that has selected the Statewide PEP uses line 9 of the OCSE-157 to report the number of children in the state with paternity established or acknowledged during the fiscal year (the numerator of the PEP for the current year), and line 8 to report the number of children in the state born out of wedlock during the fiscal year (the denominator of the next year's PEP).

64

penalties for IV-D performance was not effective until FY 2001.
The letter stated:

> However, we note that the Congress provided a
> phase-in period for the new incentive formula that
> covers FFY 2000. In addition, the performance
> standards established by the Secretary that are used
> to impose penalties are not effective until FFY
> 2001. In recognition of this phase-in for both
> incentive and penalty performance standards, we
> believe that a determination was warranted that the
> incompleteness or unreliability of these 23 states'
> data for FFY 2000 was of a technical nature that did
> not adversely affect the determination of the
> performance measures.

> Therefore, in accordance with the authority granted
> the Secretary, no state will be subject to a penalty
> for unreliable or incomplete FFY 2000 data. This
> determination applies only to unreliable or
> incomplete FFY 2000 data and does not affect
> potential data or performance penalties that may
> result from states' FFY 2001 or subsequent years'
> data or performance.

Ex. NH-14, at 2. The letter cautioned states that (among other
things) they would be subject to penalties for poor performance
as of FY 2001:

> If the Secretary finds for FFY 2001 that a state
> either failed to achieve the level of performance
> required on any of the three penalty performance
> standards for paternity establishment, support order
> establishment, and current collections in 45 CFR
> 305.40, or that the state's FFY 2001 data were
> unreliable or incomplete, the state would have to
> correct any data deficiency and meet the applicable
> performance standard(s) during the succeeding year,
> FFY 2002. If the state has either unreliable or
> incomplete data or fails to meet the same
> performance standard(s) for the corrective action
> year FFY 2002, a penalty of 1 percent of its Federal
> TANF funds for FFY 2003 will be assessed.

Id. at 2-3.

65

2.  Arguments and analysis

New Hampshire challenges ACF's determination that New Hampshire's submission of unreliable FY 2000 PEP data prevented calculation of its PEP for FY 2001, on the basis that ACF determined to disregard the unreliability of those data. New Hampshire argues that under the terms of the statute, that determination meant that the unreliability was of a technical nature that did not adversely affect the calculation of the performance measures, and that this determination applied to the data relating to out-of-wedlock births that New Hampshire reported at line 5 of its OCSE-157 for FY 2000 and which were used only to calculate New Hampshire's IV-D PEP for FY 2001.

New Hampshire argues that the December 19, 2001 letter explained that the determination to disregard the data unreliability meant that the State "will be determined to have submitted adequate data for penalty purposes," that "no state will be subject to a penalty for unreliable or incomplete FFY 2000 data," and that states "will be subject to penalties for poor performance as of FFY 2001, based on data reported for FFY 2001." New Hampshire Supp. Br. at 7, citing Ex. NH-14 (New Hampshire's emphasis). New Hampshire argues that it reported the data at issue as part of its data submission for FY 2000 and not FY 2001, and is thus being penalized for the unreliability of its FY 2000 data and not for its performance or data during FY 2001, contrary to the letter's assurances.

ACF argues that the decision to disregard all FY 2000 data unreliability was made so that states would not be subject to penalties for unreliable data reported for FY 2000, one year before states were first subject to penalties for failure to meet IV-D performance measures. ACF Response to New Hampshire Supp. Br. at 15-16, 28; 45 C.F.R. § 305.42.[26] ACF argues that the

---

[26] That regulation, "Penalty phase-in," provides:

States are subject to the performance penalties described in § 305.40 based on data reported for FY 2001. Data reported for FY 2000 will be used as a base year to determine improvements in performance during FY 2001. There will be an automatic one-year corrective action period before any penalty is assessed. The penalties will be assessed and then suspended during the corrective action period.

(continued...)

66

December 19 letter informed states that the determination to disregard the unreliability of FY 2000 data did not apply to the determination of performance for FY 2001. ACF argues that the regulations and preamble establish a penalty system in which determinations of reliability and performance are made discretely for each year and apply to that year only. ACF notes that any unreliable data from one year that are needed to determine performance in the next year must be corrected and resubmitted in reliable form by the deadline for submitting that next year's data. These aspects of the penalty and incentive system, ACF argues, establish that a determination to disregard the unreliability of data submitted in a particular year do not render those data reliable for use in determining performance in a following year.

The issue is thus whether the determination to disregard any unreliability of data submitted for FY 2000 rendered those data reliable for calculating the performance measures for FY 2001. For the reasons explained below, we agree with ACF that this determination applied only to the assessment of performance for FY 2000 and did not relieve states of their responsibility to submit reliable data needed to determine performance for FY 2001, including any data from FY 2000 that were needed to calculate performance for FY 2001 but had been found to be unreliable when submitted for FY 2000.

