# ATTACHMENT 2

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

## Appellate Division

SUBJECT:  Indiana Family and Social         DATE:  October 26, 2005
          Services Administration
          Docket No. A-04-56
          Decision No. 2001

## DECISION

The Indiana Family and Social Services Administration (Indiana)
appeals a determination by the Administration for Children and
Families (ACF), dated November 14, 2003.  ACF determined that
Indiana is subject to a penalty for failure to demonstrate that,
for fiscal years (FYs) 2001 and 2002, its child support
enforcement program under title IV-D of the Social Security Act
(Act) met performance standards relating to the establishment of
paternity of children who were born out of wedlock.  The penalty
is $1,447,594, one percent of the amount of federal funding that
Indiana received for FY 2001 under the Temporary Assistance for
Needy Families program (TANF) established by title IV-A of the
Act, and was imposed by reducing the TANF funding that Indiana
received during FY 2004.

For the reasons discussed below, we sustain ACF's determination
that Indiana is subject to a penalty.  The Board previously
addressed many of the issues presented in this appeal in Alabama
Dept. of Human Resources, et al., DAB No. 1989 (2005).  The Board
there upheld ACF's determinations, also announced in letters
dated November 14, 2003, that nine States were subject to
penalties for failure to demonstrate that their child support
enforcement programs met performance standards during FYs 2001
and 2002.  Based on the analysis in DAB No. 1989, the Board also
upheld ACF's determinations that two other states were subject to
penalties for FYs 2001 and 2002, in Puerto Rico Dept. of the
Family, DAB No. 1993 (2005) and Nevada Dept. of Human Resources,
DAB No. 1995 (2005).

Our decision summarizes and adopts our analysis in DAB No. 1989,
and explains why additional issues Indiana raises do not provide
a basis for overturning the penalty.  Indiana is properly subject

2

to a penalty because it failed to submit reliable data needed to
calculate its performance for FYs 2001 and 2002. A state's
obligation to submit reliable data needed to calculate
performance is an important aspect of the IV-D system, which
imposes penalties for unreliable data without regard to whether
the state met the required level of performance. Thus, Indiana's
arguments (which Indiana did not substantiate in any event) that
the unreliability of its data was due to data entry errors that
did not evidence any failure to provide IV-D services provide no
basis to reverse the penalty, and do not entitle Indiana to have
the unreliability excused, pursuant to ACF's authority in certain
circumstances to disregard data unreliability that is technical
in nature. Moreover, contrary to what Indiana argues, ACF
complied with applicable notice requirements. Proposed statutory
changes that would have changed the notice requirements were
never enacted, so we and ACF must apply the provisions as in
effect. We must also apply regulations prescribing the methods
for determining performance and data reliability and initiating
the penalty process. Indiana has failed to demonstrate that
these provisions are not applicable and do not support the
penalty here.

Summary of the applicable law

Title IV-A of the Act (sections 401-419; 42 U.S.C. §§ 601-619),
"Block Grants to States for Temporary Assistance for Needy
Families" (the TANF program), provides grants to eligible states
that have approved programs for providing assistance to needy
families with children, and for providing their parents with job
preparation, work and support services to enable them to leave
the program and become self-sufficient. Sections 401, 402 of the
Act. To receive TANF funds, a state must operate a child support
enforcement program consistent with title IV-D of the Act.
Section 402(a)(2) of the Act. Title IV-D (sections 451-469B; 42
U.S.C. §§ 651-669b) is a cooperative federal-state program that
aims at increasing the effectiveness of child support collection
by such measures as locating absent parents, establishing
paternity, obtaining child and spousal support, and assuring that
assistance in obtaining support is available to all children for
whom such assistance is requested. Maryland Dept. of Human
Resources, DAB No. 1875 (2003), citing section 451 of the Act.
States operate their child support enforcement programs subject
to oversight by ACF's Office of Child Support Enforcement (OCSE).
We refer in this decision to ACF as the respondent federal
agency; the IV-D regulations refer to OCSE.

Titles IV-A and IV-D and regulations at 45 C.F.R. Part 305 create
a system of incentives and penalties under which federal TANF

3

funds are awarded to or withheld from states based on scores they achieve on several IV-D performance measures. The performance measure at issue here is called the "paternity establishment percentage" (PEP). It measures a state's performance at establishing the paternity of children born out of wedlock. (There are five performance measures used to award incentives, of which three are also used to impose penalties.) ACF determines a state's level of performance based on data that the state submits, using a form prescribed by ACF. States are assessed on their performances for each federal fiscal year (FY or FFY), which runs from October 1 through September 30. 45 C.F.R. § 305.32. States must submit complete and reliable performance data for each fiscal year by December 31 following the end of the fiscal year, and only data submitted by that date will be used to determine the state's performance for that fiscal year. 45 C.F.R. § 305.32(f).

ACF conducts data reliability audits, or DRAs, to determine if the data that the state submits for a fiscal year are complete and reliable; the data must meet a 95% standard of reliability. 45 C.F.R. § 305.1(i). (For convenience, in this decision we refer to the complete and reliable data that states must submit simply as reliable data.) ACF may disregard the unreliability of data and treat the data as adequate if it determines that the unreliability is of a technical nature that does not affect calculation of the state's IV-D performance measures. Section 409(a)(8)(C) of the Act; 45 C.F.R. § 305.62. In December 2001, ACF used that authority to accept all unreliable FY 2000 data, which was submitted by 23 states, including Indiana. Indiana Appeal (App.) File at 20-22.

As we concluded in DAB No. 1989, the Act and regulations provide for imposing a penalty on a state that, for two consecutive years, fails to demonstrate with reliable data that it achieved the required PEP. Thus, a state is subject to a penalty if, for two consecutive years, it fails either to achieve the required PEP, or to submit reliable data needed to calculate its PEP. (A third basis for a penalty, in addition to failing a IV-D penalty performance measure such as the PEP or submitting unreliable data, is failure to substantially comply with the requirements of the IV-D program. That basis is not at issue here, where the penalty is based on the unreliability of Indiana's PEP data.)

