ATTACHMENT 2

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

## Appellate Division

SUBJECT:   Indiana Family and Social          DATE:   October 26, 2005
           Services Administration
           Docket No. A-04-56
           Decision No. 2001

## DECISION

The Indiana Family and Social Services Administration (Indiana) appeals a determination by the Administration for Children and Families (ACF), dated November 14, 2003. ACF determined that Indiana is subject to a penalty for failure to demonstrate that, for fiscal years (FYs) 2001 and 2002, its child support enforcement program under title IV-D of the Social Security Act (Act) met performance standards relating to the establishment of paternity of children who were born out of wedlock. The penalty is $1,447,594, one percent of the amount of federal funding that Indiana received for FY 2001 under the Temporary Assistance for Needy Families program (TANF) established by title IV-A of the Act, and was imposed by reducing the TANF funding that Indiana received during FY 2004.

For the reasons discussed below, we sustain ACF's determination that Indiana is subject to a penalty. The Board previously addressed many of the issues presented in this appeal in Alabama Dept. of Human Resources, et al., DAB No. 1989 (2005). The Board there upheld ACF's determinations, also announced in letters dated November 14, 2003, that nine States were subject to penalties for failure to demonstrate that their child support enforcement programs met performance standards during FYs 2001 and 2002. Based on the analysis in DAB No. 1989, the Board also upheld ACF's determinations that two other states were subject to penalties for FYs 2001 and 2002, in Puerto Rico Dept. of the Family, DAB No. 1993 (2005) and Nevada Dept. of Human Resources, DAB No. 1995 (2005).

Our decision summarizes and adopts our analysis in DAB No. 1989, and explains why additional issues Indiana raises do not provide a basis for overturning the penalty. Indiana is properly subject

2

to a penalty because it failed to submit reliable data needed to calculate its performance for FYs 2001 and 2002. A state's obligation to submit reliable data needed to calculate performance is an important aspect of the IV-D system, which imposes penalties for unreliable data without regard to whether the state met the required level of performance. Thus, Indiana's arguments (which Indiana did not substantiate in any event) that the unreliability of its data was due to data entry errors that did not evidence any failure to provide IV-D services provide no basis to reverse the penalty, and do not entitle Indiana to have the unreliability excused, pursuant to ACF's authority in certain circumstances to disregard data unreliability that is technical in nature. Moreover, contrary to what Indiana argues, ACF complied with applicable notice requirements. Proposed statutory changes that would have changed the notice requirements were never enacted, so we and ACF must apply the provisions as in effect. We must also apply regulations prescribing the methods for determining performance and data reliability and initiating the penalty process. Indiana has failed to demonstrate that these provisions are not applicable and do not support the penalty here.

<u>Summary of the applicable law</u>

Title IV-A of the Act (sections 401-419; 42 U.S.C. §§ 601-619), "Block Grants to States for Temporary Assistance for Needy Families" (the TANF program), provides grants to eligible states that have approved programs for providing assistance to needy families with children, and for providing their parents with job preparation, work and support services to enable them to leave the program and become self-sufficient. Sections 401, 402 of the Act. To receive TANF funds, a state must operate a child support enforcement program consistent with title IV-D of the Act. Section 402(a)(2) of the Act. Title IV-D (sections 451-469B; 42 U.S.C. §§ 651-669b) is a cooperative federal-state program that aims at increasing the effectiveness of child support collection by such measures as locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support is available to all children for whom such assistance is requested. <u>Maryland Dept. of Human Resources</u>, DAB No. 1875 (2003), citing section 451 of the Act. States operate their child support enforcement programs subject to oversight by ACF's Office of Child Support Enforcement (OCSE). We refer in this decision to ACF as the respondent federal agency; the IV-D regulations refer to OCSE.

Titles IV-A and IV-D and regulations at 45 C.F.R. Part 305 create a system of incentives and penalties under which federal TANF

3

funds are awarded to or withheld from states based on scores they
achieve on several IV-D performance measures.  The performance
measure at issue here is called the "paternity establishment
percentage" (PEP).  It measures a state's performance at
establishing the paternity of children born out of wedlock.
(There are five performance measures used to award incentives, of
which three are also used to impose penalties.)  ACF determines a
state's level of performance based on data that the state
submits, using a form prescribed by ACF.  States are assessed on
their performances for each federal fiscal year (FY or FFY),
which runs from October 1 through September 30.  45 C.F.R.
§ 305.32.  States must submit complete and reliable performance
data for each fiscal year by December 31 following the end of the
fiscal year, and only data submitted by that date will be used to
determine the state's performance for that fiscal year.  45
C.F.R. § 305.32(f).

ACF conducts data reliability audits, or DRAs, to determine if
the data that the state submits for a fiscal year are complete
and reliable; the data must meet a 95% standard of reliability.
45 C.F.R. § 305.1(i).  (For convenience, in this decision we
refer to the complete and reliable data that states must submit
simply as reliable data.)  ACF may disregard the unreliability of
data and treat the data as adequate if it determines that the
unreliability is of a technical nature that does not affect
calculation of the state's IV-D performance measures.  Section
409(a)(8)(C) of the Act; 45 C.F.R. § 305.62.  In December 2001,
ACF used that authority to accept all unreliable FY 2000 data,
which was submitted by 23 states, including Indiana.  Indiana
Appeal (App.) File at 20-22.

As we concluded in DAB No. 1989, the Act and regulations provide
for imposing a penalty on a state that, for two consecutive
years, fails to demonstrate with reliable data that it achieved
the required PEP.  Thus, a state is subject to a penalty if, for
two consecutive years, it fails either to achieve the required
PEP, or to submit reliable data needed to calculate its PEP.  (A
third basis for a penalty, in addition to failing a IV-D penalty
performance measure such as the PEP or submitting unreliable
data, is failure to substantially comply with the requirements of
the IV-D program.  That basis is not at issue here, where the
penalty is based on the unreliability of Indiana's PEP data.)

