# EXHIBIT B

| Tab Number | Description |
| --- | --- |
| 1 | 45 C.F.R. Part 16 |
| 2 | 45 C.F.R. Part 262 |
| 3 | 45 C.F.R. Part 305 |

# Tab 1

## PART 15—UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS

AUTHORITY: Sec. 213, Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub. L. 91–646, 84 Stat. 1894 (42 U.S.C. 4633) as amended by the Surface Transportation and Uniform Relocation Assistance Act of 1987, Title IV of Pub. L. 100–17, 101 Stat. 246–256 (42 U.S.C. 4601 note).

### § 15.1  Uniform relocation assistance and real property acquisition.

Regulations and procedures for complying with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Pub. L. 91–646, 84 Stat. 1894, 42 U.S.C. 4601 et seq.), as amended by the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Title IV of Pub. L. 100–17, 101 Stat. 246–256, 42 U.S.C. 4601 note) are set forth in 49 CFR Part 24.

[52 FR 48026, Dec. 17, 1987 and 54 FR 8912, Mar. 2, 1989]

## PART 16—PROCEDURES OF THE DEPARTMENTAL GRANT APPEALS BOARD

Sec.
16.1   What this part does.
16.2   Definitions.
16.3   When these procedures become available.
16.4   Summary of procedures below.
16.5   How the Board operates.
16.6   Who represents the parties.
16.7   The first steps in the appeal process: The notice of appeal and the Board's response.
16.8   The next step in the appeal process: Preparation of an appeal file and written argument.
16.9   How the Board will promote development of the record.
16.10  Using a conference.
16.11  Hearing.
16.12  The expedited process.
16.13  Powers and responsibilities.
16.14  How Board review is limited.
16.15  Failure to meet deadlines and other requirements.
16.16  Parties to the appeal.
16.17  Ex parte communications (communications outside the record).
16.18  Mediation.
16.19  How to calculate deadlines.
16.20  How to submit material to the Board.
16.21  Record and decisions.
16.22  The effect of an appeal.
16.23  How long an appeal takes.
APPENDIX A TO PART 16—WHAT DISPUTES THE BOARD REVIEWS

AUTHORITY: 5 U.S.C. 301 and secs. 1, 5, 6, and 7 of Reorganization Plan No. 1 of 1953, 18 FR 2053, 67 Stat. 631 and authorities cited in the Appendix.

SOURCE: 46 FR 43817, Aug. 31, 1981, unless otherwise noted.

### § 16.1  What this part does.

This part contains requirements and procedures applicable to certain disputes arising under the HHS programs described in Appendix A. This part is designed to provide a fair, impartial, quick and flexible process for appeal from written final decisions. This part supplements the provisions in Part 74 of this title.

### § 16.2  Definitions.

(a) *Board* means the Departmental Grant Appeals Board of the Department of Health and Human Services. Reference below to an action of *the Board* means an action of the Chair, another Board member, or Board staff acting at the direction of a Board member. In certain instances, the provisions restrict action to particular Board personnel, such as the Chair or a Board member assigned to a case.

(b) Other terms shall have the meaning set forth in Part 74 of this title, unless the context below otherwise requires.

### § 16.3  When these procedures become available.

Before the Board will take an appeal, three circumstances must be present:

(a) The dispute must arise under a program which uses the Board for dispute resolution, and must meet any special conditions established for that program. An explanation is contained in Appendix A.

(b) The appellant must have received a final written decision, and must appeal that decision within 30 days after receiving it. Details of how final decisions are developed and issued, and what must be in them, are contained in 45 CFR 74.304.

ADDEN 7

0000529

**Department of Health and Human Services**    **§ 16.7**

(c) The appellant must have exhausted any preliminary appeal process required by regulation. For example, see 42 CFR part 50 (subpart D) for Public Health Service programs. In such cases, the *final written decision* required for the Board's review is the decision resulting from the preliminary review or appeal process. Appendix A contains further details.

[46 FR 43817, Aug. 31, 1981, as amended at 62 FR 38218, July 17, 1997]

**§ 16.4 Summary of procedures below.**

The Board's basic process is review of a written record (which both parties are given ample opportunity to develop), consisting of relevant documents and statements submitted by both parties (see § 16.8). In addition, the Board may hold an informal conference (see § 16.10). The informal conference primarily involves questioning of the participants by a presiding Board member. Conferences may be conducted by telephone conference call. The written record review also may be supplemented by a hearing involving an opportunity for examining evidence and witnesses, cross-examination, and oral argument (see § 16.11). A hearing is more expensive and time-consuming than a determination on the written record alone or with an informal conference. Generally, therefore, the Board will schedule a hearing only if the Board determines that there are complex issues or material facts in dispute, or that the Board's review would otherwise be significantly enhanced by a hearing. Where the amount in dispute is $25,000 or less, there are special expedited procedures (see § 16.12 of this part). In all cases, the Board has the flexibility to modify procedures to ensure fairness, to avoid delay, and to accommodate the peculiar needs of a given case. The Board makes maximum feasible use of preliminary informal steps to refine issues and to encourage resolution by the parties. The Board also has the capability to provide mediation services (see § 16.18).

**§ 16.5 How the Board operates.**

(a) The Board's professional staff consists of a Chair (who is also a Board member) and full- and part-time Board members, all appointed by the Sec-

retary; and a staff of employees and consultants who are attorneys or persons from other relevant disciplines, such as accounting.

(b) The Chair will assign a Board member to have lead responsibility for each case (the "presiding Board member"). The presiding Board member will conduct the conference or hearing, if one is held. Each decision of the Board is issued by the presiding Board member and two other Board members.

(c) The Board staff assists the presiding Board member, and may request information from the parties; conduct telephone conference calls to request information, to clarify issues, or to schedule events; and assist in developing decisions and other documents in a case.

(d) The Chair will assure that no Board or staff member will participate in a case where his or her impartiality could reasonably be questioned.

(e) The Board's powers and responsibilities are set forth in § 16.13.

**§ 16.6 Who represents the parties.**

The appellant's notice of appeal, or the first subsequent submission to the Board, should specify the name, address and telephone number of the appellant's representative. In its first submission to the Board and the appellant, the respondent (i.e., the federal party to the appeal) should specify the name, address and telephone number of the respondent's representative.

**§ 16.7 The first steps in the appeal process: The notice of appeal and the Board's response.**

(a) As explained in 45 CFR 74.304, a prospective appellant must submit a notice of appeal to the Board within 30 days after receiving the final decision. The notice of appeal must include a copy of the final decision, a statement of the amount in dispute in the appeal, and a brief statement of why the decision is wrong.

(b) Within ten days after receiving the notice of appeal, the Board will send an acknowledgment, enclose a copy of these procedures, and advise the appellant of the next steps. The Board will also send a copy of the notice of appeal, its attachments, and the

0000530

Board's acknowledgment to the respondent. If the Board Chair has determined that the appeal does not meet the conditions of § 16.3 or if further information is needed to make this determination, the Board will notify the parties at this point.

**§ 16.8  The next step in the appeal process: Preparation of an appeal file and written argument.**

Except in expedited cases (generally those of $25,000 or less; see § 16.12 for details), the appellant and the respondent each participate in developing an appeal file for the Board to review. Each also submits written argument in support of its position. The responsibilities of each are as follows:

(a) *The appellant's responsibility.* Within 30 days after receiving the acknowledgment of the appeal, the appellant shall submit the following to the Board (with a copy to the respondent):

(1) An appeal file containing the documents supporting the claim, tabbed and organized chronologically and accompanied by an indexed list identifying each document. The appellant should include only those documents which are important to the Board's decision on the issues in the case.

(2) A written statement of the appellant's argument concerning why the respondent's final decision is wrong (appellant's brief).

(b) *The respondent's responsibility.* Within 30 days after receiving the appellant's submission under paragraph (a) of this section, the respondent shall submit the following to the appellant (with a copy to the Board):

(1) A supplement to the appeal file containing any additional documents supporting the respondent's position, organized and indexed as indicated under paragraph (a) of this section. The respondent should avoid submitting duplicates of documents submitted by the appellant.

(2) A written statement (respondent's brief) responding to the appellant's brief.

(c) *The appellant's reply.* Within 15 days after receiving the respondent's submission, the appellant may submit a short reply. The appellant should avoid repeating arguments already made.

(d) *Cooperative efforts.* Whenever possible, the parties should try to develop a joint appeal file, agree to preparation of the file by one of them, agree to facts to eliminate the need for some documents, or agree that one party will submit documents identified by the other.

(e) *Voluminous documentation.* Where submission of all relevant documents would lead to a voluminous appeal file (for example where review of a disputed audit finding of inadequate documentation might involve thousands of receipts), the Board will consult with the parties about how to reduce the size of the file.

**§ 16.9  How the Board will promote development of the record.**

The Board may, at the time it acknowledges an appeal or at any appropriate later point, request additional documents or information; request briefing on issues in the case; issue orders to show cause why a proposed finding or decision of the Board should not become final; hold preliminary conferences (generally by telephone) to establish schedules and refine issues; and take such other steps as the Board determines appropriate to develop a prompt, sound decision.

**§ 16.10  Using a conference.**

(a) Once the Board has reviewed the appeal file, the Board may, on its own or in response to a party's request, schedule an informal conference. The conference will be conducted by the presiding Board member. The purposes of the conference are to give the parties an opportunity to make an oral presentation and the Board an opportunity to clarify issues and question both parties about matters which the Board may not yet fully understand from the record.

(b) If the Board has decided to hold a conference, the Board will consult or correspond with the parties to schedule the conference, identify issues, and discuss procedures. The Board will identify the persons who will be allowed to participate, along with the parties' representatives, in the conference. The parties can submit with their briefs under § 16.8 a list of persons who might participate with them, indicating how

74

0000531

**Department of Health and Human Services**                    **§ 16.11**

each person is involved in the matter. If the parties wish, they may also suggest questions or areas of inquiry which the Board may wish to pursue with each participant.

(c) Unless the parties and the Board otherwise agree, the following procedures apply:

(1) Conferences will be recorded at Department expense. On request, a party will be sent one copy of the transcript. The presiding Board member will insure an orderly transcript by controlling the sequence and identification of speakers.

(2) Only in exceptional circumstances will documents be received at a conference. Inquiry will focus on material in the appeal file. If a party finds that further documents should be in the record for the conference, the party should supplement the appeal file, submitting a supplementary index and copies of the documents to the Board and the other party not less than ten days prior to the conference.

(3) Each party's representative may make an oral presentation. Generally, the only oral communications of other participants will consist of statements requested by the Board or responses to the Board's questions. The Board will allow reply comment, and may allow short closing statements. On request, the Board may allow the participants to question each other.

(4) There will be no post-conference submissions, unless the Board determines they would be helpful to resolve the case. The Board may require or allow the parties to submit proposed findings and conclusions.

