## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

State of ALABAMA DEPARTMENT OF )
HUMAN RESOURCES, )
CHILD SUPPORT ENFORCEMENT DIVISION, )
*et al.*, )
 )
    *Plaintiffs*,  ) Civ. No. 1:05CV2098 (RJL)
 )
  v. )
 )
UNITED STATES DEPARTMENT OF HEALTH )
AND HUMAN SERVICES, *et al.* )
 )
    *Defendants*. )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF PLAINTIFF AGENCIES OF THE STATES OF
ALABAMA, DELAWARE, HAWAII, INDIANA, KANSAS, LOUISIANA, NEW
MEXICO, AND RHODE ISLAND**

Caroline M. Brown (D.C. Bar No. 438432)
Joseph Zambuto, Jr. (D.C. Bar No. 484542)
Kelly C. Blevins (D.C. Bar No. 488287)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
*Attorneys for Plaintiff Agencies of the States
of Alabama, Delaware, Hawaii, Indiana,
Kansas, Louisiana, New Mexico, and Rhode
Island*

April 19, 2006

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.    Statutory and Regulatory Overview of the Title IV-A TANF Program
      and the Title IV-D Child Support Enforcement Program. ................................. 3

II.   ACF's Data Reliability Audits. ........................................................................... 9

III.  The FFY 2001 Data Reliability Audit Reports, Penalties, and Appeal. ........... 11

IV.   The DAB Decisions. ......................................................................................... 15

STANDARD OF REVIEW .............................................................................................. 16

ARGUMENT .................................................................................................................... 17

I.    The DAB Acted Arbitrary and Capriciously in Determining that
      45 C.F.R. § 305.66 is Not a Prior Notice Regulation ...................................... 17

   A.   *The DAB's Interpretation of § 305.66 is in Conflict with the Plain Text of the
        Regulation and at Odds with Numerous Statements in the Preambles to the
        Proposed and Final Rules.* ........................................................................... 17

   B.   *ACF's Failure to Give the Required Notice Affected the States' Ability to Avoid the
        Penalty and Prepare for Its Potential Consequence.* ..................................... 22

II.   ACF Acted Arbitrary and Capriciously in Using Different Standards to Assess the
      Reliability of IV-D and Statewide Paternity Establishment Data. ................... 28

   A.   *ACF Acted Contrary To Congressional Intent In Using Two Different Definitions of
        "Reliable Data."* .......................................................................................... 29

   B.   *ACF Failed To Give States Requisite Notice Of Its Use Of Different Standards.* ........... 32

   C.   *The DAB's Acceptance of the Different Definitions of "Reliability"
        Cannot Be Justified.* .................................................................................... 34

CONCLUSION .................................................................................................................. 42

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ackerman v. United States*, 324 F. Supp. 2d 1 (D.D.C. 2004)...........................................16

*American Lung Associate v. E.P.A*, 134 F.3d 388 (D.C. Cir. 1997)................................34

*Back Country Horsemen of America v. Johanns*, No.Civ.A. 05-0960 (ESH), 2006
    WL 825534 (D.D.C. Mar. 29, 2006).....................................................................16, 17

*Barnes v. Gorman*, 536 U.S. 181 (2002) ........................................................................27

*Burlington Northern & Santa Fe Railway v. Surface Transportation Board*, 403
    F.3d 771 (D.C. Cir. 2005) .............................................................................34, 35

*Donnelly v. F.A.A.*, 411 F.3d 267 (D.C. Cir. 2005) .........................................................19

*Drake v. F.A.A.*, 291 F.3d 59 (D.C. Cir. 2002)...........................................................18, 22

*Human Resources Management, Inc. v. Weaver*, 442 F. Supp. 241 (D.D.C. 1978).........32

*Mine Reclamation Corp. v. Federal Energy Regulatory Commission*, 30 F.3d
    1519 (D.C. Cir. 1994) ...............................................................................................22

*Motor Vehicle Manufacturers Association of the United States v. State Farm
    Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .................................32, 34, 35

*National Insulation Transport Committee v. Interstate Commerce Commission*,
    683 F.2d 533 (D.C. Cir. 1982).................................................................................30

*National Organization of Veterans' Advocates Inc. v. Sec'y of Veterans Affairs*,
    260 F.3d 1365 (Fed. Cir. 2001).................................................................................34

*National Treasury Employees Union v. FLRA*, 392 F.3d 498 (D.C. Cir. 2004)...............32

*Paige International, Inc. v. U.S. Department of Transportation,* No. Civ.A. 03-
    2213 (EGS), 2005 WL. 3276196 (D.D.C. Sept. 27, 2005)..........................................16

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).........................2, 26

*Petroleum Communications, Inc. v. F.C.C.*, 22 F.3d 1164 (D.C. Cir. 1994)....................34

*Potter v. United States*, 155 U.S. 438 (1894)..................................................................19

*S.A. Storer and Sons Co. v. Sec'y of Labor*, 360 F.3d 1363 (D.C. Cir. 2004) .............17, 27

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)......................................34

*Satellite Broad. Co. v. F.C.C.*, 824 F.2d 1 (D.C. Cir. 1987)................................................33

*Sorenson v. Treasury*, 475 U.S. 851 (1986)........................................................................30

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)....................................34

## FEDERAL STATUTES

5 U.S.C. § 552...........................................................................................................................32

5 U.S.C. § 706.............................................................................................................................2

42 U.S.C. § 452.........................................................................................................................35

42 U.S.C. § 603...........................................................................................................................4

42 U.S.C. § 609................................................................................................................. passim

42 U.S.C. § 610......................................................................................................................2, 9

42 U.S.C. § 652................................................................................................................. passim

42 U.S.C. § 654...................................................................................................................5, 6, 9

42 U.S.C. § 658a..................................................................................................................7, 30

## FEDERAL REGULATIONS

45 C.F.R. § 262.1..................................................................................................................13, 20

45 C.F.R. § 262.5.......................................................................................................................19

45 C.F.R. § 262.7............................................................................................................13, 40, 41

45 C.F.R. § 305.1...................................................................................................................8, 9, 35

45 C.F.R. § 305.2.......................................................................................................................34

45 C.F.R. § 305.32.....................................................................................................................10

45 C.F.R. § 305.40.....................................................................................................................38

45 C.F.R. § 305.42 ...........................................................................................8, 11, 22

45 C.F.R. § 305.61 .........................................................................................................38

45 C.F.R. § 305.62 .........................................................................................................23

45 C.F.R. § 305.63 .........................................................................................................36

45 C.F.R. § 305.64 ...................................................................................................3, 24, 33

45 C.F.R. § 305.66 .................................................................................................. passim

45 C.F.R. § 305.99 (1998) ........................................................................................21, 22

## FEDERAL ADMINISTRATIVE RULINGS

*Alabama Dep't of Human Resources*, DAB No. 1989 (2005).................................. passim

*Indiana Family and Social Svcs. Admin.*, DAB No. 2001 (2005) ............................ passim

*New Mexico Human Svcs. Dept.*, DAB No. 1224 (1991)...........................................33, 38

*Puerto Rico Dep't of Social Svcs.*, DAB No. 1253 (1991)..............................................38

*Ohio Dep't of Human Svcs.*, DAB No. 1202 (1990) ........................................................38

*Tennessee Dep't of Health.*, DAB No. 989 (1987)...........................................................38

## FEDERAL ADMINISTRATIVE PUBLICATIONS

*Child Support Enforcement Program; Incentive Payments, Audit Penalties;*
   *Proposed Rules,* U.S. Dep't of Health & Human Services, Admin. of Children
   and Families, 64 Fed. Reg. 55,074, 55,102 (Oct. 8, 1999) ................................. passim

*Child Support Enforcement Program; Incentive Payments, Audit Penalties; Final*
   *Rules,* U.S. Dep't of Health & Human Services, Admin. of Children and
   Families, 64 Fed. Reg. 55,074, 55,102 (Oct. 8, 1999)........................................ passim

## INTRODUCTION

In this action, Plaintiffs -- the agencies responsible for administering the Child

Support Enforcement programs in the States of Alabama, Delaware, Hawaii, Indiana, Kansas,

Louisiana, New Mexico and Rhode Island (collectively, "the States" or "the Plaintiffs") -- seek

judicial review of Department of Health and Human Services ("HHS") Departmental Appeals

Board ("DAB") Decision No. 1989, dated July 28, 2005, and DAB Decision No. 2001, dated

October 26, 2005.  *See* JAR 1-82; IAR 1-27.[1]  These decisions upheld penalties assessed by the

HHS Administration for Children and Families ("ACF") against the States' Temporary

Assistance for Needy Families ("TANF") block grants in November 2003 for the States'

purported failure to meet certain performance and data reliability standards in their Child

Support Enforcement programs.

The penalties that give rise to this action were the first assessed pursuant to

revisions of Title IV-A (governing the Temporary Assistance for Needy Families program) and

IV-D (governing the Child Support Enforcement program) of the Social Security Act made in

1996, 1997, and 1998.  Some of these revisions were the product of several years of cooperative

effort between ACF, its Office of Child Support Enforcement ("OCSE"), and state

representatives to revise the then-existing incentive and penalty structure applicable to state

Child Support Enforcement programs.  In its regulations implementing these statutory revisions,

and even in the letters assessing the penalties, ACF repeatedly pointed to the federal-state

"partnership" that developed the new structure.  However, in assessing and upholding the

---

[1] Throughout this brief, cites to the "JAR" refer to the administrative record from the joint HHS DAB appeal filed by Plaintiff agencies of the States of Alabama, Delaware, Hawaii, New Mexico, and Rhode Island.  Cites to the "IAR" refer to the administrative record from the HHS DAB appeal filed by Plaintiff State of Indiana.

penalties against Plaintiffs and other States, HHS failed in the most fundamental and basic ways to be a responsible partner to its colleagues in the States.

