## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF ALABAMA DEPARTMENT OF HUMAN          )
RESOURCES, et al                             )
                                             )
                    Plaintiffs,              )          1:05CV2098 (RJL)
                                             )
        vs.                                  )
                                             )
UNITED STATES DEPARTMENT OF HEALTH AND        )
HUMAN SERVICES, et al                        )
                                             )
                    Defendants.              )
_____)


## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants, United States Department of Health and Human Services and Michael O.

Leavitt, Secretary of the Department of Health and Human Services, by and through their

undersigned counsel, hereby move this Court to enter summary judgment on their behalf

pursuant to Fed. R. Civ. P. 56 for the reasons set forth in the accompanying Memorandum of

Points and Authorities.


Dated: May 24, 2006                  Respectfully submitted,
                                     PETER D. KEISLER
                                     Assistant Attorney General

                                     KENNETH L. WAINSTEIN
                                     United States Attorney for the District of Columbia

                                     SHEILA M. LIEBER
                                     Deputy Director, Federal Programs Branch


                                     _/s/_____
Of Counsel                           ADAM D. KIRSCHNER
LINDA GRABEL                         Trial Attorney
Assistant Chief Counsel              U.S. Department of Justice
Children, Families, and Aging Division   Civil Division, Federal Programs Branch

Office of the General Counsel
U.S. Department of
Health and Human Services

<u>Mailing Address</u>
P.O. Box 883
Washington, D.C., 20044
<u>Delivery Address</u>
20 Massachusetts Ave., NW., Room 7222
Washington, DC 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES, et al | ) ) ) | |
| Plaintiffs, | ) ) | 1:05CV2098 (RJL) |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al | ) ) ) | |
| Defendants. | ) ) | |

**CONSOLIDATED MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Of Counsel
LINDA GRABEL
Assistant Chief Counsel
Children, Families, and Aging Division
Office of the General Counsel
U.S. Department of
Health and Human Services

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney for the District of Columbia

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch

_/s/_____
ADAM D. KIRSCHNER
Trial Attorney, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C., 20044
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

# TABLE OF CONTENTS

Page(s)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Statutory and Regulatory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    The DAB's Decision in Favor of ACF was in Accordance with
          the Applicable Regulations and Did Not Contravene the Plain
          Meaning of Any of Those Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          A.    The DAB acted consistently with 45 C.F.R. § 305.66 by ruling
              that ACF gave proper notice to the states after the Secretary
              had found that the states were subject to a penalty. . . . . . . . . . . . . . . . . . 19

          B.    ACF's communications with the states were consistent
              with the statutory and regulatory scheme that the states
              are to monitor their own data to ensure compliance with
              42 U.S.C. § 609(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    II.    The DAB Properly Concluded that ACF Used Reasonable Methods to Determine
          Whether the Data the States Submitted were Reliable. . . . . . . . . . . . . . . . . . . 36

          A.    The DAB properly determined that ACF followed the statutory and
              regulatory guidelines in determining that the data several states submitted
              were unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

          B.    Plaintiffs have no viable claim that notice and comment rulemaking
              was required concerning ACF's auditing methodology. . . . . . . . . . . . . . 43

              1.    Plaintiffs have waived their notice and comment argument. . . . . . 43

              2.    It was not required for ACF to engage in notice and comment
                  rulemaking on its audit methodology. . . . . . . . . . . . . . . . . . . . 45

C.     Plaintiffs have not shown they were prejudiced by ACF counting only inclusion errors for statewide PEP data. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

III.     Plaintiffs Overstate the Total Fiscal Impact of the Penalties Assessed for their Failure to Meet the Requisite Performances Measures.. . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

Ackerman v. United States,
    324 F. Supp. 2d 1 (D.D.C. 2004) .................................................................... 17

Arizona v. Thompson,
    281 F.3d 248 (D.C. Cir. 2002) ....................................................................... 18

Batterton v. Marshall,
    648 F.2d 694 (D.C. Cir. 1980) .................................................................. 45, 46

Bowles v. Seminole Rock & Sand Co.,
    325 U.S. 410 (1945) ....................................................................................... 18

Burlington N. Fe Railway v. Surface Transp. Bd.,
    403 F.3d 771 (D.C. Cir. 2005) ....................................................................... 42

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ....................................................................................... 17

Christensen v. Harris County,
    529 U.S. 576 (2000) ....................................................................................... 17

Davis v. Michigan Dept. of Treasury,
    489 U.S. 803 (1989) ....................................................................................... 37

Doe v. Chao,
    540 U.S. 614 (2004) ....................................................................................... 37

Guardian Federal S & L v. Federal S & L Ins. Corp.,
    589 F.2d 658 (D.C. Cir. 1978) .................................................................. 45, 46

Mistick PBT v. Chao,
    440 F.3d 503 (D.C. Cir. 2006) ....................................................................... 18

Nati'l Insulation Transp. Committee v. Interstate Commerce Comm'n,
    683 F.2d 533 (D.C. Cir. 1982) ....................................................................... 37

National Medical Enterprises, Inc. v. Shalala,
    43 F.3d 691 (D.C. Cir. 1995) ......................................................................... 17

Pennhurst State School & Hospital v. Halderman,
    451 U.S. 1  ...................................................................................................... 31

Presbyterian Medical Center of the University of Pennsylvania Health System v. Shalala,
    170 F.3d 1146 (D.C. Cir. 1999) ................................................................................. 18

Sims v. Apfel,
    530 U.S. 103 (2000) ........................................................................................... 36, 44

State of Ohio, Department of Human Services v. Sullivan,
    789 F. Supp. 1395 (S.D. Ohio 1992) .......................................................................... 44

Thomas Jefferson University v. Shalala,
    512 U.S. 504 (1994) ................................................................................... 17, 18, 28

United States v. Mead,
    533 U.S. 218 (2001) ................................................................................................. 17

Wyoming Outdoor Council v. United States Forest Service,
    165 F.3d 43 (D.C. Cir. 1995) ................................................................................... 28

## **STATUTES**

5 U.S.C. § 553(b) .......................................................................................... 43, 45

42 U.S.C. § 601 ..................................................................................................... 5

42 U.S.C. § 602(a)(1) .............................................................................................. 6

42 U.S.C. § 602(a)(2) ......................................................................................... 6, 34

42 U.S.C. §603 ...................................................................................................... 6

42 U.S.C. 603(h) (1984) ............................................................................. 5, 22, 23, 34

42 U.S.C. §§ 608(a)(3) ............................................................................................ 5

42 U.S.C. § 609(a)(8) ....................................................................................... passim

42 U.S.C. §610 .................................................................................................... 21

42 U.S.C. §§ 651 ................................................................................................... 6

42 U.S.C. § 652(g)(1) ....................................................................................... passim

42 U.S.C. § 654(15) ............................................................................................ 7, 9

42 U.S.C. § 658a ............................................................................................... 9, 10

## **REGULATIONS**

45 C.F.R. §§ 262.1(b) ........................................................................ passim

45 C.F.R. § 262.7 ........................................................... 12, 24, 25 26

45 C.F.R. § 305.0 ...................................................................... 10

45 C.F.R. § 305.1 ...................................................................... 7, 11

45 C.F.R. § 305.2(a)(2) ...................................................... 1, 10, 35

45 C.F.R. § 305.32 ...................................................... 11, 13, 30

45 C.F.R. § 305.40 ...................................................... 11, 12

45 C.F.R. § 305.60 ...................................................... 10, 11, 26, 36

45 C.F.R. § 305.61 ........................................................................ passim

45 C.F.R. § 305.64 ...................................................... 11, 26, 33, 34, 46

45 C.F.R. § 305.66 ........................................................................ passim

45 C.F.R. §305.99 (1998) ...................................................... 23

## **RULES**

65 Fed. Reg. 82189 ...................................................................... 28

65 Fed. Reg. 82,190 ...................................................................... 26

65 Fed. Reg. 82,192 ........................................................................ passim

## INTRODUCTION

To promote the effectiveness and efficiency of the federal child support enforcement program, Congress created a funding mechanism to reward or penalize states based on the quality of the services they provide to the public.  The program's goal is to locate non-custodial parents and ensure that they provide for their children.  States must meet minimal performance standards to show that they are rendering such services to children in need of assistance.  Specifically, the Secretary of the United States Department of Health and Human Services found that in successive fiscal years, plaintiffs submitted inaccurate and unreliable child support data, which are used to determine the amount of child support funding states receive, and/or failed to provide child support enforcement services at minimally acceptable levels prescribed by Congress.[1]  Plaintiffs do not dispute this conclusion.  The repeated failures of plaintiffs, eight states (Alabama, Delaware, Hawaii, Indiana,[2] Kansas, Louisiana, New Mexico, and Rhode Island) and the District of Columbia,[3] to demonstrate minimally adequate performance with

---

[1]ACF assessed the District of Columbia a penalty in part because of its failure to meet the performance level for Support Order Establishments in fiscal year 2001.  That measure is from the regulations.  See 45 C.F.R. § 305.2(a)(2).  All other performance failures by the plaintiffs were with respect to the paternity establishment percentage measure defined by Congress.  See 42 U.S.C. § 609(a)(8).

[2]Indiana appealed separately from the other states to the Departmental Appeals Board, but the Board's decision in the Indiana appeal incorporated the analysis of its previous decision regarding the other states.

[3]The District of Columbia is being represented by a counsel separate from that of the other parties.  This brief will address arguments raised by the District of Columbia's Memorandum in Support of District of Columbia's Motion for Summary Judgment (Dkt. #20) as well as the Memorandum in Support of Motion for Summary Judgment of Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island (Dkt. #19-3).

respect to specified child support enforcement requirement resulted in the imposition of statutorily required penalties.

As a result of plaintiffs' successive child support data performance and/or reliability failures, the Administration for Children and Families ("ACF") imposed a penalty equal to the statutorily mandated reduction of one percent to plaintiffs' State Family Assistance Grants ("SFAGs"), which are the block grants provided by the Department of Health and Human Services ("HHS") to the states under the Temporary Assistance for Needy Families ("TANF") program.[4]  Plaintiffs do not dispute the findings that led to the imposition of the penalties or dispute that based on the findings the imposition of the penalties was required by statute. Instead, plaintiffs make two arguments.  First, they complain that ACF should have provided the states earlier formal notice of the uncontested data inadequacies that ACF had previously identified to the states in the course of its audits.  Second, they argue that ACF should have used the same auditing methodology for two alternative formulations of one of the performance measures because some states that chose a different performance measure from some of these plaintiffs benefitted from that choice and the corresponding difference in sampling methodology. What plaintiffs are really saying is that their own failure to meet performance and data reliability requirements should be excused because they should have had advance notice that using the other performance measure (i.e., the measure the states themselves chose not to use) would allegedly have allowed them to shield their non-compliance to a greater extent.

---

[4]ACF administers for HHS both the federal Child Support Enforcement program under Title IV-D of the Social Security Act ("Act"), 42 U.S.C. §§ 651-669B, and the TANF program under Title IV-A of the Act, 42 U.S.C. §§ 601-619.

As the HHS Departmental Appeals Board ("DAB" or "Board") correctly recognized, neither of plaintiffs' contentions is supported by the applicable statutory provisions or regulations. Accordingly, the DAB rejected these claims. ACF provided timely and appropriate notice under the applicable regulation, 45 C.F.R. § 305.66. The notice provision requires that after a state is "subject to a penalty," HHS adequately describe the performance measure(s) the state failed to meet and/or any data reliability failure, the manner in which the penalty is assessed, and the protocol for appealing such a penalty. The notice that ACF, the entity within HHS that is responsible for federal administration of the Title IV programs, sent to the states met all such requirements. Plaintiffs' contention that the notice was not timely relies on a distorted reading of the statutory and regulatory requirements.