First, we agree with ACF that data submissions, reliability determinations, and performance calculations are made yearly and apply to each year individually. The provision permitting ACF to

---

[26](...continued)
The preamble to this section explains that—

> States will be subject to penalties for poor performance as of fiscal year 2001 . . . . For example, if the Secretary finds with respect to FY 2001, that the State had either failed to achieve the level of performance required or that the State's FY 2001 data was unreliable or incomplete, then the State would be required to correct the deficiency and meet the performance measure during the succeeding year, i.e., FY 2002. If the State has either unreliable or incomplete data or fails the performance measure for the corrective action year, FY 2002, a penalty will be assessed.

65 Fed. Reg. 82,188-89.

67

disregard data unreliability begins by referring to data that has
been found to be unreliable pursuant to the statutorily-required
audits of data that states submit annually.  Section 409(a)(8)(C)
of the Act.  States submit their data on OCSE-157 forms for
discrete, individual years, and performance is calculated yearly.
The regulation applies the disregard provision to a state that is
"subject to a penalty," and states are subject to a penalty for
each successive year of unreliable data or failing performance.
45 C.F.R. § 305.62.  Thus, a determination to disregard the
unreliability of data submitted on one year's OCSE-157 applies
only to that year and to the calculation of that year's
performance, and effectively means that the unreliability does
not adversely affect the determination performance measures for
that year only.

A determination that the unreliability of data is merely
technical and does not adversely affect the calculation of
performance cannot apply to a subsequent year, as state data and
performances for the subsequent year are not yet known.  That
determination is thus necessarily linked to calculating the
performance for the year of the OCSE-157 on which the data were
first submitted.  Here, the determination to disregard the
unreliability of FY 2000 data was made shortly before the
deadline for submitting FY 2001 data, before ACF was aware of
states' data or performances for FY 2001.  ACF could not
determine at that time whether or not data unreliability,
including the unreliability of data for FY 2000, would adversely
affect determination of state performances for FY 2001.

Moreover, the provision permitting the disregard of data
unreliability says only that the data may be considered
"adequate."  Application of the disregard provision does not
render the subject data reliable when they are not.  Language in
the regulation stating that a penalty will be imposed if data in
a succeeding year "are still incomplete and unreliable" does not
except data that are unreliable or incomplete but have been found
to be adequate.  45 C.F.R. § 305.61(a)(2).

The definition of the PEP in the statute and regulations and the
content of information reported on the OCSE-157 establish that
calculation of the PEP for FY 2001 required data from the
preceding fiscal year.  New Hampshire was aware that line 5 data
from its OCSE-157 for FY 2000 were not reliable, via an exit
conference following the FY 2000 DRA on February 1, 2001, and
ACF's draft and final FY 2000 DRA reports, dated July 16 and
August 2, 2001, respectively.  Exs. NH-19, NH-20, NH-21.  The
Part 305 preamble established that unreliable data from one year
that are needed to determine performance for the following year,

68

such as the data at issue here, had to be corrected and
resubmitted as reliable data, by the deadline for submitting the
following year's data:

> Section 305.32(f) specifies that States are required
> to submit data used to determine incentives
> following instructions and formats required by HHS
> and on Office of Management and Budget (OMB)
> approved reporting instruments, and sets December
> 31st of each calendar year as the final deadline for
> the submittal of State data for a fiscal year. It
> includes any necessary data from the previous fiscal
> year needed to calculate the paternity establishment
> percentage or any improvements over that fiscal
> year's performance necessary to earn incentives or
> avoid penalties for the current fiscal year.

65 Fed. Reg. 82,184.

Thus, where calculation of New Hampshire's PEP for FY 2001
required data from FY 2000, and the data submitted on the
OCSE-157 for FY 2000 had been found to be unreliable, New
Hampshire was aware that it had to resubmit corrected, reliable
data by the deadline for submitting FY 2001 data, December 31,
2001. Because a determination to disregard the unreliability of
data submitted for FY 2000 would apply to the determination of
performance for FY 2000 only, the determination announced in the
December 19, 2001 letter did not relieve New Hampshire of its
obligation to submit reliable data regarding the number of
children born out of wedlock in the preceding fiscal year by the
deadline for submitting data for FY 2001.

Additionally, the basis for the determination to disregard the
unreliability of FY 2000 data clearly applied only to the
calculation of performance for FY 2000, and not for FY 2001. As
the December 19, 2001 letter states, that determination, which
applied to all 23 states that submitted unreliable FY 2000 data,
was made so that states would not be subject to penalties for
unreliable data beginning with data for FY 2000, prior to the
start of the penalty process for IV-D *performance* in FY 2001.
The letter cautioned that the determination did not apply to
performance penalties that could result from performance during
FY 2001. It thus did not apply to performance during FY 2001,
nor to data for FY 2000 which were needed to calculate
performance for FY 2001.