ACF imposed the penalty against Indiana pursuant to section 409 of the Act, titled "Penalties." Section 409(a) provides for TANF penalties against states, for some 14 categories of noncompliance with various requirements imposed by title IV, mostly relating to

4

a state's TANF program under title IV-A.[1] At issue here is
section 409(a)(8) of the Act, which imposes the IV-D performance
penalties.  Section 409(a)(8) provides in relevant part as
follows:

> (8) NONCOMPLIANCE OF STATE CHILD SUPPORT
> ENFORCEMENT PROGRAM WITH REQUIREMENTS OF PART D.—
> (A) IN GENERAL.—If the Secretary finds, with
> respect to a State's program under part D, in a
> fiscal year beginning on or after October 1,
> 1997—
> (i) . . . that the State program failed to
> achieve the paternity establishment
> percentages . . . or to meet other
> performance measures that may be established
> by the Secretary;
> (II) . . . that the State data submitted
> pursuant to section 454(15)(B) is incomplete
> or unreliable; or
> (III) . . . that a State failed to
> substantially comply with 1 or more of the
> requirements of part D . . . and
> (ii) that, with respect to the succeeding
> fiscal year—
> (I) the State failed to take sufficient
> corrective action to achieve the
> appropriate performance levels or
> compliance as described in subparagraph
> (A)(i); or
> (II) the data submitted by the State
> . . . is incomplete or unreliable; the
> amounts otherwise payable to the State
> under this part . . . prior to quarters
> following the end of the first quarter
> throughout which the State program has
> achieved the paternity establishment
> percentages or other performance measures
> as described in subparagraph (A)(i)(I),
> or is in substantial compliance with 1 or
> more of the requirements of part D as
> described in subparagraph (A)(i)(III), as
> appropriate, shall be reduced . . . .

---

[1] Those other penalties may be combined with IV-D
penalties to increase the total amount of the reduction in a
state's TANF funding.  Those other penalties are not at issue
here.

5

For some other violations listed at section 409(a), the Secretary may not impose a penalty if he finds that there was reasonable cause for the violation, and must afford a state the opportunity to enter into a corrective compliance plan prior to imposing a penalty. Notably, section 409 withholds those ameliorative measures from the title IV-D penalties at issue here. Sections 409(b),(c) of the Act.

The regulation implementing the IV-D penalty provisions refers to failure to achieve the paternity establishment percentage as well as two other penalty performance measures created by the regulations. These measures, not at issue here, assess a state's performance at establishing orders of support and at collecting support in IV-D cases. The regulation provides in relevant part as follows:

> (a) A State will be subject to a financial penalty and the amounts otherwise payable to the State under title IV-A of the Act will be reduced in accordance with § 305.66:
> (1) If . . . :
> (i) . . . the State's program failed to achieve the paternity establishment percentages . . . or to meet the support order establishment and current collections performance measures . . . or
> (ii) . . . the State did not submit complete and reliable data . . . or
> (iii) . . . the State failed to substantially comply with one or more of the requirements of the IV-D program . . . and
> (2) With respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable.

45 C.F.R. § 305.61.

In the preamble to the Part 305 regulations, which was forwarded to the states as part of Action Transmittal OCSE-AT-01-01, ACF referred to the first of the two consecutive years of failure as the performance year. 65 Fed. Reg. 82,178, 82,186, 82,187, 87,189 (Dec. 27, 2000). In this appeal the performance year was FY 2001, and the corrective action year was FY 2002.

The penalties consist of reductions in the annual TANF funding that a state receives under title IV-A of the Act, called the

6

State Family Assistance Grant (SFAG).  (The SFAG is the amount of
each basic block grant allocated to each eligible state under the
formula at section 403(a)(1) of the Act.  45 C.F.R. § 260.30.)
The penalties range from one to two percent of a state's SFAG for
the first finding of two consecutive years of failure, from two
to three percent for the second consecutive finding, and from
three to five percent for each subsequent consecutive finding.
Section 409(a)(8)(B) of the Act; 45 C.F.R. § 305.61(c).  A state
must expend additional state funds to replace any reduction in
the SFAG resulting from penalties.  Section 409(a)(12) of the
Act; 45 C.F.R. § 262.1(e).  A state may appeal a decision
imposing penalties to the Board.  45 C.F.R. §§ 262.7,
305.66(b)(2).

The performance measure at issue here, the paternity
establishment percentage, is essentially the percentage of
children born out of wedlock for whom paternity has been
established or acknowledged; it is "commonly known as the PEP."
45 C.F.R. § 305.2(a)(1).  The Act and the regulations at Part 305
establish two versions of the PEP, one based on children in a
state's IV-D caseload, the other based on all children in the
state.  States may select either measure and may change their
selection from year to year.  Id.; section 452(g)(1) of the Act.
Indiana selected the "IV-D PEP," which is based on the caseload
of a state's IV-D program and is defined as follows:

> [T]he term "IV-D paternity establishment
> percentage" means, with respect to a State for a
> fiscal year, the ratio (expressed as a percentage)
> that the total number of children—
> > (i) who have been born out of wedlock,
> > (ii)(I) except as provided in the last
> > sentence of this paragraph, with respect to
> > whom assistance is being provided under the
> > State program funded under part A in the fiscal
> > year or, at the option of the State, as of the
> > end of such year, or (II) with respect to whom
> > services are being provided under the State's
> > plan approved under this part in the fiscal
> > year or, at the option of the State, as of the
> > end of such year pursuant to an application
> > submitted under section 454(4)(A)(ii), and
> > (iii) of whom paternity has been
> > established or acknowledged,
> bears to the total number of children born out of
> wedlock and (except as provided in such last
> sentence) with respect to whom assistance was being
> provided under the State program funded under part A

7

as of the end of the preceding fiscal year or with
respect to whom services were being provided under
the State's plan approved under this part as of the
end of the preceding fiscal year pursuant to an
application submitted under section 454(4)(A)(ii);

. . . .

Section 452(g)(2)(A) of the Act. The regulation expresses the
IV-D PEP with the following ratio:

> Total # of Children in IV-D Caseload in the Fiscal
> Year or, at the option of the State, as of the end
> of the Fiscal Year who were Born Out-of-Wedlock with
> Paternity Established or Acknowledged
> _____
> Total # of Children in IV-D Caseload as of the end
> of the preceding Fiscal Year who were Born
> Out-of-Wedlock

45 C.F.R. § 305.2(a)(1).

A state must maintain a PEP of at least 90% to avoid a penalty.
A state with a PEP lower than 90% may still avoid a penalty if
its PEP increased over the PEP for the previous year by the
percentages specified in the following table from the regulation:

| PEP | Increase required over previous year's PEP | Penalty FOR FIRST FAILURE if increase not met |
|-----|-----|-----|
| 90% or more .......... | None | No Penalty. |
| 75% to 89% .......... | 2% | 1-2% TANF Funds. |
| 50% to 74% .......... | 3% | 1-2% TANF Funds. |
| 45% to 49% .......... | 4% | 1-2% TANF Funds. |
| 40% to 44% .......... | 5% | 1-2% TANF Funds. |
| 39% or less .......... | 6% | 1-2% TANF Funds. |