ACF imposed the penalty against Indiana pursuant to section 409
of the Act, titled "Penalties."  Section 409(a) provides for TANF
penalties against states, for some 14 categories of noncompliance
with various requirements imposed by title IV, mostly relating to

4

a state's TANF program under title IV-A.[1] At issue here is section 409(a)(8) of the Act, which imposes the IV-D performance penalties. Section 409(a)(8) provides in relevant part as follows:

>     (8) NONCOMPLIANCE OF STATE CHILD SUPPORT
> ENFORCEMENT PROGRAM WITH REQUIREMENTS OF PART D.—
>         (A) IN GENERAL.—If the Secretary finds, with
>     respect to a State's program under part D, in a
>     fiscal year beginning on or after October 1,
>     1997—
>         (i) . . . that the State program failed to
>     achieve the paternity establishment
>     percentages . . . or to meet other
>     performance measures that may be established
>     by the Secretary;
>         (II) . . . that the State data submitted
>     pursuant to section 454(15)(B) is incomplete
>     or unreliable; or
>         (III) . . . that a State failed to
>     substantially comply with 1 or more of the
>     requirements of part D . . . and
>         (ii) that, with respect to the succeeding
>     fiscal year—
>         (I) the State failed to take sufficient
>     corrective action to achieve the
>     appropriate performance levels or
>     compliance as described in subparagraph
>     (A)(i); or
>         (II) the data submitted by the State
>     . . . is incomplete or unreliable; the
>     amounts otherwise payable to the State
>     under this part . . . prior to quarters
>     following the end of the first quarter
>     throughout which the State program has
>     achieved the paternity establishment
>     percentages or other performance measures
>     as described in subparagraph (A)(i)(I),
>     or is in substantial compliance with 1 or
>     more of the requirements of part D as
>     described in subparagraph (A)(i)(III), as
>     appropriate, shall be reduced . . . .

_____

    [1] Those other penalties may be combined with IV-D penalties to increase the total amount of the reduction in a state's TANF funding. Those other penalties are not at issue here.

5

For some other violations listed at section 409(a), the Secretary may not impose a penalty if he finds that there was reasonable cause for the violation, and must afford a state the opportunity to enter into a corrective compliance plan prior to imposing a penalty.  Notably, section 409 withholds those ameliorative measures from the title IV-D penalties at issue here.  Sections 409(b),(c) of the Act.

The regulation implementing the IV-D penalty provisions refers to failure to achieve the paternity establishment percentage as well as two other penalty performance measures created by the regulations.  These measures, not at issue here, assess a state's performance at establishing orders of support and at collecting support in IV-D cases.  The regulation provides in relevant part as follows:

> (a) A State will be subject to a financial penalty and the amounts otherwise payable to the State under title IV-A of the Act will be reduced in accordance with § 305.66:
> (1) If . . . :
> (i) . . . the State's program failed to achieve the paternity establishment percentages . . . or to meet the support order establishment and current collections performance measures . . . or
> (ii) . . . the State did not submit complete and reliable data . . . or
> (iii) . . . the State failed to substantially comply with one or more of the requirements of the IV-D program . . . and
> (2) With respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable.

45 C.F.R. § 305.61.

In the preamble to the Part 305 regulations, which was forwarded to the states as part of Action Transmittal OCSE-AT-01-01, ACF referred to the first of the two consecutive years of failure as the performance year.  65 Fed. Reg. 82,178, 82,186, 82,187, 87,189 (Dec. 27, 2000).  In this appeal the performance year was FY 2001, and the corrective action year was FY 2002.

The penalties consist of reductions in the annual TANF funding that a state receives under title IV-A of the Act, called the

6

State Family Assistance Grant (SFAG).  (The SFAG is the amount of
the basic block grant allocated to each eligible state under the
formula at section 403(a)(1) of the Act.  45 C.F.R. § 260.30.)
The penalties range from one to two percent of a state's SFAG for
the first finding of two consecutive years of failure, from two
to three percent for the second consecutive finding, and from
three to five percent for each subsequent consecutive finding.
Section 409(a)(8)(B) of the Act; 45 C.F.R. § 305.61(c).  A state
must expend additional state funds to replace any reduction in
the SFAG resulting from penalties.  Section 409(a)(12) of the
Act; 45 C.F.R. § 262.1(e).  A state may appeal a decision
imposing penalties to the Board.  45 C.F.R. §§ 262.7,
305.66(b)(2).

The performance measure at issue here, the paternity
establishment percentage, is essentially the percentage of
children born out of wedlock for whom paternity has been
established or acknowledged; it is "commonly known as the PEP."
45 C.F.R. § 305.2(a)(1).  The Act and the regulations at Part 305
establish two versions of the PEP, one based on children in a
state's IV-D caseload, the other based on all children in the
state.  States may select either measure and may change their
selection from year to year.  Id.; section 452(g)(1) of the Act.
Indiana selected the "IV-D PEP," which is based on the caseload
of a state's IV-D program and is defined as follows:

> [T]he term "IV-D paternity establishment
> percentage" means, with respect to a State for a
> fiscal year, the ratio (expressed as a percentage)
> that the total number of children—
> > (i) who have been born out of wedlock,
> > (ii)(I) except as provided in the last
> > sentence of this paragraph, with respect to
> > whom assistance is being provided under the
> > State program funded under part A in the fiscal
> > year or, at the option of the State, as of the
> > end of such year, or (II) with respect to whom
> > services are being provided under the State's
> > plan approved under this part in the fiscal
> > year or, at the option of the State, as of the
> > end of such year pursuant to an application
> > submitted under section 454(4)(A)(ii), and
> > (iii) of whom the paternity has been
> > established or acknowledged,
> bears to the total number of children born out of
> wedlock and (except as provided in such last
> sentence) with respect to whom assistance was being
> provided under the State program funded under part A

7

as of the end of the preceding fiscal year or with
respect to whom services were being provided under
the State's plan approved under this part as of the
end of the preceding fiscal year pursuant to an
application submitted under section 454(4)(A)(ii);

. . . .

Section 452(g)(2)(A) of the Act.  The regulation expresses the
IV-D PEP with the following ratio:

Total # of Children in IV-D Caseload in the Fiscal
Year or, at the option of the State, as of the end
of the Fiscal Year who were Born Out-of-Wedlock with
Paternity Established or Acknowledged
Total # of Children in IV-D Caseload as of the end
of the preceding Fiscal Year who were Born
Out-of-Wedlock

45 C.F.R. § 305.2(a)(1).

A state must maintain a PEP of at least 90% to avoid a penalty.
A state with a PEP lower than 90% may still avoid a penalty if
its PEP increased over the PEP for the previous year by the
percentages specified in the following table from the regulation:

| PEP | Increase required over previous year's PEP | Penalty FOR FIRST FAILURE if increase not met |
|-----|--------------------------------------------|------------------------------------------------|
| 90% or more ........... | None ............... | No Penalty. |
| 75% to 89% ............ | 2% ................. | 1-2% TANF Funds. |
| 50% to 74% ............ | 3% ................. | 1-2% TANF Funds. |
| 45% to 49% ............ | 4% ................. | 1-2% TANF Funds. |
| 40% to 44% ............ | 5% ................. | 1-2% TANF Funds. |
| 39% or less ........... | 6% ................. | 1-2% TANF Funds. |