**§ 16.11   Hearing.**

(a) *Electing a hearing.* If the appellant believes a hearing is appropriate, the appellant should specifically request one at the earliest possible time (in the notice of appeal or with the appeal file). The Board will approve a request (and may schedule a hearing on its own or in response to a later request) if it finds there are complex issues or material facts in dispute the resolution of which would be significantly aided by a hearing, or if the Board determines that its decisionmaking otherwise would be enhanced by oral presentations and arguments in an adversary,

evidentiary hearing. The Board will also provide a hearing if otherwise required by law or regulation.

(b) *Preliminary conference before the hearing.* The Board generally will hold a prehearing conference (which may be conducted by telephone conference call) to consider any of the following: the possibility of settlement; simplifying and clarifying issues; stipulations and admissions; limitations on evidence and witnesses that will be presented at the hearing; scheduling the hearing; and any other matter that may aid in resolving the appeal. Normally, this conference will be conducted informally and off the record; however, the Board, after consulting with the parties, may reduce results of the conference to writing in a document which will be made part of the record, or may transcribe proceedings and make the transcript part of the record.

(c) *Where hearings are held.* Hearings generally are held in Washington, DC. In exceptional circumstances, the Board may hold the hearing at an HHS Regional Office or other convenient facility near the appellant.

(d) *Conduct of the hearing.* (1) The presiding Board member will conduct the hearing. Hearings will be as informal as reasonably possible, keeping in mind the need to establish an orderly record. The presiding Board member generally will admit evidence unless it is determined to be clearly irrelevant, immaterial or unduly repetitious, so the parties should avoid frequent objections to questions and documents. Both sides may make opening and closing statements, may present witnesses as agreed upon in the prehearing conference, and may cross-examine. Since the parties have ample opportunity to develop a complete appeal file, a party may introduce an exhibit at the hearing only after explaining to the satisfaction of the presiding Board member why the exhibit was not submitted earlier (for example, because the information was not available).

(2) The Board may request the parties to submit written statements of witnesses to the Board and each other prior to the hearing so that the hearing will primarily be concerned with cross-examination and rebuttal.

(3) False statements of a witness may be the basis for criminal prosecution under sections 287 and 1001 of Title 18 of the United States Code.

(4) The hearing will be recorded at Department expense.

(e) *Procedures after the hearing.* The Board will send one copy of the transcript to each party as soon as it is received by the Board. At the discretion of the Board, the parties may be required or allowed to submit post-hearing briefs or proposed findings and conclusions (the parties will be informed at the hearing). A party should note any major prejudicial transcript errors in an addendum to its post-hearing brief (or if no brief will be submitted, in a letter submitted within a time limit set by the Board).

### § 16.12  The expedited process.

(a) *Applicability.* Where the amount in dispute is $25,000 or less, the Board will use these expedited procedures, unless the Board Chair determines otherwise under paragraph (b) of this section. If the Board and the parties agree, the Board may use these procedures in cases of more than $25,000.

(b) *Exceptions.* If there are unique or unusually complex issues involved, or other exceptional circumstances, the Board may use additional procedures.

(c) *Regular expedited procedures.* (1) Within 30 days after receiving the Board's acknowledgment of the appeal (see § 16.7), each party shall submit to the Board and the other party any relevant background documents (organized as required under § 16.8), with a cover letter (generally not to exceed ten pages) containing any arguments the party wishes to make.

(2) Promptly after receiving the parties' submissions, the presiding Board member will arrange a telephone conference call to receive the parties' oral comments in response to each other's submissions. After notice to the parties, the Board will record the call. The Board member will advise the parties whether any opportunities for further briefing, submissions or oral presentations will be established. Cooperative efforts will be encouraged (see § 16.8(d)).

(3) The Board may require the parties to submit proposed findings and conclusions.

(d) *Special expedited procedures where there has already been review.* Some HHS components (for example, the Public Health Service) use a board or other relatively independent reviewing authority to conduct a formal preliminary review process which results in a written decision based on a record including documents or statements presented after reasonable notice and opportunity to present such material. In such cases, the following rules apply to appeals of $25,000 or less instead of those under paragraph (c) of this section:

(1) Generally, the Board's review will be restricted to whether the decision of the preliminary review authority was clearly erroneous. But if the Board determines that the record is inadequate, or that the procedures under which the record was developed in a given instance were unfair, the Board will not be restricted this way.

(2) Within 30 days after receiving the Board's acknowledgment of appeal (see § 16.7), the parties shall submit the following:

(i) The appellant shall submit to the Board and the respondent a statement why the decision was clearly erroneous. Unless allowed by the Board after consultation with the respondent, the appellant shall not submit further documents.

(ii) The respondent shall submit to the Board the record in the case. If the respondent has reason to believe that all materials in the record already are in the possession of the appellant, the respondent need only send the appellant a list of the materials submitted to the Board.

(iii) The respondent may, if it wishes, submit a statement why the decision was not clearly erroneous.

(3) The Board, in its discretion, may allow or require the parties to present further arguments or information.

### § 16.13  Powers and responsibilities.

In addition to powers specified elsewhere in these procedures, Board members have the power to issue orders (including "show cause" orders); to examine witnesses; to take all steps necessary for the conduct of an orderly hearing; to rule on requests and motions, including motions to dismiss; to

0000533

**Department of Health and Human Services**     § 16.18

grant extensions of time for good reasons; to dismiss for failure to meet deadlines and other requirements; to close or suspend cases which are not ready for review; to order or assist the parties to submit relevant information; to remand a case for further action by the respondent; to waive or modify these procedures in a specific case with notice to the parties; to reconsider a Board decision where a party promptly alleges a clear error of fact or law; and to take any other action necessary to resolve disputes in accordance with the objectives of these procedures.

### § 16.14  How Board review is limited.

The Board shall be bound by all applicable laws and regulations.

### § 16.15  Failure to meet deadlines and other requirements.

(a) Since one of the objectives of administrative dispute resolution is to provide a decision as fast as possible consistent with fairness, the Board will not allow parties to delay the process unduly. The Board may grant extensions of time, but only if the party gives a good reason for the delay.

(b) If the appellant fails to meet any filing or procedural deadlines, appeal file or brief submission requirements, or other requirements established by the Board, the Board may dismiss the appeal, may issue an order requiring the party to show cause why the appeal should not be dismissed, or may take other action the Board considers appropriate.

(c) If the respondent fails to meet any such requirements, the Board may issue a decision based on the record submitted to that point or take such other measures as the Board considers appropriate.

### § 16.16  Parties to the appeal.

(a) The only parties to the appeal are the appellant and the respondent. If the Board determines that a third person is a real party in interest (for example, where the major impact of an audit disallowance would be on the grantee's contractor, not on the grantee), the Board may allow the third person to present the case on appeal for the appellant or to appear with a party in the case, after consultation with the

parties and if the appellant does not object.

(b) The Board may also allow other participation, in the manner and by the deadlines established by the Board, where the Board decides that the intervenor has a clearly identifiable and substantial interest in the outcome of the dispute, that participation would sharpen issues or otherwise be helpful in resolution of the dispute, and that participation would not result in substantial delay.

### § 16.17  Ex parte communications (communications outside the record).

(a) A party shall not communicate with a Board or staff member about matters involved in an appeal without notice to the other party. If such communication occurs, the Board will disclose it to the other party and make it part of the record after the other party has an opportunity to comment. Board members and staff shall not consider any information outside the record (see § 16.21 for what the record consists of) about matters involved in an appeal.

(b) The above does not apply to the following: Communications among Board members and staff; communications concerning the Board's administrative functions or procedures; requests from the Board to a party for a document (although the material submitted in response also must be given to the other party); and material which the Board includes in the record after notice and an opportunity to comment.

### § 16.18  Mediation.

(a) *In cases pending before the Board.* If the Board decides that mediation would be useful to resolve a dispute, the Board, in consultation with the parties, may suggest use of mediation techniques and will provide or assist in selecting a mediator. The mediator may take any steps agreed upon by the parties to resolve the dispute or clarify issues. The results of mediation are not binding on the parties unless the parties so agree in writing. The Board will internally insulate the mediator from any Board or staff members assigned to handle the appeal.

(b) *In other cases.* In any other grants dispute, the Board may, within the

77

0000534

limitations of its resources, offer persons trained in mediation skills to aid in resolving the dispute. Mediation services will only be offered at the request, or with the concurrence, of a responsible federal program official in the program under which the dispute arises. The Board will insulate the mediator if any appeal subsequently arises from the dispute.

### § 16.19 How to calculate deadlines.

In counting days, include Saturdays, Sundays, and holidays; but if a due date would fall on a Saturday, Sunday or Federal holiday, then the due date is the next Federal working day.

### § 16.20 How to submit material to the Board.

(a) All submissions should be addressed as follows: Departmental Grant Appeals Board, Room 2004, Switzer Building, 330 C Street SW., Washington, DC 20201.

(b) All submissions after the notice of appeal should identify the Board's docket number (the Board's acknowledgement under § 16.7 will specify the docket number).

(c) Unless the Board otherwise specifies, parties shall submit to the Board an original and two copies of all materials. Each submission other than the notice of appeal, must include a statement that one copy of the materials has been sent to the other party, identifying when and to whom the copy was sent.

(d) Unless hand delivered, all materials should be sent to the Board and the other party by certified or registered mail, return receipt requested.

(e) The Board considers material to be submitted on the date when it is postmarked or hand delivered to the Board.

### § 16.21 Record and decisions.

(a) Each decision is issued by three Board members (see § 16.5(b)), who base their decision on a record consisting of the appeal file; other submissions of the parties; transcripts or other records of any meetings, conferences or hearings conducted by the Board; written statements resulting from conferences; evidence submitted at hearings; and orders and other documents issued by the Board. In addition, the Board may include other materials (such as evidence submitted in another appeal) after the parties are given notice and an opportunity to comment.

(b) The Board will promptly notify the parties in writing of any disposition of a case and the basis for the disposition.

### § 16.22 The effect of an appeal.

(a) *General.* Until the Board disposes of an appeal, the respondent shall take no action to implement the final decision appealed.

(b) *Exceptions.* The respondent may—

(1) Suspend funding (see § 74.114 of this title);

(2) Defer or disallow other claims questioned for reasons also disputed in the pending appeal;

(3) In programs listed in Appendix A, B.(a)(1), implement a decision to disallow Federal financial participation claimed in expenditures reported on a statement of expenditures, by recovering, withholding or offsetting payments, if the decision is issued before the reported expenditures are included in the calculation of a subsequent grant; or

(4) Take other action to recover, withhold, or offset funds if specifically authorized by statute or regulation.