First and foremost, ACF failed to give States the required notice and opportunity to correct that is embodied in the penalty provisions. Both the federal statute and ACF's own regulations guarantee a State the right to written notice and a reasonable opportunity to take corrective action to cure the deficiency as prerequisites to the imposition of a penalty. *See* 42 U.S.C. § 610(a) (notice of adverse action); 42 U.S.C. § 609(a)(8)(ii) (corrective action year); 45 C.F.R. §§ 305.66 (a)-(b) (notice), (c)-(d) (corrective action year).[2]

As the courts have repeatedly recognized, in federal-state programs the requirement that the federal government give clear notice to the States is not a mere formality but a concrete safeguard of the federal system. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That is all the more true here, where a State risks losing TANF funding because of the activities of its Child Support Enforcement program, an entirely separate program often administered by a separate agency. Thus, formal notice and an opportunity for the two agencies to work together to address identified program deficiencies are of the utmost importance. Penalizing one state agency for the actions of another is itself a highly unusual practice. For ACF to engage in this practice without even following its own unambiguous regulations is contrary to law. *See* 5 U.S.C. § 706(2)(D) (requiring the setting aside of agency actions taken "without observance of procedure required by law.").

_____

[2] For the Court's convenience, Plaintiffs have compiled the statutory provisions most relevant to this case -- 42 U.S.C. §§ 609, 610, 652, 654, 658a -- from the Joint Administrative Record, JAR 490-527, and have attached these provisions as Exhibit A to Plaintiffs' Memorandum. The most relevant regulatory provisions -- 45 C.F.R. Parts 16, 262, and 305, JAR 529-56 -- are attached as Exhibit B.

Second, ACF did not live up to its partnership with the States when it failed to inform them that its auditors were instructed to apply different standards to determine whether the State had submitted reliable data depending upon how a State chose to report its paternity establishment percentage ("PEP") using the caseload of children in the IV-D program or statewide data, a choice that is provided by statute.  *See* 42 U.S.C. § 652(g)(2).  The different standards make it much more likely that a State choosing to report its PEP using IV-D data will be determined to have unreliable data.  It is not simply a coincidence that every State subject to a penalty because of unreliable PEP data has used the IV-D measurement.  A fair partner would have used uniform standards for assessing data reliability or, at the very least, given the States adequate and timely notice of its use of different audit standards and the serious consequences attendant with choosing the IV-D reporting option.  Again, ACF failed to abide by its own regulations, which recognize the need for transparency in this regard.  *See* 45 C.F.R. § 305.64(a) (calling for audit process to be explained).  Neither ACF nor the DAB has ever offered an adequate explanation for the use of disparate standards.

For these reasons, the States are entitled to summary judgment invalidating the agency actions at issue here as arbitrary, capricious, contrary to law, and an abuse of discretion and ordering ACF to restore to each plaintiff State the full fiscal impact of the penalties.

## BACKGROUND

I. **Statutory and Regulatory Overview of the Title IV-A TANF Program and the Title IV-D Child Support Enforcement Program.**

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), major welfare reform legislation that ended the Aid to Families with Dependent Children ("AFDC") entitlement program and replaced it with the Temporary Assistance for Needy Families ("TANF") block grant program.  *See* Pub. L. No. 104-

193, 110 Stat. 2105 (1996) (adding Section 403, codified at 42 U.S.C. § 603).  Under the TANF

program, States now receive annual block grants to subsidize the cost of providing services and

cash assistance to needy families.  *Id*.  If a State is subject to a penalty that results in a reduction

of its TANF block grant, the State is required to make up the difference with state-only funds.

*See* 42 U.S.C. § 609(a)(12).

        The Child Support Enforcement program was established in 1975 as Title IV-D of

the Social Security Act.  Each State runs a Child Support Enforcement program, either in the

human services department, department of revenue, or district attorney's office, often with the

help of prosecuting attorneys, other law enforcement agencies, and officials of family or

domestic relations courts.  The program provides four major services:  locating non-custodial

parents, establishing paternity, establishing child support obligations, and collecting child

support for families.  Child support services are available without charge to families receiving

cash assistance through TANF, and for a fee to families who are not receiving public assistance.

The majority of the program's participants are not currently receiving TANF assistance.  *See*

Office of Child Support Enforcement, FY 2002 and FY 2003 Annual Report to Congress,

*available at* http://www.acf.dhhs.gov/programs/cse/pubs/2005/reports/annual_report/#charts (last

visited Apr. 17, 2006).

        Child Support Enforcement programs underwent a major revision as part of the

welfare reform legislation of the late 1990s.  PRWORA amended Title IV-D to set certain

performance measurements for States to meet in establishing paternity.  *See* Pub. L. No. 104-

193, § 341(c), 110 Stat. 2105 (adding Section 452(g), codified at 42 U.S.C. § 652(g)).  Section

452(g) of the Act provides that in order to be found in substantial compliance with Title IV-D

requirements, a State's Child Support Enforcement program must meet a "paternity

establishment percentage" (also known as a "PEP") of 90 percent or, if less than 90 percent, that it show an increase over its PEP in the immediately preceding fiscal year.  The statute sets forth a sliding scale under which the lower a State's PEP, the larger an increase it must have over the prior year in order to be determined in compliance with Title IV-D.  *See, e.g.,* 42 U.S.C. § 652(g)(1)(B) (State with a PEP between 75 percent and 90 percent must show a 2 percentage point increase over prior year); 42 U.S.C. § 652(g)(1)(F) (State with a PEP less than 40 percent must show a 6 percentage point increase over prior year).

A State has the option to choose between two calculations to determine its PEP. The first is the "IV-D paternity establishment percentage," which is the percentage of children in the IV-D program who are born out of wedlock and for whom paternity has been established. The second is the "statewide paternity establishment percentage," which is the total number of children born out of wedlock statewide for whom paternity has been established.  42 U.S.C. § 654(g)(2)(A), (B).  In both cases the statutory formula uses a numerator (children with paternity established) based on the current fiscal year's data, and a denominator (children born out of wedlock) based on the immediately preceding fiscal year.  *Id.*  A State's PEP must be based on "reliable data," 42 U.S.C. § 654(g)(1), defined as "the most recent data available which are found by the Secretary to be reliable for purposes of this section."  42 U.S.C. § 654(g)(2)(C).

The PEP performance levels set forth in statute are not absolute.  Section 452(g)(3) states that the "Secretary may modify the requirements of this subsection to take into account such additional variables as the Secretary identifies . . . that affect the ability of a State to meet the requirements of this subsection."  42 U.S.C. § 652(g)(3)(A).  Examples of such variables are the percentage of children in a State who are born out of wedlock or for whom support has not been established.  *Id.*

PRWORA also amended Section 454(a)(15) of the Act to require a State to transmit to the Secretary "data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages). . . ." 42 U.S.C. § 654(a)(15)(B). Section 454(a)(4) then directs the Secretary to conduct audits at least once every three years "to assess the completeness, reliability, and security of the data and the accuracy of the reporting system used in calculating performance indicators." 42 U.S.C. § 654(a)(4)(c)(i).

The year following PRWORA's enactment, the Welfare Reform Technical Amendments Act of 1997, Pub. L. 105-33, 111 Stat. 251 (1997), amended Section 409 of Title IV-A, 42 U.S.C. § 609, to put in place penalties for noncompliance of state Child Support Enforcement programs with the requirements of Title IV-D. That section provides that if the Secretary finds:

> (l) on the basis of data submitted by a State pursuant to section 454(15)(B), or on the basis of the results of a review conducted under section 452(a)(4), that the State program failed to achieve the paternity establishment percentages (as defined in section 452(g)(2)), or to meet other performance measures that may be established by the Secretary;
>
> (II) on the basis of the results of an audit or audits conducted under section 452(a)(4)(C)(i) that the State data submitted pursuant to section 454(15)(B) is incomplete or unreliable; or
>
> (III) on the basis of the results of an audit or audits conducted under section 452(a)(4)(C) that a State failed to substantially comply with 1 or more of the requirements of part D . . .

and that, "with respect to the succeeding fiscal year"--

> (I) the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance as described in subparagraph (A)(i); or

(II) the data submitted by the State pursuant to section 454(15)(B)
is incomplete or unreliable,

then the State's TANF block grant shall be reduced by a specified percentage "for quarters

following the end of such succeeding fiscal year" and continuing until "the State program has

achieved the paternity establishment percentages or other performance measures[.]"  The amount

of the reduction is 1 to 2 percent in the first year; 2 to 3 percent for a second consecutive finding;

and 3 to 5 percent for the third consecutive finding.  42 U.S.C. § 609(a)(8)(B).

The statute does include an important exception, however, directing the Secretary

to disregard noncompliance which is of a "technical nature."   42 U.S.C. § 609(a)(8)(C).

Specifically, it states that the Secretary may determine either that a State's noncompliance "does

not adversely affect the performance of the State's program under part D" or that data found to

be incomplete or reliable can still be considered adequate if "the extent of the incompleteness or

unreliability is of a technical nature which does not adversely affect the determination of the

level of the State's paternity establishment percentages . . . or other performance measures[.]"  *Id.*

The final piece in the statutory puzzle is the Child Support Performance and

Incentive Act of 1998, Pub. L. 105-200, 112 Stat. 645 (1998), which amended the incentive

structure for performance in various areas of child support enforcement.  The incentive

provisions are included in Section 458 of Title IV-D, 42 U.S.C. § 658a.  A State can receive

incentive payments based on its performance in five areas: (1) paternity establishment; (2)

support order establishment; (3) current collections; (4) arrearage payments; and (5) cost-

effectiveness.  42 U.S.C. § 658a(B)(4).  Among other things, the incentive provisions state that

the incentive base for a particular performance measure is "zero" unless the Secretary determines

that the data submitted are "complete and reliable."  42 U.S.C. § 658a(b)(5)(B).