Plaintiffs' dissatisfaction with the audit methodology used by ACF to measure a state's performance with respect to the paternity establishment measure ignores the logic that different auditing methodologies may be appropriate to audit two different data universes. Consistent with the statute and implementing regulations, each plaintiff chose one of two alternative measurements determined from two different data universes to calculate its paternity establishment measure ("PEP"), one of the child support enforcement performance measures. The statute and implementing regulations direct the Secretary of HHS to determine if the data used by each state to calculate its PEP are reliable , but nowhere does the statute or any regulation require the Secretary to employ the same auditing and sampling methodology for different data universes. The statute and regulations require only that ACF follow an acceptable government auditing protocol. ACF followed an acceptable protocol and plaintiffs do not

contend otherwise.  As the DAB found, ACF acted properly in applying a different sampling methodology for these two different data sets based on each set's distinct characteristics.

Plaintiffs' challenge to the Secretary's interpretation of his own regulations is similarly misguided.  Under well-established legal principles requiring the highest level of deference to an agency's interpretation of its own regulations, especially when a complicated regulatory regime is implicated, the Secretary's imposition of the statutorily mandated penalties at issue here must be sustained.  The challenged actions were consistent with all pertinent regulations, as well as the governing statute, and should be upheld.  Accordingly, the Court should grant summary judgment for the defendants and deny summary judgment for the plaintiffs.

## **BACKGROUND**

### A.    **Statutory and Regulatory Provisions**

This case involves a challenge by several states of the United States Department of Health and Human Services' Departmental Appeals Board's decision to uphold a penalty assessed by the Administration for Children and Families against those states' TANF grants. The penalty was assessed on account of failures occurring in the administration of those states' child support enforcement programs.  In 1996, Congress amended its welfare laws and replaced the former Aid to Families with Dependent Children ("AFDC") with a new grant program, TANF, that was designed to increase "the flexibility of States in operating" programs that were meant to, among other things, "provide assistance to needy families so that children may be cared for in their own home or in the homes of relatives."  42 U.S.C. § 601.  Congress passed three major pieces of legislation in 1996, 1997, and 1998 that form the statutory structure at issue

in this case.  See Personal Responsibility and Work Opportunity Reconciliation Act

("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996); Balanced Budget Act of 1997, Pub

L. No. 105-33, 111 Stat. 251 (1997); Child Support Performance and Incentive Act of 1998, Pub

L. 105-2000, 112 Stat. 645 (1998).

  The relevant aspect in this case is the relationship between the grants states receive under

TANF (previously AFDC), Title IV-A of the Social Security Act, 42 U.S.C. 601 et seq., and the

grants they receive for the child support enforcement programs of Title IV-D ("Part D" or "child

support") of the Social Security Act, 42 U.S.C. 651 et seq..  These two separate programs have

been linked by the populations they serve since the establishment of the child support program in

1975.  See Social Services Amendments of 1974, Pub L. No. 93-647, 88 Stat. 2716, 2732 (1975)

(adding Part D to the Social Security Act).  The child support program was established to

provide paternity and child support collection services for children and their custodial parents

who were receiving cash benefits under Title IV-A.  See S. Rep. No. 93-1356, at 42, reprinted in

1974 U.S.C.C.A.N. 8133, 8146 ("all children have the right to receive support from their

fathers").  Such individuals assign to the state their rights to child support from the non-custodial

parent and any support collections made are returned to the state and federal government to

reimburse them for the costs of the assistance provided.  42 U.S.C. §§ 608(a)(3) and 654(5).

These two programs have also been linked since 1984 by a penalty provision in Title IV-A for

any state that fails to properly administer its Part D programs.  See Child Support Enforcement

Amendments of 1984, Pub. L. No. 98-378 § 9(b), 98 Stat. 13305, 1316 (1984); see also 42

U.S.C. 603(h) (1984) (repealed by PRWORA § 103, 110 Stat. at 2112 (1996)); 42 U.S.C. §

609(a)(8).

A state is currently eligible to receive a federal block grant for TANF under 42 U.S.C. §

603 if it meets certain requirements, including submitting a state plan under 42 U.S.C. §

602(a)(1) that is approved by the Secretary of the Department of Health and Human Services

("Secretary").  See 42 U.S.C. § 602.  The state is also required to operate a child support

enforcement program in accordance with Title IV-D of the Social Security Act, 42 U.S.C. 651 et

seq..  See  42 U.S.C. § 602(a)(2).  Title IV-D is a state operated, federally supervised, open-

ended grant-in-aid program under which the federal government matches the expenditures states

make in administering their programs at a minimum of 66 percent.  See 42 U.S.C. §§ 651 and

655.  The Office of Child Support Enforcement ("OCSE") within ACF is responsible for

conducting oversight of the state child support programs and the TANF penalties relating to

child support.  JAR at 5.

States are assessed a penalty if they fail to meet specified requirements of Title IV-D.

The penalty consists of a percentage reduction of their TANF grant, otherwise known as a State

Family Assistance Grant or SFAG.  42 U.S.C. § 609.  A state's TANF grant is reduced between

one and two percent for a first-time failure, two and three percent for a second consecutive

failure, and three to five percent for each consecutive subsequent failure.  42 U.S.C. §

609(a)(8)(B).  A state's Part D child support enforcement program is in noncompliance if the

state fails to meet certain levels of performance, or to have complete and reliable data, during a

fiscal year and "with respect to the succeeding fiscal year," does not "take sufficient corrective

action," or have complete and reliable data.  42 U.S.C. § 609(a)(8)(A).  The performance

measures include the paternity establishment percentage ("PEP") and "those established by the

Secretary."  Id.  A state is also in noncompliance if it submits two consecutive years of

unreliable data for any Part D performance indicator, including those used only to calculate

incentive payments.  See 42 U.S.C. §§ 609(a)(8)(A)(I)  and (ii)(II); see also 42 U.S.C. §

654(15)(B).

A state must have a PEP of at least 90 percent or show a specified increase in its PEP

level from the previous year for the state to be in compliance with "section 609(a)(8)."  42

U.S.C. § 652(g)(1).  For example, a state is noncompliant for a fiscal year if the state has a PEP

of between 75 and 90 percent for that year and has not improved it by two percent over the

preceding fiscal year.  42 U.S.C. § 652(g)(1)(B).  A state is to choose between two

measurements to calculate its PEP for "determining compliance."  42 U.S.C. § 652(g)(1).  A

state may use data that is "based on children in a state's IV-D caseload"[5] or data "based on all

children in the state."  Joint Administrative Record ("JAR") at 3.[6]  The statute defines the

different calculations for the IV-D PEP and the statewide PEP:

> (A) the term "IV-D paternity establishment percentage" means, with respect to a State for a fiscal year, the ratio (expressed as a percentage) that the total number of children–
>
> (I) who have been born out of wedlock,
>
>> (ii) (I) except as provided in the last sentence of this paragraph, with respect to whom assistance is being provided under the State program funded under part A of this subchapter in the fiscal year or, at the option of the State, as of the end of such year, or (II) with respect to whom services are being provided under the State's plan approved under this part in the fiscal year or, at the option of the State, as of the end of such year pursuant to an application submitted under section 654(4)(A)(ii) of this title, and

_____

[5]A IV-D case is a parent "who is now or eventually may be obligated under law for the support of a child or children receiving services under the title IV-D program."  45 C.F.R. § 305.1.

[6]There are two administrative records in this case, one based on the appeal to the Board by all of the plaintiffs, except Indiana, and one based on Indiana's appeal to the Board.  The former is referred to as the Joint Administrative Record and the latter is referred to as the Indiana Administrative Record.

-7-

(iii) the paternity of whom has been established or acknowledged, bears to the total number of children born out of wedlock and (except as provided in such last sentence) with respect to whom assistance was being provided under the State program funded under part A of this subchapter as of the end of the preceding fiscal year or with respect to whom services were being provided under the State's plan approved under this part as of the end of the preceding fiscal year pursuant to an application submitted under section 654(4)(A)(ii) of this title;

(B) the term "statewide paternity establishment percentage" means, with respect to a State for a fiscal year, the ratio (expressed as a percentage) that the total number of minor children–

(I) who have been born out of wedlock, and

(ii) the paternity of whom has been established or acknowledged during the fiscal year, bears to the total number of children born out of wedlock during the preceding fiscal year.

42 U.S.C. § 652(g)(2).  Reliable data is defined as "the most recent data available which are found by the Secretary to be reliable for purposes of this section."  Id.

The TANF statute also gives the Secretary discretion to accept otherwise inadequate data if the Secretary determines "that the extent of the incompleteness or unreliability of the data is of a technical nature which does not adversely affect the performance of the State's program under part D" or "that the extent of the incompleteness or unreliability of the data is of a technical nature which does not adversely affect the determination of the level of the State's paternity establishment percentages (as defined under section 652(g)(2) of this title) or other performance measures that may be established by the Secretary."  See 42 U.S.C. § 609(a)(8)(C)(ii).  Other state failures with regard to their TANF grant may be excused if the "Secretary determines that the State has reasonable cause for failing to comply with the requirement" or if the State enters into a "corrective action plan."  42 U.S.C. §§ 609(b) and (c).  However, these grounds cannot be

used to excuse a state's noncompliance with the requirements of its Part D child support

enforcement programs.  Id.

       To ensure that the states submit reliable data for their Part D performance measures and

other child support purposes, the Secretary must establish under the child support program an

"organizational unit" that "conducts audits, in accordance with the Government auditing

standards of the Comptroller General of the United States."  42 U.S.C. § 652(a)(4)(C).  These

audits must be conducted "at least once every 3 years" and are to "assess the completeness,

reliability, and security of the data and the accuracy of the reporting systems used in calculating

performance indicators under subsection (g) of this section and section 658[7] of this title."  Id.

(footnote added).  As described above, 42 U.S.C. § 652(g) defines reliable data as "the most

recent data available which are found by the Secretary to be reliable for purposes of this

section."  42 U.S.C. § 652(g)(2).  Under the child support program, each state constructs a state

plan that must include provisions to establish a system to transmit "to the Secretary data and

calculations concerning the levels of accomplishment (and rates of improvement) with respect to

applicable performance indicators (including paternity establishment percentages) to the extent

necessary for purposes of sections 654(g) and 658a of this title."  42 U.S.C. § 654(15)(B).

       The Secretary enacted regulations that correspond to the statutory provisions dealing with

a state's child support enforcement performance measures and data reliability provisions as

required by 42 U.S.C. §§ 652(a)(4), 652(g)(1), and 658a.  See 45 C.F.R. Part 305.  The

regulations implement "the incentive system requirements as described in section 458A" and

---

[7]Section 658 was repealed and replaced with 42 U.S.C. § 658a.  That statutory provision deals
with incentive payments states receive based on their level of performance on specified
performance measures.

"the penalty provisions as required in sections 409(a)(8) and 452(g) of the Act," along with the "Federal audit requirements under sections 409(a)(8) and 452(a)(4) of the Act."[8]  45 C.F.R. § 305.0.  Specifically, "[s]ections 305.40 through 305.42 and §§ 305.60 through 305.66 describe the penalty and audit processes."  Id.