Thus, we conclude that ACF's position that the determination to
disregard the unreliability of FY 2000 data applied only to the

69

use of those data for calculating FY 2000 performance and did not relieve states of their obligation to submit reliable data needed to calculate performance for FY 2001 is the only reasonable interpretation of the regulations. Even if New Hampshire's interpretation were a reasonable one, New Hampshire did not argue that the reason it did not submit revised, reliable data was that it had determined that it did not need to. Instead, the record indicates that New Hampshire understood the need to take action to correct the data but had questions and concerns about the effort entailed that led it to delay corrective action. The December 19, 2001 letter moreover was received by New Hampshire on December 24, 2001. It was thus received too close to the deadline for submitting FY 2001 data for New Hampshire to have relied on its reading of the letter in declining not to submit reliable data on children born out of wedlock in its IV-D caseload for FY 2000 that were needed to calculate its PEP for FY 2001. Ex. NH-14. New Hampshire also has not argued that it relied on reading the letter to mean that it did not need to submit corrected data. New Hampshire does argue that other communications with ACF led it to believe that it did not need to resubmit corrected, reliable data. We address these arguments next.

Accordingly, we conclude that ACF's decision to disregard the unreliability of FY 2000 data did not render those data reliable for the calculation of performance for FY 2001 nor relieve New Hampshire of its obligation to submit reliable data needed to calculate its PEP for FY 2001.

> B. <u>New Hampshire could not reasonably have concluded,
> based on ACF's communications, that it did not need to
> submit reliable FY 2000 PEP data to avoid a penalty.</u>

New Hampshire argues that ACF led New Hampshire to believe that it did not need to resubmit corrected, reliable FY 2000 data. New Hampshire argues that it repeatedly sought ACF's guidance about whether to correct and resubmit its unreliable FY 2000 data, beginning shortly after it learned of ACF's findings in a FY 2000 DRA exit conference in February 2001. New Hampshire argues that ACF at first failed to respond to New Hampshire's inquiries and later replied only that New Hampshire would have to resubmit corrected data in order to qualify for incentives based on increased PEP performance in FY 2001, and failed to inform New Hampshire that it needed to resubmit corrected FY 2000 data in order to avoid a penalty. New Hampshire argues that it reasonably concluded, based on ACF's responses and failures to respond to its inquiries, that it did not need to correct the coding errors in its IV-D case records that caused its FY 2000

data to be unreliable. New Hampshire further requests that, if the Board does not reverse the penalty, then New Hampshire should be permitted to submit a revised OCSE-157 for FY 2000 containing the results of its review of IV-D cases, which New Hampshire says it would have submitted if ACF had instructed New Hampshire that it needed to do so.

However, the record does not support New Hampshire's arguments. New Hampshire's inquiries to ACF are unclear and do not establish that New Hampshire asked ACF if it had to resubmit reliable FY 2000 data in order for those data to be used to calculate its PEP performance for FY 2001. Instead, New Hampshire appears to have been asking that ACF permanently excuse the coding errors in New Hampshire's open IV-D cases that caused the data reported for FY 2000 to be unreliable, and to not count those errors in future DRAs, so that New Hampshire would not have to undertake the considerable effort that reviewing all of its open IV-D cases would entail.

New Hampshire's communications indicate that the unreliability of the data that it reported at lines 5 and 6 of its OCSE-157 for FY 2000 was due to a coding error in some of its IV-D case records that caused some children to be wrongly excluded from the totals of children born out of wedlock that New Hampshire reported at those lines. As New Hampshire explains, these children were assigned a code meaning "paternity not an issue" (which New Hampshire called "code S"), for use in the data field that its computerized IV-D system uses to record whether paternity has been established. New Hampshire's correspondence indicates this code was meant to be used for children who were born in wedlock, but had been mistakenly assigned to some children who had been born out of wedlock and thus should have been included among the data that New Hampshire reported at lines 5 and 6 of the OCSE-157. Exs. NH-20, at 2; NH-24; NH-25.

New Hampshire's inquiries to ACF about whether New Hampshire should correct the coding errors are not clear as to precisely what action New Hampshire sought from ACF. These communications proceeded as follows:

- New Hampshire's initial inquiry, a letter to the ACF Boston area audit office dated February 21, 2001 (and re-sent on May 30, 2001) shows that New Hampshire was concerned that correcting the coding errors would cause "a temporary, invalid, and therefore, unreliable inflation of the number of paternities established on the next OCSE 157 report" and that "[a]ttempting to correct the errors for lines 5 and 6 will result in a faulty and unreliable

71

performance measure." Exs. NH-24, NH-25. New Hampshire requested "reconsideration of data associated with those children added to NECSES [New Hampshire's computerized system] prior to 10/01/00. . . . so that if they were coded S, and therefore do not appear on lines 5 or 6, and should have been on both lines, that we be permitted to leave them coded S. We will delay implementation of any corrective action pending your decision regarding this request." Id. New Hampshire also opined that the errors did not affect New Hampshire's PEP ratio because they caused cases to be excluded from both lines 5 and 6. Id.