45 C.F.R. § 305.40(a)(1), Table 4.

Basis for the penalty

ACF notified Indiana that it is subject to a penalty in a letter
from the Assistant Secretary for Children and Families dated
November 14, 2003. The letter stated that the PEP data that
Indiana submitted for FYs 2001 and 2002 failed to meet the data
reliability standard, and that Indiana was thus subject to a
reduction in TANF funding of $1,447,594, one percent of its

8

adjusted SFAG for the TANF program for FY 2001.[2]  Indiana App.
File at 53-55.  The DRA reports of ACF's audits of Indiana's data
submissions for FYs 2001 and 2002 show that ACF had found
Indiana's data to be unreliable because data on the number of
children in Indiana's IV-D caseload who were born out of wedlock
or whose paternities had been established were missing some
children who should have been included, and included others who
were born in wedlock or whose paternities had not been
established.  Indiana App. File at 23-34, 42-52.  ACF
subsequently informed Indiana that the funding reductions would
begin during 2004, because states had not been notified of their
penalties until after the start of FY 2004.  Indiana App. File at
57-58.

Arguments and analysis

Indiana does not dispute ACF's determination that it submitted
unreliable data for the PEP performance measure for FYs 2001 and
2002, the basis for the determination that it is subject to a
penalty.  Instead, Indiana argues that ACF failed to notify
Indiana of its unreliable data as required by the regulations,
depriving Indiana of the full corrective action year to which it
was entitled before being subject to a penalty.  Indiana also
argues that ACF should have accepted Indiana's data pursuant to
its authority to accept unreliable data if it finds that the
unreliability is of a technical nature that does not affect
calculation of a state's performance measures, and that it is
unfair to subject Indiana to a penalty solely because its data
failed to satisfy the 95% standard for data reliability.  Indiana
asserts that its data errors did not evidence any failure to
deliver IV-D services or errors in case records supporting its
computerized data, and that its efforts to correct and improve
its IV-D data have increased the overall reliability of its IV-D
data from FY 2000 to FY 2002.

    I.   ACF complied with applicable notice requirements.

Indiana argues that the penalty should be reversed because ACF
failed to afford Indiana the automatic one-year corrective action

_____

    [2]  The November 14, 2003 letter also indicates that
Indiana submitted unreliable FY 2001 data related to the Support
Order Establishment and the Arrearage Collections performance
measures.  However, because Indiana submitted reliable FY 2002
data on those two performance measures, its submission of
unreliable FY 2001 data on those measures is not at issue here.
Indiana App. File at 42-52 (FY 2002 DRA report).

9

period that the regulations provide for states to correct
unreliable data or deficient performance before being subject to
a penalty.  Indiana argues that ACF's November 14, 2003 letter
informing Indiana of the penalty was deficient because it did not
permit Indiana the opportunity to enter into a corrective action
plan, or to receive direction on corrective processes from ACF,
before the imposition of a penalty.  Indiana also notes that ACF
did not issue its final DRA report on the reliability of
Indiana's data for FY 2001 until July 30, 2002, and that Indiana
did not have a full year to take corrective action before having
to submit data for FY 2002.  Indiana argues that it is
fundamentally unfair and a deprivation of due process to impose a
penalty on Indiana when these statutory and regulatory conditions
precedent to the imposition of a penalty have not been satisfied.

Indiana notes that the applicable regulations are silent on the
matter of timeliness of notice letters, and points out that for
other TANF penalties at section 409(a)(8), there are a series of
steps prior to a penalty, including the submission of a
corrective compliance plan.  Indiana Brief (Br.) at 9.  Indiana
argues that it should have been provided a similar opportunity
here.

The regulation outlining when a state is subject to a penalty,
and the notice ACF must furnish, provides as follows:

> (a) **If a State is found by the Secretary to be
> subject to a penalty** as described in § 305.61 of
> this part, the OCSE will notify the State in writing
> of such finding.
> (b) The notice will:
> (1) Explain the deficiency or deficiencies which
> result in the State being subject to a penalty,
> indicate the amount of the potential penalty, and
> give reasons for the finding; and
> (2) Specify that the penalty will be assessed in
> accordance with the provisions of 45 C.F.R.
> § 262.1(b) through (e) and 262.7 if the State is
> found to have **failed to correct the deficiency or
> deficiencies cited in the notice during the
> automatic corrective action year (i.e., the
> succeeding fiscal year following the year with
> respect to which the deficiency occurred.)**
> (c) The penalty under § 305.61 of this part will
> be assessed if the Secretary determines that the
> State has not corrected the deficiency or
> deficiencies cited in the notice by the end of the
> corrective action year.

10

> (d) Only one corrective action period is provided
> to a State with respect to a given deficiency where
> consecutive findings of noncompliance are made with
> respect to that deficiency.  In the case of a State
> against which the penalty is assessed and which
> failed to correct the deficiency or deficiencies
> cited in the notice by the end of the corrective
> action year, **the penalty will be effective for any**
> **quarter after the end of the corrective action year**
> and ends for the first full quarter throughout which
> the State IV-D program is determined to have
> corrected the deficiency or deficiencies cited in
> the notice.
>
> (e) A consecutive finding occurs only when the
> State does not meet the same criterion or criteria
> cited in the notice in paragraph (a) of this
> section.

45 C.F.R. § 305.66 (emphasis added).

In its brief, Indiana cited 45 C.F.R. § 305.42, which phased in
the IV-D performance penalties, and also refers to an automatic
corrective action year:

> States are subject to the performance penalties
> described in § 305.40 based on data reported for FY
> 2001.  Data reported for FY 2000 will be used as a
> base year to determine improvements in performance
> during FY 2001.  There will be an automatic one-year
> corrective action period before any penalty is
> assessed.  The penalties will be assessed and then
> suspended during the corrective action period.