45 C.F.R. § 305.40(a)(1), Table 4.

<u>Basis for the penalty</u>

ACF notified Indiana that it is subject to a penalty in a letter
from the Assistant Secretary for Children and Families dated
November 14, 2003.  The letter stated that the PEP data that
Indiana submitted for FYs 2001 and 2002 failed to meet the data
reliability standard, and that Indiana was thus subject to a
reduction in TANF funding of $1,447,594, one percent of its

8

adjusted SFAG for the TANF program for FY 2001.[2]  Indiana App.
File at 53-55.  The DRA reports of ACF's audits of Indiana's data
submissions for FYs 2001 and 2002 show that ACF had found
Indiana's data to be unreliable because data on the number of
children in Indiana's IV-D caseload who were born out of wedlock
or whose paternities had been established were missing some
children who should have been included, and included others who
were born in wedlock or whose paternities had not been
established.  Indiana App. File at 23-34, 42-52.  ACF
subsequently informed Indiana that the funding reductions would
begin during 2004, because states had not been notified of their
penalties until after the start of FY 2004.  Indiana App. File at
57-58.

<u>Arguments and analysis</u>

Indiana does not dispute ACF's determination that it submitted
unreliable data for the PEP performance measure for FYs 2001 and
2002, the basis for the determination that it is subject to a
penalty.  Instead, Indiana argues that ACF failed to notify
Indiana of its unreliable data as required by the regulations,
depriving Indiana of the full corrective action year to which it
was entitled before being subject to a penalty.  Indiana also
argues that ACF should have accepted Indiana's data pursuant to
its authority to accept unreliable data if it finds that the
unreliability is of a technical nature that does not affect
calculation of a state's performance measures, and that it is
unfair to subject Indiana to a penalty solely because its data
failed to satisfy the 95% standard for data reliability.  Indiana
asserts that its data errors did not evidence any failure to
deliver IV-D services or errors in case records supporting its
computerized data, and that its efforts to correct and improve
its IV-D data have increased the overall reliability of its IV-D
data from FY 2000 to FY 2002.

    I.    <u>ACF complied with applicable notice requirements.</u>

Indiana argues that the penalty should be reversed because ACF
failed to afford Indiana the automatic one-year corrective action

---

    [2]  The November 14, 2003 letter also indicates that
Indiana submitted unreliable FY 2001 data related to the Support
Order Establishment and the Arrearage Collections performance
measures.  However, because Indiana submitted reliable FY 2002
data on those two performance measures, its submission of
unreliable FY 2001 data on those measures is not at issue here.
Indiana App. File at 42-52 (FY 2002 DRA report).

9

period that the regulations provide for states to correct
unreliable data or deficient performance before being subject to
a penalty.  Indiana argues that ACF's November 14, 2003 letter
informing Indiana of the penalty was deficient because it did not
permit Indiana the opportunity to enter into a corrective action
plan, or to receive direction on corrective processes from ACF,
before the imposition of a penalty.  Indiana also notes that ACF
did not issue its final DRA report on the reliability of
Indiana's data for FY 2001 until July 30, 2002, and that Indiana
did not have a full year to take corrective action before having
to submit data for FY 2002.  Indiana argues that it is
fundamentally unfair and a deprivation of due process to impose a
penalty on Indiana when these statutory and regulatory conditions
precedent to the imposition of a penalty have not been satisfied.

Indiana notes that the applicable regulations are silent on the
matter of timeliness of notice letters, and points out that for
other TANF penalties at section 409(a)(8), there are a series of
steps prior to a penalty, including the submission of a
corrective compliance plan.  Indiana Brief (Br.) at 9.  Indiana
argues that it should have been provided a similar opportunity
here.

The regulation outlining when a state is subject to a penalty,
and the notice ACF must furnish, provides as follows:

    (a) **If a State is found by the Secretary to be
subject to a penalty** as described in § 305.61 of
this part, the OCSE will notify the State in writing
of such finding.
    (b) The notice will:
    (1) Explain the deficiency or deficiencies which
result in the State being subject to a penalty,
indicate the amount of the potential penalty, and
give reasons for the finding; and
    (2) Specify that the penalty will be assessed in
accordance with the provisions of 45 C.F.R.
§ 262.1(b) through (e) and 262.7 if the State is
found to have **failed to correct the deficiency or
deficiencies cited in the notice during the
automatic corrective action year (i.e., the
succeeding fiscal year following the year with
respect to which the deficiency occurred.)**
    (c) The penalty under § 305.61 of this part will
be assessed if the Secretary determines that the
State has not corrected the deficiency or
deficiencies cited in the notice by the end of the
corrective action year.

10

    (d) Only one corrective action period is provided to a State with respect to a given deficiency where consecutive findings of noncompliance are made with respect to that deficiency.  In the case of a State against which the penalty is assessed and which failed to correct the deficiency or deficiencies cited in the notice by the end of the corrective action year, **the penalty will be effective for any quarter after the end of the corrective action year** and ends for the first full quarter throughout which the State IV-D program is determined to have corrected the deficiency or deficiencies cited in the notice.

    (e) A consecutive finding occurs only when the State does not meet the same criterion or criteria cited in the notice in paragraph (a) of this section.

45 C.F.R. § 305.66 (emphasis added).

In its brief, Indiana cited 45 C.F.R. § 305.42, which phased in the IV-D performance penalties, and also refers to an automatic corrective action year:

    States are subject to the performance penalties described in § 305.40 based on data reported for FY 2001.  Data reported for FY 2000 will be used as a base year to determine improvements in performance during FY 2001.  There will be an automatic one-year corrective action period before any penalty is assessed.  The penalties will be assessed and then suspended during the corrective action period.