### § 16.23 How long an appeal takes.

The Board has established general goals for its consideration of cases, as follows (measured from the point when the Board receives the first submission after the notice of appeal):

—For regular review based on a written record under § 16.8, 6 months. When a conference under § 16.10 is held, the goal remains at 6 months, unless a requirement for post-conference briefing in a particular case renders the goal unrealistic.

—For cases involving a hearing under § 16.11, 9 months.

—For the expedited process under § 16.12, 3 months.

These are goals, not rigid requirements. The paramount concern of the Board is to take the time needed to review a record fairly and adequately in order to produce a sound decision. Furthermore, many factors are beyond the

0000535

**Department of Health and Human Services**                    **Pt. 16, App. A**

Board's direct control, such as unforeseen delays due to the parties' negotiations or requests for extensions, how many cases are filed, and Board resources. On the other hand, the parties may agree to steps which may shorten review by the Board; for example, by waiving the right to submit a brief, by agreeing to shorten submission schedules, or by electing the expedited process.

APPENDIX A TO PART 16—WHAT
DISPUTES THE BOARD REVIEWS

*A. What this Appendix covers.*

This appendix describes programs which use the Board for dispute resolution, the types of disputes covered, and any conditions for Board review of final written decisions resulting from those disputes. Disputes under programs not specified in this appendix may be covered in a program regulation or in a memorandum of understanding between the Board and the head of the appropriate HHS operating component or other agency responsible for administering the program. If in doubt, call the Board. Even though a dispute may be covered here, the Board still may not be able to review it if the limits in paragraph F apply.

*B. Mandatory grant programs.*

(a) The Board reviews the following types of final written decisions in disputes arising in HHS programs authorizing the award of mandatory grants:

(1) Disallowances under Titles I, IV, X, XIV, XVI(AABD), XIX, and XX of the Social Security Act, including penalty disallowances such as those under sections 403(g) and 1903(g) of the Act and fiscal disallowances based on quality control samples.

(2) Disallowances in mandatory grant programs administered by the Public Health Service, including Title V of the Social Security Act.

(3) Disallowances in the programs under sections 113 and 132 of the Developmental Disabilities Act.

(4) Disallowances under Title III of the Older American Act.

(5) Decisions relating to repayment and withholding under block grant programs as provided in 45 CFR 96.52.

(6) Decisions relating to repayment and withholding under State Legalization Impact Assistance Grants as provided in 45 CFR 402.24 and 402.25.

(b) In some of these disputes, there is an option for review by the head of the granting agency prior to appeal to the Board. Where an appellant has requested review by the agency head first, the "final written decision" required by §16.3 for purposes of Board review will generally be the agency head's

decision affirming the disallowance. If the agency head declines to review the disallowance or if the appellant withdraws its request for review by the agency head, the original disallowance decision is the "final written decision." In the latter cases, the 30-day period for submitting a notice of appeal begins with the date of receipt of the notice declining review or with the date of the withdrawal letter.

*C. Direct, discretionary project programs.*

(a) The Board reviews the following types of final written decisions in disputes arising in any HHS program authorizing the award of direct, discretionary project grants or cooperative agreements:

(1) A disallowance or other determination denying payment of an amount claimed under an award, or requiring return or set-off of funds already received. This does not apply to determinations of award amount or disposition of unobligated balances, or selection in the award document of an option for disposition of program-related income.

(2) A termination for failure to comply with the terms of an award.

(3) A denial of a noncompeting continuation award under the project period system of funding where the denial is for failure to comply with the terms of a previous award.

(4) A voiding (a decision that an award is invalid because it was not authorized by statute or regulation or because it was fraudulently obtained).

(b) Where an HHS component uses a preliminary appeal process (for example, the Public Health Service), the "final written decision" for purposes of Board review is the decision issued as a result of that process.

*D. Cost allocation and rate disputes.*

The Board reviews final written decisions in disputes which may affect a number of HHS programs because they involve cost allocation plans or rate determinations. These include decisions related to cost allocation plans negotiated with State or local governments and negotiated rates such as indirect cost rates, fringe benefit rates, computer rates, research patient care rates, and other special rates.

*E. SSI agreement disputes.*

The Board reviews disputes in the Supplemental Security Income (SSI) program arising under agreements for Federal administration of State supplementary payments under section 1616 of the Social Security Act or mandatory minimum supplements under section 212 of Pub. L. 93–66. In these cases, the Board provides an opportunity to be heard and offer evidence at the Secretarial level of review as set out in the applicable agreements. Thus, the "final written decision" for purposes of Board review is that determination appealable to the Secretary under the agreement.

*F. Where Board review is not available.*

0000536

Pt. 17

The Board will not review a decision if a hearing under 5 U.S.C. 554 is required by statute. If the basis of the decision is a violation of applicable civil rights or non-discrimination laws or regulations (for example, Title VI of the Civil Rights Act), or if some other hearing process is established pursuant to statute.

*G. How the Board determines whether it will review a case.*

Under §16.7, the Board Chair determines whether an appeal meets the requirements of this Appendix. If the Chair finds that there is some question about this, the Board will request the written opinion of the HHS component which issued the decision. Unless the Chair determines that the opinion is clearly erroneous, the Board will be bound by the opinion. If the HHS component does not respond within a time set by the Chair, or cannot determine whether the Board clearly does or does not have jurisdiction, the Board will take the appeal.

[46 FR 43817, Aug. 31, 1981, as amended at 47 FR 29492, July 6, 1982; 53 FR 7864, Mar. 10, 1988; 62 FR 38218, July 17, 1997]

## PART 17—RELEASE OF ADVERSE INFORMATION TO NEWS MEDIA

Sec.
17.1   Definition.
17.2   Basic policy.
17.3   Precautions to be taken.
17.4   Regulatory investigations and trial-type proceedings.
17.5   Context to be reflected.
17.6   Advance notice.
17.7   Retractions or corrections.

AUTHORITY: 5 U.S.C. 301.

SOURCE: 41 FR 3, Jan. 2, 1976, unless otherwise noted.

### §17.1   Definition.

Adverse information released by an agency means any statement or release by the Department or any principal operating component made to the news media inviting public attention to an action or a finding by the Department or principal operating component of the Department which may adversely affect persons or organizations identified therein. This part does not apply to nor is it affected by any disclosure of records to the public in response to requests made under the Freedom of Information Act (Pub. L. 90–23). The criteria for such disclosures are set forth in the Department's Public Information Regulation (45 CFR Part 5).

### §17.2   Basic policy.

All adverse information release to news media shall be factual in content and accurate in description. Disparaging terminology not essential to the content and purpose of the publicity shall be avoided.

### §17.3   Precautions to be taken.

The issuing organization shall take reasonable precautions to assure that information released is accurate and that its release fulfills an authorized purpose.

### §17.4   Regulatory investigations and trial-type proceedings.

Adverse information relating to regulatory investigations of specifically identified persons or organizations or to pending agency trial-type proceedings shall be released only in limited circumstances in accordance with the criteria outlined below:

(a) Where the Department or a principal operating component determines that there is a significant risk that the public health or safety may be impaired or substantial economic harm may occur unless the public is notified immediately, it may release information to news media as one of the means of notifying the affected public speedily and accurately. However, where the Department or principal operating component determines that public harm can be avoided by immediate discontinuance of an offending practice, a respondent shall be allowed an opportunity, where feasible, to cease the practice (pending a legal test) in lieu of release of adverse information by the agency.

(b) Where it is required in order to bring notice of pending agency adjudication to persons likely to desire to participate therein or likely to be affected by that or a related adjudication, the Department or principal operating component shall rely on the news media to the extent necessary to provide such notice even though it may be adverse to a respondent.

### §17.5   Context to be reflected.

The authority for and the character of the information shall be made clear,

0000537

**Tab 2**

**Office of Family Assistance, ACF, HHS**

(1) The State does not have a state-wide process in place to inform parents about the exception to the work requirement and enable them to demonstrate that they have been unable to obtain child care; or

(2) There is a pattern of substantiated complaints from parents or organizations verifying that a State has reduced or terminated assistance in violation of this requirement.

(c) We may impose a reduced penalty if the State demonstrates that the violations were isolated or that they affected a minimal number of families.

## Subpart F—How Do Welfare Reform Waivers Affect State Penalties?

### § 261.60 How do existing welfare reform waivers affect a State's penalty liability under this part?

A welfare reform waiver could affect a State's penalty liability under this part, subject to subpart C of part 260 of this chapter and section 415 of the Act.

## Subpart G—What Nondisplacement Rules Apply in TANF?

### § 261.70 What safeguards are there to ensure that participants in work activities do not displace other workers?

(a) An adult taking part in a work activity outlined in § 261.30 may not fill a vacant employment position if:

(1) Another individual is on layoff from the same or any substantially equivalent job; or

(2) The employer has terminated the employment of any regular employee or caused an involuntary reduction in its work force in order to fill the vacancy with an adult taking part in a work activity.

(b) A State must establish and maintain a grievance procedure to resolve complaints of alleged violations of the displacement rule in this section.

(c) This section does not preempt or supersede State or local laws providing greater protection for employees from displacement.

§ 262.1

## PART 262—ACCOUNTABILITY PROVISIONS—GENERAL

Sec.
262.0  What definitions apply to this part?
262.1  What penalties apply to States?
262.2  When do the TANF penalty provisions apply?
262.3  How will we determine if a State is subject to a penalty?
262.4  What happens if we determine that a State is subject to a penalty?
262.5  Under what general circumstances will we determine that a State has reasonable cause?
262.6  What happens if a State does not demonstrate reasonable cause?
262.7  How can a State appeal our decision to take a penalty?

AUTHORITY: 31 U.S.C. 7501 *et seq.*; 42 U.S.C. 606, 609, and 610.

SOURCE: 64 FR 17890, Apr. 12, 1999, unless otherwise noted.

### § 262.0  What definitions apply to this part?

The general TANF definitions at §§ 260.30 through 260.33 of this chapter apply to this part.

### § 262.1  What penalties apply to States?

(a) We will assess fiscal penalties against States under circumstances defined in parts 261 through 265 of this chapter. The penalties are:

(1) A penalty of the amount by which a State misused its TANF funds;

(2) An additional penalty of five percent of the adjusted SFAG if such misuse was intentional;

(3) A penalty of four percent of the adjusted SFAG for each quarter a State fails to submit an accurate, complete and timely required report;

(4) A penalty of up to 21 percent of the adjusted SFAG for failure to satisfy the minimum participation rates;

(5) A penalty of no more than two percent of the adjusted SFAG for failure to participate in IEVS;

(6) A penalty of no more than five percent of the adjusted SFAG for failure to enforce penalties on recipients who are not cooperating with the State Child Support Enforcement (IV-D) agency;

(7) A penalty equal to the outstanding loan amount, plus interest, for failure to repay a Federal loan;

141

ADDEN 8

0000538

(8) A penalty equal to the amount by which a State fails to meet its basic MOE requirement;

(9) A penalty of five percent of the adjusted SFAG for failure to comply with the five-year limit on Federal assistance;

(10) A penalty equal to the amount of contingency funds that were received but were not remitted for a fiscal year, if the State fails to maintain 100 percent of historic State expenditures in that fiscal year;

(11) A penalty of no more than five percent of the adjusted SFAG for the failure to maintain assistance to an adult single custodial parent who cannot obtain child care for a child under age six;

(12) A penalty of no more than two percent of the adjusted SFAG plus the amount a State has failed to expend of its own funds to replace the reduction to its SFAG due to the assessment of penalties in this section in the immediately succeeding fiscal year;

(13) A penalty equal to the amount of the State's Welfare-to-Work formula grant for failure to meet its basic MOE requirement during a year in which it receives the formula grant; and

(14) A penalty of not less than one percent and not more than five percent of the adjusted SFAG for failure to impose penalties properly against individuals who refuse to engage in required work in accordance with section 407 of the Act.