ACF's Office of Child Support Enforcement ("OCSE") published its proposed rulemaking implementing these penalty and incentive sections on October 8, 1999, 64 Fed. Reg. 55,074, and issued its final rule on December 27, 2000, 65 Fed. Reg. 82,178.  In addition to the paternity establishment percentage, the regulations added two other performance measures for which substandard performance could subject a State to a penalty taken against its TANF grant. The two additional measures are each State's percentage of support orders established and percentage of current collections.

The regulations define "reliable data" as the "most recent data available which are found by the Secretary to be reliable and is a state that exists when data are sufficiently complete and error free to be convincing for their purpose and context."  45 C.F.R. § 305.1(i).  The regulations establish that a State's data must meet a 95 percent standard of reliability effective in FFY 2001.  *Id*.  This standard means that, beginning in 2001, only 5 percent of the data for each performance measure may contain errors.

The regulations provide that if a State is found by the Secretary to be subject to a penalty, "the OCSE will notify the State in writing of such finding."  45 C.F.R. § 305.66(a).  The regulations specify that the notice will "(1) [e]xplain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the finding" and "(2) [s]pecify that the penalty will be assessed . . . if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective action year."  45 C.F.R. § 305.66(b).  The regulations elsewhere confirm that "[t]here will be an automatic one-year corrective action before any penalty is assessed" and that "[t]he penalties will be assessed and then suspended during the corrective action period."  45 C.F.R. § 305.42.

The notice requirement is consistent with the corrective action provisions of Section 409(a)(8) as well as Section 410 of the TANF statute, 42 U.S.C. § 610, which provides that "[w]ithin 5 days after the date the Secretary takes any adverse action under this part with respect to a State, the Secretary shall notify the chief executive officer of the State of the adverse action."  42 U.S.C. § 610(a).

## II.    ACF's Data Reliability Audits.

In accordance with Section 454(a)(15), OCSE measures state performance through the annual collection and analysis of state-reported data.  At the end of each fiscal year, OCSE requires each State to submit form OCSE-157.  *See, e.g.,* JAR 677-79.  The form consists of over forty lines for the entry of data relating to state child support enforcement efforts.  The data from eight of these entries ("the performance indicators") are used to calculate a performance level for four of the five performance measures that can be the subject of an incentive payments and the subset of three measures that can be the subject of a penalty.

As set forth in Section 452(a)(4), the OCSE Office of Audit then performs data reliability audits to ensure the completeness and reliability of the eight performance indicators used to compute the performance level percentages.  According to an audit guide dated March 2002, the auditors select a random sample of files from a State's child support case file system and examine them to determine whether the information in the files matches the data reported on the OCSE-157.  *See* JAR 640-41.  Then, through the use of statistical formulae, the auditors project an efficiency rating and confidence limit for each performance indicator.  If the results of the audit establish, with a 95 percent confidence level, that a performance indicator's efficiency rating is below 95 percent, then the indicator is deemed unreliable.  *See* 45 C.F.R. § 305.1(i) (setting a 95 percent standard of reliability effective as of FFY 2001).

The regulations provide that States must submit the OCSE-157 form for a federal fiscal year ("FFY") by December 31, the end of the first quarter after the end of the fiscal year. 45 C.F.R. § 305.32(f). "Only data submitted as of December 31st will be used to determine the State's performance for the prior fiscal year and the amount of incentive payments due the States." *Id.* ACF's data reliability audits usually take place the following spring, with final reports issued in the summer. By the time the audit results are released there generally are less than three months before the end of the next fiscal year for which data must be submitted.

In the audits, ACF auditors use two different standards for what constitutes an "error" when evaluating the reliability of the IV-D PEP and statewide PEP data. For States using the IV-D PEP indicator (which is recorded on Lines 5 and 6 of the OCSE-157), OCSE evaluates the reliability of the IV-D PEP data based on the same sample selected from the states' child support universe that they use to evaluate the reliability of the other performance measures. *See* JAR 641. The auditors assess errors if they determine that the State excluded any data that should have been included in the IV-D PEP data in Lines 5 and 6 of the ACF-157 report (exclusion errors -- for example, excluding a child for whom paternity has been established) and if they determine that the State included any data that should not have been included in these lines (inclusion errors -- for example, including a child for whom paternity has not been established). *See* JAR 642; *see also, e.g.,* JAR 1231, 1267.

However, for States that use the statewide PEP (which is recorded on Lines 8 and 9 of the OCSE-157), OCSE auditors draw a different random sample of cases from a combination of sources, such as Vital Statistics, IV-D, and other state agencies. JAR 641 n.6. The auditors look at these cases only to determine if the States made inclusion errors by incorrectly including any sampled cases on Lines 8 and 9 of the OCSE-157 report, where

statewide figures are reported; they do not consider whether the States made any exclusion errors by improperly omitting data that should have been included in these lines. *See id.* (for Lines 8 and 9, "the auditors will select a random sample of 50 cases from each source to determine if cases from each source appear to be correctly included"). *See also, e.g.*, JAR 1011 (to assess the reliability of Lines 8 and 9, the agency "verified whether the sample children selected were supported by information on the State's system and whether that information was properly reported").

Because the auditors count both exclusion and inclusion errors in IV-D PEP data, a State that chooses this measure has a much greater risk of being found to have errors in its data. The increased risk that States using the IV-D PEP measure will fail the data reliability standard is not merely hypothetical: for FFY 2002, 10 out of 26 states (or more than a third) that used the IV-D PEP indicator failed to meet the reliability standard for that year, while only 1 out of the 28 states that used the statewide PEP indicator failed. *See* AR JAR 651.

The different standards for what constitutes an "error" in the PEP data were not explained to the States at the time they decided whether to use the statewide PEP measure or the IV-D PEP measure. The only (unexplained) indication of the distinction appears in a footnote in ACF's *Guide for Auditing Data Reliability*, which was published in March 2002 and made available to some States after that time -- too late for any State to change its PEP measure for FFY 2001 and 2002. *See* JAR 627.

## III.    The FFY 2001 Data Reliability Audit Reports, Penalties, and Appeal.

Although data reliability audits were conducted for FFY 2000 data, the first year for which States were subject to performance penalties was FFY 2001. *See* 45 C.F.R. § 305.42 ("Penalty phase-in"). In December 2001, ACF confirmed to each State that the first year for assessing penalties would be based on FFY 2001 data. *See, e.g.*, JAR 1712. In letters to each

11

State, ACF reported that 23 States had failed the data reliability audits for fiscal year 2000 but that in recognition of the phase-in period for the new incentive provisions, ACF "believe[d] that a determination was warranted that the incompleteness or unreliability of these 23 states' data for FFY 2000 was of a technical nature that did not adversely affect the determination of the performance measures." JAR 1713. It concluded that "in accordance with the authority granted the Secretary, no state will be subject to a penalty for incomplete or unreliable FFY 2000 data." *Id*. The letter noted generally that "States will be subject to penalties for poor performance as of FFY 2001, based on data reported for FFY 2001." *Id*. ACF sent this letter to the IV-D agency in charge of the child support program in each State, not to the IV-A agency responsible for administering the TANF program.

Subsequent to the December 19, 2001 letter, the OCSE Office of Audit completed data reliability audits of each State's child support enforcement data for FFY 2001. The Office of Audit issued draft and final reports to each State, summarizing the results of its audits, but expressly disavowed that they were making any determinations as to penalties. Instead, the reports specifically stated that the Office of Audit merely conducts audits, but does not make any final determinations regarding data reliability. *See* JAR 687, 754, 852, 964, 1027, 1106-07, 1186-87, 1264; IAR 77. Again, the Office of Audit sent both the draft and final audit reports to the IV-D agencies in each state, not to the IV-A agencies.

On November 14, 2003, ACF sent letters to the IV-A agencies in thirteen States (including the Plaintiffs), informing them for the first time that ACF was immediately assessing a 1 percent penalty against their FFY 2004 TANF grants, because of the failure of the Child Support Enforcement program to meet performance and/or data reliability standards in FFY 2001 and 2002. *See* JAR 86-88, 89-91, 95-97, 98-100, 101-03, 107-09, 110-112; IAR 106-08.

12

The state agencies operating the TANF program were generally not involved in the process of submitting the OCSE-157 form, meeting with the OCSE auditors, and receiving copies of the OCSE audit reports. As a result, the November 14, 2003 letter to state TANF agencies announcing that a penalty was immediately being assessed against their grant generally came as a considerable, and unwelcome, surprise. Because most state fiscal years start in July, state budgets had already been set and state legislatures were out of session. And, although the penalty purports to be only 1 percent of a State's TANF funds, its fiscal impact is at least twice that: as the November 14, 2003 letter explained, a State facing a penalty reduction in its TANF grant is required to make up the shortfall with additional state funds in the following fiscal year. *See* 45 C.F.R. § 262.1(e).[3]

Plaintiffs Alabama, Delaware, the District of Columbia, Hawaii, Kansas, Louisiana, New Mexico, and Rhode Island jointly appealed these penalties to the Departmental Appeals Board ("DAB" or "the Board").[4] Plaintiff Indiana filed a separate appeal before the DAB. Pursuant to ACF's regulations, the States had sixty days from the date of the penalty letter

---

[3] The amount of the penalties imposed on each Plaintiff, as well as the total fiscal impact of the penalty, are as follows: Alabama: $532,692 penalty, with a total fiscal impact of $1,065,384, *see* JAR 41; Delaware: $293,489 penalty, with a total fiscal impact of $586,978, *see* JAR 45; Hawaii: $921,048 penalty, with a total fiscal impact of $1,842,096, *see* JAR 56; Indiana: $1,447,594 penalty, with a total fiscal impact of $2,895,198, *see* IAR 1; Kansas: $807,487 penalty, with a total fiscal impact of $1,614,974, *see* JAR 56; Louisiana: $1,096,723 penalty, with a total fiscal impact of $2,193,446, *see* JAR 61; New Mexico: $946,877 penalty, with a total fiscal impact of $1,893,754, *see* JAR 75; Rhode Island: $945,007 penalty, with a total fiscal impact of $1,890,014, *see* JAR 77.