The regulations mirror the statute.  A state may receive incentive payments for achieving certain levels of performance for each of five measures: PEP, support order establishment, current collections, arrearage collection, or cost-effectiveness.  45 C.F.R. § 305.20.  Failure to meet the required level of performance for one of three measures (PEP, support order establishment, or current collections) may form a basis for ACF to assess a penalty against a state's TANF grant.[9]  45 C.F.R. § 305.40.  Another possible basis for ACF to assess a penalty is if the state does not submit reliable and complete data for any of the performance indicators, including those solely used to calculate performance levels for the purpose of determining incentives.  See 45 U.S.C. § 305.61; see also 45 C.F.R. § 305.60.  The regulations also direct OCSE to "conduct audits, at least once every three years (or more frequently if the State fails to meet performance standards and reliability of data requirements) to assess the completeness, authenticity, reliability, accuracy and security of data."  Id.  Reliable data is defined by the regulations as "the most recent data available which are found by the Secretary to be reliable and is a state that exists when data are sufficiently complete and error free to be convincing for their

_____

[8]After the regulations were published, section 458A of the Social Security Act was "redesignated as section 458 effective October 1, 2001."  See 45 C.F.R. § 305.0.  It is codified as 42 U.S.C. § 658a.  Sections 409 and 452 of the Social Security Act are codified as 42 U.S.C. §§ 609 and 652.

[9]The statutory provision only identified the PEP performance measure but specifically refers to "other performance measures that may be established by the Secretary."  42 U.S.C. § 609(a)(8)(i)(I).

purpose and context." 45 C.F.R. § 305.1.  Furthermore, "State data must meet a 95 percent standard of reliability [], with the recognition that data may contain errors as long as they are not of a magnitude that would cause a reasonable person, aware of the errors, to doubt a finding or conclusion based on the data."  Id.

States are to submit the complete and reliable data "to calculate performance for incentives and penalties for a fiscal year" by "December 31st, the end of the first quarter after the end of the fiscal year." 45 C.F.R. § 305.32.  The auditors "will prepare and send to the IV-D agency a copy of their interim report on the results of the audit" and incorporate in its final report "written comments [along with the auditors response,] on any part of the [interim] report which the IV-D agency believes is in error." 45 C.F.R. § 305.64.  Prior to starting the audit, the auditors are to "explain [to the IV-D agency] how the audit will be performed and make any necessary arrangements."  Id.

A state is subject to a penalty based on failing to meet its performance measures for two consecutive years, failing to submit reliable data for any of its performance indicators for those two years, or a combination of failing to meet its performance measures and to submit reliable data for two consecutive years.  45 C.F.R. § 305.61.  With regard to the PEP, the regulations make it clear that "[s]tates have the option of using either the IV-D paternity establishment percentage or the statewide paternity establishment percentage." 45 C.F.R. § 305.60.  A state does not meet the required measure for a fiscal year if it does not have a PEP of at least 90 percent or satisfy the specified PEP increase from the previous fiscal year as defined in Table 4 of 45 C.F.R. § 305.40.  This specified PEP increase is consistent with 42 U.S.C. § 652(g).  For example, just as in 42 U.S.C. §652(g), a state, which has a PEP of between 75 and 90 percent for

-11-

one fiscal year, must have shown an increase in its PEP of at least two percent from the

proceeding fiscal year.  See 45 C.F.R. § 305.40(a)(1).  After a state has failed to satisfy the

performance measures over the two-year period and is "subject to a penalty," the "OCSE will

notify the State in writing of such finding."  45 C.F.R. § 305.66.  Specifically, the notice informs

the State of what was deficient, how a penalty will be assessed, and that a state is entitled to

appeal the penalty assessment to the Departmental Appeals Board.  Id.; see also 45 C.F.R. §§

262.1(b) through (e) and 262.7.

**B.    Factual Background**

On November 14, 2003, ACF sent a letter informing the plaintiffs states, Alabama,

Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island, as well as the

District of Columbia (collectively "plaintiffs" or "states"), that they were subject to penalties for

failure to demonstrate that their child support enforcement programs "met required performance

standards during fiscal years (FYs) 2001 and 2002."  JAR at 1 (DAB Decision No. 1989); IAR at

1 (DAB Decision No. 2001).[10]  The November 14, 2003 "letters informed each State that it had

failed one or more penalty performance measures and/or submitted unreliable data for FYs 2001

and 2002," and that each state was subject to a reduction in its TANF grants.  Id. at 4.  ACF

assessed each state a penalty of a one-percent reduction "in the amount of funding that each State

---

[10]Indiana filed its own appeal to the DAB but is a plaintiff in this lawsuit.  See Plaintiffs'
Amended Complaint.  In the Indiana appeal, DAB Decision No. 2001, the Departmental Appeals
Board adopted its "analysis in DAB No. 1989" for the common issues raised by Indiana and
raised by the other states in that appeal.  IAR at 1.  Indiana only raises the notice argument in
this lawsuit, an issue addressed in DAB No. 1989.  Therefore, unless otherwise specified, cites to
the joint administrative record for DAB No. 1989 incorporates any cites to the administrative
record for Indiana's appeal.

received for FY 2001 under the [TANF program] established by title IV-A of the [Social Security Act]."[11]  JAR at 1-2.

The sequence of events that led to ACF assessing penalties against the states was as follows:

- By December 31, 2001, each state was required to submit to ACF form OCSE-157 for FY 2001, which included both the final data necessary to calculate each state's performance measures and a demarcation of whether that state wanted those performance measures calculated using its IV-D caseload or its statewide data.  JAR at 235-36 (ACF's Response to Joint Submission of Petitioners); see, e.g., JAR at 704 (Alabama's OCSE-157 form); see also 45 C.F.R. § 305.32.

- ACF informed each state if that state had any data reliability problems at an exit conference for the audit ACF had conducted to determine whether the states had submitted complete, reliable, and accurate data,.  JAR at 236.

- In ACF's final Data Reliability Audits reports ("DRAs") sent out between May and August 1, 2002, ACF included any comments by the states regarding findings ACF had made in draft reports.  The DRAs also included ACF's responses to those comments.  Id. at 236 (ACF's Response to Joint Submission of Petitioners), 1408 (Exhibit 3 to ACF's Response to Joint Submission of Petitioners); IAR at 55 (Indiana's 2001 DRA report).

_____

[11]Plaintiffs argue in their background section that their total fiscal impact of the penalty is double their actual fiscal impact.  See Memorandum of Points and Authorities in Support of Motion for Summary Judgment of Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island at 13 and 13 n.3.  It is true that states faced with a penalty reduction are required to "expend additional State funds to replace any reduction in the SFAG resulting from penalties."  See 45 C.F.R. 262.1(e).  However, this does not double the amount of the state's fiscal liability.  All it means is that the recipients of the aid are not penalized by the state's failure to meet the statutory requirements because the state must itself provide the funds that the federal government would have provided had the state complied with relevant IV-D requirements.  See, infra, Section III.

- Based on the audits, ACF notified each state by November 12, 2002 if that particular state was eligible for incentive payments for each incentive measure, or if it had failed to submit complete and reliable data for any of those measures. JAR at 236, 1509 (Exhibit 4 to ACF's Response to Joint Submission of Petitioners); IAR at 302.

- The same process was conducted for FY 2002, with the final audit reports going out by September 3, 2003. JAR at 237-38, 1563 (Exhibit 5 to ACF's Response to Joint Submission of Petitioners); IAR at 55.

- ACF sent out the notification of the grant awards for incentive payments for FY 2002 by November 13, 2003. JAR at 238 (ACF's Response to Joint Submission of Petitioners), 1667 (Exhibit 6 to ACF's Response to Joint Submission of Petitioners); IAR at 308.

- On November 14, 2003, ACF informed each state that was subject to a penalty that it had failed to meet certain performance measures or submit complete and reliable data for two consecutive years. JAR at 1 (DAB Decision No. 1989), 238 (ACF's Response to Joint Submission of Petitioners); IAR at 1(DAB Decision No. 2001).

- All of the plaintiffs, except the District of Columbia, had failed to satisfy the PEP requirements. JAR at 1739.

- ACF assessed the District of Columbia a penalty for failing to submit reliable data and/or failing to meet performance standards for its Support Order Establishment and Arrearage Collection measures. JAR at 783.

-14-

Plaintiffs, except Indiana, appealed jointly to the Departmental Appeals Board ("DAB" or "Board"), which issued a decision on July 28, 2005 addressing both the issues that were common to multiple states and those that were specific to each state. JAR at 1. The DAB upheld the penalties assessed by ACF. Id. Indiana appealed separately and, in a decision issued October 26, 2005, the Board upheld ACF's penalty assessed against Indiana's TANF grant. IAR at 1. Plaintiffs, including Indiana, have now brought this lawsuit against defendants United States Department of Health and Human Services and Secretary of Health and Human Services Michael O. Leavitt (collectively "defendants"). They raise two issues common to all or most of the states; (1) the states did not receive proper notice that ACF would assess a penalty against their TANF grants and (2) ACF improperly used two different auditing methodologies for IV-D caseload data and statewide data. See Plaintiffs' Amended Complaint ("Pl Am Compl"). Plaintiffs allege that the actions by ACF, and the DAB's decision to uphold the penalties, were arbitrary and capricious and in violation of the Administrative Procedures Act ("APA"). See Pl Compl at ¶¶ 47, 49. The notice issue is common to all the states and the methodology argument is common to the states of Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island. Pl Am Compl at ¶¶ 38, 39.

The DAB held that ACF did not violate its notice provision, 45 C.F.R. § 305.66, because "the regulation did not require ACF to notify the States of their FY 2001 failures prior to or during FY 2002, the corrective action year." JAR at 12. In its discussion of why ACF did not violate 45 C.F.R. § 305.66, the DAB explained "that in the penalty process established by the regulations, penalties follow two consecutive years of failing performance or unreliable data relating to the same performance measure, and the start of the corrective action year is not

conditioned upon notice from ACF." JAR at 12. The DAB stated that "[n]either the statute nor the regulation provide a specific time frame or deadline for ACF to notify a state of the possibility of penalties raised by its performance-year scores. Moreover, the structure of the system established by section 409 of the [Social Security Act] and the Part 305 [of 45 C.F.R.] necessarily does not permit states a full year following notice of their performance-year failures before the imposition of penalties upon the end of the corrective action year." JAR at 13. The DAB concluded that it "found that these provisions place on a state the ultimate responsibility for monitoring its own performance and that, in any event, the States here were aware of their own performances and moreover were informed of their data reliability during the corrective action year." JAR at 13.

The DAB also determined that "ACF presented a reasonable rationale for choosing a methodology for auditing Statewide PEP data different from its methodology for auditing IV-D PEP data." JAR at 38. The DAB explained that "this is not a situation where an agency applied different interpretations of what constitutes a data error for the same data universe." JAR at 39. Furthermore, the DAB also concluded that the states also did not "establish that they were prejudiced by the different techniques." JAR at 39. In rejecting the states' argument that "they were entitled to prior notice of the different sample selection methodologies," the DAB maintained that the states "cite[d] no authority showing a right to prior notice of different sample selection methodologies, and did not present any expert evidence that employing the different methodologies was not reasonable in light of the differences between the two universes from which the samples were drawn." JAR at 39. The states had not argued to the DAB that ACF violated the APA by not providing notice and comment prior to using different auditing

methodologies for the two different data universes.  See JAR at 133-138; see also JAR at 462-467.