- In its next communication, a July 24, 2001 e-mail to an ACF official, New Hampshire asked "whether an error in a case is restricted to [the] given fiscal year or for the life of a case." Ex. NH-23, at 1. New Hampshire quoted ACF's response, in the Part 305 preamble, to a comment that "[t]he rule is unclear whether an error in a case applies to the 'life of the case' or is restricted to a given fiscal year. We recommend that the error be restricted to a given fiscal year." ACF replied in the preamble that "[a]n error in a case is restricted to a given fiscal year." 65 Fed. Reg. 82,207. The e-mail from New Hampshire asked if "failing the DRA on paternity coding in 2000 is restricted to those cases (and only year 2000 cases)? Does it mean that if we submit an acceptable corrective action plan and implement it going forward that we cannot be penalized or suffer loss of incentives for cases in year 2000 and before?" Ex. NH-23, at 1; New Hampshire Supp. Br. at 4. ACF did not respond to New Hampshire's e-mail inquiry.

- Finally, in its July 26, 2001 comments on the draft FY 2000 DRA report, New Hampshire repeated its earlier explanation of the problems that caused children born out of wedlock to be excluded from the data that New Hampshire reported on its FY 2000 OCSE-157, and again opined that these errors did not affect the calculation of New Hampshire's PEP. New Hampshire then asked that it not have to correct the coding errors in its open IV-D cases:

  > We specifically ask that you reconsider the treatment of cases coded "S" which do not, but should, appear on lines 5 or 6, by permitting New Hampshire to leave them coded "S" with no negative consequence for future DRAs. All field staff have been provided a training guide on paternity codes to reduce the occurrence for data entry errors in

72

the future.  We have also established plans to
re-train our workers on the use of paternity codes,
and we are re-writing policy for release to field
staff.  We have already addressed the problem on
over 1,300 cases in our automated system where the
"S" code was used inappropriately, and the change
could be made centrally without a need to review
the individual case files.  A complete fix would
involve the manual review of New Hampshire's entire
caseload, less the 1,300 cases fixed on the system.
Absent responses to our previous letters and now
receipt of the draft DRA findings, we have made
plans for such a review and will begin within days,
despite the cost in dollars and ongoing service
levels provided to clients.  It is questionable
whether a total case review can be completed before
the conclusion of the current fiscal year.

Ex. NH-20, at 3.  New Hampshire later reported in an
e-mail to ACF dated December 31, 2001 that its staff
spent approximately six weeks at the end of FY 2001
reviewing and where necessary correcting the
paternity coding on all of the open cases, over
37,000 in number.  Ex. NH-13, at 1.

ACF finally responded to New Hampshire's inquiries in a
letter from the ACF Office of Audit dated November 26,
2001, advising that any request for reconsideration "of
your situation" would have to be made directly to the OCSE
Commissioner.  Ex. NH-15, at 1.  In response to New
Hampshire's concern that correcting the coding problem in
its case records would cause an inflation in the number of
paternities established and result in faulty and
unreliable performance measures for three years, the
letter states:

However, in accordance with the preamble of
the "Incentives, Penalty and Audit Final
Rule" in AT-01-01 [Part 305], you may need to
correct and resubmit your FY 2000 data if you
need to demonstrate improvement which would
qualify for incentives.  However, if your
State will otherwise achieve the minimum
performance level without showing an increase
over the prior year, the correction to the FY
2000 data would be unnecessary.  By
resubmitting the prior year's data, this will

73

> not result in an inflation of the data for
> this year.

Id. at 2.

While it is regrettable that ACF did not respond earlier to New Hampshire's inquiries, the correspondence from New Hampshire indicates that New Hampshire understood that the coding errors from periods prior to October 1, 2000, the end of FY 2000, would have to be corrected unless it got an assurance from ACF that those errors would not be treated as errors in any future audit or would be disregarded. That New Hampshire chose to delay implementation of corrective action in hopes that it could obtain such an assurance did not change its recognition of its obligation to correct those errors, in the absence of such an assurance.

New Hampshire argues that ACF's advice in the November 26, 2001 letter from the ACF Office of Audit misled New Hampshire into believing that it did not have to submit corrected FY 2000 data to avoid a penalty based on its FY 2001 PEP, because the letter addressed only incentives, and not penalties, as if the only reason New Hampshire would have to resubmit reliable FY 2000 data would be to qualify for incentives based on improvements in FY 2001. However, New Hampshire provided no evidence that it abandoned its corrective action efforts or determined not to resubmit the FY 2000 data based on what was said in the letter, rather than for some other reason. New Hampshire's own correspondence suggests that it did not expect to be able to make the corrections in a timely manner.