Indiana's arguments about the notice regulation are similar to
those that the States made in DAB No. 1989.  There, we held that
the law and regulations do not require notice of a state's IV-D
data or performance failures prior to the beginning of the
corrective action year, and that the penalty process is self-
implementing in that the corrective action year automatically
follows the performance year without notice from ACF.  We further
held that the structure of the system established by section 409
of the Act and the Part 305 regulations necessarily does not
permit states a full year following notice of their
performance-year failures before the imposition of penalties upon
the end of the corrective action year.  We concluded that these
provisions place on a state the ultimate responsibility for
monitoring its own performance, and that the States were aware of
their own performances and moreover had been informed of their

11

data reliability problems during FY 2002, the corrective action year. Our reasons for so holding and for determining that Indiana's arguments lack merit as well are as follows:

- The notice requirements of section 305.66 apply if a state is found to be "subject to a penalty as described in § 305.61 . . . ." Section 305.61 provides that a state will be "subject to a financial penalty," and the amounts otherwise payable to it under title IV-A will be reduced, upon the completion of two consecutive years of noncompliance or unreliable data relating to the same performance measure. A state is thus not subject to a penalty, and the notice requirements of section 305.66 do not apply, until the completion of two consecutive years of noncompliance. Similarly, the Act provides for penalties if the Secretary finds that a state failed to attain the required level of performance in the same penalty performance measure, submitted unreliable data needed to calculate performance, or failed to substantially comply with the requirements of the IV-D program, and **"that, with respect to the succeeding fiscal year,"** the state failed to take sufficient corrective action to achieve the appropriate performance levels or compliance, or submitted unreliable data. Section 409(a)(8)(A) of the Act (emphasis added). That has happened here. Section 409(a)(8) makes no reference to notice being required to commence the second of the two consecutive years for which deficient performance or unreliable data will subject a state to a penalty. Thus, ACF is not required to notify a state that it is subject to penalties until after the end of two consecutive years of deficient performance or unreliable data.

- The conditional nature of some of the language in section 305.66, such as its reference to "potential penalties," likely reflects its incorporation of selected regulations from 45 C.F.R. Part 262 that concern some of the penalties listed in section 409(a) of the Act, other than the IV-D penalties at section 409(a)(8) that are at issue here. Part 262 addresses the collection of multiple penalties, the maximum reduction that may be made in a state's SFAG, and the right to appeal penalty determinations to the Board. 45 C.F.R. §§ 262.1(b)-(e), 262.7. A IV-D penalty to which a state is subject following two years of unreliable data or deficient IV-D performance is a potential penalty because it is subject to these provisions before the actual amount of the reduction to be taken in a state's SFAG is determined. The November 14,

12

2003 letter noted these other provisions, stating that the
announced penalty "will be imposed in accordance with the
provisions of 45 C.F.R. § 262.1(b) through (e) . . . . ."
Indiana App. File at 53-55. However, there is no
indication here that the penalty is to be combined with
penalties under other portions of section 409(a), or
exceeds the maximum reduction that may be taken in a
state's SFAG. In the absence of multiple penalties, ACF
could inform Indiana of the amount of its SFAG reduction
in the November 14, 2003 letter issued pursuant to section
305.66, as it did.

- The structure of the penalty system necessarily does not
  permit the start of the corrective action year to be
  conditioned on notice from ACF of performance-year
  deficiencies, and does not afford a state a full year
  following notice to correct its deficiencies before being
  subject to penalties. A state has until December 31st to
  submit its data relating to performance in a given fiscal
  year, which ends on the previous September 30th. 45 C.F.R.
  § 305.32(f). This deadline is approximately 90 days into
  the immediately succeeding corrective action year and does
  not permit review of the data and notification of findings
  in time for the state to have a full year to take
  corrective action. Language from the preamble to the
  notice regulation confirms that the decision that a state
  is subject to a penalty is a determination that "will be
  made as soon as possible after the end of the corrective
  action year." 65 Fed. Reg. 82,192.

- The Act's only requirement of notice regarding the
  penalties in section 409(a) is in section 410. Section
  410(a) requires the Secretary to notify the chief
  executive officer of the state of any adverse action,
  including any action with respect to the imposition of a
  penalty under section 409, within 5 days after the date
  the Secretary takes such adverse action. This section
  makes no reference to notice prior to the time that ACF
  determines that a state is subject to a penalty.

- Section 409 of the Act withholds from a state
  opportunities to avoid a IV-D penalty that it affords for
  some of the other penalties listed in section 409(a),
  which primarily concern compliance with requirements for
  the operation of a state's TANF program under title IV-A.
  Section 409(b) forbids the Secretary from imposing some of
  those other penalties if he finds that there was
  reasonable cause for the noncompliance, and section 409(c)

13

grants states the opportunity to avoid a penalty by
achieving compliance pursuant to a corrective compliance
plan that the state develops subject to ACF's approval.
However, those ameliorative measures "do not apply" to any
penalty under section 409(a)(8) (or to five more of the
fourteen enumerated penalties listed in section 409(a)).
Sections 409(b)(2), (c)(4) of the Act.  The inapplicability
of the corrective compliance plan process to IV-D
penalties underscores the self-implementing nature of the
IV-D penalty process, which is not dependent on
intermediate action by ACF (such as approving a corrective
compliance plan or providing a state notice of its
performance failures) before the commencement of the
automatic corrective action year.

Indiana argues that although the regulations are silent on
the question of timeliness of notice letters, and the
right to submit a corrective compliance plan is "not
mandatory" with respect to IV-D penalties, ACF should have
provided that opportunity, because ACF's process for
notifying Indiana that its data were not reliable denied
Indiana the automatic one-year corrective action period to
which it is entitled by the regulations.  Indiana Br. at
9-10.  However, rather than making the corrective
compliance plan procedures optional for IV-D penalties or
remaining silent on their application, section 409
explicitly withholds them from IV-D penalties.[3]  Moreover,
the penalties for which corrective action plan procedures
are available may be imposed after only a single year of
failure, rather than the two consecutive years for which a
state is subject to IV-D penalties.  Sections
409(a)(1)-(5), (11), (14) of the Act.  ACF was thus
reasonable in implementing a IV-D penalty system that
affords states the opportunity to remedy deficiencies

_____

[3]  States formerly had the opportunity to submit a
corrective action plan with respect to IV-D penalties under
former section 403(h)(1) of the Act.  As amended by the Child
Support Enforcement Amendments of 1984, Public Law No. 98-378,
that section mandated reductions in federal funding for a state's
AFDC program if the state was found not to have complied
substantially with IV-D requirements.  Rather than directing the
immediate imposition of a penalty on a state that failed an audit
for the first time, the statute provided that the penalty could
be suspended while the state was given an opportunity to achieve
compliance through a corrective action plan approved by ACF.
Former section 403(h)(2)(A)-(C) of the Act.

14

prior to being penalized, but holds them responsible for
monitoring their own data and performances and taking
whatever actions are necessary to achieve compliance after
a year of failing data or performance.  We note that Part
305 affords a state the opportunity to comment on draft
audit reports, giving the state some notice of problems
that may lead to a penalty and an opportunity to present
its views before a determination is made that the state is
subject to a penalty.  45 C.F.R. § 305.64.