Indiana's arguments about the notice regulation are similar to those that the States made in DAB No. 1989.  There, we held that the law and regulations do not require notice of a state's IV-D data or performance failures prior to the beginning of the corrective action year, and that the penalty process is self-implementing in that the corrective action year automatically follows the performance year without notice from ACF.  We further held that the structure of the system established by section 409 of the Act and the Part 305 regulations necessarily does not permit states a full year following notice of their performance-year failures before the imposition of penalties upon the end of the corrective action year.  We concluded that these provisions place on a state the ultimate responsibility for monitoring its own performance, and that the States were aware of their own performances and moreover had been informed of their

11

data reliability problems during FY 2002, the corrective action
year. Our reasons for so holding and for determining that
Indiana's arguments lack merit as well are as follows:

- The notice requirements of section 305.66 apply if a state
  is found to be "subject to a penalty as described in
  § 305.61 . . . ." Section 305.61 provides that a state
  will be "subject to a financial penalty," and the amounts
  otherwise payable to it under title IV-A will be reduced,
  upon the completion of two consecutive years of
  noncompliance or unreliable data relating to the same
  performance measure. A state is thus not subject to a
  penalty, and the notice requirements of section 305.66 do
  not apply, until the completion of two consecutive years
  of noncompliance. Similarly, the Act provides for
  penalties if the Secretary finds that a state failed to
  attain the required level of performance in the same
  penalty performance measure, submitted unreliable data
  needed to calculate performance, or failed to
  substantially comply with the requirements of the IV-D
  program, and **"that, with respect to the succeeding fiscal
  year,"** the state failed to take sufficient corrective
  action to achieve the appropriate performance levels or
  compliance, or submitted unreliable data. Section
  409(a)(8)(A) of the Act (emphasis added). That has
  happened here. Section 409(a)(8) makes no reference to
  notice being required to commence the second of the two
  consecutive years for which deficient performance or
  unreliable data will subject a state to a penalty. Thus,
  ACF is not required to notify a state that it is subject
  to penalties until after the end of two consecutive years
  of deficient performance or unreliable data.

- The conditional nature of some of the language in section
  305.66, such as its reference to "potential penalties,"
  likely reflects its incorporation of selected regulations
  from 45 C.F.R. Part 262 that concern some of the penalties
  listed in section 409(a) of the Act, other than the IV-D
  penalties at section 409(a)(8) that are at issue here.
  Part 262 addresses the collection of multiple penalties,
  the maximum reduction that may be made in a state's SFAG,
  and the right to appeal penalty determinations to the
  Board. 45 C.F.R. §§ 262.1(b)-(e), 262.7. A IV-D penalty
  to which a state is subject following two years of
  unreliable data or deficient IV-D performance is a
  potential penalty because it is subject to these
  provisions before the actual amount of the reduction to be
  taken in a state's SFAG is determined. The November 14,

12

2003 letter noted these other provisions, stating that the announced penalty "will be imposed in accordance with the provisions of 45 C.F.R. § 262.1(b) through (e) . . . . ." Indiana App. File at 53-55. However, there is no indication here that the penalty is to be combined with penalties under other portions of section 409(a), or exceeds the maximum reduction that may be taken in a state's SFAG. In the absence of multiple penalties, ACF could inform Indiana of the amount of its SFAG reduction in the November 14, 2003 letter issued pursuant to section 305.66, as it did.

The structure of the penalty system necessarily does not permit the start of the corrective action year to be conditioned on notice from ACF of performance-year deficiencies, and does not afford a state a full year following notice to correct its deficiencies before being subject to penalties. A state has until December 31st to submit its data relating to performance in a given fiscal year, which ends on the previous September 30th. 45 C.F.R. § 305.32(f). This deadline is approximately 90 days into the immediately succeeding corrective action year and does not permit review of the data and notification of findings in time for the state to have a full year to take corrective action. Language from the preamble to the notice regulation confirms that the decision that a state is subject to a penalty is a determination that "will be made as soon as possible after the end of the corrective action year." 65 Fed. Reg. 82,192.

The Act's only requirement of notice regarding the penalties in section 409(a) is in section 410. Section 410(a) requires the Secretary to notify the chief executive officer of the state of any adverse action, including any action with respect to the imposition of a penalty under section 409, within 5 days after the date the Secretary takes such adverse action. This section makes no reference to notice prior to the time that ACF determines that a state is subject to a penalty.

Section 409 of the Act withholds from a state opportunities to avoid a IV-D penalty that it affords for some of the other penalties listed in section 409(a), which primarily concern compliance with requirements for the operation of a state's TANF program under title IV-A. Section 409(b) forbids the Secretary from imposing some of those other penalties if he finds that there was reasonable cause for the noncompliance, and section 409(c)

13

grants states the opportunity to avoid a penalty by achieving compliance pursuant to a corrective compliance plan that the state develops subject to ACF's approval. However, those ameliorative measures "do not apply" to any penalty under section 409(a)(8) (or to five more of the fourteen enumerated penalties listed in section 409(a)). Sections 409(b)(2), (c)(4) of the Act. The inapplicability of the corrective compliance plan process to IV-D penalties underscores the self-implementing nature of the IV-D penalty process, which is not dependent on intermediate action by ACF (such as approving a corrective compliance plan or providing a state notice of its performance failures) before the commencement of the automatic corrective action year.

Indiana argues that although the regulations are silent on the question of timeliness of notice letters, and the right to submit a corrective compliance plan is "not mandatory" with respect to IV-D penalties, ACF should have provided that opportunity, because ACF's process for notifying Indiana that its data were not reliable denied Indiana the automatic one-year corrective action period to which it is entitled by the regulations. Indiana Br. at 9-10. However, rather than making the corrective compliance plan procedures optional for IV-D penalties or remaining silent on their application, section 409 explicitly withholds them from IV-D penalties.[3] Moreover, the penalties for which corrective action plan procedures are available may be imposed after only a single year of failure, rather than the two consecutive years for which a state is subject to IV-D penalties. Sections 409(a)(1)-(5), (11), (14) of the Act. ACF was thus reasonable in implementing a IV-D penalty system that affords states the opportunity to remedy deficiencies

_____

[3] States formerly had the opportunity to submit a corrective action plan with respect to IV-D penalties under former section 403(h)(1) of the Act. As amended by the Child Support Enforcement Amendments of 1984, Public Law No. 98-378, that section mandated reductions in federal funding for a state's AFDC program if the state was found not to have complied substantially with IV-D requirements. Rather than directing the immediate imposition of a penalty on a state that failed an audit for the first time, the statute provided that the penalty could be suspended while the state was given an opportunity to achieve compliance through a corrective action plan approved by ACF. Former section 403(h)(2)(A)-(C) of the Act.

14

prior to being penalized, but holds them responsible for
monitoring their own data and performances and taking
whatever actions are necessary to achieve compliance after
a year of failing data or performance.  We note that Part
305 affords a state the opportunity to comment on draft
audit reports, giving the state some notice of problems
that may lead to a penalty and an opportunity to present
its views before a determination is made that the state is
subject to a penalty.  45 C.F.R. § 305.64.