(b) In the event of multiple penalties for a fiscal year, we will add all applicable penalty percentages together. We will then assess the penalty amount against the adjusted SFAG that would have been payable to the State if we had assessed no penalties. As a final step, we will subtract other (fixed) penalty amounts from the adjusted SFAG.

(c)(1) We will take the penalties specified in paragraphs (a)(1), (a)(2) and (a)(7) of this section by reducing the SFAG payable for the quarter that immediately follows our final decision.

(2) We will take the penalties specified in paragraphs (a)(3), (a)(4), (a)(5), (a)(6), (a)(8), (a)(9), (a)(10), (a)(11), (a)(12), (a)(13), and (a)(14) of this section by reducing the SFAG payable for the fiscal year that immediately follows our final decision.

(d) When imposing the penalties in paragraph (a) of this section, the total reduction in an affected State's quarterly SFAG amount must not exceed 25 percent. If this 25-percent limit prevents the recovery of the full penalty amount imposed on a State during a quarter or a fiscal year, as appropriate, we will apply the remaining amount of the penalty to the SFAG payable for the immediately succeeding quarter until we recover the full penalty amount.

(e)(1) In the immediately succeeding fiscal year, a State must expend additional State funds to replace any reduction in the SFAG resulting from penalties.

(2) The State must document compliance with this replacement provision on its TANF Financial Report (or Territorial Financial Report).

§ 262.2  When do the TANF penalty provisions apply?

(a) A State will be subject to the penalties specified in § 262.1(a)(1), (2), (7), (8), (9), (10), (11), (12), (13), and (14) for conduct occurring on and after the first day the State operates the TANF program.

(b) A State will be subject to the penalties specified in § 262.1(a)(3), (4), (5), and (6) for conduct occurring on and after July 1, 1997, or the date that is six months after the first day the State operates the TANF program, whichever is later.

(c) For the time period prior to October 1, 1999, we will assess State conduct as specified in § 260.40(b) of this chapter.

§ 262.3  How will we determine if a State is subject to a penalty?

(a)(1) We will use the single audit under OMB Circular A-133, in conjunction with other reviews, audits, and data sources, as appropriate, to determine if a State is subject to a penalty for misusing Federal TANF funds (§ 263.10 of this chapter), intentionally misusing Federal TANF funds (§ 263.12 of this chapter), failing to participate in IEVS (§ 264.10 of this chapter), failing to comply with paternity establishment and child support requirements (§ 264.31 of this chapter), failing to maintain assistance to an adult single

142

0000539

**Office of Family Assistance, ACF, HHS** §262.4

custodial parent who cannot obtain child care for child under six (§261.57 of this chapter), and failing to reduce assistance to a recipient who refuses without good cause to work (§261.54 of this chapter).

(2) We will also use the single audit as a secondary method of determining if a State is subject to other penalties if an audit detects lack of compliance in other penalty areas.

(b)(1) We will use the TANF Data Report required under part 265 of this chapter to determine if a State failed to meet participation rates (§§261.21 and 261.23 of this chapter) or failed to comply with the five-year limit on Federal assistance (§264.1 of this chapter).

(2) Data in these reports are subject to our verification in accordance with §265.7 of this chapter.

(c)(1) We will use the TANF Financial Report (or, as applicable, the Territorial Financial Report) as the primary method for determining if a State has failed to meet the basic MOE requirement (§263.8 of this chapter), meet the Contingency Fund MOE requirement (§264.76 of this chapter), or replace SFAG reductions with State-only funds (§264.50 of this chapter).

(2) Data in these reports are subject to our verification in accordance with §265.7 of this chapter.

(d) We will determine that a State is subject to the specific penalties for failure to perform if we find information in the reports under paragraphs (b) and (c) of this section to be insufficient to show compliance or if we determine that the State has not adequately documented actions verifying that it has met the participation rates or the time limits.

(e) To determine if a State has met its MOE requirements, we will also use the supplemental information in the annual report required in accordance with §265.9(c) of this chapter.

(f) States must maintain records in accordance with §92.42 of this title.

§262.4 **What happens if we determine that a State is subject to a penalty?**

(a) If we determine that a State is subject to a penalty, we will notify the State agency in writing, specifying which penalty we will impose and the reasons for the penalty. This notice will:

(1) Specify the penalty provision at issue, including the penalty amount;

(2) Specify the source of information and the reasons for our decision;

(3) Invite the State to present its arguments if it believes that the information or method that we used were in error or were insufficient or that its actions, in the absence of Federal regulations, were based on a reasonable interpretation of the statute; and

(4) Explain how and when the State may submit a reasonable cause justification under §262.5 and/or corrective compliance plan under §262.6.

(b) Within 60 days of when it receives our notification, the State may submit a written response that:

(1) Demonstrates that our determination is incorrect because our information or the method that we used in determining the violation or the amount of the penalty was in error or was insufficient, or that the State acted, in the absence of Federal rules, on a reasonable interpretation of the statute;

(2) Demonstrates that the State had reasonable cause for failing to meet the requirement(s); and/or

(3) Provides a corrective compliance plan, pursuant to §262.6.

(c) If we find that we determined the penalty erroneously, or that the State has adequately demonstrated that it had reasonable cause for failing to meet one or more requirements, we will not impose the penalty.

(d) Reasonable cause and corrective compliance plans are not available for failing to repay a Federal loan; meet the basic MOE requirement; meet the Contingency Fund MOE requirement; expend additional State funds to replace adjusted SFAG reductions due to the imposition of one or more penalties listed in §262.1; or maintain 80 percent, or 75 percent, as appropriate, basic MOE during a year in which the State receives a Welfare-to-Work grant.

(e)(1) If we request additional information from a State that we need to determine reasonable cause, the State must ordinarily provide such information within 30 days.

(2) Under unusual circumstances, we may give the State an extension of the time to respond to our request.

143

0000540

(f)(1)(i) We will notify the State in writing of our findings with respect to reasonable cause generally within 60 days of the date when we receive its response to our penalty notice (in accordance with paragraph (b) of this section).

(ii) If the finding is negative and the State has not yet submitted a corrective compliance plan, it may do so in response to this notice in accordance with § 262.6.

(2) We will notify the State of our decision regarding its corrective compliance plan in accordance with the provisions of § 262.6(g).

(g) We will impose a penalty in accord with the provisions in § 262.1(c) after we make our final decision and the appellate process is completed, if applicable. If there is an appellate decision upholding the penalty, we will take the penalty and charge interest back to the date that we formally notified the Governor of the adverse action pursuant to § 262.7(a)(1).

§ 262.5  Under what general circumstances will we determine that a State has reasonable cause?

(a) We will not impose a penalty against a State if we determine that the State had reasonable cause for its failure. The general factors a State may use to claim reasonable cause include:

(1) Natural disasters and other calamities (e.g., hurricanes, earthquakes, fire) whose disruptive impact was so significant as to cause the State's failure;

(2) Formally issued Federal guidance that provided incorrect information resulting in the State's failure; or

(3) Isolated problems of minimal impact that are not indicative of a systemic problem.

(b)(1) We will grant reasonable cause to a State that:

(i) Clearly demonstrates that its failure to submit complete, accurate, and timely data, as required at § 265.8 of this chapter, for one or both of the first two quarters of FY 2000, is attributable, in significant part, to its need to divert critical system resources to Year 2000 compliance activities; and

(ii) Submits complete and accurate data for the first two quarters of FY 2000 by September 30, 2000.

(2) A State may also use the additional factors for claiming reasonable cause for failure to comply with the five-year limit on Federal assistance or the minimum participation rates, as specified at §§ 261.52 and 264.3 and subpart B of part 260 of this chapter.

(c) In determining reasonable cause, we will consider the efforts the State made to meet the requirement, as well as the duration and severity of the circumstances that led to the State's failure to achieve the requirement.

(d)(1) The burden of proof rests with the State to fully explain the circumstances and events that constitute reasonable cause for its failure to meet a requirement.

(2) The State must provide us with sufficient relevant information and documentation to substantiate its claim of reasonable cause.

[64 FR 17890, Apr. 12, 1999; 64 FR 40291, July 26, 1999]

§ 262.6  What happens if a State does not demonstrate reasonable cause?

(a) A State may accept the penalty or enter into a corrective compliance plan that will correct or discontinue the violation in order to avoid the penalty if:

(1) A State does not claim reasonable cause; or

(2) We find that the State does not have reasonable cause.

(b) A State that does not claim reasonable cause will have 60 days from receipt of our notice described in § 262.4(a) to submit its corrective compliance plan.

(c) A State that unsuccessfully claimed reasonable cause will have 60 days from the date that it received our second notice, described in § 262.4(f), to submit its corrective compliance plan.

(d) The corrective compliance plan must include:

(1) A complete analysis of why the State did not meet the requirements;

(2) A detailed description of how the State will correct or discontinue, as appropriate, the violation in a timely manner;

0000541

**Office of Family Assistance, ACF, HHS**                                    **§ 262.7**

(3) The time period in which the violation will be corrected or discontinued;

(4) The milestones, including interim process and outcome goals, that the State will achieve to assure it comes into compliance within the specified time period; and

(5) A certification by the Governor that the State is committed to correcting or discontinuing the violation, in accordance with the plan.

(e) The corrective compliance plan must correct or discontinue the violation within the following time frames:

(1) For a penalty under § 262.1(a)(4) or (a)(9), by the end of the first fiscal year ending at least six months after our receipt of the corrective compliance plan; and

(2) For the remaining penalties, by a date the State proposes that reflects the minimum period necessary to achieve compliance.

(f) During the 60-day period following our receipt of the State's corrective compliance plan, we may request additional information and consult with the State on modifications to the plan.

(g) We will accept or reject the State's corrective compliance plan, in writing, within 60 days of our receipt of the plan, although a corrective compliance plan is deemed to be accepted if we take no action during the 60-day period following our receipt of the plan.