[4] The New Hampshire Department of Health and Human Services also participated in the joint appeal to the DAB, but is not a plaintiff in this action. Four other States and territories -- including Plaintiff Indiana -- individually appealed similar penalties, also announced in letters from ACF dated November 14, 2003. The District of Columbia participated in the joint appeal to the DAB but is separately represented in this action.

to file the briefs and all documentation supporting their appeals. *See* 45 C.F.R. § 262.7; *see also* JAR 87.

The States' primary challenge to the penalties was based on ACF's failure to satisfy the notice requirement contained in 45 C.F.R. § 305.66(b), which requires that ACF must give States notice of a potential penalty that "[s]pecif[ies] that the penalty will be assessed…if the State is found to have failed to correct the deficiency or deficiencies cited in the notice in the automatic corrective action year." *See* JAR 126-33; IAR 40-43. The November 2003 letter assessing the penalty was the first notice the States received that their TANF grants were subject to penalty.

Six of the States[5] also challenged the penalties on the grounds that ACF's use of different error standards in assessing IV-D PEP and statewide PEP data reliability was arbitrary, capricious and without basis in the statute or regulation. *See* JAR 133-38. Because the different standards created a wide discrepancy in failure rates between States that chose the IV-D PEP measure and States that chose the statewide PEP measure, the States argued that they were, at a minimum, entitled to notice and an explanation of the differences, so they could make an informed decision about which PEP measure to use. *See* JAR 137-38. The States also submitted that the Secretary should have exercised his authority to disregard noncompliance which is of a "technical nature," *see* 42 U.S.C. § 609(a)(8), and declined to impose penalties on States whose PEP data were found unreliable due to errors that only understated the State's PEP performance. *See* JAR 138-41. The States also raised a number of state-specific challenges to the penalties.

---

[5] These States were Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island.

IV.     **The DAB Decisions.**

Over eighteen months after the States filed their appeals (or 21 months, in

Indiana's case), the DAB issued its decisions upholding the penalties in their entirety.  The DAB

rejected the States' notice arguments, finding that the notice requirements of 45 C.F.R. § 305.66

do not apply until "the completion of two consecutive years of noncompliance with the

regulations, after which a penalty must be assessed."  JAR 13-14.[6]  The Board also found that,

even without formal notice of possible penalties, the States had an opportunity to take corrective

action because they knew or should have known of their deficient performance.  JAR 17-20.

In addition, the Board determined that both a State's obligation to correct

deficiencies in its Title IV-D data and the IV-D penalty process are "self-implementing."  JAR

15-16.  Relying on the regulations' timeline for the submission of performance data, the DAB

found that the structure of the penalty system "does not permit the start of the corrective action

year to be conditioned on notice from ACF of a state's performance or data reliability…and

further does not afford a state a full year following notice to correct its deficiencies before being

subject to penalties."  JAR 16.  The Board also determined that the "self-implementing" nature

of the IV-D penalty process was "underscore[d]" by the fact that the statute does not allow States

subject to a penalty to submit a corrective action plan or for the Secretary to forgive penalties if

there was reasonable cause for the violation, as is true for some other TANF penalties.  *See* JAR

20.

---

[6] Because the Board's decision in DAB Decision No. 2001 explicitly incorporates by reference
and summarizes the arguments in the Board's prior decision in DAB Decision No. 1989, this
brief cites only to DAB Decision No. 1989.  *See* IAR 1.

The Board also rejected the States' arguments that ACF acted arbitrarily and capriciously in applying different definitions of "error" when assessing the reliability of IV-D and PEP data.  The DAB found that ACF had presented a reasonable rationale for the different standards:  it is more difficult for auditors to determine exclusion errors for statewide PEP data, since that data comes from a multiplicity of sources outside the IV-D agency, than for IV-D PEP data.  JAR 38.  The Board also found that no authority entitled the States to "prior notice of the different sample selection methodologies." JAR 39.  Moreover, according to the Board, the States had not presented expert evidence that employing differing standards was unreasonable, nor had they sufficiently established that they were prejudiced by the varying standards.  *Id*.

The DAB also rejected the States' technical noncompliance argument and all of the state-specific challenges.  *See* JAR 26-32, 41-82; IAR 17-26.

## STANDARD OF REVIEW

This case involves a challenge to a final administrative action under the Administrative Procedure Act ("APA"), 5 U.S.C. 551 *et seq*.  Summary judgment is an appropriate procedure for resolving such a challenge, but "the proper standard of review is that found at 5 U.S.C. § 706 rather than Rule 56 of the Federal Rules of Civil Procedure." *Back Country Horsemen of Am. v. Johanns*, No.Civ.A. 05-0960 (ESH), 2006 WL 825534, at *3 (D.D.C. Mar. 29, 2006).  Hence, the court must determine "whether the challenged decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706 (2)(A)." *Paige Int'l, Inc. v. U.S. Dep't of Trans*., No. Civ.A. 03-2213 (EGS), 2005 WL 3276196, at *1 (D.D.C. Sept. 27, 2005).

Although this standard is deferential to the agency, the court "must give the [agency's] decision a thorough, probing, in-depth review," *Ackerman v. United States*, 324 F. Supp. 2d 1, 5 (D.D.C. 2004) (citation omitted), to determine "whether the agency acted within

the scope of its legal authority, whether the agency has explained its decision, whether the facts

on which the agency purports to have relied have some basis in the record, and whether the

agency considered the relevant factors." *Back Country*, 2006 WL 825534, at *3 (citation

omitted).

An agency's interpretation of one of its own regulations must "reflect clear,

rational decisionmaking that gives regulated members of the public adequate notice of their

obligations." *S.A. Storer and Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1371 (D.C. Cir. 2004)

(citation omitted).

## **ARGUMENT**

### I.    The DAB Acted Arbitrary and Capriciously in Determining that 45 C.F.R. § 305.66 is Not a Prior Notice Regulation

> A.    *The DAB's Interpretation of § 305.66 is in Conflict with the Plain Text of the Regulation and at Odds with Numerous Statements in the Preambles to the Proposed and Final Rules.*

As described above, the first and only written notice that any State received from

the Secretary was a November 14, 2003 letter announcing a final decision to impose a penalty.

The DAB concluded that the Secretary acted lawfully, reasoning that the IV-D penalty

framework is "self-implementing" and the notice called for under 45 C.F.R. § 305.66 can be

given in the same letter that assesses the final penalty.  *See* JAR 13-14.  This interpretation

cannot be reconciled with the plain text of the regulation, which reads as follows:

> (a)  If a State is found by the Secretary to be subject to a penalty as described in § 305.61 of this part, then [the agency] will notify the State in writing of such finding.

> (b)  The notice will:

> > (1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the *potential* penalty, and give reasons for the finding; and

> (2) Specify that the penalty *will be* assessed in accordance
> with the provisions of 45 C.F.R. 262.1(b) through (e) and 262.7 *if*
> the State is found to have failed to correct the deficiency or
> deficiencies *cited in the notice* during the automatic corrective
> action year (i.e., the succeeding fiscal year following the year with
> respect to which the deficiency occurred.)

45 C.F.R. § 305.66(a)-(b) (emphases added).  The regulation describes in clear and unambiguous

terms a sequence of events.  First, the State receives a written "notice" from the agency

"explaining" specific programmatic deficiencies and "indicating" to the State precisely how

much money it stands to forfeit as a penalty.  *See* 45 C.F.R. § 305.66(b)(1).  Then, the State has

an opportunity to cure the deficiencies "cited in the notice" during a corrective action year.  *See*

45 C.F.R. § 305.66(b)(2).  After the conclusion of the corrective action year, the Secretary must

determine whether the State has succeeded or failed to cure the deficiencies "cited in the notice."

45 C.F.R. § 305.66(c).  If it has succeeded, then it avoids the penalty.  *See id.*  If it has failed,

then the "potential" penalty announced in the notice ripens into a final penalty.  *See id.*; *see also*

45 C.F.R. § 305.66(d).

      In short, the written notice required under § 305.66 serves as a warning -- "You,

State, must fix deficiencies A, B, and C by a date certain or suffer a penalty in the amount of X

dollars."  To be most useful to the State, the warning should arrive in the beginning of the

corrective action year.  To be of any use at all, it must arrive before the end of the corrective

action year.  In this case, the letter arrived thirteen months after the corrective action year had

expired, announcing imposition of the penalty.  That is a warning in the same way that a punch

in the face is a warning to duck.  A federal agency is entitled to substantial deference from the

courts when interpreting its own regulations, but no deference is owed to an "interpretation" that

conflicts with clear and unambiguous language in the regulation.  *See Drake v. F.A.A.*, 291 F.3d

59, 68 (D.C. Cir. 2002) (citation omitted) ("The language of the regulation must be ambiguous,

lest a substantively new rule be promulgated under the guise of interpretation."). Here, the plain text of § 305.66 confirms that the purpose of the notice is to alert a State to the risk or possibility of a penalty. This is why subpart (b) refers to a "potential penalty."

Under the DAB's interpretation of § 305.66, the regulation permits the notice to be commensurate with the penalty. The "notice" announces a fait accompli -- something that has already happened and cannot be changed. The Board's interpretation relegates the words "potential," "if," and "will be" -- not to mention the notion of a year in which to take corrective action -- to the status of "mere surplusage," in violation of basic tenets of statutory and regulatory construction. *Cf. Donnelly v. F.A.A.*, 411 F.3d 267, 271 (D.C. Cir. 2005) ("We must strive to interpret a statute to give meaning to every clause and word…"); *see also Potter v. United States*, 155 U.S. 438, 446 (1894) (a word in a statute "cannot be regarded as mere surplusage; it means something"). In fact, under the Board's interpretation, the whole regulation is surplus, as there is no need for "notice" if the penalty has already been assessed, as other provisions already require the agency to notify the Governor and the State agency of any adverse action -- "i.e., the reduction in [the TANF grant]" -- within five days of assessing the penalty. *See* 45 C.F.R. 262.7(a)(1).