## STANDARD OF REVIEW

Plaintiffs allege that defendants' actions were "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law" and, therefore, in violation of the APA. See Pl Am Compl at ¶¶ 47, 49 (citing 5 U.S.C. § 706(2)(A)).  "While summary judgment is appropriate to resolve disputes over administrative actions, the court does not employ the standard under Fed. R. Civ. P. 56 but, instead, applies the standard of review under the relevant statute and the APA."  Ackerman v. United States, 324 F. Supp. 2d 1, 5 (D.D.C. 2004).

The Supreme Court held in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) "that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute."  Christensen v. Harris County, 529 U.S. 576, 587-588 (2000).   The Supreme Court has "recognized a very good indicator of delegation meriting Chevron treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." United States v. Mead, 533 U.S. 218, 229 (2001).

A court is to "give substantial deference to an agency's interpretation of its own regulations."  Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994); see also National Medical Enterprises, Inc. v. Shalala, 43 F.3d 691, 696 (D.C. Cir. 1995) (when a party "calls into question the Secretary's interpretation of her own regulation, [a court must] apply a still more deferential standard than that afforded under Chevron").  The D.C. Circuit has held

-17-

that it "affords great deference to an agency's interpretation of its own regulation: under well-recognized precedent, [it] can reject the Secretary's interpretation only if it is plainly erroneous or inconsistent with the regulation." Mistick PBT v. Chao, 440 F.3d 503, 511 (D.C. Cir. 2006) (quotation marks omitted). A court's "task is not to decide which among several competing interpretation best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson University v. Shalala, 512 U.S. at 512 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945) (other citations omitted). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical program." Thomas Jefferson University, 512 U.S. at 512 (interpreting a Medicare program); see also Presbyterian Medical Center of the University of Pennsylvania Health System v. Shalala, 170 F.3d 1146, 1151 (D.C. Cir. 1999) (same).[12]

---

[12]In its brief, the District of Columbia cites to Arizona v. Thompson, 281 F.3d 248, 254 (D.C. Cir. 2002) for the proposition that deference is not warranted when an "agency 'believes that interpretation is compelled by Congress.'" D.C.'s Mem at 10. In that case, the agency had argued that it was not exercising discretion but rather following the intent of Congress. See Arizona v. Thompson, 281 F.3d at 253-54. However, in this case, defendants are merely arguing that they reasonably interpreted their own regulations in a manner consistent with the relevant statutory and regulatory regimes. Furthermore, the District's arguments are focused on the idea that ACF violated the plain language of its own regulations rather than the penalty language of a statute.

## ARGUMENT

I.     **The DAB's Decision in Favor of ACF was in Accordance with the Applicable Regulations and Did Not Contravene the Plain Meaning of Any of Those Regulations.**

A.     **The DAB acted consistently with 45 C.F.R. § 305.66 by ruling that ACF gave proper notice to the states after the Secretary had found that the states were subject to a penalty.**

The first of the two issues before the Court is very simple; the question is whether 45 C.F.R. § 305.66 requires ACF to give advance notice to the states before they are subject to a penalty. For ACF, and for the DAB in ruling in ACF's favor, to have acted arbitrarily and capriciously, ACF must have contravened the plain meaning of the regulation. However, it is the plaintiffs who are attempting to contravene the plain meaning of 45 C.F.R. § 305.66 by arguing that notice is required prior to when a state is subject to a penalty. As the Board properly concluded, the "notice requirements of section 305.66 do not apply until a state 'is found by the Secretary to be subject to a penalty as described in § 305.61 . . .'" JAR 13 (quoting 45 C.F.R. § 305.66). Section 305.61 describes that a state is "subject to a penalty" if (1) that state failed to satisfy the IV-D program or performance requirements, or to submit complete and reliable data, "<u>and</u> (2) [w]ith respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable." 45 C.F.R. § 305.61 (emphasis added).

Plaintiffs are not arguing that the letters ACF sent on November 14, 2003 were insufficient forms of notice, but rather they argue, that the notices "should arrive in the beginning of the corrective action year." Memorandum of Points and Authorities in Support of

-19-

Motion for Summary Judgment of Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island ("Pl Mem") at 17, 18.[13] However, a  state is found to be in noncompliance of child support enforcement program requirements only after "the Secretary finds . . . in a fiscal year" that the states have not met certain standards <u>and</u> "with respect to <u>the succeeding fiscal year</u> – (I) the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance . . . ; or (II) the data submitted by the State . . . is incomplete or unreliable." 42 U.S.C. § 609(a)(8)(A) (emphasis added); <u>see</u> also 45 C.F.R. § 305.61.  In other words, a state does not fall within the ambit of the penalty statute unless and until it is shown at the end of the succeeding fiscal year that the state has not taken sufficient corrective action.  The November 14, 2003 letters from ACF informed each plaintiff state that because it did not take sufficient corrective action, or did not submit complete and reliable data, from 2001 to 2002, the state's 2001 TANF grant would be assessed a penalty.  <u>See</u> <u>e.g.</u>, JAR at 663 ("Alabama failed for a second consecutive year to demonstrate with reliable data the specified minimum level of performance in PEP or to improve over the previous year's performance.  I regret to inform you that Alabama will receive the penalty for the FFY 2001 performance.").

The DAB found that the "States misconstrue ACF's obligation to provide notice under the regulations."  JAR at 13.  Specifically, the Board properly pointed out that the notice requirement is only after a state is subject to a penalty and that is only "upon completion of two

---

[13]The District of Columbia in its brief argue that the "[a]nswer must be no" to the question of "whether the November 14th letter is itself sufficient notice under 42 C.F.R. § 305.66(a)."  D.C.'s Mem at 9.  The District's argument is focused only on the fact that the November 14th letter was sent "when the penalty has already been assessed."  <u>Id</u>.  However, as explained throughout this section, notice is only required when the Secretary finds a state "subject to a penalty."  45 C.F.R. § 305.66(a).

consecutive years of noncompliance or unreliable data relating to the same performance

measure." JAR at 14. The Board concluded, "A state is thus not subject to a penalty, and the

notice requirements of 305.66 do not apply, until the completion of two consecutive years of

noncompliance, after which a penalty must be assessed." <u>Id</u>. If with reliable data, a state has a

PEP level of 90%, or shows sufficient improvement in its PEP, it would not be subject to a

penalty. <u>See</u> 45 C.F.R. § 305.61. Therefore, the Secretary could not find a state "subject to a

penalty" until after the completion of the two years. <u>See</u> 45 C.F.R. § 305.66(a). To read the

notice regulation as requiring notice after the first year would render the entire clause "subject to

a penalty" meaningless.[14]

 Plaintiffs also misinterpret the regulation's use of the term "corrective action year."

Specifically, the District of Columbia argues that the "failure to provide notice is particularly

egregious in light of the clear Congressional intent that the District has a one-year period in

which to correct any identified deficiencies" and the remaining plaintiffs argue that each "State

has an opportunity to cure the deficiencies 'cited in the notice' during a corrective action year."

<u>See</u> District of Columbia's Memorandum of Points and Authorities in Support of the District of

Columbia's Motion for Summary Judgment ("D.C.'s Mem") at 6; Pl Mem at 18 (citations

omitted). However, the corrective action of which the regulation is referring is just a descriptive

term regarding the required improvement a state must show during a succeeding fiscal year if the

---

[14] Plaintiffs' contention that the statute or congressional intent requires the agency to provide
formal notice to the states when they have failed to meet a requirement for a single year is
simply not supported by the statutory language. <u>See</u> Pl Mem at 26. There is simply no notice
provision anywhere in 42 U.S.C. § 609(a)(8). The only notice requirement in the statute is in 42
U.S.C. § 610. That notice is actual notice of the imposition of a penalty to a state's TANF grant
and the right of appeal to the DAB within 60 days of receipt of such notice. <u>See</u> 42 U.S.C. §
610.

state is to avoid being found in noncompliance and receiving a penalty.  The regulation at issue, 45 C.F.R. § 305.66, defines the "automatic corrective action year" as the "<u>the succeeding fiscal year</u> following the year with respect to which the deficiency occurred."  <u>See</u> 45 C.F.R. § 305.66 (emphasis added).  This is a direct reference to the language used in 42 U.S.C. § 609(a)(8)(A)(ii)(I) that "with respect to the succeeding fiscal year" a State must "take sufficient corrective action to achieve the appropriate performance levels or compliance."  This is quite different than meaning that the states have an opportunity to construct a corrective action plan to avoid a penalty.

Congress specifically excluded child support enforcement program penalties from corrective compliance plans and warning notice provisions.  See 42 U.S.C. 609(c).  For many of the TANF penalty provisions, such as failure to participate in the income and eligibility and verification system, a state may have the "opportunity to enter into a corrective compliance plan."  42 U.S.C. § 609(c)(1)(A); <u>see also</u> 42 U.S.C. § 609(a)(4).  This opportunity, along with the Secretary informing the state of a violation, comes before a penalty is imposed against the state.  <u>Id</u>.  However, noncompliance with a child support enforcement program requirement is specifically excluded from the violations for which a state must receive prior notice and have an opportunity to enter into a corrective action compliance plan.  42 U.S.C. 609(c)(4).  Congress actually changed this from a previous system in which after ACF had made a finding that a state had not "complied substantially with IV-D requirements," that state had "the opportunity to submit a corrective action plan."  JAR at 20 n.8; <u>see also</u> 42 U.S.C. 603(h) (1984) (repealed by Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193 § 103, 110 Stat. 2105, 2112 (1996)).  Nevertheless, plaintiffs argue that 45 C.F.R. §

-22-

305.66 should be treated similarly to the notice regulation it replaced, 45 C.F.R. § 305.99. See

Pl Mem at 21. Under section 305.99 (consistent with the statutory predecessor to PRWORA),

the Secretary provided advance notice to a noncompliant state that it had failed to satisfy its IV-

D requirements and informed that state of its opportunity to enter a "corrective action plan." See

45 C.F.R. 305.99(c).[15] Section 305.66 (like the PRWORA) does not provide for advance notice

of a failure, or of the opportunity to develop a corrective action plan, because 42 U.S.C. §

609(a)(8) does not provide for such plans and 42 U.S.C. § 609(c) specifically excludes the

failure to meet child support enforcement program requirements from such plans. Therefore,

ACF clearly followed the regulatory and statutory guidelines by interpreting the term "corrective

action year" as not being synonymous with a year in which the state, following approval by the

Secretary, has been operating under a corrective action plan with regard to the state's adherence

to child support enforcement program requirements.

    Plaintiffs incorrectly contend that there is a "sequence of events" described in 45 C.F.R.

§ 305.66. Pl's Mem at 18. They argue that the notice regulation requires that a state is first

notified of a deficiency in its PEP (or other performance measures) for one year so that then the

_____

[15]In arguing that 45 C.F.R. § 305.66 should be treated similarly to former § 305.99, plaintiffs
exclude the remaining part of the phrase in the preamble of the final rule that refers to 45 C.F.R.
§ 305.99. See Pl Mem at 21. Plaintiffs only quote the language "[s]imilar to the notice aspects
of the former audit process at former § 305.99." Id. (quoting 65 Fed. Reg. 82,192). However,
the entire language reads, "[s]imilar to the notice aspects of the former audit process at former §
305.99, paragraph (a) [of § 305.66] requires that, if the Secretary, on the basis of the results of an
audit or review, finds a State to be subject to a penalty, OCSE will notify the State in writing of
such finding." 65 Fed. Reg. 82,192 (emphasis added). The difference is § 305.66 is operating in
a regime in which a penalty is not assessed until two consecutive years of failure, but § 305.99
operated in a regime in which a penalty would be assessed for one year of failure and then
"suspended if the State [met] the conditions" of the corrective action plan. See 45 C.F.R.
305.99(b)(3) (1998); see also 42 U.S.C. 603(h) (1984) (repealed by PRWORA § 103, 110 Stat. at
2112 (1996)).