In any event, even if New Hampshire did show that its failure to resubmit the data was attributable to its reliance on the November 26, 2001 letter, we would conclude that that reliance was unreasonable. First, New Hampshire did not show that the Office of Audit has the authority to set ACF policy on whether data needed to be resubmitted (or on any of the other issues raised). Second, to the extent that the Office of Audit letter reflects a view that correcting the FY 2000 data would be important only if New Hampshire wanted to qualify for an incentive payment, that view is in conflict with the statute and regulations, which contemplate that the IV-D PEP will be calculated using data on children born out-of-wedlock from the preceding year and that all of the data used for the performance measures in a particular year are subject to being audited for reliability. Sections 452(a)(4),(g)(2), 454(15)(B) of the Act; 45 C.F.R. §§ 305.1(i),(j), 305.2(a)(1), 305.32(f), 305.60, 305.65. New Hampshire knew from the definition of the IV-D PEP

74

measure that calculation of its IV-D PEP for FY 2001 required data on children born out-of-wedlock for FY 2000 that had been found to be unreliable, and also that unreliable line 5 data had to be resubmitted to permit calculation of the next year's PEP based on reliable data.

New Hampshire's inquiries broadly sought a permanent disregard of the coding errors in any of its open IV-D cases. This is apparent from New Hampshire's requests that it not have to review all of its open IV-D case records to uncover and correct the coding errors and that it instead be permitted to leave them coded as they were "with no negative consequence for future DRAs," and its request for "reconsideration of data associated with those children added . . . prior to 10/01/00. . . . so that if they were coded S, and therefore do not appear on lines 5 or 6, and should have been on both lines, that we be permitted to leave them coded S." Exs. NH-20, at 3; NH-24, NH-25. Such a permanent disregard of errors is nowhere authorized in the statute or regulations.

To the extent that New Hampshire was requesting that ACF determine that New Hampshire's unreliable FY 2000 data were adequate for FY 2000 purposes, that request was effectively granted when ACF made that determination for unreliable FY 2000 data submitted by 23 states. The communications concerning New Hampshire's coding error, which took place before that determination, do not address the effect of that determination on New Hampshire's use of the unreliable data for FY 2000 to calculate its PEP for FY 2001, and do not otherwise provide a basis for New Hampshire to have concluded that it did not need to resubmit reliable data for FY 2000 for that data to be used to calculate its PEP for FY 2001.

We also note that New Hampshire's inquiries were to a certain extent based on erroneous premises. First, merely because New Hampshire's data entry errors affected both lines 5 and 6, does not necessarily mean that they would not affect the PEP calculation, as New Hampshire argued in its correspondence.[27] Second, the preamble regarding the effect of "case errors" in a future fiscal year does not in context refer to the type of data entry errors at issue here. Third, New Hampshire did not explain

_____

[27] Fairly simple mathematical tests show that this is not true. For example, taking 100 from both the numerator and the denominator of the ratio 1000 to 4000 results in the ratio 900 to 3,900, and changes the measure, expressed as a percent, from 25% to 23.1%.

75

its assertion that correction of the coding error in cases other than the 1,300 that had already been corrected electronically entailed manual review of all 37,000 cases in its IV-D caseload, instead of only those coded "S" (which could be identified through its computerized system).

Thus, we conclude that New Hampshire's argument based on its communications with ACF has no merit.

Accordingly, we sustain the determination that New Hampshire is subject to a penalty.

New Mexico Human Services Department, Docket No. A-04-52

The New Mexico Human Services Department (New Mexico) appeals a penalty of $946,877. ACF determined that New Mexico is subject to a penalty on the grounds that PEP data that New Mexico submitted for FYs 2001 and 2002 did not meet the data reliability standard. Ex. NM-3.

New Mexico argues that it did not submit unreliable data with respect to the same performance measure for two consecutive years because it switched from using the Statewide PEP measure for FY 2001 to the IV-D PEP performance measure for FY 2002. Thus, New Mexico argues, the data reliability errors that ACF identified for FY 2002, at lines 5 and 6 of New Mexico's FY 2002 OCSE-157, the lines used by IV-D PEP states, were not the second year of failure required for a penalty, but rather the first time that New Mexico had submitted unreliable data for those lines. New Mexico argues that before being subject to a penalty it should be given a corrective action year during FY 2003 with respect to its unreliable IV-D PEP data for FY 2002.