The self-implementing nature of the penalty system is
confirmed by a statement in ACF's November 14, 2003 letter
recognizing that states "do not have a full year to
correct deficiencies following the release of final DRA
reports."  The letter noted that Congress had been
considering a "technical fix" to the federal statute to
ensure that states receive a full year for corrective
action following notice of a deficiency, but that in the
absence of such an amendment there was no choice but to
impose penalties under current law until Congress enacts
legislation.  Indiana App. File at §3-55.  The States in
DAB No. 1989 cited these statements as showing that ACF
did not provide proper notice of FY 2001 deficiencies in
time for corrective action during FY 2002.  We held there
that the cited statement and the legislative history of
the subject amendment acknowledge that under the current
law the corrective action year commences automatically
after the performance year, without any action by ACF in
the form of audit reports or notices.  The amendment would
have "change[d] the corrective action year to the fiscal
year following the fiscal year in which the Secretary
makes a finding of noncompliance and recommends a
corrective action plan."  S. Rep. No. 108-162, at 53-54
(Oct. 3, 2003).  The reason for this proposal was that
"[c]urrent language does not recognize the time necessary
to conduct federal audits and that those audits now occur
during what is, under current law, a state's corrective
action year.  This technical correction will give states a
full year to correct identified deficiencies."  Id.  The
subject bill, H.R.4, 108th Cong., 1st Sess., as reported in
the Senate on October 3, 2003, was apparently never
brought to a vote.  150 Cong. Rec. S3520, S3529, S3538
(Apr. 1, 2004).  Indiana cited the Assistant Secretary's
language in the November 14, 2003 letter recognizing that
states do not have a full year to correct deficiencies
following the release of final DRA reports as showing that
Indiana was not given sufficient notice of its deficiency
and time to establish a corrective action plan.  However,

15

the subsequent legislative history confirms that the
aspects of the IV-D penalty system about which Indiana
complains are a product of the statute as written, which
ACF is bound to apply.

States are responsible for monitoring their own
performances and data reliability.  The Part 305 preamble
cautions that a state "should be continuously monitoring
its own performance and taking action to improve
performance which its own data shows may fail to achieve
the performance measures.  The state is also responsible
for maintaining proper procedures and controls to ensure
data reliability and completeness."  65 Fed. Reg. 82,192.
The preamble goes on to note that "the State should not
wait or rely upon the Secretary's determination of a data
or a performance deficiency in order to begin corrective
action.  Two consecutive years of failure (either poor
data or poor performance) in the same performance measure
criterion will trigger a penalty imposition."  Id.
Elsewhere, the preamble describes the automatic corrective
action period as a "delay which allows States to identify
and to correct either reporting or performance problems
prior to being assessed a financial penalty," and again
warns states that they "should be diligent in continuously
monitoring their own performance and data reliability."
65 Fed. Reg. 82,205.  Indiana argues that the preamble's
advice that states monitor their performance, which ACF
cited in the November 14, 2003 letter, was insufficient to
meet the statutory requirement for a corrective action
year.  However, as we found in DAB No. 1989, the statute
and regulation do not require notice from ACF to begin the
corrective action year.  The preamble simply reminds
states that the self-implementing nature of the penalty
system requires them to maintain sufficient awareness of
their IV-D data and performances to be able to take
corrective action, without awaiting notification from ACF
that they are at risk of being found subject to penalties.[4]

---

[4]  In February 2000, ACF provided states with a draft
version of its "Guide for Auditing Data Reliability."  ACF Ex. 2.
ACF sent the final version of the guide to states with "Dear
Colleague" letter DC-02-07, dated April 1, 2002.  ACF reports
that it provided states with the audit guide so that they could
perform their own audits at any time to identify and correct
deficiencies.  ACF Br. at 24, n.20.  Indiana reports that it
received the audit guide, but that it never received what it
(continued...)

16

States moreover are aware of their own performances because they are responsible for submitting the data used to calculate their performances and can perform the calculations themselves. They are aware of whether their data for a fiscal year are reliable because they receive draft and final DRA reports during the following calendar year, and are entitled to audit exit conferences at the conclusion of audit fieldwork. 45 C.F.R. § 305.64(b). In DAB No. 1989, we noted that the States had time periods ranging from four to seven months following release of the FY 2001 DRA reports (and from six to eight months following release of the draft reports), to correct any data reliability problems prior to submitting their FY 2002 data, which were due December 31, 2002. Here, ACF's DRA report on Indiana's data submission for FY 2001 was dated July 30, 2002 (the draft DRA report that ACF issued and on which Indiana provided comments is not in the record). Indiana App. File at 23-41. The record shows that Indiana was aware of problems in its FY 2001 PEP data prior to its receipt of the final DRA report for that year. An internal Indiana e-mail dated June 11, 2002 notes that Indiana faced a possible penalty of up to $20 million based on incorrect data in its computerized IV-D system, and that those data "must be 'cleaned up' by September 30 of this year." Indiana App. File at 89. The automatic commencement of the automatic corrective action year for FY 2001 deficiencies did not deprive Indiana of the opportunity to attempt to remedy its data reliability problems. Moreover, as we note in the next section of this decision, Indiana did succeed in correcting those problems with respect to data used for performance measures other than the PEP.

See DAB No. 1989, at 11-26.

For the above reasons, we conclude that ACF complied with the applicable notice requirements in determining that Indiana is subject to a penalty.

---

[4](...continued) calls the Data Reliability Audit Working Guide. Indiana App. File at 98. Since we base our finding that states were provided notice of the workings of the IV-D penalty system on the statute, the Part 305 regulations, and the preamble to Part 305, and not on the audit guide, Indiana's assertion does not change our analysis.

17

II.   Indiana is properly subject to a penalty for failing
      to submit reliable PEP data for FYs 2001 and 2002.

Indiana next argues that it should not suffer a penalty solely
because its PEP data failed to meet the 95% standard of
reliability.  Indiana does not dispute ACF's findings that
Indiana's PEP data for FYs 2001 and 2002 failed to meet that
standard and were thus not reliable.  Instead, Indiana argues
that ACF should disregard the unreliability of its data because
it resulted from errors in its computerized data that were not
indicative of errors in the underlying case records or of any
failure to deliver needed IV-D services.  Indiana also argues
that the penalty is unfair in light of these aspects of the data
errors, the extent and success of Indiana's efforts to improve
its data, and the budgetary impact of a penalty.  These arguments
do not provide a basis to reverse ACF's determination that
Indiana is subject to a penalty.