The self-implementing nature of the penalty system is
confirmed by a statement in ACF's November 14, 2003 letter
recognizing that states "do not have a full year to
correct deficiencies following the release of final DRA
reports."  The letter noted that Congress had been
considering a "technical fix" to the federal statute to
ensure that states receive a full year for corrective
action following notice of a deficiency, but that in the
absence of such an amendment there was no choice but to
impose penalties under current law until Congress enacts
legislation.  Indiana App. File at §3-55.  The States in
DAB No. 1989 cited these statements as showing that ACF
did not provide proper notice of FY 2001 deficiencies in
time for corrective action during FY 2002.  We held there
that the cited statement and the legislative history of
the subject amendment acknowledge that under the current
law the corrective action year commences automatically
after the performance year, without any action by ACF in
the form of audit reports or notices.  The amendment would
have "change[d] the corrective action year to the fiscal
year following the fiscal year in which the Secretary
makes a finding of noncompliance and recommends a
corrective action plan."  S. Rep. No. 108-162, at 53-54
(Oct. 3, 2003).  The reason for this proposal was that
"[c]urrent language does not recognize the time necessary
to conduct federal audits and that those audits now occur
during what is, under current law, a state's corrective
action year.  This technical correction will give states a
full year to correct identified deficiencies."  Id.  The
subject bill, H.R.4, 108th Cong., 1st Sess., as reported in
the Senate on October 3, 2003, was apparently never
brought to a vote.  150 Cong. Rec. S3520, S3529, S3538
(Apr. 1, 2004).  Indiana cited the Assistant Secretary's
language in the November 14, 2003 letter recognizing that
states do not have a full year to correct deficiencies
following the release of final DRA reports as showing that
Indiana was not given sufficient notice of its deficiency
and time to establish a corrective action plan.  However,

15

the subsequent legislative history confirms that the
aspects of the IV-D penalty system about which Indiana
complains are a product of the statute as written, which
ACF is bound to apply.

States are responsible for monitoring their own
performances and data reliability.  The Part 305 preamble
cautions that a state "should be continuously monitoring
its own performance and taking action to improve
performance which its own data shows may fail to achieve
the performance measures.  The state is also responsible
for maintaining proper procedures and controls to ensure
data reliability and completeness."  65 Fed. Reg. 82,192.
The preamble goes on to note that "the State should not
wait or rely upon the Secretary's determination of a data
or a performance deficiency in order to begin corrective
action.  Two consecutive years of failure (either poor
data or poor performance) in the same performance measure
criterion will trigger a penalty imposition."  Id.
Elsewhere, the preamble describes the automatic corrective
action period as a "delay which allows States to identify
and to correct either reporting or performance problems
prior to being assessed a financial penalty," and again
warns states that they "should be diligent in continuously
monitoring their own performance and data reliability."
65 Fed. Reg. 82,205.  Indiana argues that the preamble's
advice that states monitor their performance, which ACF
cited in the November 14, 2003 letter, was insufficient to
meet the statutory requirement for a corrective action
year.  However, as we found in DAB No. 1989, the statute
and regulation do not require notice from ACF to begin the
corrective action year.  The preamble simply reminds
states that the self-implementing nature of the penalty
system requires them to maintain sufficient awareness of
their IV-D data and performances to be able to take
corrective action, without awaiting notification from ACF
that they are at risk of being found subject to penalties.[4]

---

[4]  In February 2000, ACF provided states with a draft
version of its "Guide for Auditing Data Reliability."  ACF Ex. 2.
ACF sent the final version of the guide to states with "Dear
Colleague" letter DC-02-07, dated April 1, 2002.  ACF reports
that it provided states with the audit guide so that they could
perform their own audits at any time to identify and correct
deficiencies.  ACF Br. at 24, n.20.  Indiana reports that it
received the audit guide, but that it never received what it

(continued...)

16

States moreover are aware of their own performances
because they are responsible for submitting the data used
to calculate their performances and can perform the
calculations themselves. They are aware of whether their
data for a fiscal year are reliable because they receive
draft and final DRA reports during the following calendar
year, and are entitled to audit exit conferences at the
conclusion of audit fieldwork. 45 C.F.R. § 305.64(b). In
DAB No. 1989, we noted that the States had time periods
ranging from four to seven months following release of the
FY 2001 DRA reports (and from six to eight months
following release of the draft reports), to correct any
data reliability problems prior to submitting their FY
2002 data, which were due December 31, 2002. Here, ACF's
DRA report on Indiana's data submission for FY 2001 was
dated July 30, 2002 (the draft DRA report that ACF issued
and on which Indiana provided comments is not in the
record). Indiana App. File at 23-41. The record shows
that Indiana was aware of problems in its FY 2001 PEP data
prior to its receipt of the final DRA report for that
year. An internal Indiana e-mail dated June 11, 2002
notes that Indiana faced a possible penalty of up to $20
million based on incorrect data in its computerized IV-D
system, and that those data "must be 'cleaned up' by
September 30 of this year." Indiana App. File at 89. The
automatic commencement of the automatic corrective action
year for FY 2001 deficiencies did not deprive Indiana of
the opportunity to attempt to remedy its data reliability
problems. Moreover, as we note in the next section of
this decision, Indiana did succeed in correcting those
problems with respect to data used for performance
measures other than the PEP.

See DAB No. 1989, at 11-26.

For the above reasons, we conclude that ACF complied with the
applicable notice requirements in determining that Indiana is
subject to a penalty.

---

[4](...continued)
calls the Data Reliability Audit Working Guide. Indiana App.
File at 98. Since we base our finding that states were provided
notice of the workings of the IV-D penalty system on the statute,
the Part 305 regulations, and the preamble to Part 305, and not
on the audit guide, Indiana's assertion does not change our
analysis.

17

II.    Indiana is properly subject to a penalty for failing
to submit reliable PEP data for FYs 2001 and 2002.

Indiana next argues that it should not suffer a penalty solely
because its PEP data failed to meet the 95% standard of
reliability.  Indiana does not dispute ACF's findings that
Indiana's PEP data for FYs 2001 and 2002 failed to meet that
standard and were thus not reliable.  Instead, Indiana argues
that ACF should disregard the unreliability of its data because
it resulted from errors in its computerized data that were not
indicative of errors in the underlying case records or of any
failure to deliver needed IV-D services.  Indiana also argues
that the penalty is unfair in light of these aspects of the data
errors, the extent and success of Indiana's efforts to improve
its data, and the budgetary impact of a penalty.  These arguments
do not provide a basis to reverse ACF's determination that
Indiana is subject to a penalty.