(h) If a State does not submit an acceptable corrective compliance plan on time, we will assess the penalty immediately.

(i) We will not impose a penalty against a State with respect to any violation covered by a corrective compliance plan that we accept if the State completely corrects or discontinues, as appropriate, the violation within the period covered by the plan.

(j) Under limited circumstances, we may reduce the penalty if the State fails to completely correct or discontinue the violation pursuant to its corrective compliance plan and in a timely manner. To receive a reduced penalty, the State must demonstrate that it met one or both of the following conditions:

(1) Although it did not achieve full compliance, the State made significant progress towards correcting or discontinuing the violation; or

(2) The State's failure to comply fully was attributable to either a natural disaster or regional recession.

**§ 262.7 How can a State appeal our decision to take a penalty?**

(a)(1) We will formally notify the Governor and the State agency of an adverse action (i.e., the reduction in the SFAG) within five days after we determine that a State is subject to a penalty under parts 261 through 265 of this chapter.

(2) Such notice will include the factual and legal basis for taking the penalty in sufficient detail for the State to be able to respond in an appeal.

(b)(1) The State may file an appeal of the action, in whole or in part, with the HHS Departmental Appeals Board (the Board) within 60 days after the date it receives notice of the adverse action. The State must submit its brief and supporting documents when it files its appeal.

(2) The State must send a copy of the appeal, and any supplemental filings, to the Office of the General Counsel, Children, Families and Aging Division, Room 411–D, 200 Independence Avenue, SW., Washington, DC 20201.

(c) We will submit our reply brief and supporting documentation within 45 days of the receipt of the State's submission under paragraph (b) of this section.

(d) The State may submit a reply and any supporting documentation within 21 days of its receipt of our reply under paragraph (c) of this section.

(e) The appeal to the Board must follow the provisions of the rules under this section and those at §§ 16.2, 16.9, 16.10, and 16.13–16.22 of this title, to the extent that they are consistent with this section.

(f) The Board will consider an appeal filed by a State on the basis of the documentation and briefs submitted, along with any additional information the Board may require to support a final decision. Such information may include a hearing if the Board determines that it is necessary. In deciding whether to uphold an adverse action or any portion of such action, the Board will

145

0000542

conduct a thorough review of the issues.

(g)(1) A State may obtain judicial review of a final decision by the Board by filing an action within 90 days after the date of such decision. It should file this action with the district court of the United States in the judicial district where the State agency is located or in the United States District Court for the District of Columbia.

(2) The district court will review the final decision of the Board on the record established in the administrative proceeding, in accordance with the standards of review prescribed by 5 U.S.C. 706(2). The court will base its review on the documents and supporting data submitted to the Board.

## PART 263—EXPENDITURES OF STATE AND FEDERAL TANF FUNDS

Sec.
263.0   What definitions apply to this part?

### Subpart A—What Rules Apply to a State's Maintenance of Effort?

263.1   How much State money must a State expend annually to meet the basic MOE requirement?
263.2   What kinds of State expenditures count toward meeting a State's basic MOE expenditure requirement?
263.3   When do child care expenditures count?
263.4   When do educational expenditures count?
263.5   When do expenditures in State-funded programs count?
263.6   What kinds of expenditures do not count?
263.8   What happens if a State fails to meet the basic MOE requirement?
263.9   May a State avoid a penalty for failing to meet the basic MOE requirement through reasonable cause or through corrective compliance?

### Subpart B—What Rules Apply to the Use of Federal TANF Funds?

263.10   What actions would we take against a State if it uses Federal TANF funds in violation of the Act?
263.11   What uses of Federal TANF funds are improper?
263.12   How will we determine if a State intentionally misused Federal TANF funds?
263.13   Is there a limit on the amount of Federal TANF funds that a State may spend on administrative costs?

### Subpart C—What Rules Apply to Individual Development Accounts?

263.20   What definitions apply to Individual Development Accounts (IDAs)?
263.21   May a State use the TANF grant to fund IDAs?
263.22   Are there any restrictions on IDA funds?
263.23   How does a State prevent a recipient from using the IDA account for unqualified purposes?

AUTHORITY: 42 U.S.C. 604, 607, 609, and 862a.

SOURCE: 64 FR 17893, Apr. 12, 1999, unless otherwise noted.

## §263.0   What definitions apply to this part?

(a) Except as noted in §263.2(d), the general TANF definitions at §260.30 through §260.33 of this chapter apply to this part.

(b) The term "administrative costs" means costs necessary for the proper administration of the TANF program or separate State programs.

(1) It excludes direct costs of providing program services.

(i) For example, it excludes costs of providing diversion benefits and services, providing program information to clients, screening and assessments, development of employability plans, work activities, post-employment services, work supports, and case management. It also excludes costs for contracts devoted entirely to such activities.

(ii) It excludes the salaries and benefits costs for staff providing program services and the direct administrative costs associated with providing the services, such as the costs for supplies, equipment, travel, postage, utilities, rental of office space and maintenance of office space.

(2) It includes costs for general administration and coordination of these programs, including contract costs and all indirect (or overhead) costs. Examples of administrative costs include:

(i) Salaries and benefits of staff performing administrative and coordination functions;

(ii) Activities related to eligibility determinations;

(iii) Preparation of program plans, budgets, and schedules;

(iv) Monitoring of programs and projects;

146

# Tab 3

**Office of Child Support Enforcement, ACF, HHS** §305.1

305.65  State cooperation in the audit.
305.66  Notice, corrective action year, and imposition of penalty.

AUTHORITY: 42 U.S.C. 609(a)(8), 652(a)(4) and (g), 658A and 1302.

SOURCE: At 65 FR 82208, Dec. 27, 2000, unless otherwise noted.

### §305.0  Scope.

This part implements the incentive system requirements as described in section 458A (to be redesignated as section 458 effective October 1, 2001) of the Act and the penalty provisions as required in sections 409(a)(8) and 452(g) of the Act. This part also implements Federal audit requirements under sections 409(a)(8) and 452(a)(4) of the Act. Sections 305.0 through 305.2 contain general provisions applicable to this part. Sections 305.31 through 305.36 of this part describe the incentive system. Sections 305.40 through 305.42 and §§305.60 through 305.66 describe the penalty and audit processes.

### §305.1  Definitions.

The definitions found in §301.1 of this chapter are also applicable to this part. In addition, for purposes of this part:

(a) The term *IV–D case* means a parent (mother, father, or putative father) who is now or eventually may be obligated under law for the support of a child or children receiving services under the title IV–D program. A parent is a separate IV–D case for each family with a dependent child or children that the parent may be obligated to support. If both parents are absent and liable or potentially liable for support of a child or children receiving services under the IV–D program, each parent is considered a separate IV–D case. In counting cases for the purposes of this part, States may exclude cases closed under §303.11 and cases over which the State has no jurisdiction. Lack of jurisdiction cases are those in which a non-custodial parent resides in the civil jurisdictional boundaries of another country or federally recognized Indian Tribe and no income or assets of this individual are located or derived from outside that jurisdiction and the State has no other means through which to enforce the order.

(b) The term *Current Assistance collections* means collections received and distributed on behalf of individuals whose rights to support are required to be assigned to the State under title IV–A of the Act, under title IV–E of the Act, or under title XIX of the Act. In addition, a referral to the State's IV–D agency must have been made.

(c) The term *Former Assistance collections* means collections received and distributed on behalf of individuals whose rights to support were formerly required to be assigned to the State under title IV–A (TANF or Aid to Families with Dependent Children, AFDC), title IV–E (Foster Care), or title XIX (Medicaid) of the Act.

(d) The term *Never Assistance/Other collections* means all other collections received and distributed on behalf of individuals who are receiving child support enforcement services under title IV–D of the Act.

(e) The term *total IV–D dollars expended* means total IV–D administrative expenditures claimed by a State in a specified fiscal year adjusted in accordance with §305.32 of this part.

(f) The term *Consumer Price Index* or *CPI* means the last Consumer Price Index for all-urban consumers published by the Department of Labor. The CPI for a fiscal year is the average of the Consumer Price Index for the 12-month period ending on September 30 of the fiscal year.

(g) The term *State incentive payment share for a fiscal year* means the incentive base amount for the State for the fiscal year divided by the sum of the incentive base amounts for all of the States for the fiscal year.

(h) The term *incentive base amount for a fiscal year* means the sum of the State's performance level percentages (determined in accordance with §305.33) multiplied by the State's corresponding maximum incentive base on each of the following measures:

(1) The paternity establishment performance level;

(2) The support order performance level;

(3) The current collections performance level;

(4) The arrears collections performance level; and

(5) the cost-effectiveness performance level.

269

*ADDEN 9*

0000544

(i) The term *reliable data*, means the most recent data available which are found by the Secretary to be reliable and is a state that exists when data are sufficiently complete and error free to be convincing for their purpose and context. State data must meet a 95 percent standard of reliability effective beginning in fiscal year 2001. This is with the recognition that data may contain errors as long as they are not of a magnitude that would cause a reasonable person, aware of the errors, to doubt a finding or conclusion based on the data.

(j) The term *complete data* means all reporting elements from OCSE reporting forms, necessary to compute a State's performance levels, incentive base amount, and maximum incentive base amount, have been provided within timeframes established in instructions to these forms and § 305.32(f) of this part.

## § 305.2  Performance measures.

(a) The child support incentive system measures State performance levels in five program areas:

Paternity establishment; support order establishment; current collections; arrearage collections; and cost-effectiveness. The penalty system measures State performance in three of these areas: Paternity establishment; establishment of support orders; and current collections.

(1) *Paternity Establishment Performance Level.* States have the choice of being evaluated on one of the following two measures for their paternity establishment percentage (commonly known as the PEP). The count of children shall not include any child who is a dependent by reason of the death of a parent (unless paternity is established for that child). It shall also not include any child whose parent is found to have good cause for refusing to cooperate with the State agency in establishing paternity, or for whom the State agency determines it is against the best interest of the child to pursue paternity issues.