To support its contention that none of these words is entitled to its plain meaning, the DAB offers only speculation that the "conditional nature of some of the language in section 305.66" is "likely attributable" to its incorporation of "selected regulations at 45 C.F.R. Part 262 …." JAR 14. Part 262 contains regulations governing the procedures for assessing other types of TANF penalties and provides States subject to these penalties the opportunity to submit corrective compliance plans or demonstrate reasonable cause for their noncompliance. *See* 45 C.F.R. § 262.5. However, those sections of Part 262 under which certain potential penalties may

be avoided are <u>not</u> the sections incorporated in § 305.66.  The only sections incorporated into Section 305.66 are 262.1(b)-(e) (which address the situation when multiple penalties are assessed) and Section 262.7 (which addresses notice of adverse action and the ability to appeal a penalty to the DAB).  The only remotely conditional aspect of the incorporated sections is the section specifying that total aggregate penalties may not exceed 25% of the TANF block grant in a single year, *see* 45 C.F.R. 262.1(d), but even then the excess penalties are not "conditional" but rather are rolled over into the succeeding year.

Moreover, there is no indication in the preamble adopting the notice provisions that the incorporation of sections of Part 262 was driving the overtly conditional nature of § 305.66.  To the contrary, the regulatory history repeatedly confirms that the "conditional nature" of the language in the notice provision reflects an intent to establish a precise sequence of events (notice of assessment, suspension of assessment pending corrective action period, final redetermination).  The preamble to the proposed regulations provides:

> A penalty would be applied when a State was determined not to meet a requirement, but the penalty would be *suspended* during the following year and applied *only if* the State failed to correct any *identified deficiencies* by the end of the corrective action year.

64 Fed. Reg. 55,090 (proposed rule).   The "deficiencies" described above are supposed to be "identified" in the notice:

> Proposed Section 305.66 addresses *notice to the State of any deficiency or deficiencies identified*…. The proposed paragraph (a) would require that, if the Secretary, on the basis of the results of an audit or review, finds a State to be subject to a penalty, OCSE would *notify the State in writing* of such finding.  Under proposed paragraph (b), the notice would:
>
> (1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the Secretary's finding; and

> (2) Specify that the penalty would be assessed if the State fails to correct the deficiency or deficiencies cited in the notice during the subsequent fiscal year, referred to as the "corrective action" year.

*Id*. at 55,092 (emphases added).  The language in the preamble to the final rule is just as clear:

> A penalty *will be* (future tense) applied *only if* the State failed to correct any *identified deficiencies* by the end of [the] automatic corrective action year….

65 Fed. Reg. 82,192 (final rule).  And,

> The notice will … [2] specify that the penalty *will be* [future tense] assessed … *if* the State is found to have failed to correct the deficiency or *deficiencies cited in the notice* during the automatic corrective action year.

*Id.* (emphases added).  Similarly,

> Under paragraph (c) of [Section 305.66], the penalty *will be* assessed if the Secretary determines that the State has not corrected the deficiency or deficiencies *cited in the notice* by the end of the corrective action year.  This *determination will be made* as soon as possible after the end of the corrective action year.

*Id.* (emphases added).

Finally, the preamble contains repeated statements confirming that the notice rule at § 305.66 is supposed to be "similar" to the one that preceded it.  *See* 65 Fed. Reg. 82,192 (final rule) ("[s]imilar to the notice aspects of the former audit process at former § 305.99…."); 64 Fed. Reg. 55,092 (proposed rule) (same).  Under the previous notice regulation at former §305.99, the Secretary was required to "notify the State in writing" of a penalty; list the "unmet audit criteria"; "give reasons" for the Secretary's finding; and "[s]pecify" that "the penalty will be suspended for a period not to exceed one year from the date of the notice" if the State submits -- and the Secretary approves -- a corrective action plan.  *See* 45 C.F.R. § 305.99 (1998) (emphasis added).  Thus, "similar" to § 305.66, the notice issued under the old regulation preceded the opportunity for corrective action.  The key difference is that now a State

automatical*y* receives a one-year period for corrective action, whereas before that was a matter left to the discretion of the Secretary. *Compare* 45 C.F.R. § 305.66(c), *with* 45 C.F.R. § 305.99 (c) (1998).

In addition to the preamble, the language of other regulations also confirm the "conditional nature" of § 305.66. For example, § 305.42 ("Penalty Phase-In") provides:

> There will be an automatic one-year corrective action period
> before any penalty is assessed. The penalties will be *assessed and*
> *then suspended* during the corrective action period.

In sum, the language of the regulation, the statutory and regulatory history, and the statements in the preamble cannot support the DAB's holding that the regulation does not require ACF to put a State on notice of a potential penalty so that it is fully aware of the imperative to take immediate steps. As such, it is not entitled to any deference from this court. *See Drake,* 291 F.3d at 68. Because ACF failed to comply with the clear and unambiguous terms of § 305.66, the penalties must be set aside as "arbitrary, capricious, or otherwise not in accordance with law." *See Mine Reclamation Corp. v. Federal Energy Regulatory Comm'n,* 30 F.3d 1519, 1524 (D.C. Cir. 1994) (invoking the "well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action") (internal references omitted).

> B.    *ACF's Failure to Give the Required Notice Affected the States' Ability to Avoid*
>       *the Penalty and Prepare for Its Potential Consequence.*

As an alternative ground for upholding the penalties, the DAB declared that even if § 305.66 "requires that a state be given notice during the corrective action year of its performance or data reliability failures…the States here either received such notice or were in fact aware of their performances during the corrective action year." JAR 17. This reasoning, too, is faulty and cannot support the agency action.

The DAB first maintains that "the information provided in the draft and final DRA [data reliability audit] reports," made the States "aware" of their programmatic deficiencies. *See* JAR 18-20. That contention is wrong for two reasons. First and foremost, the regulations require more than a general "awareness" of programmatic deficiencies. ACF made a commitment to provide written notice in the form and content set forth in § 305.66, and the audit reports fall short of that standard. They do not even contain the word "penalty," let alone explain the reasons for the penalty; indicate its amount; and/or specify when and under what circumstances it will be imposed -- all of which are express requirements of § 305.66(b).

Second, the auditors themselves expressly disavowed that they were making any final determinations as to the sufficiency of the States' IV-D performance data. Each of the audit reports for FFY 2001 contains an identical disclaimer announcing that "[t]he appropriate ACF official will make any final determination as to the reliability of [the State's] reported performance indicator data." JAR 687, 754, 852, 964, 1027, 1106-07, 1186-87, 1264; IAR 77.

Presumably, the reason that the audit reports do not even refer to the assessment of a penalty is because only the Secretary (or his designee), and not the auditors, has the authority to assess the penalty, including the authority to determine whether a State qualifies for a disregard based on technical non-compliance. *See* 42 U.S.C. § 609(a)(8)(C); 45 C.F.R. § 305.62. This point is underscored by ACF's resolution of data reliability issues in FY 2000. The OCSE auditors concluded that 23 States had fallen short of the 90 percent data reliability threshold for FY 2000, but ACF expressly invoked the authority of the Secretary to hold that the identified deficiencies were of a "technical nature that did not adversely affect the determination of the [IV-D] performance measures." JAR 1713. This demonstrates that until the Secretary makes a final determination as to the import of the auditors' findings, a State does not know

whether it is at risk of a penalty.  With respect to the penalties at issue, the Secretary did nothing

of the kind.  This is why the November 2003 letters imposing the penalties -- the first penalties

imposed under the new regulations -- caught the States by surprise.

        The DAB appears to have discounted the importance of prior notice, based on the

belief that a State should always be aware of programmatic deficiencies in need of correction.

But the fact that the States are required to perform self-assessment, *see* JAR 18, does not relieve

ACF of its own clearly defined responsibilities.  To the extent that the DAB held otherwise, its

decision cannot be squared with the plain meaning of the notice regulation, nor can it be said to

reflect a considered judgment of how the penalty framework operates in the real world.

        While a State can usually self-determine its performance on the substantive

performance indicators (*i.e.*, percent of current collections, arrearages, etc.), such self-assessment

is more difficult to conduct with respect to data reliability.  Reliability can only be assessed

through audit, and audits are not only intensely more time-consuming but the results can diverge

based on audit methodology, including sample size and what the auditors count as errors.  A

State could get different results depending on whether its self-assessments were random, whether

it had large or small samples, whether it sampled "cases" (i.e., families) or individual children,

and what it used as the definition of "reliable."  Even a State that wanted to replicate the federal

data reliability audit exactly would not have known how to do so until the audit guidelines were

shared with the States halfway through FFY 2002.

        In addition, the difference between a finding of reliable data or unreliable data can

turn on a judgment call by the auditors as to how to treat one or two unusual cases within the

audit sample. States can have good cause to disagree with the auditors' findings, *see, e.g.,* JAR

1239-1245 (Rhode Island comments to FY 2002 audit report), which is why the regulations grant

States an opportunity to comment on draft audit reports.  *See* 45 C.F.R. § 305.64 (c).  Those

comments must be included in the final audit report.  *See id.*  It then falls to the Secretary to

consider the points of disagreement reflected in the report; make final determinations; and notify

States accordingly.  *See* JAR 26 ("Part 305 affords states the opportunity to comment on draft

audit reports, and requires that their comments be included in the final audit report….This

suggests that those comments and responses will be reviewed by ACF <u>prior to a final decision on

data reliability</u> or performance….") (emphasis added).