-23-

state has an opportunity to correct the deficiency during the second year. Id. However, the

notice regulation has no temporal requirement or sequence of events. See 45 C.F.R. § 305.66.

Instead, the regulation merely details what is required of the Secretary to give proper notice to a

state that has failed to meet certain program or data requirements and is being assessed a

penalty.[16] OCSE is to "notify the State in writing" if the Secretary found the state "subject to a

penalty as described in § 305.61." See 45 C.F.R. § 305.66(a). That written notice must contain

two elements. 45 C.F.R. § 305.66(b). First, it must give the basis for the penalty, such as

describe which of the performance measures referred to in 45 C.F.R. § 305.61(a)(1)(i) the state

was deficient in or indicate that the state had submitted unreliable data for a particular

performance indicator. See 45 C.F.R. § 305.66(b)(1); see also 45 C.F.R. § 305.61(a)(1)(ii).

Second, the written notice must inform the state that any final penalty will be assessed in

consideration of other penalties assessed against the state's TANF grant and that the state is

entitled to an appeals process. 45 C.F.R. § 305.66(b)(2); see also 45 C.F.R. § 262.1 (b)-(e); 45

C.F.R. § 262.7.[17]

---

[16] The District of Columbia argues that if "the notice comes after the opportunity to do anything about the potential penalty, the notice has no meaning." D.C.'s Mem at 9. The notice is not necessarily meant to give the states a chance to take corrective action. As explained in the preamble to 45 C.F.R. § 305.66, each state "should be continuously monitoring its own performance and taking action to improve performance." 65 Fed. Reg. 82192; see also 65 Fed. Reg. 8189 and 82205 (instructing the states to continually monitor their own data). The purpose of the notice is, inter alia, to inform the states that they are subject to a penalty for failure to meet certain child support performance measures and that any penalty will assessed in accordance with other TANF penalty accounting measures. See 45 §§ 305.66(a) and (b).

[17] Plaintiffs mistakenly consider ACF's interpretation of 45 C.F.R. § 305.66 as being redundant to what is required under 45 C.F.R. § 262.7. See Pl Mem at 19 ("under the Board's interpretation the whole regulation is surplus" because 262.7(a)(1) "already require[s] the agency to notify the Governor and the State agency of any adverse action"). However, though the two regulations both require notice after finding a state subject to a penalty, they require different scopes of notice. Section 262.7 requires the "factual and legal basis for taking the penalty," as opposed to

The notice regulation describes the circumstances under which the Secretary will find a state is "subject to a penalty" under 45 C.F.R. § 305.66(a). See 45 C.F.R. § 305.66(c). The regulation states that a penalty is assessed only if by end of the corrective action year the state did not correct the deficiencies or show sufficient improvement. Id. Section 305.66 also informs the state of the manner in which the penalty is imposed, the time period for which the penalty is imposed, and that there is only one corrective action year for a given year's deficiencies even if the state had been in noncompliance with the same requirement over several years. See 45 C.F.R. §§ 305.66(d) and (e).

The plaintiffs focus on the use of the term "will" and the conditional nature of some of the language in 45 C.F.R. § 305.66 to argue that a future effect is intended so that the states must get notice before the end of the corrective action period. See Pl Mem at 19-21. However, the use of the term "will" is intended to identify those actions that are mandatory, rather than prospective. The term "will" is used throughout the regulations in Part 305 for such a purpose. See, e.g., 45 C.F.R. § 305.60(a) ("OCSE will conduct audits"); 45 C.F.R. § 305.61(a) ("[a] State will be subject to a penalty . . . [i]f on the basis" of data submitted it fails to submit complete and reliable data or meet program requirements); 45 C.F.R. § 305.64(a) ("Federal auditors will hold an exit conference"); see also The New Shorter Oxford English Dictionary 3686 (Lesley Brown ed.) (1993) (defining the word "will" in part as "[i]ntention or determination that what one

---

§ 305.66 which specifically refers to notice of the performance measure "deficiencies." In addition, § 262.7 applies to any "reduction in the SFAG," but § 305.66 only applies to states' child support enforcement programs and the relevant performance measures. The preamble to the notice regulation describes that the reference to Part 262 in 45 C.F.R. § 305.66(b)(2) is to indicate that "the imposition of a penalty is subject to certain limitations, appeals and replacement of funds requirements specified in sections 409 and 410 of the [Social Security Act]." See 65 Fed. Reg. 82192.

wishes or ordains be done by another or others"). In addition, plaintiffs incorrectly cite the preamble language, which gives the false impression that the language is referring to the notice regulation as opposed to when a state is actually subject to a penalty. The phrase "[a] penalty will be applied only if the State failed to correct any identified deficiencies by the end of this automatic corrective action year" is contained at 65 Fed. Reg. 82,190, not 82,190, and is referring to 45 C.F.R. § 305.61, not 305.66. See Pl Mem at 21. This language makes sense in terms of 45 C.F.R. § 305.61; it clarifies that a state is only subject to a penalty if it had program or data failure for one year "[a]nd with respect to the corrective action year immediately following such failure, if the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete or unreliable." See 65 Fed. Reg. 82,190 (emphasis added).

The DAB also explained that the conditional nature of some of the language in section 305.66, such as the requirement that the notice will "indicate the amount of the potential penalty," is "likely attributable to its incorporation" of 45 C.F.R. §§ 262.1 (b)-(e) and 262.7. See JAR at 14. Specifically, the Board stated, "Section 262.1(b) through (e) includes procedures for collecting multiple penalties from a state found to have committed more than one of the violations listed in [42 U.S.C. § 609(a)], the maximum reduction that may be made in a state's [State Family Assistance Grant ("SFAG")] regardless of the number of penalties, and the requirement that penalties will be taken by reducing the SFAG payable for the quarter that immediately follows ACF's final decision." JAR 14. The penalty described in the notice to the states could only be potential because it is conditioned on being consistent with other TANF penalty requirements which are not the subject of section 305.66. For example, 45 C.F.R.

262.1(d) mandates that the "total reduction in an affected State's quarterly SFAG amount must not exceed 25 percent." Therefore, if the penalty imposed because of a state's failure to meet its PEP requirement caused a state's quarterly SFAG to be reduced by more than 25 percent, then part of the penalty imposed for the state's PEP failure would be imposed the following quarter or possibly even later if the other reductions continued to be applied. 45 C.F.R. 262.1(d). Hence, the penalty described in the notice issued pursuant to 45 C.F.R. § 305.66 is only potential because part of it would not be assessed on the basis of 45 C.F.R. § 305.61(b) alone, but also on the basis of additional violation of other Title IV requirements.

Plaintiffs also mistakenly consider the references to "identified deficiencies" and "deficiencies cited in the notice" in the regulation and in the preamble as meaning that ACF must put the states on notice of those deficiencies sometime during the corrective action period. See Pl Mem at 21. However, the phrase "identified deficiencies" in context refers to the fact that states are subject to a penalty only if they have not shown during the succeeding fiscal year that compliance with the performance measures or sufficient improvement of the initial fiscal year's deficiencies has been achieved. The notice of the penalty would be insufficient if it did not identify the original deficiencies because there would be no way of knowing if the states had improved upon, or corrected, those deficiencies. Otherwise, the notice would not meet the requirement that OCSE must "give reasons for the finding" that "the State [is] subject to a penalty." See 45 C.F.R. § 305.66(b)(1).

The preamble to 45 C.F.R. § 305.66 clearly expresses the Secretary's understanding that ACF does not have to give advance notice to the states that their submitted data for one year were either unreliable or had failed to meet program requirements:

> [T]he State should not wait or rely upon the Secretary's determination of a data or a performance deficiency in order to begin corrective action. Two consecutive years of failure (either poor data or poor performance) in the same performance measure criterion will trigger a penalty imposition.

65 Fed. Reg. 82192; see also 65 Fed. Reg. 82189 and 82205. This preamble, along with the regulations and statutory provisions, make it clear that a state is responsible for ensuring that it is in compliance with its performance measures and that its data are complete and reliable. The states cannot rely on the absence of advance notice from ACF to excuse its noncompliance.

**B.    ACF's communications with the states were consistent with the statutory and regulatory scheme that the states are to monitor their own data to ensure compliance with 42 U.S.C. § 609(a)(8).**

A court is to "give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994). "A court need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance." Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 52 (D.C. Cir. 1995). Plaintiffs are asking this court to violate this longstanding principle. Most of their arguments are directed at why, in plaintiffs' view, advance notice should be required; but that is far different from showing that notice is required prior to a penalty being assessed.

ACF complied with the notice requirement under 45 C.F.R. § 305.66 in its letters to the states dated November 14, 2003. See JAR at 12, 13, 14. That letter acknowledged that the agency would prefer to give the notice to the states prior to the corrective action period but given the language of the statute it has "no recourse but to comply with the current statute and to proceed with the penalty." JAR at 664. The Assistant Secretary for Children and Families,

Wade F. Horn, Ph.D., even mentioned that he was working with Congress on "a possible solution" to the problem that states "do not have a full year to correct deficiencies following the release of final [Data Reliability Audit] reports." Id. Dr. Horn referenced legislation that ultimately was never brought to a vote, in which "the Senate Finance Committee approved a bill which contains a technical fix to the Federal statute to ensure that states receive a full year for corrective action following notice of a deficiency." Id. The Senate Report on the proposed legislation stated that a statutory change was needed because "current language does not recognize the time necessary to conduct federal audits and that those audits now occur during what, under current law, is a state's corrective action year. This technical correction will give states a full year to correct identified deficiencies." JAR at 21-22 (DAB decision quoting S. Rep. No. 108-162, at 53-54 (Oct. 3, 2003)). The Board found that "this statement in the legislative history acknowledges, consistent with our decision here, that under the law as currently written the corrective action year commences automatically after the performance year, without any action by ACF in the form of audit reports or notices." JAR at 22.

As described above, a state is not subject to a penalty until it has failed to submit reliable data that meets performance measures for two consecutive years. The DAB explained that "the two years follow one upon another automatically, and the statue does not require or make any reference to notice being required to commence the second of the two consecutive years." JAR at 15. The structure of the regulations do not even "permit the start of the corrective action year to be conditioned on notice from ACF of a state's performance or data reliability with respect to the performance year, and further does not afford a state a full year following notice to correct its deficiencies before being subject to penalties." JAR at 16. The federal fiscal year runs from

-29-

October 1st through September 30th of the following year, but states are not even required to submit data "to calculate performance for incentives and penalties for a fiscal year" until "December 31st, the end of the first quarter after the end of the fiscal year."  45 C.F.R. § 305.32; see also JAR at 16.  The December 31st deadline is three months into what would be the state's corrective action year.  The states' contention that the "DAB appears to have discounted the importance of prior notice" seems to be more directed at the statute and implementing regulations for not establishing a system that gives states advance notice than at ACF's interpretations of the statute and relevant regulations.  See Pl Mem at 24.