New Mexico argues that a state is subject to a penalty only for consecutive identical deficiencies, citing 45 C.F.R. § 305.66 ("[a] consecutive finding occurs only when the State does not meet the same criterion or criteria"), and the Part 305 preamble at 65 Fed. Reg. 82,192 ("[a] new corrective action year will be triggered by a data deficiency or performance failure under a different criterion than was cited in the prior penalty notice"). New Mexico argues that although the IV-D PEP and the Statewide PEP both measure paternity establishment, they are not identical or interchangeable. In this regard, New Mexico notes that ACF considers the IV-D PEP and Statewide PEP data universes sufficiently different to justify different auditing methods, counting exclusion errors against IV-D PEP data but not against Statewide PEP data. New Mexico argues that deficiencies in its

Statewide PEP data for FY 2001 had no bearing on the errors in its IV-D PEP data for FY 2002.

ACF characterizes the distinction advanced by New Mexico as semantic rather than substantive, and argues that the actual distinction made by the statute and regulations for the purpose of imposing penalties based on consecutive year failures is among the three performance measures established for imposing penalties (and, for data purposes, among the five performance measures established for awarding incentives). ACF also argues that there is nothing in the statute supporting the notion that consecutive data failures warranting a penalty must be with respect to the same lines in the OCSE-157 form, and that the statute imposes penalties for two consecutive years of unreliable data, which ACF says covers all data submitted by a state.

We concur with ACF that a state's penalty liability for two consecutive years of unreliable PEP data is not limited to data specific to only one type of PEP measure, and is not abrogated or delayed by a state's decision to switch from one to the other. In either case, unreliable data will render impossible the calculation of the state's PEP. Additionally, as ACF argues, New Mexico's reading could permit a state to avoid liability for unreliable data by switching between the two PEP measures from year to year.

The statute and regulations provide for a penalty if a state submits unreliable data in one year, and, with respect to the succeeding fiscal year, the data submitted by the state are unreliable. That was the case here.[28] The deficiency that needs to be corrected to avoid a penalty is the failure to submit reliable data, and not the presence of any particular type of error.

---

[28]   To the extent that ACF's arguments — that the statute in penalizing unreliable data does not distinguish among the different data lines on the OCSE-157 and that its imposition of a penalty for two years of unreliable data "covers all data submitted by the State" — could be read as supporting penalties for two years of unreliable data with respect to different performance measures (e.g., unreliable PEP data followed by unreliable SOE data), ACF has rejected such a reading in the preamble, which provides that "[t]wo consecutive years of failure (either poor data or poor performance) in the same performance measure criterion will trigger a penalty imposition." ACF Response to New Mexico Supp. Br. at 6; 65 Fed. Reg. 82,192.

77

Earlier, in addressing arguments raised by Alabama, we concluded that under the statute, regulations and preamble, a state is subject to a penalty for two consecutive years of unreliable data or deficient performance with respect to the same performance measure. In either case, the state has failed to demonstrate with reliable data that it met the required level of performance. While we recognize that both the IV-D PEP and the Statewide PEP are referred to as measures in section 305.2(a)(1), elsewhere the term performance measure is used to refer to the PEP as one of the five performance measures established by the statute for awarding incentives, of which three are also used to assess penalties. The preamble consistently refers to the PEP as one of the five incentive and three penalty performance measures, with no distinction between the IV-D and the Statewide PEPs as different incentive or penalty performance measures. 65 Fed. Reg. 82,183, 82,184, 82,187, 82,201, 82,210.

Accordingly, we sustain the determination that New Mexico is subject to a penalty.

### Rhode Island Department of Human Services, A-04-53

The Rhode Island Department of Human Services (Rhode Island) appeals a penalty of $945,007. ACF determined that Rhode Island is subject to a penalty on the grounds that PEP data that Rhode Island submitted for FYs 2001 and 2002 did not meet the data reliability standard. Ex. RI-2.

Rhode Island argues that the unreliability of its data should be disregarded as technical in nature because it resulted from computer programming errors and because the ACF auditors relied on information from Rhode Island's IV-A agency that was not available to its IV-D agency when it submitted its data. Rhode Island also disputes two of ACF's data error determinations for FY 2002.

We find that the data errors were substantive and that Rhode Island has not demonstrated that those errors should be disregarded as merely technical in nature, and we sustain the penalty. As explained below, we do not rule on Rhode Island's dispute of two data error determinations for FY 2002.

### A. Unreliability of FY 2001 data resulting from computer programming errors was not merely technical in nature.

Rhode Island argues that exclusion errors for FY 2001 resulted because the State's IV-D computer system was not programmed to include, among the data that Rhode Island reported on the

78

OCSE-157, children who turned 18 during the fiscal year, or children for whom the IV-D agency was seeking only medical support (health insurance) but not child support. Rhode Island argues that it was not aware of these programming flaws prior to the FY 2001 DRA. Rhode Island does not dispute ACF's determination that these cases should have been included in its data.