                Background on Indiana's data

Indiana selected the IV-D PEP measure, which measures a state's
performance at establishing the paternity of children in its IV-D
caseload.  States using the IV-D PEP report data yearly at lines
5 and 6 of form OCSE-157, the Child Support Enforcement Annual
Data Report, pursuant to the requirement that they submit data
following instructions and formats as required by HHS.  45 C.F.R.
§ 305.32(f).  At line 5, states report the number of children in
IV-D cases open at the end of the fiscal year who were born out
of wedlock.  At line 6, they report the number of children born
out of wedlock in IV-D cases open during or at the end of the
fiscal year with paternity established or acknowledged.  Data are
produced by the single statewide automated IV-D data processing
and information retrieval system that each state must operate
with ACF's approval.  Section 454A of the Act; 45 C.F.R. Part
307.  Indiana's computerized IV-D system is called ISETS, the
Indiana Support Enforcement Tracking System.  Indiana Br. at 5;
Indiana App. File at 5.

To audit Indiana's line 5 data for FY 2001 (children in IV-D
cases open at the end of FY 2001 who were born out of wedlock),
ACF auditors reviewed records for a sample of 91 children and
identified 14 errors, for a data efficiency rate of 85% with a
95% confidence interval of 76% to 91%.  ACF determined that
Indiana wrongly omitted from line 5 seven children who were born
out of wedlock because of inaccurate or incomplete information in
their computer records.  The DRA report indicates that Indiana
should have included children at line 5 "if the Born-Out-of-

18

Wedlock (BOW) indicator has a Paternity Contested (P) or Born-Out-of-Wedlock (W) code." Indiana App. File at 30. The BOW indicator was blank for six children and in error for one child. ACF also determined that Indiana wrongly included seven children in its line 5 data, five from non-IV-D cases, and two others who were born in wedlock but whose records contained codes indicating that they were born out of wedlock. Indiana App. File at 29-31; see also 83-84 (Indiana directions for completing paternity information reports). To audit Indiana's line 6 data for FY 2001 (the number of children born out of wedlock in IV-D cases open during or at the end of FY 2001 with paternity established or acknowledged), ACF auditors reviewed records for a sample of 44 children and identified nine errors, for a data efficiency rate of 80%, with a 95% confidence interval of 65% to 90%. ACF determined that Indiana wrongly omitted five children whose paternities had been established, because the BOW indicator or the paternity disposition codes were blank or erroneous. Indiana also wrongly included four children, three who had not had their paternities established, and one child who was not part of a IV-D case.

For FY 2002, to audit Indiana's line 5 data, ACF reviewed records for 115 children and identified 22 errors, for an efficiency rate of 81% with a 95% confidence interval of 72% to 88%. ACF determined that Indiana wrongly omitted 15 children who were born out of wedlock because the BOW indicator was blank for two children and erroneous for 13 children, and that Indiana wrongly included seven children who were wrongly coded as having been born out of wedlock. For line 6, the auditors reviewed records for 89 children and identified 15 errors, for a data efficiency rate of 83%, with a 95% confidence interval of 74% to 90%. They determined that Indiana wrongly omitted 12 children whose paternities had been established, because paternity disposition codes were not completed for six children, erroneous BOW indicators were entered for four children, and paternities were not reported for two children due to a programming error. Indiana also wrongly included three children who were born in wedlock. Indiana App. File at 45-46.

Indiana does not dispute these DRA findings.

<u>Analysis of Indiana's data reliability arguments</u>

Indiana argues that ACF should disregard the unreliability of its PEP data as being of a technical nature because the data errors are not indicative of inaccuracies in the underlying IV-D case records, or of any failure by Indiana to deliver needed IV-D services including paternity establishment and child support

19

enforcement services.[5]  Indiana asserts that no parent or child
was harmed by discrepancies between written court documents and
the information recorded in ISETS.  Indiana also states that
there is no suggestion that it manipulated PEP data or ever
falsely claimed that it established paternities or that paternity
was not at issue in a given case.  Indiana also asserts that the
errors in its FY 2002 data did not evidence any failure to
deliver IV-D services because they tended to understate Indiana's
performance at establishing paternities.  Indiana Br. at 17-18.
Indiana argues that ACF abused its discretion by disregarding
data unreliability for FY 2000 but not for FYs 2001 or 2002,
where the unreliability for all three years resulted from the
same types of data errors.

Indiana reports that some of the data errors that the ACF
auditors discovered were caused by clerical staff in the offices
of Indiana county prosecutors, who incorrectly entered
information into ISETS, based on their review of documents from
legal proceedings including paternity establishments, marriage
dissolutions and child support enforcement actions.  Indiana
reports that staff sometimes incorrectly completed, or failed to
complete, the BOW indicators and paternity disposition codes in
the computerized records.  Some instances of missing or
incomplete BOW indicators from older records, Indiana believes,
are attributable to lack of a requirement prior to 1999 that IV-D
records indicate whether a child was born out of wedlock.
Indiana notes that prior to implementation of the new incentive
and penalty system, there was no requirement to provide data on
children who were born out of wedlock, and thus no need to record
that information in Indiana's computerized records.  Indiana
asserts that still other errors resulted from incomplete or
inaccurate information that Indiana received from applicants for
IV-D services who did not understand "the subtle legal
distinctions among the various factors that enter into the
paternity status determination."  Indiana Br. at 15.  Indiana
reports that under its law, a child's paternity is always subject

_____

     [5]  Indiana asserts that "[a]t the time the local county
prosecutor determined the paternity status of every child
considered in the sample on which the audit was based, Indiana's
paternity establishment data was reliable."  Indiana Br. at 13.
Given that Indiana does not dispute ACF's DRA findings, this
statement presumably means that records maintained by county
prosecutors accurately reflected the paternities of the children
in IV-D cases on which the prosecutors worked, and that data
errors were thus due to the entry of inaccurate information into
ISETS.

20

to challenge, even when the child was born in wedlock, and there is no substantive difference in how paternity is established for children born in and out of wedlock. Thus, Indiana asserts, it might potentially have to determine the paternity of every child in its IV-D database, and erroneously reporting a child as having been born out of wedlock does not mean that Indiana will not be required to establish that child's paternity.

Indiana also notes that it undertook extensive, successful efforts to improve the reliability of its data. Indiana reports that after failing the DRA for FY 2000, it formed a task force of six regional teams that included representatives from its child support bureau, local prosecutors' offices, and the staff that administer its programs under titles IV-A and IV-D. The task force analyzed IV-D cases that had failed the audit and identified some 180,000 problematic IV-D cases comprising three broad categories: cases resulting from conversion to the computer system, inappropriate Medicaid referrals, and cases with missing or illogical paternity information. They then took measures to correct the data, including completing a form for each case, correcting BOW information discrepancies, and making computer programming changes to close cases that had been incorrectly converted as IV-D cases in ISETS during the automated process of converting county records into the state system. Indiana states that by the time it submitted its data for FY 2002, it had physically reviewed approximately 144,000 original court case files at a cost of $254,000. Indiana Br. at 6-7.