Background on Indiana's data

Indiana selected the IV-D PEP measure, which measures a state's
performance at establishing the paternity of children in its IV-D
caseload.  States using the IV-D PEP report data yearly at lines
5 and 6 of form OCSE-157, the Child Support Enforcement Annual
Data Report, pursuant to the requirement that they submit data
following instructions and formats as required by HHS.  45 C.F.R.
§ 305.32(f).  At line 5, states report the number of children in
IV-D cases open at the end of the fiscal year who were born out
of wedlock.  At line 6, they report the number of children born
out of wedlock in IV-D cases open during or at the end of the
fiscal year with paternity established or acknowledged.  Data are
produced by the single statewide automated IV-D data processing
and information retrieval system that each state must operate
with ACF's approval.  Section 454A of the Act; 45 C.F.R. Part
307.  Indiana's computerized IV-D system is called ISETS, the
Indiana Support Enforcement Tracking System.  Indiana Br. at 5;
Indiana App. File at 5.

To audit Indiana's line 5 data for FY 2001 (children in IV-D
cases open at the end of FY 2001 who were born out of wedlock),
ACF auditors reviewed records for a sample of 91 children and
identified 14 errors, for a data efficiency rate of 85% with a
95% confidence interval of 76% to 91%.  ACF determined that
Indiana wrongly omitted from line 5 seven children who were born
out of wedlock because of inaccurate or incomplete information in
their computer records.  The DRA report indicates that Indiana
should have included children at line 5 "if the Born-Out-of-

18

Wedlock (BOW) indicator has a Paternity Contested (P) or Born-Out-of-Wedlock (W) code." Indiana App. File at 30. The BOW indicator was blank for six children and in error for one child. ACF also determined that Indiana wrongly included seven children in its line 5 data, five from non-IV-D cases, and two others who were born in wedlock but whose records contained codes indicating that they were born out of wedlock. Indiana App. File at 29-31; see also 83-84 (Indiana directions for completing paternity information reports). To audit Indiana's line 6 data for FY 2001 (the number of children born out of wedlock in IV-D cases open during or at the end of FY 2001 with paternity established or acknowledged), ACF auditors reviewed records for a sample of 44 children and identified nine errors, for a data efficiency rate of 80%, with a 95% confidence interval of 65% to 90%. ACF determined that Indiana wrongly omitted five children whose paternities had been established, because the BOW indicator or the paternity disposition codes were blank or erroneous. Indiana also wrongly included four children, three who had not had their paternities established, and one child who was not part of a IV-D case.

For FY 2002, to audit Indiana's line 5 data, ACF reviewed records for 115 children and identified 22 errors, for an efficiency rate of 81% with a 95% confidence interval of 72% to 88%. ACF determined that Indiana wrongly omitted 15 children who were born out of wedlock because the BOW indicator was blank for two children and erroneous for 13 children, and that Indiana wrongly included seven children who were wrongly coded as having been born out of wedlock. For line 6, the auditors reviewed records for 89 children and identified 15 errors, for a data efficiency rate of 83%, with a 95% confidence interval of 74% to 90%. They determined that Indiana wrongly omitted 12 children whose paternities had been established, because paternity disposition codes were not completed for six children, erroneous BOW indicators were entered for four children, and paternities were not reported for two children due to a programming error. Indiana also wrongly included three children who were born in wedlock. Indiana App. File at 45-46.

Indiana does not dispute these DRA findings.

Analysis of Indiana's data reliability arguments

Indiana argues that ACF should disregard the unreliability of its PEP data as being of a technical nature because the data errors are not indicative of inaccuracies in the underlying IV-D case records, or of any failure by Indiana to deliver needed IV-D services including paternity establishment and child support

19

enforcement services.[5]  Indiana asserts that no parent or child
was harmed by discrepancies between written court documents and
the information recorded in ISETS.  Indiana also states that
there is no suggestion that it manipulated PEP data or ever
falsely claimed that it established paternities or that paternity
was not at issue in a given case.  Indiana also asserts that the
errors in its FY 2002 data did not evidence any failure to
deliver IV-D services because they tended to understate Indiana's
performance at establishing paternities.  Indiana Br. at 17-18.
Indiana argues that ACF abused its discretion by disregarding
data unreliability for FY 2000 but not for FYs 2001 or 2002,
where the unreliability for all three years resulted from the
same types of data errors.

Indiana reports that some of the data errors that the ACF
auditors discovered were caused by clerical staff in the offices
of Indiana county prosecutors, who incorrectly entered
information into ISETS, based on their review of documents from
legal proceedings including paternity establishments, marriage
dissolutions and child support enforcement actions.  Indiana
reports that staff sometimes incorrectly completed, or failed to
complete, the BOW indicators and paternity disposition codes in
the computerized records.  Some instances of missing or
incomplete BOW indicators from older records, Indiana believes,
are attributable to lack of a requirement prior to 1999 that IV-D
records indicate whether a child was born out of wedlock.
Indiana notes that prior to implementation of the new incentive
and penalty system, there was no requirement to provide data on
children who were born out of wedlock, and thus no need to record
that information in Indiana's computerized records.  Indiana
asserts that still other errors resulted from incomplete or
inaccurate information that Indiana received from applicants for
IV-D services who did not understand "the subtle legal
distinctions among the various factors that enter into the
paternity status determination."  Indiana Br. at 15.  Indiana
reports that under its law, a child's paternity is always subject

---

     [5]  Indiana asserts that "[a]t the time the local county
prosecutor determined the paternity status of every child
considered in the sample on which the audit was based, Indiana's
paternity establishment data was reliable."  Indiana Br. at 13.
Given that Indiana does not dispute ACF's DRA findings, this
statement presumably means that records maintained by county
prosecutors accurately reflected the paternities of the children
in IV-D cases on which the prosecutors worked, and that data
errors were thus due to the entry of inaccurate information into
ISETS.

20

to challenge, even when the child was born in wedlock, and there
is no substantive difference in how paternity is established for
children born in and out of wedlock. Thus, Indiana asserts, it
might potentially have to determine the paternity of every child
in its IV-D database, and erroneously reporting a child as having
been born out of wedlock does not mean that Indiana will not be
required to establish that child's paternity.

Indiana also notes that it undertook extensive, successful
efforts to improve the reliability of its data. Indiana reports
that after failing the DRA for FY 2000, it formed a task force of
six regional teams that included representatives from its child
support bureau, local prosecutors' offices, and the staff that
administer its programs under titles IV-A and IV-D. The task
force analyzed IV-D cases that had failed the audit and
identified some 180,000 problematic IV-D cases comprising three
broad categories: cases resulting from conversion to the
computer system, inappropriate Medicaid referrals, and cases with
missing or illogical paternity information. They then took
measures to correct the data, including completing a form for
each case, correcting BOW information discrepancies, and making
computer programming changes to close cases that had been
incorrectly converted as IV-D cases in ISETS during the automated
process of converting county records into the state system.
Indiana states that by the time it submitted its data for FY
2002, it had physically reviewed approximately 144,000 original
court case files at a cost of $254,000. Indiana Br. at 6-7.