(i) *IV-D Paternity Establishment Percentage* means the ratio that the total number of children in the IV-D caseload in the fiscal year (or, at the option of the State, as of the end of the fiscal year) who have been born out-of-wedlock and for whom paternity has been established or acknowledged, bears to the total number of children in the IV-D caseload as of the end of the preceding fiscal year who were born out-of-wedlock. The equation to compute the measure is as follows (expressed as a percent):

$$\frac{\text{Total \# of Children in IV-D Caseload in the Fiscal Year or, at the option of the State, as of the end of the Fiscal Year who were Born Out-of-Wedlock with Paternity Established or Acknowledged}}{\text{Total \# of Children in IV-D Caseload as of the end of the preceding Fiscal Year who were Born Out-of-Wedlock}}$$

(ii) *Statewide Paternity Establishment Percentage* means the ratio that the total number of minor children who have been born out-of-wedlock and for whom paternity has been established or acknowledged during the fiscal year, bears to the total number of children born out-of-wedlock during the preceding fiscal year. The equation to compute the measure is as follows (expressed as a percent):

270

0000545

**Office of Child Support Enforcement, ACF, HHS** § 305.2

$$\frac{\text{Total \# of Minor Children who have been Born Out - of - Wedlock and for Whom Paternity has been Established or Acknowledged During the Fiscal Year}}{\text{Total \# of Children Born Out of Wedlock During the Preceding Fiscal Year}}$$

(2) *Support Order Establishment Performance Level.* This measure requires a determination of whether or not there is a support order for each case. These support orders include all types of legally enforceable orders, such as court, default, and administrative. Since the measure is a case count at a point-in-time, modifications to an order do not affect the count. The equation to compute the measure is as follows (expressed as a percent):

$$\frac{\text{Number of IV - D Cases with Support Orders During the Fiscal Year}}{\text{Total Number of IV - D Cases During the Fiscal Year}}$$

(3) *Current Collections Performance Level.* Current support is money applied to current support obligations and does not include payment plans for payment towards arrears. If included, voluntary collections must be included in both the numerator and the denominator. This measure is computed monthly and the total of all months is reported at the end of the year. The equation to compute the measure is as follows (expressed as a percent):

$$\frac{\text{Number Dollars Collected for Current Support in IV - D Cases}}{\text{Total Dollars Owed for Current Support in IV - D Cases}}$$

(4) *Arrearage Collection Performance Level.* This measure includes those cases where all of the past-due support was disbursed to the family, or retained by the State because all the support was assigned to the State. If some of the past-due support was assigned to the State and some was to be disbursed to the family, only those cases where some of the support actually went to the family can be included. The equation to compute the measure is as follows (expressed as a percent):

$$\frac{\text{Total number of eligible IV - D cases paying toward arrears}}{\text{Total number of IV - D cases with arrears due}}$$

(5) *Cost-Effectiveness Performance Level.* Interstate incoming and outgoing distributed collections will be included for both the initiating and the responding State in this measure. The equation to compute this measure is as follows (expressed as a ratio):

$$\frac{\text{Total IV - D Dollars Collected}}{\text{Total IV - D Dollars Expended}}$$

271

0000546

(b) For incentive purposes, the measures will be weighted in the following manner. Each State will earn five scores based on performance on each of the five measures. Each of the first three measures (paternity establishment, order establishment, and current collections) earn 100 percent of the collections base as defined in § 305.31(e) of this part. The last two measures (collections on arrears and cost-effectiveness) earn a maximum of 75 percent of the collections base as defined in § 305.31(e) of this part.

§ 305.31   Amount of incentive payment.

(a) The incentive payment for a State for a fiscal year is equal to the incentive payment pool for the fiscal year, multiplied by the State incentive payment share for the fiscal year.

(b) The incentive payment pool is:

(1) $422,000,000 for fiscal year 2000;

(2) $429,000,000 for fiscal year 2001;

(3) $450,000,000 for fiscal year 2002;

(4) $461,000,000 for fiscal year 2003;

(5) $454,000,000 for fiscal year 2004;

(6) $446,000,000 for fiscal year 2005;

(7) $458,000,000 for fiscal year 2006;

(8) $471,000,000 for fiscal year 2007;

(9) $483,000,000 for fiscal year 2008; and

(10) For any succeeding fiscal year, the amount of the incentive payment pool for the fiscal year that precedes such succeeding fiscal year multiplied by the percentage (if any) by which the CPI for such preceding fiscal year exceeds the CPI for the second preceding fiscal year. In other words, for each fiscal year following fiscal year 2008, the incentive payment pool will be multiplied by the percentage increase in the CPI between the two preceding years. For example, if the CPI increases by 1 percent between fiscal years 2007 and 2008, then the incentive pool for fiscal year 2009 would be a 1 percent increase over the $483,000,000 incentive payment pool for fiscal year 2008, or $487,830,000.

(c) The State incentive payment share for a fiscal year is the incentive base amount for the State for the fiscal year divided by the sum of the incentive base amounts for all of the States for the fiscal year.

(d) A State's maximum incentive base amount for a fiscal year is the State's collections base for the paternity establishment, support order, and current collections performance measures and 75 percent of the State's collections base for the fiscal year for the arrearage collections and cost-effectiveness performance measures.

(e) A State's maximum incentive base amount for a State for a fiscal year is zero, unless a Federal audit performed under § 305.60 of this part determines that the data submitted by the State for the fiscal year and used to determine the performance level involved are complete and reliable.

(f) A State's collections base for a fiscal year is equal to: two times the sum of the total amount of support collected for Current Assistance cases plus two times the total amount of support collected in Former Assistance cases, plus the total amount of support collected in Never Assistance/other cases during the fiscal year, that is: 2(Current Assistance collections + Former Assistance collections) + all other collections.

§ 305.32   Requirements applicable to calculations.

In calculating the amount of incentive payments or penalties, the following conditions apply:

(a) Each measure is based on data submitted for the Federal fiscal year. The Federal fiscal year runs from October 1st of one year through September 30th of the following year.

(b) Only those Current Assistance, Former Assistance and Never Assistance/other collections disbursed and those expenditures claimed by the State in the fiscal year will be used to determine the incentive payment payable for that fiscal year;

(c) Support collected by one State at the request of another State will be treated as having been collected in full by each State;

(d) Amounts expended by the State in carrying out a special project under section 455(e) of the Act will be excluded from the State's total IV–D dollars expended in computing incentive payments;

(e) Fees paid by individuals, recovered costs, and program income such as interest earned on collections will be deducted from total IV–D dollars expended; and

0000547

**Office of Child Support Enforcement, ACF, HHS**    **§ 305.33**

(f) States must submit data used to determine incentives and penalties following instructions and formats as required by HHS on Office of Management and Budget (OMB) approved reporting instruments. Data necessary to calculate performance for incentives and penalties for a fiscal year must be submitted to the Office of Child Support Enforcement by December 31st, the end of the first quarter after the end of the fiscal year. Only data submitted as of December 31st will be used to determine the State's performance for the prior fiscal year and the amount of incentive payments due the States.

**§ 305.33 Determination of applicable percentages based on performance levels.**

(a) A State's paternity establishment performance level for a fiscal year is, at the option of the State, the IV–D paternity establishment percentage or the Statewide paternity establishment percentage determined under § 305.2 of this part. The applicable percentage for each level of a State's paternity establishment performance can be found in table 1 of this part, except as provided in paragraph (b) of this section.

(b) If the State's paternity establishment performance level for a fiscal year is less than 50 percent, but exceeds its paternity establishment performance level for the immediately preceding fiscal year by at least 10 percentage points, then the State's applicable percentage for the paternity establishment performance level is 50 percent.

(c) A State's support order establishment performance level for a fiscal year is the percentage of the total number of cases where there is a support order determined under §§ 305.2 and 305.32 of this part. The applicable percentage for each level of a State's support order establishment performance can be found on table 1 of this part, except as provided in paragraph (d) of this section.

(d) If the State's support order establishment performance level for a fiscal year is less than 50 percent, but exceeds the State's support order establishment performance level for the immediately preceding fiscal year by at least 5 percentage points, then the State's applicable percentage is 50 percent.

TABLE 1—IF THE PATERNITY ESTABLISHMENT OR SUPPORT ORDER ESTABLISHMENT PERFORMANCE LEVEL IS:

(Use this table to determine the applicable percentage levels for the paternity establishment and support order establishment performance measures.)

| At least: (percent) | But less than: (percent) | The applicable percentage is: |
|---|---|---|
| 80 | .................... | 100 |
| 79 | 80 | 98 |
| 78 | 79 | 96 |
| 77 | 78 | 94 |
| 76 | 77 | 92 |
| 75 | 76 | 90 |
| 74 | 75 | 88 |
| 73 | 74 | 86 |
| 72 | 73 | 84 |
| 71 | 72 | 82 |
| 70 | 71 | 80 |
| 69 | 70 | 79 |
| 68 | 69 | 78 |
| 67 | 68 | 77 |
| 66 | 67 | 76 |
| 65 | 66 | 75 |
| 64 | 65 | 74 |
| 63 | 64 | 73 |
| 62 | 63 | 72 |
| 61 | 62 | 71 |
| 60 | 61 | 70 |
| 59 | 60 | 69 |
| 58 | 59 | 68 |
| 57 | 58 | 67 |
| 56 | 57 | 66 |
| 55 | 56 | 65 |
| 54 | 55 | 64 |
| 53 | 54 | 63 |
| 52 | 53 | 62 |
| 51 | 52 | 61 |
| 50 | 51 | 60 |
| 0 | 50 | 0 |

(e) A State's current collections performance level for a fiscal year is equal to the total amount of current support collected during the fiscal year divided by the total amount of current support owed during the fiscal year in all IV–D cases, determined under §§ 305.2 and 305.32 of this part. The applicable percentage with respect to a State's current collections performance level can be found on table 2, except as provided in paragraph (f) of this section.

(f) If the State's current collections performance level for a fiscal year is less than 40 percent but exceeds the current collections performance level of the State for the immediately preceding fiscal year by at least 5 percentage points, then the State's applicable percentage is 50 percent.

(g) A State's arrearage collections performance level for a fiscal year is

273

0000548

§ 305.34

equal to the total number of IV-D cases in which payments of past-due child support were received and distributed during the fiscal year, divided by the total number of IV-D cases in which there was past-due child support owed, as determined under §§ 305.2 and 305.32 of this part. The applicable percentage with respect to a State's arrearage collections performance level can be found on table 2 except as provided in paragraph (h) of this section.

(h) If the State's arrearage collections performance level for a fiscal year is less than 40 percent but exceeds the arrearage collections performance level for the immediately preceding fiscal year by at least 5 percentage points, then the State's applicable percentage is 50 percent.