          Few organizations -- and, certainly, not state government agencies -- can afford to

expend limited resources fixing problems that may not even exist.  It is incumbent on the

Secretary, therefore, to review the auditors' findings and "identify" those "deficiencies" which

need to be addressed.  If the Secretary fails to make a final determination and communicate it to

the State, then he fails to start the mechanisms at the state level necessary to ensure that

identified deficiencies are corrected.  The DAB erred, therefore, in treating the lack of prior

notice as a mere technicality.

          In this case, the need for formal notice under the rules is underscored by the

involvement of two separate programs.  The penalties arise out of activities of the State's IV-D

agency, yet the penalties are levied against the State's TANF grant, therefore reducing the

federal funds (and increasing the need for State appropriation) to the State's IV-A program.  The

Board held that this argument was "unavailing," as the "state as a whole must be viewed as a

single unit responsible for the administration of federal grant programs and funds."  JAR 22.

That rationale misses the point.  The State is not contending that the penalty process itself is

invalid but that notice of a potential adverse action is especially critical when two different

programs are involved (and even more so in the first year of operation of the new scheme of penalties).

ACF's failure to comply with its own regulation is particularly troublesome when considered in light of Congress' clearly stated intent that States should have a one-year period in which to correct any identified deficiencies. *See* 42 U.S.C. § 609(a)(8)(A)(ii) (stating that a State may be penalized under IV-D only if it failed to take corrective action in the succeeding fiscal year); 45 C.F.R. § 305.66(c) ("The penalty … will be assessed if the Secretary determines that the State has not corrected the deficiency or deficiencies cited in the notice by the end of the corrective action year.") (emphasis added); 64 Fed. Reg. 55,074 ("After a failure has been identified, a State would have an automatic one-year corrective action period . . ."). Contrary to the DAB's assertions, the fact that the corrective action year now begins automatically at the start of the succeeding fiscal year only amplifies the need for the Secretary to comply promptly with his duties under § 305.66. Whereas before delay on the part of the Secretary merely postponed the beginning of the corrective action period, now delay can rob a State of any reasonable chance to avoid a penalty. *Compare* 45 C.F.R. § 305.66 (c) ("succeeding fiscal year"), *with* 45 C.F.R. § 305.99 (1998) ("one year from the date of the notice"). The DAB, therefore, drew the wrong conclusion from Congress' decision to provide an automatic corrective action year. Congress intended to grant States a nondiscretionary entitlement to a corrective action year. *See* 42 U.S.C. § 609(a)(8)(A)(ii). There is no indication that it intended for ACF to abandon the preexisting framework for advising States of potential penalties so that they might take action to avoid them.

ACF itself has observed that the penalty framework is in need of a "technical fix" to provide States with "a full year for corrective action following notice of a deficiency." JAR 664. As the DAB notes throughout its decisions, the States bear "ultimate responsibility" for complying with the requirements of the IV-D program. *See* JAR 13. True, but ACF has responsibilities too. In the absence of the sought-after "technical fix," the least the agency can do is follow its own clear and unambiguous rules. If the agency does not like its notice regulation, it can change it -- through notice and comment rulemaking. But it was not open to the DAB to absolve the agency of its express obligations by "ascribing" to § 305.66 a meaning it "simply do[es] not have." *S.A. Storer & Sons Co.*, 360 F.3d at 1370.

The Supreme Court has stated time and again that federal-state partnerships arising out of Spending Clause legislation are "much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst,* 451 U.S. at 17, *quoted in Barnes v. Gorman*, 536 U.S. 181, 186 (2002). Therefore, it is incumbent upon the agency to ensure that the regulatory scheme it implements to execute the federal-state "contract" spells out clearly defined duties for the States.[7] This is all the more true where, as here, that scheme employs the unusual tactic of imposing penalties on one state program (IV-A) for the shortcomings of another (IV-D).

---

[7] Although not all common law contract principles apply to Spending Clause legislation, *see Barnes*, 536 U.S. at 186, they can be a useful tool for examining the contours of the federal-state relationship. *See id*. The duty described herein is analogous to the duty of good faith and fair dealing that is implicit in every contractual relationship. *See* Restatement (Second) of Contracts § 205, cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

The DAB's conclusion that it is sufficient for the Secretary to give notice contemporaneous with the final penalty cannot be reconciled with the plain meaning of § 305.66, nor can it stand in light of the obligations that undergird the federal-state partnership. For the reasons set forth above, the DAB's decision must be overturned on the ground that it is "arbitrary, capricious, or otherwise not in accordance with law."

## II.   ACF Acted Arbitrary and Capriciously in Using Different Standards to Assess the Reliability of IV-D and Statewide Paternity Establishment Data.

Plaintiffs Alabama, Delaware, Hawaii, Indiana, Louisiana, New Mexico and Rhode Island each had a penalty assessed because they were found to have had at least one year of "unreliable" data in reporting their PEPs. Each of these States opted to report their PEP performance using the IV-D caseload, an option permitted by statute. *See supra* p. 5. The findings of data unreliability for these States must be reversed due to ACF's use of different standards for assessing data reliability IV-D PEP data and statewide PEP data: for States using the IV-D PEP indicator, ACF counts both inclusion and exclusion errors, but for States that use the statewide PEP, ACF looks only for inclusion -- but not exclusion -- errors. *See* JAR 640-42.

The PEP is intended to measure a State's performance in establishing paternity for children born out of wedlock. The numerator of the PEP is the number of children for whom paternity has been established. For a State using the IV-D PEP measure, if a child for whom paternity has been established is excluded from the numerator, that counts as an error against the State for purposes of auditing data reliability. The same omission by a State reporting a statewide PEP is not considered an error. Similarly, if a State reporting a IV-D PEP erroneously reports that a child was born within a marriage (and thus omits the child from the PEP

denominator), the omission is considered an error.  The same reporting error by a State reporting

statewide data is not considered unreliable for purposes of the data reliability audit.[8]

ACF's use of different standards for counting errors in PEP data amounts to

arbitrary and capricious agency action for several separate and independent reasons.  First,

giving the term "reliable data" two different meanings contravenes normal principles of statutory

construction and Congress' intent that States be treated consistently no matter what PEP measure

they chose.  Second, ACF violated the APA by failing to give States notice of any kind -- much

less the adequate and timely notice required by the APA -- regarding its use of different

reliability standards.  Third, ACF never offered any rationale for the use of differing

methodologies prior to the DAB proceedings -- and then offered only a purely speculative

rationale to justify its conduct, which the Board accepted without any record evidence to support

it.  The analysis of ACF and the DAB on this point cannot rise to the level of "reasoned decision-

making" that is worthy of judicial deference.

> A.   *ACF Acted Contrary To Congressional Intent In Using Two Different Definitions of "Reliable Data."*

The fact that ACF has two different standards for assessing errors means

essentially that it employs two different definitions of what constitutes "reliable data" for

statewide and IV-D PEP data.   Statewide PEP data is considered "reliable" even if it contains

significant exclusion errors, while IV-D PEP data can only be "reliable" if it is 95 percent free of

both inclusion and exclusion errors.  Such differing definitions have no basis in the governing

---

[8] Frequently, children born out of wedlock but for whom paternity is acknowledged from birth are mistakenly entered into the State's database as born in wedlock, because there is no need for the State to establish paternity.  For the IV-D States, this will count as two errors (an omission from children born out of wedlock and an omission from children for whom paternity is established), *see, e.g.*, JAR 922-23, whereas for the statewide PEP states, no error will be counted.

statute, which provides only one definition of the term "reliable data." 42 U.S.C. § 652(g)(2)(C) ("the term 'reliable data' means the most recent data available which are found by the Secretary to be reliable for purposes of this section"). If "the normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning," *see Sorenson v. Treasury*, 475 U.S. 851, 860 (1986) (citations omitted), then it is certainly proper to assume that Congress did not intend a phrase used in one statutory section to be given two different meanings by the agency. *Cf. Nat'l Insulation Transp. Committee v. Interstate Commerce Comm'n*, 683 F.2d 533, 537 (D.C. Cir. 1982) ("we presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning.")

The text of PRWORA and its legislative history clearly support making this assumption here. Every reference to "paternity establishment percentage" in the Act makes no distinction between the IV-D and statewide PEP indicators, demonstrating that Congress considered these two measures to be interchangeable. *See, e.g.,* 42 U.S.C. § 609(a)(8)(A)(i)(1) (providing that a IV-D program is noncompliant if the State failed to achieve the PEP); 42 U.S.C. § 658a(b)(6)(ii) (providing the applicable incentive percentages based on PEP levels). The conference report to PRWORA confirms that "States have the option of calculating the [PEP] rate by either counting only unwed births in the State IV-D caseload or by counting all unwed births in the State," and emphasizes that the statewide PEP is "similar" to the IV-D PEP. H. R. Conf. Rep. No. 104-725, at 359-60, *reprinted in* 1996 U.S.C.C.A.N. 2649, 2746 (emphasis added).

In addition, the Act's general requirements indicate that Congress intended the agency to apply the same definition of reliable data in the context of both statewide and IV-D PEP data. Section 652(a)(5) requires the Secretary to establish "uniform definitions" so the State can comply with the procedures for collecting and reporting child support enforcement information. 42 U.S.C. § 652(a)(5). Clearly, ACF's definitions of what constitutes reliable IV-D PEP data and what constitutes reliable statewide PEP data are not "uniform." Moreover, the entire legislative design suggests that ACF must use consistent definitions of reliability. The very foundation of the penalty and incentive system set up by Congress is the data reliability audit: if a State's data is found to be incomplete or unreliable, it is subject to a penalty under Section 409(a)(8) of the Act, and it is not entitled to receive an incentive payment. Thus, treating States differently at the reliability audit stage leads to inconsistent treatment of the IV-D and statewide PEP measures at all subsequent phases of the penalty and incentive process.