The entire regulatory and statutory scheme is structured so that the corrective action year starts automatically at the end of the first fiscal year in which a state fails to meet a requisite performance level or fails to submit reliable data.  As ACF described in its November 14, 2003 letter, there is no opportunity for the states to be informed of data problems until the corrective action period has already begun.  See JAR at 664.  The statute does not even contemplate, much less require, that audits be conducted every year.  See 42 U.S.C. § 652(a)(4)(C)(I) (audits to be conducted "at least once every 3 years").  Section 609(a)(8) provides for a penalty to be imposed on a state "on the basis of an audit or audits" for a state's failure to both submit reliable data and meet its performance measures for two consecutive years.  See 42 U.S.C. 609(a)(8)(A)(i) (emphasis added).  Therefore, the statute contemplates that the Secretary may determine a penalty based on one single audit conducted retrospectively which reviews three years of data. From those three years of data, the Secretary could determine that a state failed for two consecutive years to meet its performance measures, submit complete and reliable data, or some combination of the two.  In such a situation it would be impossible to get notice before the end of

-30-

the <u>automatic</u> corrective action year.  As explained above, Congress specifically excluded child support enforcement program failures from being among those violations for which the state has extra time to construct a corrective action plan.  <u>See</u> 42 U.S.C. § 609(c); <u>see also</u>, <u>supra</u>, at 22.

Plaintiffs argue that ACF violated the "federal-state partnership[]" by not providing formal notice at some point during the corrective action period.  <u>See</u> Pl Mem at 27.  Besides the fact that it is unclear how ACF could notify a state that it was subject to a penalty before a state was subject to a penalty, the statute and regulations are actually very clear of what is required of the states.  <u>See</u> <u>Pennhurst State School & Hospital v. Halderman</u>, 451 U.S. 1, 17 ("if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").  The states must submit reliable and complete data, meet certain performance measures, and monitor their own data to ensure that they satisfied these conditions.  <u>See</u> 42 U.S.C. §§ 609(a)(8) and 652(g); <u>see also</u> 65 Fed. Reg. 82192 ("[t]he State should be continuously monitoring its own performance").  The states contend that they do not have the resources to monitor their progress and that ACF should undertake that responsibility.  <u>See</u> Pl Mem at 25.  The states are attempting to shift their statutorily mandated responsibilities to ACF.

The reason the statute and regulations do not create a system of prior notice is because the entire system of performance measures is self-implementing; the states must monitor their own data.  The preamble to 45 C.F.R. § 305.66 maintains that each state "should be continuously monitoring its own performance and taking action to improve performance which its own data show may fail to achieve the performance measures.  The State is also responsible for maintaining proper procedures and controls to ensure data reliability and completeness."  JAR at 18 (DAB decision quoting Fed. Reg. 82,192).  The states even acknowledge that they can

-31-

monitor their own performance level.  Pl Mem at 24 ("a State can usually self-determine its

performance on the substantive performance indicators").  Nevertheless, one of the plaintiffs in

this case, Kansas, is still arguing that its failure to meet the requisite PEP performance levels

should be excused because it did not get advance notice that it would be subject to a penalty.

See JAR at 1739 (showing that Kansas failed because of performance, not because of data

reliability).  Advance notice by ACF of such a substantive performance failure would not have

told Kansas's child support administrators any more than what they could learn from their own

data; Kansas's TANF grant would be subject to a penalty.

The plaintiffs, which apparently includes Kansas, only take issue with the requirement

that states have to monitor their own data to ensure that the data they submit are reliable.  See Pl

Mem at 24 ("self-assessment is more difficult to conduct with respect to data reliability").

However, the preamble language to 45 C.F.R. § 305.66 instructs each state that it "is also

responsible for proper procedures and controls to ensure data reliability and completeness" and

that each state "should not wait or rely upon the Secretary's determination of a data or a

performance deficiency in order to begin corrective action."  See Fed. Reg. 82,192 (emphasis

added).

ACF even assisted the states in the monitoring of their own data, and correcting any

problems with that data, through the issuance of draft and final audit reports.[18]  The process of

---

[18] Plaintiffs incorrectly imply that the Board found that the Data Reliability Audit ("DRA")
reports satisfied the 45 C.F.R. § 305.66 notice requirements.  See Pl Mem at 23 ("ACF made a
commitment to provide written notice in the form and content set forth in § 305.66, and the audit
reports fall short of that standard."); see also D.C.'s Mem at 7 ("[t]he DAB concludes that the
District was informed of the data reliability problems during the Corrective Action Year and
asserts that such information constituted actual notice.").  However, the Board did not address
whether the DRA reports satisfied the notice requirements. See JAR at 20 n.7 ("[s]ince we reject
the States' argument that the regulation required notice of performance or data failures prior to

the Data Reliability Audit ("DRA") reports informed the states during the corrective action year of any data reliability problems.[19]  For example, ACF instructed Delaware through its draft audit report dated April 29, 2002 that line-item #6, Children in IV-D Cases Open During or at the End of the Fiscal Year With Paternity Established or Acknowledged, had an efficiency rating of 77% (with an upper bound of 84%), short of the required 95-percent standard.  JAR at 767.

Therefore, Delaware was on notice well before the "data submissions for FY 2002 were [] due" that it would have "to correct any problems that may have caused their FY 2001 data to be found unreliable."  JAR at 19.  The reports, including the draft reports sent to the states, discuss the deficiencies and provide recommendations as to ways the states can correct the problems identified in the audit.  See, e.g., JAR at 695.  Moreover, the regulations provide the states an opportunity to respond with written comments to any draft audit report.  See 45 C.F.R. § 305.64. In fact, the plaintiffs did receive "draft and final FY 2001 DRA reports during FY 2002," several states submitted comments on those drafts, and "ACF altered its findings as to the FY 2001 data for three of the States."[20]  JAR at 19; see also IAR at 76.  The states were aware from the statute that they must submit reliable data demonstrating that they meet the performance measures, and the regulations created a system in which the requirement for the states to monitor their own data

_____

the time that a state is subject to a penalty, we need not address [the argument that DRA reports and other correspondence from ACF fulfilled the notice requirements of 45 C.F.R. § 305.66]").

[19]The incentive notices for FY 2001 sent out November 12, 2002 also informed states that had data reliability problem that they would not receive incentives because of those data problems. See JAR at 1509; IAR at 302.

[20]One of the states that appealed to the DAB did not receive a draft report but that state had submitted reliable data.  See JAR at 19.

was made easier.  See 42 U.S.C. § 609(a)(8); see also 45 C.F.R. § 305.64.  ACF made this process even easier by conducting audits every year.

Congress clearly did not contemplate providing the notice that the states are asking of ACF.[21]  Rather, Congress created a system in which the states were to monitor their own data and ensure that they were in compliance with the statutory and regulatory mandated performance measures.  The states may prefer that 45 C.F.R. § 305.66 would require notice during (or even during the start of) the corrective action period but the states' wishes do not create a regulatory requirement.  Plaintiffs' arguments as to why notice should be required does not change the fact that the entire statutory and regulatory structure is set up so that no notice is required until after the states are subject to a penalty.  That does not occur until after the end of the automatic corrective action year.  See 45 C.F.R. 305.66(a) ("[i]f a State is found by the Secretary to be subject to a penalty . . ., the OCSE will notify the State in writing of such finding") (emphasis added).

_____

[21]The fact that the penalties are levied against a state's TANF program, IV-A of the Social Security Act, because of the failure of the state's child support enforcement programs, IV-D of the Social Security Act, is irrelevant.  See Pl Mem at 25 (arguing that "the need for formal notice under the rules is underscored by the involvement of two separate programs").  From the statutory structure, the states are specifically aware of the interdependence between the two programs and the fact that a state's IV-D failure could result in a penalty being assessed against a state's IV-A program.  See 42 U.S.C. §§ 609(a)(8) and 602(a)(2)  Moreover, states have been subject to a reduction in funds under Title IV-A on account of failures in their IV-D programs since 1984.  See 42 U.S.C. 603(h) (1984) (repealed by PRWORA § 103, 110 Stat. at 2112 (1996)).

II.    **The DAB Properly Concluded that ACF Used Reasonable Methods to Determine Whether the Data the States Submitted were Reliable**.

    A.    **The DAB properly determined that ACF followed the statutory and regulatory guidelines in determining that the data several states submitted were unreliable.**

The statutory scheme sets up two different and equally acceptable ways for the states to measure whether they have met their PEP standards.  <u>See</u> 42 U.S.C. § 652(g).  States even get to choose which one they prefer, with the different measurements having separate definitions.  <u>Id</u>. ("[i]n determining compliance under this section, a State may use as its paternity establishment percentage either the State's IV-D paternity establishment percentage (as defined in paragraph (2) (A)) or the State's statewide paternity establishment percentage (as defined in paragraph (2)(B))").  The IV-D PEP is defined, in part, as children born out-of-wedlock "with respect to whom assistance is being provided under the State program funded under [the TANF block grants]."  42 U.S.C. § 652(g)(2)(A).  The statewide PEP is in relation to out-of-wedlock births for the entire state.  42 U.S.C. § 652(g)(2)(B).  The regulations match the statutory scheme in allowing the use of two different measurements: the state's IV-D program PEP and the statewide PEP.  <u>See</u> 45 C.F.R. 305.2.

Each state is required to submit complete and reliable data to determine whether it has adequately met the performance measures.  <u>See</u> 42 U.S.C. § 652(g); <u>see also</u> 42 U.S.C. § 609(a)(8).  The term "reliable data" is defined in the same subsection as the IV-D PEP and statewide PEP are defined; it is "the most recent data available which are found by the Secretary to be reliable for purposes of this section."  42 U.S.C. § 652(g)(2)(C).  Neither the statute nor the regulations requires that the agency employ a specific auditing methodology to determine if the data submitted were reliable.  <u>See</u> 42 U.S.C. § 652(a)(4) and 45 C.F.R. § 305.60 (both requiring

only that the audits be conducted "in accordance" with the "Government Auditing Standards" of the Comptroller General of the United States).[22]

Six of the joint plaintiffs are alleging that ACF, and in turn the DAB for ruling in ACF's favor, acted arbitrarily and capriciously for using different auditing methods for states that use different PEP formulations.[23]  See Pl Mem at 28.  Specifically, they argue that ACF counted both exclusion and inclusion errors in evaluating data reliability for IV-D PEPs but only counted inclusion errors for statewide PEP audits.  See id. at 28, 29.  However, plaintiffs do not contend that the states did not get to choose which measure they would use nor do they argue that ACF conducted an improper audit to conclude that the states failed to submit reliable data.  Cf. id. at 36 ("ACF's auditors could sample the statewide universe to determine exclusion errors just as they sample the IV-D PEP universe for these errors, so they would not have to look at every record in the statewide PEP universe.").  Plaintiffs are only concerned that there was a different auditing methodology for the two different data universes, not that one version of the auditing was done incorrectly.  Id. at 36-37 ("Plaintiffs are not arguing that ACF must audit statewide data to identify exclusion errors, but that, having decided not to count exclusion errors for

_____

[22] The "standards pertain to auditors' professional qualifications, the quality of audit effort, and the characteristics of professional and meaningful audit reports."  See General Accounting Office, "Government Auditing Standards 2003," at http://www.gao.gov/govaud/ybk01.htm.