Rhode Island argues that its programming errors were technical in nature, and did not affect or had a minimal impact on the calculation of its PEP, because the wrongly excluded cases were only a small fraction of the IV-D case load, as evidenced by the absence of such cases from the sample that ACF selected in auditing Rhode Island's data for FY 2000, and the fact that Rhode Island was able to fix the computer problems during the audit of FY 2001 data. Rhode Island also asserts that the exclusion of these cases from its data did not affect the performance of its IV-D program. Rhode Island Supp. Br. at 4-5. Rhode Island asserts that if ACF had not counted these exclusions from its data as errors, its FY 2001 PEP data would have met the data reliability standard.

We sustain ACF's findings for FY 2001 because Rhode Island has not shown that the exclusion of these cases did not adversely affect the determination of its PEP. Rhode Island asserts that their effect on the PEP was minimal, but does not provide any evidence or analysis supporting that assertion. Moreover, Rhode Island does explain what is meant by a minimal effect, and the mere fact that such cases were not included in ACF's sample for FY 2000 does not establish by itself that their effect was minimal. Rhode Island also does not allege that it would have met the required PEP performance level for FY 2001 if these excluded cases were not counted as errors.

Even if Rhode Island were to show, which it did not, that the exclusion errors did not alter its PEP enough to affect whether Rhode Island met the required performance level, any alteration of its PEP, however minimal, would, as ACF argues, affect Rhode Island's performance relative to other states and thus compromise the accuracy of the system for determining incentives, which is based on relative state performances.

Rhode Island's inability to submit reliable data was not rendered technical in nature simply because the computer programming errors might not have been symptomatic of a failure to deliver IV-D services, as Rhode Island alleges. It appears that these cases were wrongly excluded due to systemic errors in Rhode Island's computer programming that compromised its ability to

79

report accurate IV-D performance data and were not uncovered
prior to ACF's audit of the data that the computer system
produced.  The Act requires each state to operate an automated
data processing and information retrieval system capable of
providing data needed to calculate the IV-D performance measures
and makes failure to submit reliable data a distinct basis for a
penalty apart from any consideration of whether a state is
delivering IV-D services or otherwise complying with IV-D
requirements.  Sections 409(a)(8)(A), 454(15)(B), 454(16), 454A,
458(b)(5)(B) of the Act.  Audits look not only at a state's data,
but also at a state's compliance with the requirements to
maintain automated systems.  45 C.F.R. § 305.60(c)(1).  These
provisions signal the importance of proper programming to
generate reliable data, which are necessary for ACF to make
incentive and penalty determinations based on data submitted by a
state without having to conduct physical reviews of the
underlying case records.  Finally, as ACF points out, the 95%
data reliability standard permits the existence of truly minimal
errors, whereas the computer programming flaws in question here
called into question the reliability of Rhode Island's data and
thus any determination of performance based thereon.

In arguing that the data errors did not affect its performance of
IV-D functions, Rhode Island also cites 45 C.F.R. § 305.63.
Rhode Island Supp. Br. at 5.  That section outlines the standards
for determining whether a state is in substantial compliance with
IV-D requirements.  That is not the basis of the penalty here,
however; this penalty is based on the failure to fulfill the
requirement to submit reliable data, an integral part of the IV-D
performance incentive and penalty system.

Thus, we conclude that Rhode Island has shown no basis to reverse
the finding that it submitted unreliable FY 2001 PEP data or to
disregard the unreliability of those data.

     B.   <u>ACF's use of information from Rhode Island's IV-A
         agency in auditing Rhode Island's FY 2002 data was not
         improper.</u>

Next, regarding its FY 2002 data, Rhode Island argues that ACF
should not have assessed data errors based on information that
ACF obtained from Rhode Island's IV-A agency, in April 2003, that
Rhode Island's IV-D agency did not have when it submitted its
data.  <u>See</u> Ex. RI-5, at 2-3, comments on draft FY 2002 DRA
report.  According to the FY 2002 DRA report, Rhode Island failed
to include, in its report of children in the IV-D caseload born
out of wedlock whose paternity had been established (line 6 of
the OCS-157), children whose fathers were identified on their

80

birth certificates. Ex. RI-4, at 5. Birth records containing
paternity data for these children were not in Rhode Island's
automated IV-D system or IV-D case files and were located after
Rhode Island's IV-D agency referred the ACF auditors to the IV-A
agency, which had some birth records that had not been
transferred to the IV-D agency. Birth records for other excluded
children were found through "the IV-D/Vital records interface."
Id.