Indiana reports that these efforts improved its data for all four of the performance measures for which its data were found to be unreliable for FY 2000, to the point where, for FY 2002, only the PEP data remained unreliable.[6] Indiana points out that the efficiency rate of its PEP data increased from 52% for FY 2000 to 82% for FY 2002 (these figures are apparently averages of the efficiency rates for lines 5 and 6), and argues that requiring a 43% increase in data accuracy over that time is unrealistic and

---

[6] While Indiana reports that it submitted unreliable data for four performance measures for FY 2000, the FY 2000 DRA report indicates that data for one of those measures, the Support Order Establishment performance measure, was not unreliable. Although the efficiency rates ACF calculated for the relevant data lines were below the 90% reliability standard used for FY 2000, the data were not considered unreliable because ACF could not conclude with at least 95% confidence that the actual efficiency rates were below 90%. Indiana App. File at 2-19; Indiana Br. at 5-6.

21

fails to consider the improvement Indiana has achieved.  Indiana
Br. at 17.  Indiana argues that it is unfair to reduce Indiana's
total TANF funding and require that Indiana make up for the
reduction with its own funds solely because Indiana's PEP data
failed to meet a 95% standard of data reliability.  Indiana
reports that it faces overwhelming financial burdens and did not
have sufficient notice to plan for the impact of the penalty,
because it operates on a two-year budget.  Indiana also requests
that instead of paying the penalty funds to the federal
government, it be permitted to pay the penalty funds to its Child
Support Bureau to be used to enhance the reliability of data in
its ISETS system.

None of these arguments justifies reversing the penalty or
requiring ACF to overlook the unreliability of Indiana's data.
The Board addressed similar circumstances and arguments in DAB
No. 1989, where we held that a state's inability to submit
reliable data was not rendered technical in nature simply because
it resulted from computer programming errors that might not have
been symptomatic of a failure to deliver IV-D services.  DAB No.
1989, at 78-79.  We reach the same holding here, for the reasons
discussed below.

The Secretary is authorized to find a state's unreliable data
adequate, if he determines that the extent of the unreliability
"is of a technical nature which does not adversely affect the
determination of the level of the State's paternity establishment
percentages . . . or other performance measures that may be
established by the Secretary."  Section 409(a)(8)(C)(ii) of the
Act.  The implementing regulation, titled "[d]isregard of a
failure which is of a technical nature," provides in relevant
part:

> A State subject to a penalty under
> § 305.61(a)(1)(ii) or (iii) of this part may be
> determined, as appropriate, to have submitted
> adequate data . . . if the Secretary determines that
> the incompleteness or unreliability of the data, or
> the noncompliance with one or more of the IV-D
> requirements, is of a technical nature which . . .
> does not adversely affect the determination of the
> level of the State's paternity establishment or
> other performance measures percentages.

45 C.F.R. § 305.62.

Indiana failed to demonstrate that it qualified for the
"technical nature" provision.  Indiana does not dispute the DRA

22

findings that Indiana wrongly omitted from its data some children who were born out of wedlock or whose paternities had been established, and wrongly included others who were born in wedlock or whose paternities had not been established, or who were not from IV-D cases.  Indiana does not allege that data unreliability resulting from its inaccurate information would not have adversely affected the calculation of its PEP, as required for ACF to accept the unreliable data.  Indiana also has not shown that the errors were so de minimis that they resulted in misstating its PEP by a only few hundredths or thousandths of a percent.  Indiana does not allege that the unreliable data, even if accepted by ACF, would have shown that Indiana achieved the required PEP performance level for either FY 2001 or 2002.  Instead, the data that Indiana submitted yields failing PEP scores for FY 2001 and FY 2002 of approximately 62% and 52%, respectively.[7]  45 C.F.R. § 305.40(a)(1), Table 4.  Disregard of the unreliability would have thus likely subjected Indiana to a penalty for deficient PEP performance.  Additionally, Indiana's assertion that the erroneous data did not evidence any failure to provide services appears to conflict with its explanation for some of the data errors.  Indiana explains that some data errors were caused by applicants for IV-D services who provided incorrect paternity information because they did not understand Indiana's paternity laws.  Indiana Br. at 15.  Inaccurate information in applications for services and other documents could affect whether applicants receive appropriate IV-D services and compromise the reliability of Indiana's PEP data.  Also, it is Indiana's responsibility to devise clear applications for IV-D services that elicit accurate information.

Indiana's arguments are also unavailing because the Act makes failure to submit reliable data a distinct basis for a penalty, apart from any consideration of whether the state might actually have passed the applicable performance measure.  Prior to enactment of the current penalty provisions at section 409(a)(8), states were subject to penalties for failure to comply

---

[7]   Indiana's PEP for FY 2001 is the ratio of the number it reported at line 6 of its OCSE-157 for FY 2001 (116,619) to the number it reported at line 5 of the OCSE-157 for FY 2000 (187,704), expressed as a percentage.  Its PEP for FY 2002 is similarly the ratio of the number it reported at line 6 of its OCSE-157 for FY 2002 (124,605) to the number it reported at line 5 of the OCSE-157 for FY 2001 (239,550).  While the actual OCSE-157s are not in the record, the data that Indiana reported on those forms are included as attachments to the DRA reports for each year.  Indiana App. File at 15, 35, 48.

23

substantially with requirements of title IV-D, but the Act did
not separately impose penalties for failure to submit reliable
data needed to calculate the performance levels. Former section
403(h) of the Act. By enacting the current IV-D penalty statute,
Congress signaled the importance of a state's responsibility for
providing reliable data. DAB No. 1989, at 30. As we observed in
DAB No. 1989, section 409(a)(8) regards a state's failure to
submit reliable data as equivalent to failing to achieve the
required performance levels. A state's obligation is not merely
to submit reliable data each year, but to demonstrate with
reliable data that it achieved the required level of performance
on the measures established by the statute and regulations. Id.,
at 41-43. That obligation is apparent from the Part 305
preamble, which provides that "[t]wo consecutive years of failure
(either poor data or poor performance) in the same performance
measure criterion will trigger a penalty imposition." 65 Fed.
Reg. 82,192. In the absence of reliable data, ACF was unable to
determine whether Indiana achieved a PEP level sufficient to earn
incentives or avoid penalties. In this regard, Indiana does not
allege that reliable, accurate data would have shown that Indiana
achieved the required PEP performance level for FY 2001 or FY
2002. Thus, Indiana's allegation that it provided required IV-D
services has no bearing on whether it is subject to a penalty for
failing to submit reliable data that ACF needed to determine the
level of Indiana's performance, and is moreover not readily
subject to verification in the absence of reliable data.