Indiana reports that these efforts improved its data for all four
of the performance measures for which its data were found to be
unreliable for FY 2000, to the point where, for FY 2002, only the
PEP data remained unreliable.[6] Indiana points out that the
efficiency rate of its PEP data increased from 52% for FY 2000 to
82% for FY 2002 (these figures are apparently averages of the
efficiency rates for lines 5 and 6), and argues that requiring a
43% increase in data accuracy over that time is unrealistic and

_____

        [6] While Indiana reports that it submitted unreliable
data for four performance measures for FY 2000, the FY 2000 DRA
report indicates that data for one of those measures, the Support
Order Establishment performance measure, was not unreliable.
Although the efficiency rates ACF calculated for the relevant
data lines were below the 90% reliability standard used for FY
2000, the data were not considered unreliable because ACF could
not conclude with at least 95% confidence that the actual
efficiency rates were below 90%. Indiana App. File at 2-19;
Indiana Br. at 5-6.

21

fails to consider the improvement Indiana has achieved.  Indiana
Br. at 17.  Indiana argues that it is unfair to reduce Indiana's
total TANF funding and require that Indiana make up for the
reduction with its own funds solely because Indiana's PEP data
failed to meet a 95% standard of data reliability.  Indiana
reports that it faces overwhelming financial burdens and did not
have sufficient notice to plan for the impact of the penalty,
because it operates on a two-year budget.  Indiana also requests
that instead of paying the penalty funds to the federal
government, it be permitted to pay the penalty funds to its Child
Support Bureau to be used to enhance the reliability of data in
its ISETS system.

None of these arguments justifies reversing the penalty or
requiring ACF to overlook the unreliability of Indiana's data.
The Board addressed similar circumstances and arguments in DAB
No. 1989, where we held that a state's inability to submit
reliable data was not rendered technical in nature simply because
it resulted from computer programming errors that might not have
been symptomatic of a failure to deliver IV-D services.  DAB No.
1989, at 78-79.  We reach the same holding here, for the reasons
discussed below.

The Secretary is authorized to find a state's unreliable data
adequate, if he determines that the extent of the unreliability
"is of a technical nature which does not adversely affect the
determination of the level of the State's paternity establishment
percentages . . . or other performance measures that may be
established by the Secretary."  Section 409(a)(8)(C)(ii) of the
Act.  The implementing regulation, titled "[d]isregard of a
failure which is of a technical nature," provides in relevant
part:

> A State subject to a penalty under
> § 305.61(a)(1)(ii) or (iii) of this part may be
> determined, as appropriate, to have submitted
> adequate data . . . if the Secretary determines that
> the incompleteness or unreliability of the data, or
> the noncompliance with one or more of the IV-D
> requirements, is of a technical nature which . . .
> does not adversely affect the determination of the
> level of the State's paternity establishment or
> other performance measures percentages.

45 C.F.R. § 305.62.

Indiana failed to demonstrate that it qualified for the
"technical nature" provision.  Indiana does not dispute the DRA

22

findings that Indiana wrongly omitted from its data some children who were born out of wedlock or whose paternities had been established, and wrongly included others who were born in wedlock or whose paternities had not been established, or who were not from IV-D cases.  Indiana does not allege that data unreliability resulting from its inaccurate information would not have adversely affected the calculation of its PEP, as required for ACF to accept the unreliable data.  Indiana also has not shown that the errors were so de minimis that they resulted in misstating its PEP by a only few hundredths or thousandths of a percent.  Indiana does not allege that the unreliable data, even if accepted by ACF, would have shown that Indiana achieved the required PEP performance level for either FY 2001 or 2002.  Instead, the data that Indiana submitted yields failing PEP scores for FY 2001 and FY 2002 of approximately 62% and 52%, respectively.[7]  45 C.F.R. § 305.40(a)(1), Table 4.  Disregard of the unreliability would have thus likely subjected Indiana to a penalty for deficient PEP performance.  Additionally, Indiana's assertion that the erroneous data did not evidence any failure to provide services appears to conflict with its explanation for some of the data errors.  Indiana explains that some data errors were caused by applicants for IV-D services who provided incorrect paternity information because they did not understand Indiana's paternity laws.  Indiana Br. at 15.  Inaccurate information in applications for services and other documents could affect whether applicants receive appropriate IV-D services and compromise the reliability of Indiana's PEP data.  Also, it is Indiana's responsibility to devise clear applications for IV-D services that elicit accurate information.

Indiana's arguments are also unavailing because the Act makes failure to submit reliable data a distinct basis for a penalty, apart from any consideration of whether the state might actually have passed the applicable performance measure.  Prior to enactment of the current penalty provisions at section 409(a)(8), states were subject to penalties for failure to comply

--------

[7]  Indiana's PEP for FY 2001 is the ratio of the number it reported at line 6 of its OCSE-157 for FY 2001 (116,619) to the number it reported at line 5 of the OCSE-157 for FY 2000 (187,704), expressed as a percentage.  Its PEP for FY 2002 is similarly the ratio of the number it reported at line 6 of its OCSE-157 for FY 2002 (124,605) to the number it reported at line 5 of the OCSE-157 for FY 2001 (239,550).  While the actual OCSE-157s are not in the record, the data that Indiana reported on those forms are included as attachments to the DRA reports for each year.  Indiana App. File at 15, 35, 48.

23

substantially with requirements of title IV-D, but the Act did
not separately impose penalties for failure to submit reliable
data needed to calculate the performance levels.  Former section
403(h) of the Act.  By enacting the current IV-D penalty statute,
Congress signaled the importance of a state's responsibility for
providing reliable data.  DAB No. 1989, at 30.  As we observed in
DAB No. 1989, section 409(a)(8) regards a state's failure to
submit reliable data as equivalent to failing to achieve the
required performance levels.  A state's obligation is not merely
to submit reliable data each year, but to demonstrate with
reliable data that it achieved the required level of performance
on the measures established by the statute and regulations.  _Id._,
at 41-43.  That obligation is apparent from the Part 305
preamble, which provides that "[t]wo consecutive years of failure
(either poor data or poor performance) in the same performance
measure criterion will trigger a penalty imposition."  65 Fed.
Reg. 82,192.  In the absence of reliable data, ACF was unable to
determine whether Indiana achieved a PEP level sufficient to earn
incentives or avoid penalties.  In this regard, Indiana does not
allege that reliable, accurate data would have shown that Indiana
achieved the required PEP performance level for FY 2001 or FY
2002.  Thus, Indiana's allegation that it provided required IV-D
services has no bearing on whether it is subject to a penalty for
failing to submit reliable data that ACF needed to determine the
level of Indiana's performance, and is moreover not readily
subject to verification in the absence of reliable data.