TABLE 2—IF THE CURRENT COLLECTIONS OR ARREARAGE COLLECTIONS PERFORMANCE LEVEL IS:

(Use this table to determine the percentage levels for the current collections and arrearage collections performance measures.)

| At least (percent) | But less than: (percent) | The applicable percentage is: (percent) |
|---|---|---|
| 80 | | 100 |
| 79 | 80 | 98 |
| 78 | 79 | 96 |
| 77 | 78 | 94 |
| 76 | 77 | 92 |
| 75 | 76 | 90 |
| 74 | 75 | 88 |
| 73 | 74 | 86 |
| 72 | 73 | 84 |
| 71 | 72 | 82 |
| 70 | 71 | 80 |
| 69 | 70 | 79 |
| 68 | 69 | 78 |
| 67 | 68 | 77 |
| 66 | 67 | 76 |
| 65 | 66 | 75 |
| 64 | 65 | 74 |
| 63 | 64 | 73 |
| 62 | 63 | 72 |
| 61 | 62 | 71 |
| 60 | 61 | 70 |
| 59 | 60 | 69 |
| 58 | 59 | 68 |
| 57 | 58 | 67 |
| 56 | 57 | 66 |
| 55 | 56 | 65 |
| 54 | 55 | 64 |
| 53 | 54 | 63 |
| 52 | 53 | 62 |
| 51 | 52 | 61 |
| 50 | 51 | 60 |
| 49 | 50 | 59 |
| 48 | 49 | 58 |
| 47 | 48 | 57 |
| 46 | 47 | 56 |
| 45 | 46 | 55 |

TABLE 2—IF THE CURRENT COLLECTIONS OR ARREARAGE COLLECTIONS PERFORMANCE LEVEL IS:—Continued

(Use this table to determine the percentage levels for the current collections and arrearage collections performance measures.)

| At least (percent) | But less than: (percent) | The applicable percentage is: (percent) |
|---|---|---|
| 44 | 45 | 54 |
| 43 | 55 | 53 |
| 42 | 43 | 52 |
| 41 | 42 | 51 |
| 40 | 41 | 50 |
| 0 | 40 | 0 |

(i) A State's cost-effectiveness performance level for a fiscal year is equal to the total amount of IV-D support collected and disbursed or retained, as applicable during the fiscal year, divided by the total amount expended during the fiscal year, as determined under §§ 305.2 and 305.32 of this part. The applicable percentage with respect to a State's cost-effectiveness performance level can be found on table 3.

TABLE 3—IF THE COST-EFFECTIVENESS PERFORMANCE LEVEL IS:

(Use this table to determine the percentage level for the cost-effectiveness performance measure.)

| At least: | But less than: | The app. % is |
|---|---|---|
| 5.00 | | 100 |
| 4.50 | 4.99 | 90 |
| 4.00 | 4.50 | 80 |
| 3.50 | 4.00 | 70 |
| 3.00 | 3.50 | 60 |
| 2.50 | 3.00 | 50 |
| 2.00 | 2.50 | 40 |
| 0.00 | 2.00 | 0 |

§ 305.34  Payment of incentives.

(a) Each State must report one-fourth of its estimated annual incentive payment on each of its four quarterly collections' reports for a fiscal year. When combined with the amounts claimed on each of the State's four quarterly expenditure reports, the portion of the annual estimated incentive payment as reported each quarter will be included in the calculation of the next quarterly grant awarded to the State under title IV-D of the Act.

(b) Following the end of each fiscal year, HHS will calculate the State's annual incentive payment, using the actual collection and expenditure data

274

and the performance data submitted by December 31st by the State and other States for that fiscal year. A positive or negative grant will then be awarded to the State under title IV–D of the Act to reconcile an actual annual incentive payment that has been calculated to be greater or lesser, respectively, than the annual incentive payment estimated prior to the beginning of the fiscal year.

(c) Payment of incentives is contingent on a State's data being determined complete and reliable by Federal auditors.

### § 305.35  Reinvestment.

(a) A State must expend the full amount of incentive payments received under this part to supplement, and not supplant, other funds used by the State to carry out IV–D program activities or funds for other activities approved by the Secretary which may contribute to improving the effectiveness or efficiency of the State's IV–D program, including cost-effective contracts with local agencies, whether or not the expenditures for the activity are eligible for reimbursement under this part.

(b) In those States in which incentive payments are passed through to political subdivisions or localities, such payments must be used in accordance with this section.

(c) State IV–D expenditures may not be reduced as a result of the receipt and reinvestment of incentive payments.

(d) A base amount will be determined by subtracting the amount of incentive funds received and reinvested in the State IV–D program for fiscal year 1998 from the total amount expended by the State in the IV–D program during the same period. Alternatively, States have an option of using the average amount of the previous three fiscal years (1996, 1997, and 1998) as a base amount. This base amount of State spending must be maintained in future years. Incentive payments under this part must be used in addition to, and not in lieu of, the base amount.

(e) Requests for approval of expending incentives on activities not currently eligible for funding under the IV–D program, but which would benefit the IV–D program, must be submitted in accordance with instructions issued by the Commissioner of the Office of Child Support Enforcement.

### § 305.36  Incentive phase-in.

The incentive system under this part will be phased-in over a three-year period during which both the old system and the new system will be used to determine the amount a State will receive. For fiscal year 2000, a State will receive two-thirds of what it would have received under the incentive formula set forth in § 304.12 of this chapter, and one-third of what it would receive under the formula set forth under this part. In fiscal year 2001, a State will receive one-third of what it would have received under the incentive formula set forth under § 304.12 of this chapter and two-thirds of what it would receive under the formula under this part. In fiscal year 2002, the formula set forth under this part will be fully implemented and would be used to determine all incentive amounts.

### § 305.40  Penalty performance measures and levels.

(a) There are three performance measures for which States must achieve certain levels of performance in order to avoid being penalized for poor performance. These measures are the paternity establishment, support order establishment, and current collections measures set forth in § 305.2 of this part. The levels the State must meet are:

(1) *The paternity establishment percentage* which is required under section 452(g) of the Act for penalty purposes. States have the option of using either the IV–D paternity establishment percentage or the statewide paternity establishment percentage defined in § 305.2 of this part. Table 4 shows the level of performance at which a State will be subject to a penalty under the paternity establishment measure.

275

0000550

§ 305.42                                                    45 CFR Ch. III (10–1–01 Edition)

TABLE 4—STATUTORY PENALTY PERFORMANCE STANDARDS FOR PATERNITY ESTABLISHMENT

(Use this table to determine the level of performance for the paternity establishment measure that will incur a penalty.)

| PEP | Increase required over previous year's PEP | Penalty FOR FIRST FAILURE if increase not met |
|---|---|---|
| 90% or more | None | No Penalty. |
| 75% to 89% | 2% | 1–2% TANF Funds. |
| 50% to 74% | 3% | 1–2% TANF Funds. |
| 45% to 49% | 4% | 1–2% TANF Funds. |
| 40% to 44% | 5% | 1–2% TANF Funds. |
| 39% or less | 6% | 1–2% TANF Funds. |

(2) The support order establishment performance measure is set forth in § 305.2 of this part. For purposes of the penalty with respect to this measure, there is a threshold of 40 percent, below which a State will be penalized unless an increase of 5 percent over the previous year is achieved—which will qualify it for an incentive. Performance in the 40 percent to 49 percent range with no significant increase will not be penalized but neither will it qualify for an incentive payment. Table 5 shows at which level of performance a State will incur a penalty under the child support order establishment measure.

TABLE 5—PERFORMANCE STANDARDS FOR ORDER ESTABLISHMENT

(Use this table to determine the level of performance for the order establishment measure that will incur a penalty.)

| Performance level | Increase over previous year | Incentive/Penalty |
|---|---|---|
| 50% or more | no increase over previous year required | Incentive. |
| 40% to 49% | w/5% increase over previous year | Incentive. |
|  | w/out 5% increase | No Incentive/No Penalty. |
| Less than 40% | w/5% increase over previous year | Incentive. |
|  | w/out 5% increase | Penalty equal to 1–2% of TANF funds for the first failure, 2–3% for second failure, and so forth, up to a maximum of 5% of TANF funds. |

(3) The *current collections* performance measure is set forth in § 305.2 of this part. There is a threshold of 35 percent below which a State will be penalized unless an increase of 5 percent over the previous year is achieved (that qualifies it for an incentive). Performance in the 35 percent to 40 percent range with no significant increase will not be penalized but neither will it qualify for an incentive payment. Table 6 shows at which level of performance the State will incur a penalty under the current collections measure.

TABLE 6—PERFORMANCE STANDARDS FOR CURRENT COLLECTIONS

(Use this table to determine the level of performance for the current collections measure that will incur a penalty.)

| Performance level | Increase over previous year | Incentive/Penalty |
|---|---|---|
| 40% or more | no increase over previous year required | Incentive. |
| 35% to 39% | w/5% increase over previous year | Incentive. |
|  | w/out 5% increase | No Incentive/No Penalty. |
| less than 35% | w/5% increase over previous year | Incentive. |
|  | w/out 5% increase | Penalty equal to 1–2% of TANF funds for the first failure, 2–3% for second failure, and so forth, up to a maximum of 5% of TANF funds. |

(b) The provisions listed under § 305.32 of this part also apply to the penalty performance measures.

§ 305.42   Penalty phase-in.

States are subject to the performance penalties described in § 305.40 based on

276

**Office of Child Support Enforcement, ACF, HHS**                    **§ 305.61**

data reported for FY 2001. Data reported for FY 2000 will be used as a base year to determine improvements in performance during FY 2001. There will be an automatic one-year corrective action period before any penalty is assessed. The penalties will be assessed and then suspended during the corrective action period.

**§ 305.60  Types and scope of Federal audits.**

(a) OCSE will conduct audits, at least once every three years (or more frequently if the State fails to meet performance standards and reliability of data requirements) to assess the completeness, authenticity, reliability, accuracy and security of data and the systems used to process the data in calculating performance indicators under this part;

(b) Also, OCSE will conduct audits to determine the adequacy of financial management of the State IV-D program, including assessments of:

(1) Whether funds to carry out the State program are being appropriately expended, and are properly and fully accounted for; and

(2) Whether collections and disbursements of support payments are carried out correctly and are fully accounted for; and

(c) OCSE will conduct audits for such other purposes as the Secretary may find necessary.

(1) These audits include audits to determine if the State is substantially complying with one or more of the requirements of the IV-D program (with the exception of the requirements of section 454(24) of the Act relating to statewide-automated systems and section 454(27)(A) and (B)(i) relating to the State Disbursement Unit) as defined in § 305.63 of this part. Other audits will be conducted at the discretion of OCSE.

(2) Audits to determine substantial compliance will be initiated based on substantiated evidence of a failure by the State to meet IV-D program requirements. Evidence, which could warrant an audit to determine substantial compliance, includes:

(i) The results of two or more State self-reviews conducted under section 454(15)(A) of the Act which: Show evidence of sustained poor performance;

or indicate that the State has not corrected deficiencies identified in previous self-assessments, or that those deficiencies are determined to seriously impact the performance of the State's program; or

(ii) Evidence of a State program's systemic failure to provide adequate services under the program through a pattern of non-compliance over time.

(d) OCSE will conduct audits of the State's IV-D program through inspection, inquiries, observation, and confirmation and in accordance with standards promulgated by the Comptroller General of the United States in "Government Auditing Standards."