It is impossible for the agency to fulfill Congress' intent that the statewide and IV-D PEP be treated consistently without using similar standards in assessing data reliability for both methods of reporting PEP performance. The application of differing methodologies undercuts the very purpose of the data reliability audits, which is to ensure that States are treated fairly:

> Federal auditors' assessment of data reliability is a critical aspect of assuring that both incentives and penalties are based on accurate and reliable State-reported data. This is an important control . . . because it underpins the fairness of the incentive and penalty system and the resulting confidence that States have in rewards dispensed and penalties assessed nationwide.

64 Fed. Reg. 55,074 (emphasis added).

The DAB ignored the statute's concerns with uniformity, justifying ACF's different definitions of "reliable data" on the fact that Congress created the two different types of PEP measures and left it to ACF to define when data submitted by States is reliable.  *See* JAR 40.  This reasoning clearly begs the question of whether Congress intended ACF to treat States that chose IV-D PEP measure and States that chose the statewide PEP measure consistently in the data reliability process.  The provisions and history discussed above, however, indicate that the answer to that question is an emphatic "yes."  By violating basic canons of statutory interpretation and acting contrary to Congressional intent in using two different definitions of the term "reliable data," ACF acted arbitrary and capriciously.  *See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acts arbitrarily and capriciously when it relies on factors Congress did not intend it to consider); *Nat'l Treasury Employees Union v. F.L.R.A.*, 392 F.3d 498, 499 (D.C. Cir. 2004) (rejecting agency interpretation as "contrary to the clearly expressed intent of Congress").

B.    *ACF Failed To Give States Requisite Notice Of Its Use Of Different Standards.*

Even if the statute permitted ACF to adopt a different standard of "reliability," it was incumbent on ACF to fully and adequately explain to the States that it was doing so, in order that the States could take the differing standards into account when choosing which statistic to report and how to self-assess.  The penalties cannot stand because the States did not receive adequate and timely notice of ACF's policy.  The APA requires that agencies publish in the Federal Register all "statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D).  A State cannot be "adversely affected by a matter required to be published in the Federal Register and not so published," "[e]xcept to the extent that a [State] has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(1)(E); *see also Human Resources Mgmt., Inc. v. Weaver*, 442 F. Supp. 241, 251 (D.D.C.

1977) (APA does not require "advance publication" of interpretive rules and general statements of policy, to the extent that a person has "actual and timely notice" of a matter by which he may be adversely affected).  Moreover, "[t]raditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party [or a State] for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad. Co. v. F.C.C.,* 824 F.2d 1, 3 (D.C. Cir. 1987).  ACF's own regulations recognize the importance of giving States information regarding the audit process.  *See* 45 C.F.R. § 305.64(a) (requiring federal auditors to meet with IV-D agency and "explain how the audit will be performed").

        Even if ACF's standards for what constitutes an error is not a "substantive rule" requiring notice-and-comment rulemaking, it is unquestionable that they are policy statements or interpretations of general applicability.  *See New Mexico Human Svcs. Dep't.*, DAB No. 1224 (1991) (holding that OCSE auditing methodologies are "general statements of policy or rules of agency procedure or practice").  Yet ACF did not publish the standards in the Federal Register, nor did they give the States actual and timely notice of them.  The earliest time when States could have possibly learned that ACF auditors counted exclusion errors only in IV-D PEP data was upon their receipt of the *Guide for Auditing Data Reliability* sometime after the *Guide*'s publication in March 2002.  At this point, the States had already selected a PEP reporting measure, submitted their OCSE-157 forms for FFY 2001, and were more than halfway through their corrective action year.  Even if the States who chose the IV-D PEP measure could have divined ACF's use of different methodologies and fully realized its implications from the *Guide*'s footnotes in March 2002, it was too late for them to switch PEP measures, which, as explained more fully in the next section, requires the collection of several years' worth of data. Because the States did not receive timely notice of ACF's use of differing methodologies, it

would contravene fundamental principles of administrative law for them to be penalized as a result of ACF's policy of defining different errors for IV-D and statewide PEP data.

    C.    *The DAB's Acceptance of the Different Definitions of "Reliability" Cannot Be Justified.*

    The Board's stated reasons for permitting ACF to apply different standards of reliability are neither reasonable nor supported by any evidence in the record. As a general matter, "an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 48-49. This is because judicial deference to agency decisions is only appropriate when that agency has engaged in "reasoned decision-making." *American Lung Assoc. v. E.P.A*, 134 F.3d 388, 392 (D.C. Cir. 1998). Where, as here, an "agency applies different standards to similarly situated entities," the agency must "support this disparate treatment with a reasoned explanation and substantial evidence in the record," or else its action is arbitrary and capricious. *Burlington N. & Santa Fe Railway v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005); *see also Petroleum Communications, Inc. v. F.C.C.*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("We have long held that an agency must provide an adequate explanation before it treats similarly situated parties differently."); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similarly situated parties differently").

    The agency's burden is the same when it uses different definitions of the same term (here, "reliable data") in different contexts. *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1380 (Fed. Cir. 2001) (requiring agency to give a reasonable explanation why it used different definitions of "foreign like product" for price purposes and when calculating constructed value); *Nat'l Org. of Veterans' Advocates Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1379-80 (Fed. Cir. 2001) (requiring agency to provide a reasonable explanation why it had

given phrase "entitled to receive" two different interpretations).  Thus, the issue is not whether

ACF's definition of reliability for IV-D PEP data is independently reasonable but whether it is

reasonable and justified in light of its decision to use a less onerous definition in evaluating the

reliability of statewide PEP data.

Prior to submitting its brief to the Board, ACF never offered *any* explanation -- in

the *Guide for Auditing Data Reliability* or anywhere else -- as to why it counts exclusion errors

when assessing IV-D PEP data reliability, but not when assessing statewide PEP data reliability.

The explanation ACF offered to the Board was not supported by any "evidence in the record,"

*see Burlington Northern*, 403 F.3d at 777, but merely by pure speculation about the potential

difficulties and burdens of assessing exclusion errors in statewide PEP data.  *See* JAR 251-52.  In

its brief to the DAB, ACF even admitted that the agency itself was not aware that the use of

differing methodologies might result in more data reliability problems for States using the IV-D

PEP measure.  JAR 252-53.  Despite the fact that ACF had clearly not carefully considered the

ramifications of its policy decisions before implementing them, the DAB accepted ACF's

purported rationale for developing this policy in its entirety, without requiring ACF to offer any

evidence in support of its claims.  JAR 38-39.

The purely hypothetical rationale offered by ACF and accepted by the DAB

contains numerous flaws and thus cannot constitute the "cogent[] expl[anation]" that is required

for judicial deference.  *See Motor Vehicles Mfrs Ass'n*, 463 U.S. at 48.  First, contrary to the

DAB's statement, JAR 38, it is not necessarily true for all states that the statewide PEP universe

is much larger than the IV-D PEP universe.  As is apparent from the definitions of the statewide

and IV-D PEP, the statewide universe is limited to the children born out-of-wedlock during a

single fiscal year, while the IV-D universe encompasses all children receiving IV-D services who

35

were born out-of-wedlock, which would include children born over an eighteen-year period.  *See*

45 C.F.R. § 305.2.  In rejecting the States' argument on this point, the Board apparently

overlooked the critical fact that the statewide PEP universe does not consist of "*all* children born

in a state in a year," *see* JAR 39 (emphasis added), but only those children born out-of-wedlock

in a given year.  Moreover, if a large universe is a justification for not testing for exclusion

errors, then it follows that *any* state whose IV-D PEP caseload exceeds a certain size should have

been exempt from exclusion testing.  ACF obviously did not adopt this approach in assessing IV-

D data reliability, so the size of the universe is not an adequate basis for attempting to justify the

distinctions between the IV-D PEP and the statewide PEP auditing methodologies.[9]

Additionally, auditing the underlying records for the statewide PEP universe is

most likely not as difficult as the DAB makes it out to be.  JAR 38.  ACF's auditors could

sample the statewide universe to determine exclusion errors just as they sample the IV-D PEP

universe for these errors, so they would not have to look at every record in the statewide PEP

universe.  And defining the universe that must be sampled is also not so challenging:  all States

account for registered births, regardless of whether they are in-wedlock or out-of-wedlock, so the

agency could easily sample this universe for exclusion errors.  In any case, Plaintiffs are not

arguing that ACF must audit statewide data to identify exclusion errors, but that, having decided

_____

[9]  That the size of a State's IV-D caseload may exceed statewide out-of-wedlock births is evident
in ACF's annual report to Congress reporting child support enforcement statistics.  Table 51 of
the most recent report (covering FY 2002 and FY 2003) demonstrates that in a number of States
the IV-D caseload is larger than annual out-of-wedlock births by a factor of 10.  *See* Office of
Child Support Enforcement FY 2002 and FY 2003 Annual Report to Congress, Table 51:
Paternity Establishment for Two Years, *available at*
http://www.acf.hhs.gov/programs/cse/pubs/2005/ reports/annual_report/table_51.html (last
visited Apr. 18, 2006).

not to count exclusion errors for statewide PEP States, ACF cannot turn around and hold the IV-D States to a higher standard of reliability.[10]

The final rationale for the different definitions of "reliable data" offered by ACF and accepted by the DAB -- that statewide PEP data is less likely to have deliberate exclusion errors than IV-D PEP data -- is also without merit.  JAR 38.  First of all, it is certainly not the case that States have an incentive to exclude children who should have been included in Line 6 of the IV-D PEP data, which measures the number of children born out of wedlock for whom paternity has been established in the current fiscal year.  Excluding children from this line (*i.e.*, not counting a child for whom paternity had been established) serves only to understate a State's paternity establishment performance and makes it more likely that they will not meet the required performance standard.[11]  Conceivably, a State would benefit from the deliberate exclusion of children from Line 5 (children born out of wedlock), as this keeps the denominator smaller.  But frequently a child excluded from Line 5 is also excluded from Line 6 because the

---

[10] In any case, there were ways -- other than using the same definition of "reliability" for both PEP measures -- in which ACF could have accounted for the fact that its auditing methodology held IV-D States to a higher standard.  For example, it could have lowered the threshold for establishing reliability to reflect that more errors would be counted.  It is only fair that if the auditors are counting two types of errors in IV-D PEP data and only one type of error in statewide PEP data, that the IV-D PEP States not be held to the same 95 percent standard of reliability.  This would require a departure from the rule established in 45 C.F.R. § 304.1(i), which currently sets a 95 percent standard of reliability for all performance measures, but the Secretary has the authority to modify the general rule.  *See* 42 U.S.C. § 452(g)(2)(C).