[23]Indiana is not a party to this claim.  See Plaintiffs' Amended Complaint at ¶ 39.  Only Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island raised the audit methodology in their argument to the DAB and in their complaint to this Court.  See id.  The argument should not be considered an argument on behalf of Indiana, which has waived the right to raise this claim.  See  Sims v. Apfel, 530 U.S. 103, 109 (2000) ("courts require administrative issue exhaustion as a general rule because it is usually appropriate under an agency's practice for contestants in an adversary proceeding before it to develop fully all issues there") (citation and quotation marks omitted).

-36-

statewide PEP States, ACF cannot turn around and hold the IV-D States to higher standard of reliability.").

Plaintiffs emphasize the cannons of statutory construction in which they argue that "it is certainly proper to assume that Congress did not intend a phrase used in one statutory section to be given two different meanings by the agency." See Pl Mem at 30. However, even the case they cite, Nati'l Insulation Transp. Committee v. Interstate Commerce Comm'n, 683 F.2d 533, 537 (D.C. Cir. 1982), as well as the language they quote from the case, "different terminology within a statute indicates that Congress intended to establish a different meaning," shows the limitations of their argument. See Pl Mem at 30. Congress did use different terminology in this case. Congress could have required only IV-D PEP measurements or it could have required only statewide PEP measurements. Instead, Congress gave the states a choice of which method to use and instructed the Secretary to ensure that the data the states submitted were reliable. 42 U.S.C. § 652(g). Furthermore, it is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." See Doe v. Chao, 540 U.S. 614, 629 (2004) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)). The statute mandates that the data is reliable as "found by the Secretary" in reference to the two different possible calculations for the PEP measurement. 42 U.S.C. § 652(g)(2)(C). There is no indication in the statute that the reliability of the IV-D data must be calculated in the same manner as that of the statewide data.[24]

_____

[24]Plaintiffs misconstrue the use of the word "similar" in the legislative history. See Pl Mem at 30 (claiming that the House conference report "emphasizes that the statewide PEP is 'similar' to the IV-D PEP."). The emphasis is that the ratio used to calculate the IV-D PEPs and statewide PEPs are similar, not that the two data sets are similar. See H.R. Conf. Rep. No. 104-725, at 359-60, reprinted in 1996 U.S.C.C.A.N. 2649, 2748. The House conference report specifically describes the difference between the two data sets; the statewide PEP is similar to the IV-D PEP "except

The difference between the IV-D and statewide PEP measurements relate to what is calculated in determining the PEP, not what is the statutorily mandated PEP level. Therefore, plaintiffs' argument that "[e]very reference to 'paternity establishment percentage' in the Act makes no distinction between the IV-D and statewide PEP indicators" is irrelevant. See Pl Mem at 30. States must meet the requisite PEP level regardless of what measurement they use (statewide PEP or IV-D PEP), and the data submitted by the states must be reliable. The auditors are not calculating whether the states met their PEP levels, but whether the data submitted were reliable. See JAR at 40 ("[h]ere, the statute creates the two different types of PEP measure, and it is clear that Congress intended the agency to consider whether data that states submit is reliable."). Plaintiffs maintain that "ACF's definition of what constitutes reliable IV-D PEP data and what constitutes reliable statewide PEP data are not 'uniform.'" Pl Mem at 31. The question is not whether the definitions of reliability are different but whether it was permissible for ACF to use two different methodologies for two different data universes to check the reliability of the data. Further, the statute has separate definitions for IV-D PEPs and statewide PEPs. What is uniform is that the PEP measured, regardless of which data set is used, must meet a certain level and the data used to determine that PEP must be reliable. See 42 U.S.C. § 652(g). Nevertheless, by their very nature, different data sets will lend themselves to different auditing protocols.

The Board found that "ACF presented a reasonable rationale for choosing a methodology for auditing Statewide PEP data different from its methodology for auditing IV-D PEP data." JAR at 38. Specifically, the IV-D data comes from the confined universe of the "caseload of a

_____

[for the statewide data] all out-of-wedlock births in the fiscal year in the State are in the denominator and all paternities established are in the numerator." Id. (emphasis added).

-38-

state's IV-D agency" but the statewide data comes from a "multiplicity of sources, rendering it difficult to audit underlying records at the sources." See id. For ACF to conduct a proper audit of IV-D data, the auditors just need to sample and examine the available "underlying records" of a state's IV-D caseload. Id. In contrast, for ACF to examine exclusion errors for a state that chooses to use statewide data, "it would have to examine a sample of the underlying records from each source not only for the data that were reported on the [form sent to ACF], but for similar data that were not reported." Id.

The sources of the statewide data are mostly private entities and so it is not clear that ACF would be able to obtain access to these entities' files and records. See JAR at 37 (DAB describing ACF's argument that the statewide PEP "reflects all births in a state and is taken from many sources such as public and private hospitals and birth facilities, making it impractical for federal auditors to determine if there were out-of-wedlock births that the state failed to report") (emphasis added). Even if the auditors could sample the underlying private hospital records, there is no way of knowing whether an exclusion error existed. For example, a review of a birth certificate would not inform the auditors of whether that child was born out-of-wedlock and if that child should have been included in the PEP calculation. The parents may have different last names but might nonetheless be married. In contrast, the IV-D universe is well-defined and the "underlying records are readily available to the agency." See JAR at 38. This allows the auditors to "determine if the state has failed to report any data that should have been included." Id. It is very different to penalize a state because it excluded a case for which it had underlying records that demonstrate that the case should have been included, as in the IV-D universe, than it is to penalize the state when it might not have access to such records or such records might not exist, as in the statewide universe.

-39-

Besides emphasizing that it would be very "burdensome" (if not impossible) for both the

auditors and the states to have to collect data from "the underlying records from each source"

used to calculate the statewide data, the Board referenced ACF's determination that "data for

Statewide PEPs that came from sources other than a state IV-D agency may be less likely to have

deliberate exclusion errors than data for IV-D PEPs."  JAR at 38.  In its brief to the DAB, ACF

explained that one rationale for determining exclusion errors for IV-D is that states control its

"IV-D caseload, and thus are responsible for what goes into that data universe, as well as what is

left out."  JAR at 250.  If exclusion errors were not counted, a state could simply manipulate the

data by omitting a sufficient number of out-of-wedlock births to increase the PEP to achieve 90

percent or the required level of increase over the previous year's PEP.  In contrast, state

"agencies do not likely have similar capability or authority to account for and oversee data in the

statewide universe."  Id.

To ensure that a state is properly being assessed a penalty for its failure to meet a

performance measure, or is rewarded with incentive payments for meeting or exceeding certain

standards, it is critical for the agency to ensure that the data submitted is accurate and reliable.

Id. at 250-251.  Unfortunately, for statewide data "there are unavoidable limits on sampling

methodology."[25]  Id. at 251.  As ACF explained to the DAB, "the auditors simply cannot

---

[25]Plaintiffs incorrectly imply that the auditors ignored exclusion errors for statewide data.  See Pl
Mem at 29 n. 8 (giving an example of an IV-D PEP exclusion error but maintaining that in such
an example "for the statewide PEP states, no error will be counted.").  However, ACF's decision
not to calculate exclusion errors for the statewide data was attributable to the "sampling
methodology" and data limitations discussed above, rather than the auditors having explicitly
ignored exclusion errors for states that chose to use the statewide PEP.  See JAR at 38.  The
statewide sample is drawn from cases reported by a state's IV-D agency in OCSE-157, lines 8
and 9; by definition it does not include any unreported cases.  See, e.g., JAR at 1486 (DRA for
New Mexico for FY 2001 states that "[b]ecause the Statewide PEP option was elected, samples
of 50 children were selected from Lines 8 and 9."); see also JAR at 1462 (same language in

-40-

determine whether every out-of-wedlock home birth is reported or whether every public or private hospital or birthing facility accurately reports all of its out-of-wedlock births or paternity acknowledgments." Id. The Board determined that for ACF to identify exclusion errors for statewide data either a larger sample would be needed or, if the auditors established smaller samples of each of the multiple sources for the statewide data, a "larger confidence interval" would result. JAR at 38. A larger confidence interval would mean that any projections derived from the sample would likely be less accurate and would permit data that were not in fact reliable to be then considered reliable. This is especially the true in this case because "ACF's methods for both the IV-D PEP states and the Statewide PEP states gave the states the benefit of the doubt by using the upper bound of the 95% confidence interval." JAR at 38.

ACF's auditors had to use a different sampling technique for IV-D PEP data than it did for statewide PEP data. As explained above, IV-D PEP data comes from the "caseload of a state's IV-D agency" as opposed to statewide PEP data, which comes from a "multiplicity of sources." See JAR at 38. Plaintiffs are incorrect in their claim that ACF used two different definitions of "reliable data." See Pl Mem at 29. The DAB recognized that the difference between the two different methodologies was because of the different sampling techniques used. See JAR at 34 (explaining that for statewide data "ACF does not use a sampling technique that would enable it to determine if the state failed to include a child who should have been included (for instance, a child born out of wedlock)"). Plaintiffs admit they are "not challenging ACF's sampling methodology or its statistical calculations." See Pl Mem at 38 (emphasis in original). Considering that the only question is whether the DAB properly concluded that ACF used a

Kansas's FY 2001 DRA).

reasonable sampling methodology for IV-D PEP data sets and statewide PEP data sets, plaintiffs

are left without any argument regarding ACF's audit methodology.

Plaintiffs' claim that ACF must use the same auditing methodology for two different

universes of data ignores the instruction in the statute that "reliable data" is what is "found by the

Secretary to be reliable for purposes of this section" and is "in accordance with the Government

auditing standards of the Comptroller General of the United States."  42 U.S.C. §§ 652(g)(2)(C)

and 652(a)(4)(C).  ACF is not treating two similarly situated entities differently from each other

as plaintiffs claim.  See Pl Mem at 34 (citing cases for the proposition that an agency must give a

reasoned explanation for "apply[ing] different standards to similarly situated entities.") (quoting

Burlington N. Fe Railway v. Surface Transp. Bd., 403 F.3d 771, 777 (D.C. Cir. 2005).  Rather, a

IV-D PEP state uses a much different data universe than a statewide PEP state and therefore

cannot be considered similarly situated.  As the DAB explained, "this is not a situation where an

agency applied different interpretations of what constitutes a data error to different states for the

same data universe."  JAR at 39.  Different data sets will necessarily involve different auditing

methodologies because what might make sense for one data set would not necessarily work for

another data set.  Considering that one data set in this case was much more confined and that

each state had available to it the underlying records to verify the accuracy of that data, it was

reasonable for ACF to choose a sampling methodology for that data set that enabled ACF to

check for exclusion errors.  See 42 U.S.C. § 652(a)(4)(C)(i) (the audits are "to assess the

completeness, reliability and security of the data and the accuracy of the reporting systems used

in calculating performance indicators) (emphasis added).  The Board reasonably concluded that

"the choice of sampling method may need to vary according to the nature of what is being

audited, since the purpose of using sampling is to get a reliable result while keeping the burden

on the auditors and the entity being audited to a minimum." Id. at 38.

**B.      Plaintiffs have no viable claim that notice and comment rulemaking was required concerning ACF's auditing methodology.**

**1.      Plaintiffs have waived their notice and comment argument.**

Plaintiffs contend that ACF did not give them prior notice that it would use separate

auditing methodologies for the two different data sets states chose as the basis for their PEP

measure. In their brief to the DAB, the states' only reference to notice in their auditing

methodology argument is their accusation that the difference in methodology "undermines the

fairness of the incentive and penalty system." See JAR at 138 ("[i]f there was a reason behind

the different approaches, it should have been clearly and timely communicated to the States.").