Rhode Island does not dispute that paternity of these children
had been established, based on the birth certificates. Instead,
Rhode Island argues that data errors should not be assessed
because its IV-D agency did not have the birth certificates and
was thus unaware that the children's paternity had been
established when it submitted Rhode Island's FY 2002 data. Rhode
Island argues that ACF was wrong to utilize those records because
"reliable data" is limited to "the most recent data available"
that are reliable. 45 C.F.R. § 305.1(i). Rhode Island asserts
that its PEP data for FY 2002 would have met the data reliability
standard if the auditors had limited their review to information
that was available to the IV-D agency when it submitted the FY
2002 data. Rhode Island also argues that the regulations do not
provide for ACF to use information held by third parties in
assessing the reliability of data. Rhode Island further argues
that ACF would have been unable to assess errors if Rhode
Island's IV-D agency had refused to retrieve the birth
certificates and that Rhode Island is thus being penalized for
cooperating with the audit. Rhode Island Supp. Br. at 7. In its
comments on ACF's draft FY 2002 DRA report, Rhode Island
described the ongoing and "frustrating" difficulties its IV-D
agency encountered in attempting to obtain information from its
IV-A agency, efforts which at that time had not come to fruition.
Ex. RI-5, at 2-3.

Rhode Island does not argue that the materials ACF consulted did
not exist at the time that Rhode Island submitted its data for FY
2002, and has not established that the information was not
available at the time that Rhode Island submitted its OCSE-157.
That some of these materials (birth certificates) were in
possession of Rhode Island's IV-A agency but had not been
obtained by its IV-D agency did not mean that they were not
available. The record indicates that Rhode Island was aware that
its IV-A agency likely possessed information that it needed to
assure that its IV-D data were reliable. Personnel of Rhode
Island's IV-D agency told the ACF auditors where they could
obtain this information. Ex. RI-4, at 5.

81

We do not agree with Rhode Island that its IV-A agency was a "third party" from which ACF was not authorized to obtain information during the DRA (Part 305 does not forbid ACF from utilizing information from third-party sources). In other contexts, as noted earlier, the Board has held that a state as a whole must be viewed as a single unit responsible for the administration of grant programs. That principle is applicable here, where it is not disputed that the needed records were within Rhode Island's possession.

A state's difficulty in sharing information among components of its executive branch does not permit it to avoid its responsibility to submit reliable data on a timely basis. The regulations outlining the requirements for state computerized support enforcement systems require those systems to be able to share information with other state agencies, including those administering programs under titles IV-A. 45 C.F.R. § 307.11(b), (f). Additionally, Rhode Island's arguments about the difficulty it had obtaining birth certificates do not explain its failure to utilize the information that ACF reported obtaining from the IV-D/Vital records interface. Ex. RI-4, at 5. Clearly that information was available not only to the state as a whole, but to the IV-D agency.

Thus, we conclude that it was proper for ACF to obtain from Rhode Island's IV-A agency the information that it needed to assess the reliability of Rhode Island's IV-D data.

C. We do not rule on Rhode Island's dispute of ACF's FY 2002 error determinations for two children.

Rhode Island disputes ACF's determination that Rhode Island improperly included, among the total of children in IV-D cases who were born out of wedlock (line 5 of the OCSE-157 for FY 2002), two children who were born in wedlock. Rhode Island asserts it was justified in classifying these two twin children as having been born out of wedlock because a court had determined that the father who was listed on the birth certificates and had been married to the mother at the time of birth was not their biological father, and because the mother had identified a different man as their biological father when she applied for IV-A benefits. ACF asserts that the court ruling that Rhode Island cites was insufficient under Rhode Island law to rebut the presumption of paternity that applied to the father listed on the birth certificates.

ACF acknowledges that a determination that the two children were born out of wedlock would cause the data that Rhode Island

82

reported at line 5 of the OCSE-157 for FY 2002 to meet the data reliability standard, but asserts that Rhode Island would still be subject to a penalty for FYs 2001 and 2002 based on two years of unreliable PEP data, because its data at line 6 the OCSE-157 for FY 2002 still failed to meet the data reliability standard. ACF Response to Rhode Island Supp. Br. at 16. Rhode Island does not dispute that conclusion. Accordingly, it is not necessary for us to rule on ACF's determination that these two children should have been reported as having been born in wedlock.

However, reversal of the unreliability finding for line 5 could affect a subsequent penalty that ACF has assessed for FY 2003, on the basis that the unreliability of line 5 data from FY 2002 prevented ACF from calculating Rhode Island's PEP for FY 2003. ACF assessed that penalty in a letter dated February 17, 2005, and Rhode Island's appeal of that penalty has been assigned Board Docket No. A-05-47 and stayed pending this decision. The parties may in that appeal fully address ACF's determination that the two children should not have been included in the data that Rhode Island reported at line 5 of its OCSE-157 for FY 2002 and whether reversal of that determination would affect the penalty assessed on Rhode Island for FY 2003.

Accordingly, we sustain the determination that Rhode Island is subject to a penalty.

Conclusion

After fully considering the common issues and the issues raised by individual States' appeals, we sustain the penalties in full for all nine States.


Judith A. Ballard

Cecilia Sparks Ford

Donald F. Garrett
Presiding Board Member