The importance of maintaining accurate data on computerized
systems as well as in individual case records is apparent from
the Act's requirement that each state operate a single automated
data processing and information retrieval system capable of
providing data needed to calculate the IV-D performance measures.
Sections 454(15)(B), 454(16), 454A, 458(b)(5)(B) of the Act. The
regulations echo the importance of such systems by requiring
states to maintain computerized systems that can control, account
for, and monitor all the factors in the support collection and
paternity determination processes, and by having provided federal
funding at enhanced rates of 80% and 90% in the costs of
developing and installing such systems. 45 C.F.R. §§ 307.5,
307.10, 307.30, 307.31. ACF's audits look not only at a state's
data, but also at a state's compliance with the requirements to
maintain automated systems. 45 C.F.R. § 305.60(c)(1). These
provisions informed states of the importance of maintaining
computerized systems capable of generating reliable data, so that
ACF may make incentive and penalty determinations based on data
submitted by a state without having to conduct physical reviews
of the underlying case records. DAB No. 1989, at 78-79.

24

Indiana's assertions that some data errors resulted from faulty
data entry and conversion of case records in ISETS, or may have
understated Indiana's performance at establishing paternities for
FY 2002, are also not grounds to disregard the unreliability of
Indiana's data. In DAB No. 1989, we held that the statute and
regulations do not distinguish among unreliable data based on
whether data errors improperly increase or decrease a state's
score on the penalty and incentive performance measures, and that
clerical and conversion errors that evidence serious
discrepancies between written documentation and computer records
call into question the reliability of the data for calculating
the state's performance. This is in part because the 95%
reliability standard reflects the requirement that errors not be
of a magnitude that would cause a reasonable person to doubt a
finding or conclusion made based on the data. 45 C.F.R.
§ 305.1(i). The emphasis of this requirement is on the magnitude
of the errors, as opposed to the type of errors. Data containing
enough errors to render them unreliable are not convincing for
the purpose of assuring that the performance calculation may be
relied upon as a reasonably accurate measure of a state's
performance, regardless of whether the errors might overstate or
understate performance. A high incidence of data errors of any
type increases the likelihood that there may be other errors that
go undetected and calls into question the reliability of the
entire body of state data. Excusing "understating" errors would
also result in states being able to pass the PEP performance
measure in succeeding years based on reported increases in
performance greater than the improvement that the state actually
achieved. DAB No. 1989, at 26-32. Additionally, Indiana did not
explain why provision of incorrect paternity information by
applicants for IV-D services would not have resulted in errors in
their individual case records.

ACF's use of the "technical nature" authority to accept all
unreliable FY 2000 data does not require it to accept Indiana's
unreliable PEP data for FY 2001 or FY 2002. ACF applied this
authority to accept unreliable FY 2000 data submitted by all of
the states with unreliable data for that year, including Indiana.
ACF announced this determination in substantively identical
letters to all states from the OCSE Commissioner dated December
19 or 27, 2001. See, e.g., Indiana App. File at 20-22; DAB No.
1989, at 29. The basis for that determination was that the new
incentive system was being phased in during FY 2000, and that
penalties based on state performance would not apply prior to
state performance in FY 2001. In DAB No. 1989, we found that
this determination was based on particular circumstances that did
not apply in subsequent years. Since penalties for IV-D
performance were not being imposed for years prior to FY 2001,

25

ACF had determined that the identified data reliability problems for FY 2000 did not affect performance measures, for purposes of any penalty that would have been based on unreliable data in FY 2000. That basis is not applicable here, where Indiana seeks to excuse the unreliability of its data for FY 2001 and FY 2002. DAB No. 1989, at 68.

Finally, Indiana's arguments that the penalty is inordinately burdensome and that it is unfair to reduce Indiana's TANF funding solely because its data failed to meet the 95% reliability standard do not provide any basis to reverse the penalty. The penalty amounts are specified in the statute and the 95% standard of data reliability is imposed by a regulation, both of which are applicable here. The Board is bound by all applicable laws and regulations and does not have the power to grant the equitable relief that Indiana seeks. 45 C.F.R. § 16.14, made applicable to appeals of section 409 penalties by 45 C.F.R. § 262.7(e). ACF was entitled to select a clear criterion for assessing data reliability, and the requirement that data meet the 95 percent reliability standard is unambiguous. For these reasons, it is not relevant that Indiana improved the reliability of its data, as its PEP data still failed to meet the 95% standard for two consecutive years. In contrast to the performance standards that permit a state with a failing PEP score to avoid a penalty by achieving specified improvements, the statute and regulations do not provide graduated standards for data reliability and do not permit a state to avoid a penalty based on improvements in otherwise unreliable data.

The financial hardship imposed by the penalty is similarly not relevant to our consideration of this appeal, or to any appeal of a penalty or disallowance where it is not included as a factor for consideration in the applicable statute or regulations. See, e.g., Latino Resource Organization, DAB No. 1974, at 6-7 (2005). As we noted in DAB No. 1989, the requirement that states spend their own funds to compensate for funding reductions due to penalties under section 409(a) is imposed by the statute and regulation, by which we are bound. Section 409(a)(12) of the Act; 45 C.F.R. § 262.1(e). Indiana provided no basis to ignore this requirement, and does not challenge ACF's determination of the amount of penalty, which is the minimum one percent provided in the statute. For these reasons, we are also unable to grant Indiana's request to pay the penalty funds not to ACF but to its Child Support Bureau to be used to enhance the reliability of data in its ISETS system. That request also conflicts with the statutory requirement that states pay penalties and use their own funds to prevent the payment of the penalty (through a reduction in TANF funding) from causing any decrease in TANF services.

26

Thus, for the reasons discussed above, Indiana's arguments about the causes of the errors in its PEP data and whether those errors reflect any failure to deliver IV-D services do not provide a basis to disregard the resulting unreliability of Indiana's data, or to reverse ACF's determination that Indiana is subject to a penalty for submitting unreliable PEP data for FYs 2001 and 2002.

<u>Conclusion</u>

For the reasons explained in our decision, we sustain the penalty in full.


_Judith A. Ballard_
Judith A. Ballard


_Cecilia Sparks Ford_
Cecilia Sparks Ford


_Donald F. Garrett_
Donald F. Garrett
Presiding Board Member