The importance of maintaining accurate data on computerized
systems as well as in individual case records is apparent from
the Act's requirement that each state operate a single automated
data processing and information retrieval system capable of
providing data needed to calculate the IV-D performance measures.
Sections 454(15)(B), 454(16), 454A, 458(b)(5)(B) of the Act.  The
regulations echo the importance of such systems by requiring
states to maintain computerized systems that can control, account
for, and monitor all the factors in the support collection and
paternity determination processes, and by having provided federal
funding at enhanced rates of 80% and 90% in the costs of
developing and installing such systems.  45 C.F.R. §§ 307.5,
307.10, 307.30, 307.31.  ACF's audits look not only at a state's
data, but also at a state's compliance with the requirements to
maintain automated systems.  45 C.F.R. § 305.60(c)(1).  These
provisions informed states of the importance of maintaining
computerized systems capable of generating reliable data, so that
ACF may make incentive and penalty determinations based on data
submitted by a state without having to conduct physical reviews
of the underlying case records.  DAB No. 1989, at 78-79.

24

Indiana's assertions that some data errors resulted from faulty data entry and conversion of case records in ISETS, or may have understated Indiana's performance at establishing paternities for FY 2002, are also not grounds to disregard the unreliability of Indiana's data. In DAB No. 1989, we held that the statute and regulations do not distinguish among unreliable data based on whether data errors improperly increase or decrease a state's score on the penalty and incentive performance measures, and that clerical and conversion errors that evidence serious discrepancies between written documentation and computer records call into question the reliability of the data for calculating the state's performance. This is in part because the 95% reliability standard reflects the requirement that errors not be of a magnitude that would cause a reasonable person to doubt a finding or conclusion made based on the data. 45 C.F.R. § 305.1(i). The emphasis of this requirement is on the magnitude of the errors, as opposed to the type of errors. Data containing enough errors to render them unreliable are not convincing for the purpose of assuring that the performance calculation may be relied upon as a reasonably accurate measure of a state's performance, regardless of whether the errors might overstate or understate performance. A high incidence of data errors of any type increases the likelihood that there may be other errors that go undetected and calls into question the reliability of the entire body of state data. Excusing "understating" errors would also result in states being able to pass the PEP performance measure in succeeding years based on reported increases in performance greater than the improvement that the state actually achieved. DAB No. 1989, at 26-32. Additionally, Indiana did not explain why provision of incorrect paternity information by applicants for IV-D services would not have resulted in errors in their individual case records.

ACF's use of the "technical nature" authority to accept all unreliable FY 2000 data does not require it to accept Indiana's unreliable PEP data for FY 2001 or FY 2002. ACF applied this authority to accept unreliable FY 2000 data submitted by all of the states with unreliable data for that year, including Indiana. ACF announced this determination in substantively identical letters to all states from the OCSE Commissioner dated December 19 or 27, 2001. See, e.g., Indiana App. File at 20-22; DAB No. 1989, at 29. The basis for that determination was that the new incentive system was being phased in during FY 2000, and that penalties based on state performance would not apply prior to state performance in FY 2001. In DAB No. 1989, we found that this determination was based on particular circumstances that did not apply in subsequent years. Since penalties for IV-D performance were not being imposed for years prior to FY 2001,

25

ACF had determined that the identified data reliability problems
for FY 2000 did not affect performance measures, for purposes of
any penalty that would have been based on unreliable data in FY
2000. That basis is not applicable here, where Indiana seeks to
excuse the unreliability of its data for FY 2001 and FY 2002.
DAB No. 1989, at 68.

Finally, Indiana's arguments that the penalty is inordinately
burdensome and that it is unfair to reduce Indiana's TANF funding
solely because its data failed to meet the 95% reliability
standard do not provide any basis to reverse the penalty. The
penalty amounts are specified in the statute and the 95% standard
of data reliability is imposed by a regulation, both of which are
applicable here. The Board is bound by all applicable laws and
regulations and does not have the power to grant the equitable
relief that Indiana seeks. 45 C.F.R. § 16.14, made applicable to
appeals of section 409 penalties by 45 C.F.R. § 262.7(e). ACF
was entitled to select a clear criterion for assessing data
reliability, and the requirement that data meet the 95 percent
reliability standard is unambiguous. For these reasons, it is
not relevant that Indiana improved the reliability of its data,
as its PEP data still failed to meet the 95% standard for two
consecutive years. In contrast to the performance standards that
permit a state with a failing PEP score to avoid a penalty by
achieving specified improvements, the statute and regulations do
not provide graduated standards for data reliability and do not
permit a state to avoid a penalty based on improvements in
otherwise unreliable data.

The financial hardship imposed by the penalty is similarly not
relevant to our consideration of this appeal, or to any appeal of
a penalty or disallowance where it is not included as a factor
for consideration in the applicable statute or regulations. See,
e.g., Latino Resource Organization, DAB No. 1974, at 6-7 (2005).
As we noted in DAB No. 1989, the requirement that states spend
their own funds to compensate for funding reductions due to
penalties under section 409(a) is imposed by the statute and
regulation, by which we are bound. Section 409(a)(12) of the
Act; 45 C.F.R. § 262.1(e). Indiana provided no basis to ignore
this requirement, and does not challenge ACF's determination of
the amount of penalty, which is the minimum one percent provided
in the statute. For these reasons, we are also unable to grant
Indiana's request to pay the penalty funds not to ACF but to its
Child Support Bureau to be used to enhance the reliability of
data in its ISETS system. That request also conflicts with the
statutory requirement that states pay penalties and use their own
funds to prevent the payment of the penalty (through a reduction
in TANF funding) from causing any decrease in TANF services.

26

Thus, for the reasons discussed above, Indiana's arguments about the causes of the errors in its PEP data and whether those errors reflect any failure to deliver IV-D services do not provide a basis to disregard the resulting unreliability of Indiana's data, or to reverse ACF's determination that Indiana is subject to a penalty for submitting unreliable PEP data for FYs 2001 and 2002.

<u>Conclusion</u>

For the reasons explained in our decision, we sustain the penalty in full.


Judith A. Ballard


Cecilia Sparks Ford


Donald F. Garrett
Presiding Board Member