**§ 305.61  Penalty for failure to meet IV-D requirements.**

(a) A State will be subject to a financial penalty and the amounts otherwise payable to the State under title IV-A of the Act will be reduced in accordance with § 305.66:

(1) If on the basis of:

(i) Data submitted by the State or the results of an audit conducted under § 305.60 of this part, the State's program failed to achieve the paternity establishment percentages, as defined in section 452(g)(2) of the Act and § 305.40 of this part, or to meet the support order establishment and current collections performance measures as set forth in § 305.40 of this part; or

(ii) The results of an audit under § 305.60 of this part, the State did not submit complete and reliable data, as defined in § 305.1 of the part; or

(iii) The results of an audit under § 305.60 of this part, the State failed to substantially comply with one or more of the requirements of the IV-D program, as defined in § 305.63; or

(2) With respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable.

(b) The reductions under paragraph (c) of this section will be made for quarters following the end of the corrective action year and will continue until the end of the first quarter throughout which the State, as appropriate:

277

**§ 305.62**　　　　　　　　　　　　　　**45 CFR Ch. III (10–1–01 Edition)**

(1) Has achieved the paternity establishment percentages, the order establishment or the current collections performance measures set forth in § 305.40 of this part;

(2) Is in substantial compliance with IV–D requirements as defined in § 305.63 of this part; or

(3) Has submitted data that are determined to be complete and reliable.

(c) The payments for a fiscal year under title IV–A of the Act will be reduced by the following percentages:

(1) One to two percent for the first finding under paragraph (a) of this section;

(2) Two to three percent for the second consecutive finding; and

(3) Not less than three percent and not more than 5 percent for the third or a subsequent consecutive finding.

(d) The reduction will be made in accordance with the provisions of 45 CFR 262.1(b)–(e) and 262.7.

**§ 305.62　Disregard of a failure which is of a technical nature.**

A State subject to a penalty under § 305.61(a)(1)(ii) or (iii) of this part may be determined, as appropriate, to have submitted adequate data or to have achieved substantial compliance with one or more IV–D requirements, as defined in § 305.63 of this part, if the Secretary determines that the incompleteness or unreliability of the data, or the noncompliance with one or more of the IV–D requirements, is of a technical nature which does not adversely affect the performance of the State's IV–D program or does not adversely affect the determination of the level of the State's paternity establishment or other performance measures percentages.

**§ 305.63　Standards for determining substantial compliance with IV–D requirements.**

For the purposes of a determination under § 305.61(a)(1)(iii) of this part, in order to be found to be in substantial compliance with one or more of the IV–D requirements as a result of an audit conducted under § 305.60 of this part, a State must meet the standards set forth below for each specific IV–D State plan requirement or requirements being audited and contained in

parts 302 and 303 of this chapter, measured as follows:

(a) The State must meet the requirements under the following areas:

(1) Statewide operations, § 302.10 of this chapter;

(2) Reports and maintenance of records, § 302.15(a) of this chapter;

(3) Separation of cash handling and accounting functions, § 302.20 of this chapter; and

(4) Notice of collection of assigned support, § 302.54 of this chapter.

(b) The State must provide services required under the following areas in at least 90 percent of the cases reviewed:

(1) Establishment of cases, § 303.2(a) of this chapter; and

(2) Case closure criteria, § 303.11 of this chapter.

(c) The State must provide services required under the following areas in at least 75 percent of the cases reviewed:

(1) Collection and distribution of support payments, including: collection and distribution of support payments by the IV–D agency under § 302.32(b) of this chapter; distribution of support collections under § 302.51 of this chapter; and distribution of support collected in title IV–E foster care maintenance cases under § 302.52 of this chapter;

(2) Establishment of paternity and support orders, including: Establishment of a case under § 303.2(b) of this chapter; services to individuals not receiving TANF or title IV–E foster care assistance, under § 302.33(a)(1) through (4) of this chapter; provision of services in interstate IV–D cases under § 303.7(a), (b) and (c)(1) through (6) and (c)(8) through (10) of this chapter; location of non-custodial parents under § 303.3 of this chapter; establishment of paternity under § 303.5(a) and (f) of this chapter; guidelines for setting child support awards under § 302.56 of this chapter; and establishment of support obligations under § 303.4(d), (e) and (f) of this chapter;

(3) Enforcement of support obligations, including, in all appropriate cases: establishment of support § 303.2(b) of this chapter; services to individuals not receiving TANF or title IV–E foster care assistance, under

0000553

**Office of Child Support Enforcement, ACF, HHS**                    **§ 305.63**

§ 302.33(a)(1) through (4) of this chapter; provision of services in interstate IV-D cases under § 303.7(a), (b) and (c)(1) through (6) and (c)(8) through (10) of this chapter; location of non-custodial parents under § 303.3 of this chapter; enforcement of support obligations under § 303.6 of this chapter and State laws enacted under section 466 of the Act, including submitting once a year all appropriate cases in accordance with § 303.6(c)(3) of this chapter to State and Federal income tax refund offset; and wage withholding under § 303.100 of this chapter. In cases in which wage withholding cannot be implemented or is not available and the non-custodial parent has been located, States must use or attempt to use at least one enforcement technique available under State law in addition to Federal and State tax refund offset, in accordance with State laws and procedures and applicable State guidelines developed under § 302.70(b) of this chapter;

(4) Review and adjustment of child support orders, including: Establishment of a case under § 303.2(b) of this chapter; services to individuals not receiving TANF or title IV-E foster care assistance, under § 302.33(a)(1) through (4) of this chapter; provision of services in interstate IV-D cases under § 303.7(a), (b) and (c)(1) through (6) and (c)(8) through (10) of this chapter; location of non-custodial parents under § 303.3 of this chapter; guidelines for setting child support awards under § 302.56 of this chapter; and review and adjustment of support obligations under § 303.8 of this chapter; and

(5) Medical support, including: establishment of a case under § 303.2(b) of this chapter; services to individuals not receiving TANF or title IV-E foster care assistance, under § 302.33(a)(1) through (4) of this chapter; provision of services in interstate IV-D cases under § 303.7(a), (b) and (c)(1) through (6) and (c)(8) through (10) of this chapter; location of non-custodial parents under § 303.3 of this chapter; securing medical support information under § 303.30 of this chapter; and securing and enforcing medical support obligations under § 303.31 of this chapter; and

(6) Disbursement of support payments in accordance with the time-frames in section 454B of the Act and § 302.32 of this chapter.

(d) With respect to the 75 percent standard in paragraph (b) of this section:

(1) Notwithstanding timeframes for establishment of cases in § 303.2(b) of this chapter; provision of services in interstate IV-D cases under § 303.7(a), (b) and (c)(4) through (6), (c)(8) and (9) of this chapter; location and support order establishment under § 303.3(b)(3) and (5), and § 303.4(d) of this chapter, if a support order needs to be established in a case and an order is established during the audit period in accordance with the State's guidelines for setting child support awards, the State will be considered to have taken appropriate action in that case for audit purposes.

(2) Notwithstanding timeframes for establishment of cases in § 303.2(b) of this chapter; provision of services in interstate IV-D cases under § 303.7(a), (b) and (c)(4) through (6), and (c)(8) and (9) of this chapter; and location and review and adjustment of support orders contained in § 303.3(b)(3) and (5), and § 303.8 of this chapter, if a particular case has been reviewed and meets the conditions for adjustment under State laws and procedures and § 303.8 of this chapter, and the order is adjusted, or a determination is made, as a result of a review, during the audit period, that an adjustment is not needed, in accordance with the State's guidelines for setting child support awards, the State will be considered to have taken appropriate action in that case for audit purposes.

(3) Notwithstanding timeframes for establishment of cases in § 303.2(b) of this chapter; provision of services in interstate IV-D cases under § 303.7 (a), (b) and (c) (4) through (6), and (c)(8) and (9) of this chapter; and location and wage withholding in § 303.3(b) (3) and (5), and § 303.100 of this chapter, if wage withholding is appropriate in a particular case and wage withholding is implemented and wages are withheld during the audit period, the State will be considered to have taken appropriate action in that case for audit purposes.

(4) Notwithstanding timeframes for establishment of cases in § 303.2(b) of this chapter; provision of services in

279

0000554

interstate IV–D cases under § 303.7 (a), (b) and (c) (4) through (6), and (c)(8) and (9) of this chapter; and location and enforcement of support obligations in § 303.3(b) (3) and (5), and § 303.6 of this chapter, if wage withholding is not appropriate in a particular case, and the State uses at least one enforcement technique available under State law, in addition to Federal and State income tax refund offset, which results in a collection received during the audit period, the State will be considered to have taken appropriate action in the case for audit purposes.

(e) The State must meet the requirements for expedited processes under § 303.101(b)(2)(i) and (iii), and (e) of this chapter.

### § 305.64  Audit procedures and State comments.

(a) Prior to the start of the actual audit, Federal auditors will hold an audit entrance conference with the IV–D Agency. At that conference, the auditors will explain how the audit will be performed and make any necessary arrangements.

(b) At the conclusion of audit fieldwork, Federal auditors will afford the State IV–D agency an opportunity for an audit exit conference at which time preliminary audit findings will be discussed and the IV–D agency may present any additional matter it believes should be considered in the audit findings.

(c) After the exit conference, Federal auditors will prepare and send to the IV–D agency a copy of their interim report on the results of the audit. Within a specified timeframe from the date the report was sent by certified mail, the IV–D agency may submit written comments on any part of the report which the IV–D agency believes is in error. The auditors will note such comments and incorporate any response into the final audit report.

### § 305.65  State cooperation in audit.

(a) Each State shall make available to the Federal auditors such records or other supporting documentation (electronic and manual) as the audit staff may request, including records to support the data as submitted on the Federal statistical and financial reports that will be used to calculate the State's performance. The State shall also make available personnel associated with the State's IV–D program to provide information that the audit staff may find necessary in order to conduct or complete the audit.

(b) States must provide evidence to Office that their data are complete and reliable as defined in § 305.2 of this part.

(c) Failure to comply with the requirements of this section with respect to audits conducted to determine compliance with IV–D requirements under § 305.60 of this part, may necessitate a finding that the State has failed to comply with the particular criteria being audited.

### § 305.66  Notice, corrective action year, and imposition of penalty.

(a) If a State is found by the Secretary to be subject to a penalty as described in § 305.61 of this part, the OCSE will notify the State in writing of such finding.

(b) The notice will:

(1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the finding; and

(2) Specify that the penalty will be assessed in accordance with the provisions of 45 CFR 262.1(b) through (e) and 262.7 if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective action year (i.e., the succeeding fiscal year following the year with respect to which the deficiency occurred.)

(c) The penalty under § 305.61 of this part will be assessed if the Secretary determines that the State has not corrected the deficiency or deficiencies cited in the notice by the end of the corrective action year.

(d) Only one corrective action period is provided to a State with respect to a given deficiency where consecutive findings of noncompliance are made with respect to that deficiency. In the case of a State against which the penalty is assessed and which failed to correct the deficiency or deficiencies cited in the notice by the end of the corrective action year, the penalty will be effective for any quarter after the end of

0000555