[11] Thus, even if these exclusions count as errors, they are errors that only hurt the State by underreporting its performance.  The Child Support Enforcement penalty provisions provide that a State shall not be subject to a penalty for incomplete and unreliable data "if the Secretary determines that the extent of the incompleteness or unreliability of the data is of a technical nature" which does not "adversely affect the determination of the level of the State's paternity establishment percentages . . . or other performance measures."  42 U.S.C. § 609(a)(8)(C); *see also* 45 C.F.R. § 305.63.  In this case, the omission of children born out of wedlock for whom paternity has been established does not "adversely affect" the State's PEP, because it only omits children for whom the State has done what the statute requires (establish paternity).

State database (erroneously) shows them as having been born in wedlock because the establishment of paternity is not an issue.  *See supra* n.8.  In any case, ACF expressly disavowed that States were manipulating the data, *see* JAR 250, and thus there is no record evidence that would support a different definition of "error" based on the fact that they could, conceivably, do so.  If OCSE auditors were to suspect that cases were being deliberately excluded, it is open to the Secretary to decide that the State's data is not reliable and to assess a penalty.  *See* 42 U.S.C. § 652(g)(3)(A) (allowing HHS to "modify the requirements of this subsection to take into account such additional variables as the Secretary identifies…that affect the ability of the State to meet the requirements of this subsection").

The only precedents cited by the DAB in support of its finding that ACF did not act arbitrarily and capriciously in using different auditing standards are inapposite, because the States here are <u>not</u> challenging ACF's sampling methodology or its statistical calculations, the types of issues addressed in the cases relied upon by the Board.  *See* JAR 37 (citing *Puerto Rico Dep't of Social Svcs.*, DAB No. 1253 (1991) (rejecting challenge to agency's recalculation of upper confidence levels); *New Mexico Human Svcs. Dep't*, DAB No. 1224 (1991) (rejecting challenge to agency's statistical sampling methodology and determination of efficiency rates and ranges); *Ohio Dep't of Human Svcs.*, DAB No. 1202 (1990) (rejecting challenge to agency's choice of efficiency rates and the methods used to calculate efficiency rates, the sample size used by the auditors, and the agency's failure to follow own guidelines regarding sampling processes); *Tennessee Dep't of Health and Environmen*t, DAB No. 898 (1987) (rejecting challenge to agency's use of sampling methodologies to determine overpayments to federal government)).  Instead, the States are challenging ACF's very definition of what constitutes reliable data and its application of different definitions to similarly situated entities.  As a result, the analysis in these

prior decisions is not "appropriate." *See* JAR 37.  The Board did not point to *any* precedents

upholding an agency's application of two different auditing standards or two different definitions

of reliability in assessing the very same measurement in a single program.

       The Board's suggestion that States are not prejudiced by the different auditing

methodologies because there are advantages to the IV-D PEP in meeting performance standards

or that the IV-D PEP States may switch to the statewide PEP measure at any time is off-base and

not supported by record evidence.  The OCSE summary report on performance indicators

indicates that performance standards are fairly equivalent between the IV-D and statewide

measures.  *See* JAR 651.  Even though some States made the conversion, switching from one

PEP to the other is not as easy as the Board implies.  The PEP measure takes into account data

from two fiscal years:  the numerator is the number of children with paternity established in the

current fiscal year, and the denominator is the children born out of wedlock in the immediately

preceding fiscal year.  Additionally, if the paternity establishment performance measure is less

than 90 percent, the State must show an improvement from the prior year.  As a result, switching

PEP measures can involve several years' worth of data.  In any case, switching PEP measures

after being assessed a penalty for unreliable PEP data does not allow a State to avoid paying the

improperly imposed penalty, even if the State meets the reliability standard under the new PEP

measure.

       Finally, the DAB's statements that the States had not presented evidence that the

different audit methodologies caused the discrepancy in failure rates between IV-D PEP States

and statewide PEP States and that they had not presented evidence of prejudice are not only

irrelevant to the analysis of whether ACF acted arbitrarily and capriciously, they are also

incorrect.  *See* JAR 39.  Alabama, Hawaii, Louisiana, and Rhode Island presented calculations --

which ACF did not dispute -- that if ACF had applied the same standard to IV-D PEP data as to

statewide PEP data (i.e., count only inclusion errors and not exclusion errors), they would have

passed the data reliability audit in at least one year and thus would not have been subject to a

penalty for having unreliable data. *See* JAR 39-40 n. 19.[12]  Similarly, Indiana would have met

the data reliability standard in both FFY 2001 and FFY 2002 if exclusion errors had not been

counted.[13]  This is clear evidence that counting exclusion errors as errors was the cause of these

States' failure of the data reliability audits and that they were prejudiced by the different

standards.

   The Board mistakenly suggests that it was incumbent on the States to prove not

only that each would have passed the reliability standards if the auditors had applied a uniform

standard of "reliability" but also that, if the data were accepted as reliable, none would have been

subject to a penalty based on their actual PEP performance. *See* DAB No. 1989 at 40 n.19.  Such

a showing is not required under 45 C.F.R. 262.7(a)(2), which provide for the State to "respond"

to the agency's "factual and legal basis for taking the penalty."  The factual and legal basis for

the penalties was ACF's determination that the PEP data was unreliable in the proceedings.

---

[12] New Mexico and Delaware both would have had far fewer data errors if exclusion errors had not been counted.  *See* JAR 40, 194-95, 474.

[13] In 2001, Indiana would have had only 7 errors (instead of 14) in its Line 5 data and only 4 errors (instead of 9) in its Line 6 data.  *See* IAR 82-84 (exclusion errors accounted for 7 Line 5 errors and 5 Line 6 errors).  Applying the formulae used by the auditors to calculate efficiency rates for data reliability, the State's FFY 2001 Line 5 data would have had an efficiency rate of 92% with an upper confidence interval of 97%, and the State's Line 6 data would have had an efficiency rate of 91% with an upper confidence interval of 96%.  *See* JAR 643-45.  In 2002, Indiana would have had only 7 errors (instead of 22) in its Line 5 data and only 3 errors (instead of 15) in its Line 6 data.  *See* IAR 95-99 (exclusion errors accounted for 15 Line 5 errors and 12 Line 6 errors).  Applying the formulae used by the auditors to calculate efficiency rates for data reliability, the State's FFY 2001 Line 5 data would have had an effiicency rate of 94% with an upper confidence interval of 97%, and the State's Line 6 data would have had an efficiency rate of 97% with an upper confidence interval of 99%.  *See* JAR 643-45.

Before the Board, ACF did not establish that the States would still have been subject to a performance penalty if it had accepted the data as reliable, and the Board never requested either party to submit that information.[14]  *See* 45 C.F.R. 262.7 ("The Board will consider an appeal filed by a State on the basis of the documentation and briefs submitted, <u>along with any additional information the Board may require to support a final decision</u>.") (emphasis added).  In any case, the prejudice to the Plaintiffs extends beyond whether each could have avoided the penalties imposed for FFY 2001, as the finding of unreliable data precludes a State from being eligible for an incentive payment; makes it more likely that the State will have unreliable data in the succeeding fiscal year (since the PEP draws from two years worth of data); and puts them at risk of a heightened penalty in subsequent years if the deficiency is not rectified.  *See* 42 U.S.C. § 609(a)(8)(B) (penalty is doubled in the second year of violation).

Finally, ACF's unannounced and previously unexplained use of different standards for assessing data reliability prejudices the entire process for assessing penalties based on PEP data.  The differences between the two standards of reliability is so significant that many States may have opted from the outset to use and to continue to use the statewide PEP instead of the IV-D PEP.  Whatever the agency's rationale for adopting differing standards of "reliable data," the States were prejudiced when their federal partner kept them in the dark.

---

[14] To do so would require use of FFY 2000 data (since the PEP denominator uses the caseload as of the end of the prior fiscal year) to establish FFY 2001 performance, as well as an assessment of whether any deficiency in FFY 2001 was corrected in FFY 2002.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court

GRANT their Motion for Summary Judgment.


Respectfully submitted,


 /s/
Caroline M. Brown (D.C. Bar No. 438432)
Joseph Zambuto, Jr. (D.C. Bar No. 484542)
Kelly C. Blevins (D.C. Bar No. 488287)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
*Attorneys for Plaintiff Agencies of the States
of Alabama, Delaware, Hawaii, Indiana,
Kansas, Louisiana, New Mexico, and Rhode
Island*


DATED:  April 19, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of April, 2006, I caused the foregoing Memorandum of Points and Authorities in Support of Motion for Summary Judgment of Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island to be served on the following counsel of record electronically by means of email and the district court's ECF system.

Adam D. Kirschner
<u>MAILING ADDRESS</u>
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
<u>DELIVERY ADDRESS</u>
20 Massachusetts Ave, N.W.
Room 7222
Washington, DC 20001

Maureen W. Zaniel
Senior Assistant Attorney General
District of Columbia Civil Enforcement Section
Suite 450 North
441 4th Street, NW
Washington, D.C. 20001

_/s/_____
Joseph Zambuto, Jr.
*Attorney for Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island*