Now those six states who contested ACF's auditing methodology to the DAB are arguing that

the "penalties cannot stand because the States did not receive adequate and timely notice of

ACF's policy." Pl Mem at 32. Specifically, they argue for the first time that ACF violated the

Administrative Procedures Act ("APA") by not publishing its auditing standards in the Federal

Register and waiting for comments by the states. See JAR at 133-138, 462-467 (sections of

plaintiffs' briefs to the DAB regarding auditing methodology argument but with no mention of

APA notice and comment argument). Besides the fact that the APA exempts from notice and

comment requirements "interpretative rules, general statements of policy, or rules of agency

organization, procedure, or practice," 5 U.S.C. § 553(b)(A), this issue has been waived by the

plaintiffs' failure to raise it before the DAB.

As the Supreme Court has explained, "courts require administrative issue exhaustion as a

general rule because it is usually appropriate under an agency's practice for contestants in an

adversary proceeding before it to develop fully all issues there." Sims v. Apfel, 530 U.S. 103, 109 (2000) (citation and quotation marks omitted). Issue exhaustion is particularly applicable to this case because the states and ACF both were able to present their arguments in an adversarial setting before the DAB. Id. ("[w]here the parties are expected to develop issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at greatest.").

State of Ohio, Department of Human Services v. Sullivan, 789 F. Supp. 1395 (S.D. Ohio 1992), supports defendants' argument that plaintiffs have waived their claim regarding lack of notice and comment on audit methodology. The case involved a final decision by the DAB "sustaining a penalty disallowance by [OCSE]," in which OCSE found that Ohio was in noncompliance with its Title IV-D requirements after OCSE had conducted "a program results audit." Id. at 1397-98. Ohio, inter alia, argued "that OCSE audits are invalid because the statistical methodology used was adopted without notice and comment." Id. at 1400. The Court disagreed, stating that it "agrees with defendant's position that it should not consider plaintiff's argument that the OCSE's statistical sampling methodology was invalid for failure to comply with the rulemaking requirements of the APA because plaintiff failed to raise this issue before the Board prior to its final decision of plaintiff's appeal." Id. at 1401 (emphasis added). The court had explained earlier in its decision that the "appropriate time for plaintiff to have raised its APA rulemaking claim relating to audit methodology was during the extensive proceedings leading to the Board's issuance of [its decision]." Id.

### 2.    It was not required for ACF to engage in notice and comment rulemaking on its audit methodology.

Even if plaintiffs had not waived the argument, ACF's auditing methodology does not even lend itself to notice and comment.  <u>See</u> 5 U.S.C. § 553(b) ("[e]xcept when notice or hearing is required by statue, [notice and comment] does not apply (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure or practice").  In <u>Guardian Federal S & L v. Federal S & L Ins. Corp.</u>, 589 F.2d 658, 666-68 (D.C. Cir. 1978), the D.C. Circuit held that a particular audit methodology was not subject to advance notice and opportunity for comment because it was a general statement of policy.  The fact the "Chief Examiner has discretion to accept a non-conforming audit" was a factor in the Court deciding that the audit methodology was a general statement of policy.  <u>Id</u>. at 666.  Unlike <u>Batterton v. Marshall</u>, 648 F.2d 694 (D.C. Cir. 1980), which held that a rigid statistical sampling methodology employed by the Department of Labor for calculating unemployment rates was subject to notice and comment, the Court in <u>Guardian</u> found that the agency's discretion along with the comprehensive regulatory framework counseled against "compulsory notice and comment procedures" that "would have the potential to mire the agency in fruitless delay, expense, and inefficiency."  <u>Guardian</u> 589 F.2d at 677-78.  The <u>Batterton</u> Court distinguished the statistical sampling methodology from the auditing methodology at issue in <u>Guardian</u>:

> The regulation at issue [in <u>Guardian</u>] prescribed criteria for audits . . . Because the regulations granted the agency discretion to accept even non-conforming audit reports, this court found the regulations to be a general statement of policy, rather than a binding rule requiring notice and comment.  The Secretary of Labor retains no such discretion here.

<u>Batterton</u>, 648 F.2d at 706.

-45-

In a similar case to this one, the DAB found that OCSE's auditing methodology is not subject to notice and comment. DAB No. 1221 (1991). The case involved the statutory precursor to TANF, Aid to Families with Dependent Children ("AFDC"). The Board concluded that OCSE's audit methodologies were a general statement of policy and more akin to the Guardian case, "which concerned an agency's audit policy guidelines," than the Batterton case, where the federal agency "adopted an inflexible system that was not subject to adjustment through adjudication or other method." Id. Specifically, the Board determined that the auditing methodologies were not binding and just "a means for gathering evidence about whether a state has achieved substantial compliance, not as an inflexible standard that must be applied." Id. (providing an example in which the "OCSE substantially revised its program results calculations when errors in them were indicated.").

As explained above, each state in this case had an opportunity to comment and make objections regarding its draft audit reports, and ACF made changes in response to those comments. See JAR at 19; see also 45 C.F.R. § 305.64. The Secretary, just like the Chief Examiner in the Guardian case, also had the option of accepting incomplete or unreliable data submitted by the state if the Secretary determined that the noncompliance was of a technical nature. See JAR at 3; see also 42 U.S.C. § 609(a)(8)(C) (the Secretary "may disregard of noncompliance" if, inter alia, "the Secretary determines that the extent of the incompleteness or unreliability of the data is a of a technical nature which does not adversely affect the determination of the level of the State's [PEP]") . Furthermore, the states were also aware of ACF's auditing methodology. In March of 2002, well before the states had to submit data for 2002, the corrective action year, ACF informed the states of the different auditing methodologies in its Guide for Auditing Data Reliability. See JAR at 34, 1398 n.6.

-46-

**C.    Plaintiffs have not shown they were prejudiced by ACF counting only inclusion errors for statewide PEP data.**

Plaintiffs have not demonstrated that they were prejudiced by the different methodologies used for the two different data sets.   Much of plaintiffs' argument is focused on the fact that several IV-D states would have met the data reliability standards if the auditors had ignored exclusion errors.   See Pl Mem at 39-40.   However, as the DAB explained, the states did "not argue and have not shown that their PEP data would have met the data reliability standard if they had selected the Statewide PEP measure."  JAR at 39.   Instead, plaintiffs ignore the difference in the two different data sets and want the best of both worlds; the use of a more lenient auditing standard for a more confined and readily accessible statistical universe.   Plaintiffs maintain that there is a "discrepancy in failure rates between IV-D PEP States and statewide PEP States" and that the "differences between the two standards of reliability is so significant that many States may have opted from the outset to use and to continue to use the statewide PEP instead of the IV-D PEP."  Pl Mem at 39, 41.   However, plaintiffs focus only on one year, 2002, in which ten states that used the IV-D measurement failed to meet reliability standards and only one state that used statewide data failed to meet the reliability standard.   See Pl Mem at 11.   However, in 2001, more statewide PEP states failed (11) than IV-D states (9) because of data reliability problems. JAR at 1739.   Guam even changed from being a statewide state in 2001, in which it had data reliability problems, to a IV-D state in 2002, in which it had no data reliability problems.   Id. One of the plaintiffs in this lawsuit, New Mexico, also changed the data source for its PEP measurements, again going from statewide in 2001 to IV-D in 2002.   Id.   New Mexico had data reliability problems in both instances.   Id.   Thus, plaintiffs have presented no evidence that their

failures to have complete and reliable data were the result of the sampling methodology used by

ACF rather than their own administrative or system failures.

The Board concluded that those states that "selected the IV-D PEP are not entitled to

have their exclusion errors <u>disregarded</u> merely because the audit sample of Statewide PEP data

did not permit identification of exclusion errors."  JAR at 40 (emphasis added).  The DAB held

that ACF did not have to employ "identical methods to audit data from obviously different

universes."  JAR at 39.  If ACF had ignored the entire category of exclusion errors for IV-D PEP

data, it would have been "contrary to the congressional intent that PEPs be calculated using

reliable data."  <u>Id</u>.  Even if the two data sets should have been analyzed in the same way, "the

remedy would be to expand the audits of Statewide PEP data," but this solution was limited

because of the "inability to identify certain exclusion errors" for the statewide PEP data.  <u>See</u> <u>Id</u>.

The DAB rationally decided that the ACF was reasonable in the auditing methodologies it

employed to ensure that the states, whether they used IV-D data or statewide data, submitted

reliable data.


III.    **Plaintiffs Overstate the Total Fiscal Impact of the Penalties Assessed for their
        Failure to Meet the Requisite Performances Measures.**

Plaintiffs allege in their complaint, and in the background section of their memorandum

in support of summary judgment, that the total fiscal impact of their being assessed a penalty is

"at least twice" the "1 percent [reduction in] a "State's TANF funds."  <u>See</u> Pl Mem at 13; <u>see</u>

<u>also</u> Pl Mem at 13 n.3; Pl Am Compl at ¶ 36.  However, it is the plaintiffs that are trying to

double count.    Plaintiffs cite 45 C.F.R. § 262.1(e) for their argument that the total fiscal impact

is twice the amount reduced in their TANF grant, but that regulation simply requires a state to

"expend additional State funds to replace any reduction in the SFAG resulting from penalties." This requirement simply means that a state may not penalize the actual or intended beneficiaries of the Title IV-A program because of a state's own failure to meet its statutory requirements.

If the plaintiffs were to prevail on the merits and with this remedy claim, they would be getting the amount by which their TANF grants were reduced and an additional amount for being assessed a penalty. With a simple example, one can see that plaintiffs are trying to get a windfall by bringing this lawsuit. Assume a state receives a $100 million in TANF funds and is assessed a penalty of 1%, or $1 million, for failure to satisfy statutory requirements. The state would then receive $99 million in TANF funds and the additional $1 million the Secretary would otherwise pay to support the state's TANF program would be paid by the state. If the state were to then prevail in a lawsuit, it would receive the $1 million it was penalized. That would make it whole again, with the state receiving a total of $100 million. However, if the plaintiffs' argument were to carry the day, that state would receive $101 million. The state would receive the amount in which its TANF grant was reduced and the amount that the states expended to replace the reduced the amount, two ways of referring to the same thing. Aside from the fact that the plaintiffs case for voiding the 1% penalty fails on the merits, the plaintiffs should not get a double recovery for bringing this lawsuit.

## <u>CONCLUSION</u>

For the reasons stated, defendants respectfully request this Court to grant their Motion for

Summary Judgment and deny plaintiffs' Motions for Summary Judgment.


Dated: May 24, 2006

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney for the District of Columbia

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch

_/s/_____

Of Counsel                                        ADAM D. KIRSCHNER
LINDA GRABEL                                       Trial Attorney
Assistant Chief Counsel                            U.S. Department of Justice
Children, Families, and Aging Division             Civil Division, Federal Programs Branch
Office of the General Counsel                       <u>Mailing Address</u>
U.S. Department of                                  P.O. Box 883
Health and Human Services                          Washington, D.C., 20044
                                                    <u>Delivery Address</u>
                                                    20 Massachusetts Ave., NW., Room 7222
                                                    Washington, DC 20001
                                                    Telephone: (202) 353-9265
                                                    Fax: (202) 616-8470
                                                    Adam.Kirschner@usdoj.gov

                                                    COUNSEL FOR DEFENDANT