**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| State of ALABAMA DEPARTMENT OF HUMAN RESOURCES, CHILD SUPPORT ENFORCEMENT DIVISION, *et al.*, | ) ) ) ) ) |
| *Plaintiffs*, | ) Civ. No. 1:05CV2098 (RJL) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.* | ) ) ) |
| *Defendants*. | ) ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF AGENCIES OF THE STATES OF ALABAMA, DELAWARE, HAWAII, INDIANA, KANSAS, LOUISIANA, NEW MEXICO, AND RHODE ISLAND**

Caroline M. Brown (D.C. Bar No. 438432)
Joseph Zambuto Jr. (D.C. Bar No. 484542)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
*Attorneys for Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island*

June 21, 2006

# TABLE OF CONTENTS

HEARING REQUESTED ........................................................................................ 1

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 1

    I.   The Defendants' Interpretation of § 305.66 Does Not Give Meaning to All Parts of the Regulation, Ultimately Renders the Regulation Superfluous, and Contradicts the Clear and Longstanding Purpose of the Notice Requirement ............................................. 1

    II.  The Court Should Reject the Agency's Position that the Use of Different Standards to Assess the Reliability of Paternity Establishment Data Was Reasonable. ........................ 7

         *A.   The Use of Different Definitions of "Reliability" Is Not Justified.* .............................. 7

         *B.   Even if it Was Permissible for ACF to Apply Different Standards, It Had an Obligation to So Notify the States.* ....................................................................... 11

    III. Plaintiffs Have Not Overstated the Total Fiscal Impact of ACF's Improper Action. ...... 17

CONCLUSION ...................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004)............................................................2

*Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979) ..............................15

*Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485 (D.C. Cir. 983).......15

*Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C. Cir. 1984)........................7, 15

*Barlow v. Collins*, 397 U.S. 159 (1970)...................................................................................15

*Dean v. Butz*, 428 F. Supp. 477 (D. Haw. 1977) .....................................................................15

*Donnelly v. FAA*, 411 F.3d 267 (D.C. Cir. 2005) .................................................................2, 3

*Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672 (D.C. Cir. 2003) .............................................2

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658 (1978)......12

*Herron v. Heckler*, 576 F. Supp. 218 (N.D. Cal. 1983).............................................................15

*Human Res. Mgmt., Inc. v. Weaver*, 442 F. Supp. 241 (D.D.C. 1977)....................................15

*Mine Reclamation Corp. v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994)............................................6

*Office of Communication of the United Church of Christ v. FCC*, 779 F.2d 702
    (D.C. Cir. 1985) .................................................................................................................7

*West Virginia by McGraw v. U.S. Dep't of Health and Human Serv.*, Civ. Action No.
    2:97-0245, 1999 U.S. Dist. LEXIS 20568 (S.D. W. Va. Mar. 31, 1999) ..........................15

### FEDERAL STATUTES

5 U.S.C. § 552....................................................................................................11, 12, 14

42 U.S.C. § 609....................................................................................................4, 17, 19

42 U.S.C. § 652..........................................................................................................7, 8

## CONGRESSIONAL PUBLICATIONS

H.R. Conf. Rep. No. 104-651 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183 ........................17

*National Problems, Local Solutions: Federalism at Work: Hearing Before the House Comm. on Government Reform*, 106th Cong. 21-22 (1999)..............................................19

## FEDERAL REGULATIONS

42 C.F.R. § 430.42 (2006) ..........................................................................................18

45 C.F.R. § 262.1 (2006) .........................................................................................2, 17

45 C.F.R. § 262.7 (2006) ...............................................................................................3

45 C.F.R. § 305.34 (2006) .............................................................................................6

45 C.F.R. § 305.60 (2006) .............................................................................................6

45 C.F.R. § 305.61 (2006) ..........................................................................................2, 6

45 C.F.R. § 305.64 (2006) .............................................................................................6

45 C.F.R. § 305.66 (2006) ...................................................................................... passim

45 C.F.R. § 305.99 (1998) .............................................................................................4

45 C.F.R. § 305.100 (1998) ...........................................................................................4

## FEDERAL ADMINISTRATIVE PUBLICATIONS

*Child Support Enforcement Program; Incentive Payments, Audit Penalties; Proposed Rules,* U.S. Dep't of Health & Human Services, Admin. of Children and Families, 64 Fed. Reg. 55,074, 55,102 (Oct. 8, 1999)..............................................................4, 5, 18

*Child Support Enforcement Program; Incentive Payments, Audit Penalties; Final Rules,* U.S. Dep't of Health & Human Services, Admin. of Children and Families, 65 Fed. Reg. 82,178, 82,216 (Dec. 27, 2000) ........................................................................4

## FEDERAL ADMINISTRATIVE DECISIONS

*New Mexico Human Serv. Dep't*, DAB No. 1224 (1991)........................................................12

## MISCELLANEOUS

*TANF and Family Economic Success*, Am. Public Human Serv. Ass'n (2005)......................19

iii

## HEARING REQUESTED

Given the complexity of the statutory and regulatory framework at issue, the Plaintiffs believe that the decision-making of the Court would be significantly aided by oral presentations and arguments. Therefore, in accordance with Local Rule 7(f), the Plaintiffs request an oral hearing. *See* LCVR 7(f) ("A party may in motion or opposition request an oral hearing.").

## INTRODUCTION

Plaintiffs -- the agencies responsible for administering the Child Support Enforcement programs in the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island (collectively, "the States" or "the Plaintiffs") -- oppose the motion for summary judgment of Defendants, United States Department of Health and Human Services, Administration for Children and Families, and Michael O. Leavitt, Secretary of the United States Department of Health and Human Services (collectively, "ACF" or "the Defendants"), for the reasons set forth in Plaintiffs' own cross-motion. The States submit this memorandum in further support of that motion and in reply to the Defendants' motion, as follows.

## ARGUMENT

**I.    The Defendants' Interpretation of § 305.66 Does Not Give Meaning to All Parts of the Regulation, Ultimately Renders the Regulation Superfluous, and Contradicts the Clear and Longstanding Purpose of the Notice Requirement.**

The Defendants' interpretation of § 305.66 is grounded in a myopic view of the regulation, centered on the phrase "subject to a penalty as described in § 305.61" contained in subpart (a). If one were to focus exclusively on that phrase and nothing else in § 305.66, then it may be reasonable to conclude that ACF can deliver a "notice" commensurate with a final

penalty, without violating § 305.66. *Compare* 45 C.F.R. § 305.66(a) (stating that notice is required when a State is "subject to" a penalty), *with* 45 C.F.R. § 305.61 (describing when a state is "subject to" a penalty). But a regulation must be read as a whole, in light of its placement and purpose within a regulatory framework. *Cf. Acree v. Republic of Iraq*, 370 F.3d 41, 52 (D.C. Cir. 2004). To interpret a single clause "divorced from its surroundings" is to violate the "cardinal rule" that the meaning of statutory or regulatory language "depends on context." *Id.* (internal references omitted).

Section 305.66 does not end with subpart (a). Much depends on subpart (b), which sheds light on both the content and the timing of the notice described in subpart (a):

(b) The notice will:

(1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the *potential* penalty, and give reasons for the finding; and

(2) Specify that the penalty *will be* assessed in accordance with the provisions of 45 C.F.R. 262.1(b) through (e) and 262.7 *if* the State is found to have failed to correct the deficiency or deficiencies *cited in the notice* during the automatic corrective action year (i.e., the succeeding fiscal year following the year with respect to which the deficiency occurred.)

45 C.F.R. § 305.66(b) (emphases added). If the notice contemplated in § 305.66 were intended merely to announce a final penalty, there would be no need for the conditional words and phrases -- "potential penalty," "if," and "will be" -- that appear throughout subpart (b) of the regulation. Rather, subpart (b) would be written in conclusive terms, *e.g.*, "The notice will specify that the State *has been assessed* a penalty *because* it failed to correct deficiencies during the automatic corrective action year." That isn't what the regulation says, and ACF's discretion -- while it may be broad -- does not extend to rewriting rules, *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003), or ignoring those provisions that it finds inconvenient. *See Donnelly v.*

*FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005). Instead, the agency must strive "to give meaning to every clause and word." *Id.*

ACF's interpretation of § 305.66 does not give meaning to "every clause and word" of the regulation. It gives meaning to subpart (a), writes off subpart (b), and ultimately renders all of § 305.66 superfluous, because there already is a regulation that requires the ACF to give States notice of the imposition of a final penalty. *See* 45 C.F.R. § 262.7. There is no need -- or rationale -- for another one.

The Defendants' only answer to this point is that § 262.7 and § 305.66 call for "different scopes" of notice. *See* ACF Br. at 24, n.17. They offer no convincing rationale for why ACF would promulgate regulations under which a State would receive two contemporaneous notices, each describing the same, supposedly final penalty. Nor do they explain why one notice would be sent describing the "factual and legal basis for taking a penalty" (under § 262.7) and another describing the "deficiency" and "the reasons for the finding" (under § 305.66). Moreover, if the Defendants are correct that their reading of Section 305.66 is not redundant and that it contemplates a separate notice than that in Section 262.7, one would expect that the States in this case would have received both such "different scopes" of notice. They did not.

The States have the only sensible reading of § 305.66 as a whole, as confirmed by the text of the regulation, its purpose, and numerous statements in the regulatory preamble. *See* Pl. Opening Br. at 17-22. The notice required under § 305.66 is not a repeat of the final notice described in § 262.7, but is intended to warn a State of the risk or possibility of a penalty. *See id.* Moreover, the States' interpretation is consistent with how the IV-D penalty framework has operated for many years. As the Defendants concede, under the notice regulation that preceded

§ 305.66, "the Secretary provided advance notice to a noncompliant state that it had failed to satisfy its IV-D requirements and informed that state of its opportunity to enter a 'corrective action plan.'" ACF Br. at 23; *see also* 45 C.F.R. § 305.99 (1998). In amending the penalty statute in 1996, Congress simply took a discretionary "opportunity for corrective action" and replaced it with an "automatic corrective action year." *See* Pl. Opening Br. at 26; 42 U.S.C. § 609(a)(8)(A)(ii). There is no indication that in doing so, Congress intended to jettison ACF's longstanding practice of giving States "advance notice" of programmatic deficiencies while there was still time to pursue corrective measures. *See* 45 C.F.R. § 305.99 (1998).

Certainly, ACF did not express any intention to depart from past notice practices when it adopted the current 45 C.F.R. pt. 305. To the contrary, the agency expounded at length on the substantial degree of continuity between the old (§ 305.99) and the new (§ 305.66):

> In these regulations, we have relied heavily on the well-established, tested and experienced Federal audit process, which was used for penalties assessed under the former [penalty statute] and former part 305, to establish the new audit regulations. In fact, much of our language governing the audit process is taken *verbatim* from former part 305, particularly in sections dealing with the audit process, State responsibilities, definition of substantial compliance, and *notice* and assessment of the penalty.

65 Fed. Reg. 82,187 (final rule)(emphasis added). *See also* 65 Fed. Reg. 82,192 ("[s]imilar to the notice aspects of the former audit process at former § 305.99…."); 64 Fed. Reg. 55,092 (proposed rule) (same).

The fact that much of the language in the new penalty regulations was "taken verbatim" from the old regulations is further support for why § 305.66 cannot reasonably be given the meaning proffered by the Defendants. Under the former regulations, the Secretary "applied" a penalty and then "suspended" it while the State pursued corrective measures. *See* 45 C.F.R. §§ 305.99, 305.100 (1998). The term "subject to a penalty" as used in § 305.66(a) is a

carryover from the old application and suspension framework, and simply refers to the point at which the State becomes *at risk* of a penalty. *See, e.g.*, 45 C.F.R. § 305.42 ("There will be an automatic one-year corrective action period before any penalty is assessed. The penalties will be assessed and then suspended during the corrective action period."); *see also* 64 Fed. Reg. 55,090 (proposed rule)("A penalty would be applied when a State was determined not to meet a requirement, but the penalty would be suspended during the following year and applied only if the State failed to correct any identified deficiencies by the end of the corrective action year.").

The Defendant's argument that the phrase "subject to" in § 305.66(a) means that the penalty has already been incurred cannot be reconciled with the remainder of the regulation, the already existing regulation requiring final notice, or the regulatory history. The States' interpretation, by contrast, is faithful to all three, and finds additional support in the plain meaning of the phrase "subject to," which includes "contingent" or "liable to incur or receive." *See* Webster's New College Dictionary (2d ed. 1995). Indeed, ACF's own usage indicates that the agency interprets "subject to a penalty" as conditional, consistent with the Plaintiffs' interpretation. *See* Letter from D. Siegel, Acting Commissioner, OCSE to P. Wilson-Coker, Commissioner, Connecticut Department of Social Services (Dec. 8, 2004), DAB Docket No. A-06-76, Pl.'s Ex. 6, at 1 (attached hereto as Attachment A) ("This letter represents official Notice that, with respect to FFY 2003, your State is *subject to* a financial penalty. The penalty *will be imposed if*, for FFY 2004, the State failed to take sufficient corrective action....")(emphases added). It is just such a notice that ACF failed to provide here.

The fact that States have an obligation to monitor their compliance with IV-D performance measures and reporting requirements (ACF Br. at 30-34) does not relieve ACF of its own obligations, and it has many under the IV-D framework. Federal authorities perform the

5

audits, 45 C.F.R. §§ 305.60, 305.64, identify the deficiencies, 45 C.F.R. § 305.66, award the

incentives, 45 C.F.R. § 305.34, and impose the penalties, 45 C.F.R. § 305.61. The Defendants --

not the States -- drive the performance assessment and penalty process from beginning to end.  It

is anything but "self-implementing."

It is beside the point that "[t]here is simply no notice provision anywhere in 42

U.S.C. § 609(a)(8)."  ACF Br. at 21, n.14.  Section 609(a)(8) promises States a corrective action

year, and ACF determined that in order to implement that provision a State would receive notice

of when it was subject to a potential penalty.  Having chosen to implement the statute in this

way, the defendants must abide by their own rule.

All parties agree that the IV-D penalty statute suffers from a defect that denies the

States a full year in which take corrective action.  *See, e.g., The Secretary of Health and Human*

*Services Report to Congress on the Implementation of the Performance-Based Incentive System;*

*Final Report*, U.S. Dep't of Health and Human Services, Office of Child Support Enforcement

(2004), at 38, *available at* http://www.acf.hhs.gov/ programs/cse/pubs/2004/ reports/

final_incentive_study_overview.html (last visited June 20, 2006)("In the past two years, OCSE

has released its audit findings between March and July, which has left states with as little as three

months to correct any errors before they must submit data for the next fiscal year.").  Under the

circumstances, it is all the more critical for federal authorities to respect the few procedural

mechanisms that do exist to protect the States.

ACF's penalties cannot stand in light of its failure to live up to this clear -- and

hardly burdensome -- requirement.  *See Mine Reclamation Corp. v. FERC,* 30 F.3d 1519, 1524

(D.C. Cir. 1994)(internal references omitted)("[A]n agency's failure to follow its own

regulations is fatal to the deviant action.").

II.    **The Court Should Reject the Agency's Position that the Use of Different Standards to Assess the Reliability of Paternity Establishment Data Was Reasonable.**[1]

    *A.*    *The Use of Different Definitions of "Reliability" Is Not Justified.*

        The Defendants note that the statute "set up two different and equally acceptable ways for the States to measure whether they have met their PEP standard." *See* ACF Br. at 35. That observation, while correct, does not answer the question whether the statute permits two different standards to assess the reliability of data for the different PEP measures. It does not.

        There is no basis to the Defendants' statement that the "statute mandates that the data is reliable as 'found by the Secretary' in reference to the two different possible calculations for the PEP measurement." ACF Br. at 37. First, the definition of the term "reliable data" in Section 652(g)(2)(C) does not contain any "reference" to either the statewide PEP or the IV-D PEP: this subparagraph merely provides that the "the term 'reliable data' means the most recent data available which are found by the Secretary to be reliable for the purposes of this section." Moreover, the overall structure of Section 652(g)(2) contradicts the agency's argument that its differing standards of determining reliability are consistent with legislative intent. Section 652(g)(2)(A) and (B) define the terms "IV-D paternity establishment percentage" and "statewide

---

[1]    There is no merit to the Defendants' argument that Indiana cannot join the argument regarding ACF's use of different data reliability standards because the State did not raise this argument before the DAB. ACF Br. at 36 n.23. It is well-recognized that where one party raises arguments before an agency, the exhaustion doctrine does not prevent another party from pressing those same challenges on appeal, even where the second party did not raise the arguments below. *See Office of Communication of the United Church of Christ v. FCC*, 779 F.2d 702, 706 (D.C. Cir. 1985). One purpose of the exhaustion requirement is to allow the agency to consider arguments and apply its expertise in the first instance, to make a record for judicial review. *See Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 781-82 (D.C. Cir. 1984). Here, there is no question that the agency did just that, as Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island all argued to the DAB that ACF's use of different reliability standards was arbitrary and capricious. Indiana, which is similarly situated, is not prevented from joining the issue on appeal.

paternity establishment percentage," then subparagraph (C) defines the term "reliable data." If
Congress had intended to permit ACF to apply two different definitions of "reliable data" to
statewide and IV-D PEP data, it could have easily included separate references to or discussions
of reliability in the two subparagraphs dealing with IV-D PEP and statewide PEP. Instead,
Congress provided only one definition of "reliable data" that applies to both PEP measures. This
supports the States' argument that Congress intended the Secretary to apply the same definition
of reliability to both data sets.

      Contrary to the Defendants' suggestion, ACF Br. at 38, it is <u>highly</u> relevant that
every reference to "paternity establishment percentage" in the Act makes no distinction between
the IV-D and the statewide PEP indicators. While it is true that all States must meet the same
PEP levels no matter what PEP measure they choose, *see* ACF Br. at 38, a State's paternity
establishment percentage is not even calculated if the State's PEP data does not pass the
reliability audit, and that State is thus not entitled to receive an incentive payment. If States are
treated differently at the data reliability stage based on whether they selected the IV-D or
statewide PEP measure, it necessarily leads to differential treatment of the two measures when it
comes time to calculate the paternity establishment percentage, to determine which States met
the statutorily mandated PEP levels, and to impose penalties and receive incentives. This
uniformity of treatment refutes the agency's argument that, for purposes of defining reliability
(and only for those purposes), it can treat the States differently.

      In their opening brief, the States spent significant time pointing out the numerous
reasons why the justification offered by ACF and adopted by the Board for the use of different
definitions of "reliability" for IV-D and Statewide PEP did not rise to the level of the "cogent[]
explanation" that is required for this Court to defer to the agency's differential treatment of

similarly situated entities. *See* Pl. Opening Br. at 35-39. The Defendants do not directly address any of the States' arguments in its opposition brief, but instead merely reiterates the reasoning set forth in the DAB's decision as to why ACF could not count exclusion errors in the statewide PEP universe. *See* ACF Br. at 38-41. All of the agency's arguments simply miss the point: the States are not arguing that ACF must change its sampling methodology of statewide PEP data in order to identify exclusion errors, but that, if the agency is not going to count exclusion errors for statewide PEP States, it cannot impose a higher standard of reliability on IV-D PEP states.

In any event, counting exclusion errors in statewide PEP data, while it may be somewhat more onerous than the current methodology, is not impossible. For example, the Defendants claim that "the sources of the statewide data are mostly private entities and so it is not clear that ACF would be able to obtain access to these entities." ACF Br. at 39. But ACF would not even need to access these entities' records in order to conduct a meaningful sample of the statewide PEP universe for exclusion errors: all States keep records of registered births (both in-wedlock and out-of-wedlock), and these records could easily be sampled for exclusion errors. *See* Pl. Opening Br. at 36. Moreover, there is no need to determine if <u>every</u> out-of-wedlock birth in the statewide universe is properly reported. ACF Br. at 40-41. ACF's auditors could sample the statewide universe to determine exclusion errors just as they sample the IV-D PEP universe for these errors.

It is also disingenuous for the Defendants to argue that for ACF to identify exclusion errors for statewide data either a larger sample would be needed or, if the auditors established smaller samples of each of the multiple sources for the statewide data, a 'larger confidence interval' would result. ACF Br. at 41. The statewide PEP universe (which includes only children born out of wedlock) is in most States much <u>smaller</u> than the IV-D PEP universe

9

(which counts all children in the IV-D caseload, regardless of the parent's marital status). *See Office of Child Support Enforcement FY 2002 and 2003 Annual Report to Congress*, Table 51: Paternity Establishment for Two Years, *available at* http://www.acf.hhs.gov/programs/cse/pubs/ 2005/reports/annual_report/table_51.html (last visited June 20, 2006). Additionally, in measuring the reliability of IV-D PEP data, ACF uses similar sample sizes and the same confidence interval for every State, regardless of the size of its overall IV-D PEP universe. For example, even though Louisiana had 199,886 out-of-wedlock IV-D children in 2002 and Delaware had only a quarter of that number (48,550), *see id.*, the auditors reviewed 140 Line 5 cases in Louisiana and 129 Line 5 cases in Delaware and used a 95 percent confidence interval for both States. *See* JAR 725, 1086. If ACF really believed that a much larger data universe required a much larger sample size or a lower confidence interval, it would so instruct the auditors conducting the IV-D PEP data reliability audits.

The Defendants' strained attempt to reduce this issue to a question of sampling methodology and to use the States' argument that they were not challenging sampling methodology against them, *see* ACF Br. at 41-42, proves too much. The Board mentioned only in passing, in its description of the auditing methodologies for IV-D and statewide PEP data, that ACF's sampling technique for statewide PEP data did not allow it to determine that the State failed to include a child who should have been included. *See* JAR 34. Moreover, Plaintiffs' statement that they are not challenging ACF's sampling methodology arose in the States' discussion of prior Board decisions, cited by the Board in this case, where the States had challenged sample size or the use of samples altogether. *See* Pl. Opening Br. at 38. In contrast, the States here are not arguing that ACF should not use samples in assessing data reliability or that the samples it used were too small. For these reasons and for the reasons set forth in the

Plaintiffs' opening brief, ACF's purported rationale for counting exclusion errors only in IV-D

PEP data does not constitute the "cogent[] explanation" that is required for judicial deference.

      B.     *Even If It Was Permissible for ACF to Apply Different Standards, It Had an*
              *Obligation to So Notify the States.*

      Notably lacking from the Defendants' justification for its use of different

reliability standards is any evidence that these concerns were in fact what led it to adopt the

different auditing standards, or that it had communicated its decision to the States in any

meaningful way. All of the Defendants' arguments in defense of its lack of notice regarding the

different definitions of "reliability" in the context of IV-D and statewide PEP data must fail.

      First, by focusing on the issue of whether ACF should have conducted notice-and-

comment rulemaking, *see* ACF Br. at 43-47, the Defendants fundamentally misconstrue

Plaintiffs' argument about why ACF's notice was inadequate. The Plaintiffs have not argued

that the penalties must be overturned because ACF did not conduct notice-and-comment

rulemaking to adopt its "reliability" definitions. Instead, Plaintiffs have consistently argued

only that ACF had a duty to inform States that it counted exclusion errors only for IV-D PEP

data and not for Statewide PEP data in time for States to make an informed decision about which

PEP measure to use. *See* JAR 118, 137, 455, 465; Pl. Opening Br. at 32-34. Even if notice did

not come through formal notice-and-comment rulemaking, notice nonetheless was required in

some form -- either through publication in the *Federal Register* or through other communications

with the States -- in order for the States to be subject to penalties by ACF's use of different

definitions of "reliability." *See* 5 U.S.C. § 552(a)(1)(D) - (E) (requiring all "statements of policy

or interpretations of general applicability formulated and adopted by the agency" to be published

in the *Federal Register* and providing that parties cannot be "adversely affected by a matter

required to be published in the Federal Register and not so published," "except to the extent that a [State] has actual and timely notice of the terms thereof.").

The Defendants do not challenge that ACF's standards for assessing data reliability were "statements of policy or interpretations of general applicability" of which States must be given "actual and timely notice" if these standards were not published in the *Federal Register*. *See* ACF Br. at 45-46. In fact, the cases and Board decisions that the Defendants cite actually support the States' position that these reliability standards were in fact "statements of policy or interpretations of general applicability." In *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corporation*, 589 F.2d 658, 666 (1978), the D.C. Circuit determined that regulations specifying criteria that audits and auditors must fulfill were "general statements of policy." In that case, there was no allegation that the plaintiff did not have notice of the regulations, so 5 U.S.C. § 552(a)(1)(E) was not implicated. Similarly, in *New Mexico Human Services Dep't*, DAB No. 1224 (1991),[2] the Board concluded that sampling methodologies used by the Office of Child Support Enforcement ("OCSE") to audit States' child support enforcement and paternity establishment program were "general statements of policy or rules of agency procedure or practice, not legislative rules." Just as in *Guardian*, in *West Virginia* the State did not raise an argument that it had insufficient notice of the sampling methodologies.

---

[2]     The Defendants' citation to DAB No. 1221, ACF Br. at 46, appears to be a mistake: that decision involved a provider's exclusion from the Medicare and Medicaid programs, not OCSE's audit methodologies. *See Joyce Faye Hughey*, DAB No. 1221 (1991). In contrast, *New Mexico Human Services Department*, DAB No. 1224 (1991) does deal with whether OCSE's audit methodologies are subject to notice-and-comment rulemaking, citing the *Batterton* and *Guardian* cases.

The Defendants' suggestion that the *Guide for Auditing Data Reliability*, published in March 2002, gave States adequate notice of the different standards for assessing the reliability of IV-D and PEP data, *see* ACF Br. at 46, is unavailing. First, the only explanation of the varying standards that the *Guide* provides is contained in scattered text and footnotes. In its description of the auditing methodology for Lines 1, 2, 5, 6, 24, 25, 28, and 29 of the OCSE-157 Report (lines 5 and 6 are the source for data used in calculating the IV-D PEP), the *Guide* provides that the auditors will:

> 1. Match the selected sample cases with each audit trail provided by the state.
>
> 2. Review the matching cases for each line to see if they should have been reported on that line. If a case was included on a line but should not have been included, count it as an error.
>
> 3. Also review the cases to determine if they were excluded from any line being reviewed but should have been included. If incorrectly excluded, count that as an error.

JAR 642. On the previous page, in a <u>footnote</u> written in much smaller font, the *Guide* states:

> Information on lines 8 and 9 (the source for statewide PEP data) may come from a combination of sources including, Vital Statistics, IV-D, and other state agencies. Should this option be selected by the state, the auditors will select a random sample of 50 cases from each source to determine if cases from each source appear to be correctly included.

JAR 641 n.6. It is certainly questionable whether requiring States to determine from these few oblique references that ACF auditors counted both exclusion errors and inclusion errors for IV-D PEP data and only inclusion errors for statewide PEP data, instead of telling States outright of the differences and their implications, rises to the level of "actual" notice.

Even more importantly, this guide was published after all States had submitted their FFY 2001 data and halfway through the States' corrective action year. The Defendants' statement that the *Guide* was published before States had to submit data for 2002, ACF Br. at 46, is beside the point, because the PEP measure takes into account the number of children born out-

13

of-wedlock in the prior fiscal year. So if a IV-D PEP State that failed the data reliability audit for 2001 had not collected statewide data on the number of children born out of wedlock in 2001, it would not have been able to switch PEP measures and avoid a penalty upon the publication of the *Guide* in March 2002. As a result, the meager notice that ACF did give of its use of different reliability standards was far from "timely."

The Defendants' argument that the States did not raise a notice argument before the Board is confounding. *See* ACF Br. at 43-44. The record clearly establishes that that the States argued that ACF failed to give them sufficient notice of the different standards, the very same argument it has raised with the Court. *See* JAR 118 ("ACF did not live up to its partnership with the States when it failed to inform them that its auditors were instructed to use different protocols in assessing data reliability..."); JAR 137 ("The unsupported and unexplained application of differing methodologies undercuts the very purpose of the data reliability audits, which is to ensure that States are treated fairly..."); JAR 455 ("ACF failed to adequately inform the States that its auditors were holding States that reported their paternity establishment percentage ('PEP') using the IV-D caseload reporting measure to a higher standard of 'reliability' than States using a statewide measure."); JAR 465 ("ACF never explicitly stated anywhere that the auditing methodologies were different."). As a result, this issue was before the Board, and the Board clearly ruled on it. *See* JAR 39 ("The States have also not shown that they were entitled to prior notice of the different sample selection methodologies.").

The fact that the States now provide additional legal authority from the Administrative Procedure Act (5 U.S.C. § 552(a)(1)(D) - (E)) in support of their notice argument does not change the exhaustion analysis. The Defendants do not cite, nor can they cite, any case holding that in appealing an issue already decided by an agency, a party may rely only on the

14

exact same authorities and cases it relied on below. Such a rule would turn every case involving judicial review of agency action into an identical play-by-play rematch of the underlying agency action -- a most likely futile exercise for all parties and the Court. Thus, the Defendants' claim that the States failed to exhaust their administrative remedies on this issue is meritless.

In any event, the States are not precluded from raising the issue here. There is a well-recognized exception to the exhaustion requirement for issues that are strictly legal, because for those issues, "[n]o factual development or application of agency expertise will aid the court's decision[,] [n]or will a decision by the court invade the field of agency expertise or discretion." *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C. Cir. 1983); *see also Barlow v. Collins*, 397 U.S. 159, 166 (1970); *Atl. Richfield Co. v. United States Dep't of Energy*, 769 F.2d 771, 782 (D.C. Cir. 1984); *Ass'n of Nat'l Adver., Inc. v. FTC*, 627 F.2d 1151, 1157 (D.C. Cir. 1979); *West Virginia by McGraw v. U.S. Dep't of Health and Human Serv.*, Civ. Action No. 2:97-0245, 1999 U.S. Dist. LEXIS 20568 at *18-19 (S.D. W. Va. Mar. 31, 1999). Such an exception certainly applies here: whether an agency has complied with the "adequate and timely notice" requirement of the Administrative Procedure Act is a legal question upon which courts frequently rule, without the benefit of a prior agency ruling on the matter. *See, e.g., Herron v. Heckler*, 576 F. Supp. 218, 233 (N.D. Cal. 1983) (agency's failure to publish claims manual limitations in the *Federal Register* violated the APA); *Human Res. Mgmt., Inc. v. Weaver*, 442 F. Supp. 241, 247 (D.D.C. 1977) (finding that agency complied with APA because States were given "actual and timely notice" of agency procedures); *Dean v. Butz*, 428 F. Supp. 477, 480 (D. Haw. 1977) (finding that agency violated APA by not publishing letter that constituted policy of general applicability in the *Federal Register*). As a result, even if the States

did not raise this exact same notice argument below, nothing prevents this Court from deciding the issue.

Finally, the Defendants' arguments that the States have not shown they were prejudiced by ACF's application of two different definitions of "reliable data," ACF Br. at 47-48, simply miss the point. Although two more statewide PEP States than IV-D PEP states failed the data reliability audits in FFY 2001, all of the statewide PEP States that failed in FY 2001 and continued using the statewide PEP measure were able to improve the reliability of their data in the corrective action year and avoid a penalty. *See* JAR 1739. As a result, in the initial round of penalties at issue in this case, no State was assessed a penalty for the unreliability of statewide PEP data, but nine states were subject to a penalty as a result of the unreliability of their IV-D PEP data. *See* JAR 1739, 651. Moreover, the pattern of more IV-D PEP States than statewide PEP States failing the data reliability audit established in FFY 2002 continued in subsequent years. For FFY 2003, five IV-D PEP States did not meet the 95 percent reliability standard, in comparison to only one statewide PEP State. *See Performance Indicator Scores and Incentives Earned: Fiscal Year 2003*, Office of Child Support Enforcement (Oct. 21, 2004) (attached hereto as Attachment B). And for FFY 2004, three IV-D PEP States failed the data reliability audit, in comparison to only one statewide PEP state. *See Performance Indicator Scores and Incentives Earned: Fiscal Year 2004*, Office of Child Support Enforcement (Oct. 18, 2005) (attached hereto as Attachment C).

In addition, the IV-D States have shown that their "failures to have complete and reliable data were the result of the…methodology used by ACF." *See* ACF Br. at 48. Alabama, Hawaii, Louisiana, Rhode Island, and Indiana have all presented calculations that if ACF had counted only inclusion errors and not exclusion errors in the IV-D PEP data as it did for

16

statewide PEP data, they would have passed the data reliability audit in at least one year and would not have been subject to a penalty for unreliable data. *See* JAR 39-40 n.19; Pl. Opening Br. at 40. These States most certainly received a penalty as a direct result of the methodology used by ACF. Moreover, for every IV-D PEP State, ACF's failure to explain in advance that it was applying different reliability standards to IV-D and statewide PEP States caused them prejudice. If States had known at the start that ACF counted two types of errors in IV-D PEP data and only one type of error in statewide PEP data, it is possible that they would have chosen to use the statewide PEP measure from the beginning (or, in New Mexico's case, continued to use the statewide PEP measure) instead of the IV-D PEP measure. For these reasons, it is disingenuous for the Defendants to claim that ACF's arbitrary and capricious use of different auditing standards did not have a detrimental impact on States that, lacking full information, chose the IV-D PEP measure.

III.    **Plaintiffs Have Not Overstated the Total Fiscal Impact of ACF's Improper Action**.

The Defendants' assertion that the States have "double-counted" the impact of the penalties is incorrect. The federal statute under which the States were penalized provides that if the grant payable to a State is reduced due to penalty, "the State shall, during the immediately succeeding fiscal year, expend under the State program funded under this part an amount equal to the total amount of such reductions." 42 U.S.C. § 609(a)(12); *see also* 45 C.F.R. § 262.1(e) ("a State must expend additional State funds to replace any reduction in the SFAG resulting from penalties."). The structure of the penalty provision requires a State to lose a part of its federal TANF funding *and* replace the shortfall with additional State funds.

The language of the regulatory and legislative history reflects an intent that States bear the burden of such penalties. The provision was crafted to ensure that "States, not welfare recipients in need of assistance, lose funding," for failure to satisfy IV-D requirements. H.R.

Conf. Rep. No. 104-651, at 1359 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2418.  While

undoubtedly the penalty does make certain that "full resources" are available to meet the goals of

the TANF program, the net effect is a penalty with double consequences for the State.  *See* 64

Fed. Reg. 17,851.

Looking more closely at the "simple example" proffered by the Defendants (ACF

Br. at 49), it is apparent that their rationale fails to take into account the full fiscal reality faced

by the penalized States.  First, assume, as did the Defendants, that in a given fiscal year the State

is assessed a penalty for failure to satisfy statutory requirements of 1% on the $100 million

TANF funds it would normally receive. The State would receive only $99 million in TANF

funds in that year, a $1 million loss. If that reduction was in error, then in order to make the State

whole again, the State would be given the $1 million that was incorrectly taken away.  This type

of penalty provision is similar to that utilized by other federal programs, like the Medicaid

disallowance, whereby federal grant money reduced in error is returned to the State. *See* 42

C.F.R. § 430.42(d).

However, the first step alone does not fully explain the situation faced by the

Plaintiffs, because the TANF penalty provision has another step.  Assume next that a State is

forced, erroneously, to take its own money and pay a penalty.  In order to make the State whole

again, the State would receive the $1 million that it was incorrectly forced to pay.  That is the

situation the States face here.  The penalty is not limited to the simple loss of federal funds, but

also requires States to backfill that loss.  The States were forced to pay a penalty of $1 million

*and* to replace those funds with $1 million from elsewhere in the state budget.

The two penalties, if assessed separately would each require repayment of $1 million to the State. Here, they were assessed together, and the net effect of the penalty is twice the amount of the federal grant reduction.

Government officials and policy research organizations alike have recognized that the TANF penalty provision results in a double burden on the State. As explained by the American Public Human Services Association, a nonprofit, bipartisan organization of State and local human service agencies, "states face a strict double penalty for failure to meet the…requirement. Not only are states penalized for falling short of the requirement, but they must also expend an equivalent amount of state funds to make up for their shortfall." *TANF and Family Economic Success,* Am. Public Human Serv. Ass'n (2005), at 72, *available at* http://www.aphsa.org/Publications/Doc/crossroads2/TANF-and-Family-Economic-Success.pdf (last visited June 20, 2006).

Moreover, the State dollars used to replace the lost federal funds cannot be counted towards TANF's maintenance of effort ("MOE") requirement. *See* 42 U.S.C. § 609(a)(7). The former Governor of Wisconsin, Tommy Thompson, who later became Secretary of Defendant HHS, correctly noted that:

> [T]here is a double jeopardy in that states could be subject to significant penalties: first by the imposition of federal penalties; and second, by the requirement that state dollars used to replace the lost federal dollars to not count toward meeting the MOE requirements.

*National Problems, Local Solutions: Federalism at Work: Hearing Before the House Comm. on Government Reform,* 106th Cong. 21-22 (1999) (statement of Tommy G. Thompson, Governor, State of Wisconsin). The net effect of the penalty is therefore a cost of $2 to the State for every $1 in lost federal funds.

Given that the net impact of the penalty is a double loss to the State, the Plaintiffs are not, as Defendants assert, double counting or "trying to get a windfall," (ACF Br. at 49) but simply attempting to restore what was lost due to the erroneous penalties.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court GRANT their Motion for Summary Judgment and DENY the Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/_____
Caroline M. Brown (D.C. Bar No. 438432)
Joseph Zambuto Jr. (D.C. Bar No. 484542)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
*Attorneys for Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island*

DATED:  June 21, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2006, I caused the foregoing Memorandum of Points and Authorities in Opposition to Defendants' Cross-Motion for Summary Judgment and in Further Support of the Motion for Summary Judgment of Plaintiff Agencies of the States of Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, and Rhode Island to be served on the following counsel of record electronically by means of email and the district court's ECF system.

> Adam D. Kirschner
> MAILING ADDRESS
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> P.O. Box 883
> Washington, DC 20044
> DELIVERY ADDRESS
> 20 Massachusetts Ave, N.W.
> Room 7222
> Washington, DC 20001
>
> Maureen W. Zaniel
> Senior Assistant Attorney General
> District of Columbia Civil Enforcement Section
> Suite 450 North
> 441 4th Street, NW
> Washington, D.C. 20001

> /s/_____
> Joseph Zambuto Jr.
> *Attorney for Plaintiff Agencies of the States*
> *of Alabama, Delaware, Hawaii, Indiana,*
> *Kansas, Louisiana, New Mexico, and Rhode*
> *Island*

# Attachment A



DEPARTMENT OF HEALTH & HUMAN SERVICES

RECEIVED

DEC  8 2004

DEC 14 2004
CHILD SUPPORT UNIT
CENTRAL OFFICE

ADMINISTRATION FOR CHILDREN AND FAMILIES
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447

Ms. Patricia A. Wilson-Coker
Commissioner
Department of Social Services
25 Sigourney Street
Hartford, Connecticut 06106-5033

Dear Ms. Wilson-Coker:

Legislative enactments in 1996, 1997 and 1998 amended the child support provisions of the
Social Security Act (the Act) to establish new systems for measuring state performance and for
awarding financial incentives and assessing penalties based on that performance. Section
452(a)(4)(C)(i) of the Act requires audits to be conducted to assess the completeness, reliability
and security of the child support data, and the accuracy of the child support reporting systems
used in calculating performance indicators under sections 452(g) and 458 of the Act. Under
section 409(a)(8)(A)(i)(II) of the Act and 45 CFR 305.61(a)(1) and (2), a financial penalty is
assessed when data submitted to calculate these performance measures are determined to be
incomplete or unreliable as determined by a data reliability audit (DRA) or if the calculated
performance level for paternity establishment (PEP), support order establishment, or current
collections fails to achieve a specified level of performance.

On August 19, 2004, the State of Connecticut received a Data Reliability Audit (DRA) report on
its child support data that was submitted for Federal Fiscal Year (FFY) 2003. The DRA was
conducted pursuant to 45 CFR 305.60. This report indicated that data for determining Paternity
Establishment did not meet the 95 percent data reliability standard needed to establish data as
being complete and reliable under 45 CFR 305.1(i). The DRA report set forth the reasons the
data did not meet the 95 percent standard for the Paternity Establishment measure. Accordingly,
based on the results of that audit, your State has been determined not to have complete and
reliable data for FFY 2003 and is therefore subject to a penalty.

This letter represents official Notice that, with respect to FFY 2003, your State is subject to a
financial penalty that will be assessed against the State's Temporary Assistance for Needy
Families (TANF) block grant. The penalty will be imposed if, for FFY 2004, the State failed to
take sufficient corrective action to assure that the PEP data submitted for FFY 2004, or used to
calculate the FFY 2004 PEP, met the data completeness and data reliability standards, or if the
State failed to achieve the appropriate performance level for the paternity establishment measure.
Under section 409(a)(8)(A)(i)(II) of the Act and 45 CFR 305.61(a)(1) and (2), if a state is
determined as a result of a DRA to have submitted incomplete or unreliable data for any of the
five performance measures identified in 45 CFR 305.2, or if the state fails to achieve the level of

Page 2 - Ms. Patricia A. Wilson-Coker

performance required on any of the three penalty performance measures identified in 45 CFR 305.40 for a fiscal year, there is an automatic corrective action year. For paternity establishment data reliability or performance failure occurring in FFY 2003, the statutory corrective action year was FFY 2004. Only one corrective action year will be provided to the State with respect to any failures relating to the paternity establishment measure. A second consecutive paternity establishment measure failure, i.e. either a data reliability or a performance failure for FFY 2004, will result in the assessment of the penalty. We expect to complete FFY 2004 DRAs by July 2005. Please note that the State may need to submit corrected FFY 2003 data (or prior years' data) in order for the State's FFY 2004 PEP to be determined complete and reliable or in order for the State to meet the required level of performance based on improvement over the prior year's performance.

If, based on the results of the DRA and the State's performance for the corrective action year (FFY 2004), the State either fails to have complete and reliable data or fails to meet the performance standard for the paternity establishment measure identified in this Notice, the penalty will be assessed (unless the noncompliance is determined to be of a technical nature which does not adversely affect the determination of the performance measures or the performance of the program) and the State will receive a penalty letter. The amount of the penalty would be equal to one percent of the adjusted State Family Assistance Grant (SFAG) for the TANF program for FFY 2003. The penalty amount for the failure cited in this Notice would be $2,401,093 (one percent of the adjusted SFAG for FFY 2003).

If imposed, the one percent penalty to the adjusted SFAG for FFY 2003 will be assessed quarterly, beginning with the first quarter of FFY 2006, for the four quarters of FFY 2005. The penalty will continue until the State is determined to have achieved the level of performance required and to have submitted complete and reliable data. The penalty will be assessed in accordance with the provisions of 45 CFR 262.1(b) through (e), which govern the assessment of multiple penalties in a fiscal year, the maximum penalty of 25 percent of a state's TANF grant for any quarter, and the timing of TANF grant reductions where the 25 percent limit prevents full recovery during a quarter. In addition, under those provisions, the State must expend additional state funds equal to the amount of the penalty (which will not count toward the maintenance-of-effort requirement under TANF) the year after the TANF penalty is assessed.

The penalty will continue for a second consecutive year if the State fails to have complete and reliable data or fails to meet the required performance level for the measure identified in this Notice during FFY 2005 and will result in an increase of the penalty to not less than two nor more than three percent of the adjusted SFAG for FFY 2003 under the TANF program. A third consecutive penalty taken for a failure in FFY 2006 will increase the amount of the penalty to not less than three nor more than five percent of the FFY 2003 adjusted SFAG.

As stated above, when FFY 2004 DRA reports are completed, those states that incur the penalty will receive a penalty letter. Upon receipt of that letter, the state may appeal the decision to impose the penalty to the Departmental Appeals Board, in accordance with 45 CFR 262.7. We will also write to notify states if the FFY 2004 DRA shows that the FFY 2003 data reliability

Page 3 - Ms. Patricia A. Wilson-Coker

problems have been corrected and the 2004 data show that the required performance level for FFY 2004 is met and the state will not have to pay a penalty.

I recognize that, under the current statute, states do not have a full year to correct deficiencies following the release of final DRA reports. I have been discussing a possible solution with those working on the TANF reauthorization bill. In September 2003, the Senate Finance Committee approved a bill which would amend the Federal statute to provide that states have a full year for corrective action following notice of a failure. However, unless the new Congress enacts a bill that includes this change, I have no recourse but to comply with the current statute and to proceed with the current penalty process. In any case, states were notified in the final rule published in the Federal Register on December 27, 2000 (65 FR 82189) that they are expected to continually monitor progress toward meeting the performance standards during the course of the year. Additionally, the final rule indicated that states should continuously monitor the completeness and reliability of their data so that they will be able to take appropriate action during the statutorily designated corrective action year.

If you have any questions, please do not hesitate to contact me.

Sincerely,

David H. Siegel
Acting Commissioner
Office of Child Support Enforcement

cc: The Honorable Jodi Rell, Governor of Connecticut
    Kevin Loveland, Director, Division of Family Services
    Diane Fray, Director, Bureau of Child Support Enforcement
    Hugh Galligan, Regional Administrator, Region I

# Attachment B

**OFFICE OF CHILD SUPPORT ENFORCEMENT**
**Performance Indicator Scores and Incentives Earned**
**Fiscal Year 2003**

| States | Percent of paternity established | | Percent of support orders established | Percent of current support collected | Percent of arrearage collections | Cost effectiveness ratio | Total incentives earned |
|---|---|---|---|---|---|---|---|
| | IV-D | Statewide | | | | | |
| Alabama | 69.97 | | 69.73 | 49.95 | 48.74 | $3.78 | $4,001,595 |
| Alaska | | 94.64 | 82.84 | 55.70 | 67.64 | 4.24 | 2,140,882 |
| Arizona | 71.60 | | 63.17 | 43.15 | 50.84 | 4.47 | 5,065,465 |
| Arkansas | 86.03 | | 78.96 | 58.28 | 56.09 | 3.12 | 3,146,484 |
| California | | 105.93 | 76.35 | 45.20 | 55.43 | 2.31 | 45,258,302 |
| Colorado | | 101.18 | 83.66 | 55.16 | 60.54 | 3.22 | 4,920,924 |
| Connecticut | NR | | 65.29 | 54.76 | 54.52 | 4.04 | 3,942,741 |
| Delaware | NR | | 70.47 | 60.66 | 64.76 | 3.03 | 970,247 |
| Dist. of Col. | | 63.87 | 31.94 a/ | 49.71 | 36.98 a/ | 2.09 | 491,354 |
| Florida | | 89.39 | 68.79 | 56.40 | 64.57 | 4.39 | 22,545,490 |
| Georgia | | 94.97 | 70.14 | 51.01 | 63.60 | 4.47 | 10,453,125 |
| Guam | NR | | 49.89 a/ | 44.60 | 45.81 | 2.10 | 60,339 |
| Hawaii | | 100.64 | 59.77 | 51.27 | 40.26 | 5.08 | 1,588,312 |
| Idaho | 100.82 | | 77.94 | 53.87 | 59.18 | 5.70 | 2,216,477 |
| Illinois | | 95.34 | 46.75 b/ | 47.04 | 51.44 | 2.64 | 7,166,179 |
| Indiana | NRP | | 75.09 | 50.54 | 54.79 | 7.91 | 5,552,522 |
| Iowa | | 94.95 | 88.63 | 60.02 | 63.36 | 5.52 | 7,220,705 |
| Kansas | | 81.48 | 68.27 | 55.30 | 61.96 | 3.12 | 3,105,801 |
| Kentucky | 82.18 | | 72.37 | 53.63 | 50.67 | 4.88 | 7,954,630 |
| Louisiana | 78.80 | | 68.47 | 56.87 | 59.76 | 5.11 | 6,130,392 |
| Maine | 99.20 | | 89.99 | 55.67 | 59.57 | 4.99 | 2,556,766 |
| Maryland | | NR | 68.84 | 63.18 | 62.36 | 4.53 | 6,537,765 |
| Massachusetts | | 86.53 | 73.93 | 60.90 | 60.44 | 5.46 | 9,958,854 |
| Michigan | | 85.96 | 72.91 | 55.70 | 58.99 | 4.79 | 27,371,576 |
| Minnesota | 84.94 | | 79.56 | 69.87 | 68.03 | 4.05 | 13,492,130 |
| Mississippi | 66.79 | | 49.62 a/ | 51.98 | 58.86 | 7.50 | 2,482,905 |
| Missouri | | 85.49 | 79.48 | 52.67 | 50.82 | 4.95 | 8,653,176 |
| Montana | 103.29 | | 84.09 | 59.05 | 64.32 | 3.63 | 1,155,004 |
| Nebraska | | 88.06 | 77.87 | 66.26 | 59.34 | 3.22 | 3,089,869 |
| Nevada | NR | | 53.46 | 40.90 | 61.21 | 3.12 | 1,293,543 |
| New Hampshire | 99.28 | | 81.22 | 64.27 | 72.21 | 4.72 | 1,982,008 |
| New Jersey | | 98.07 | 79.54 | 65.01 | 65.64 | 5.06 | 17,895,131 |
| New Mexico | NR | | 51.99 | 48.96 | 63.22 | 1.57 a/ | 672,821 |
| New York | | 90.02 | 75.84 | 64.75 | 59.84 | 5.00 | 30,829,027 |
| North Carolina | 90.97 | | 76.35 | 61.79 | 58.42 | 4.99 | 12,209,075 |
| North Dakota | 95.07 | | 85.70 | 71.35 | 68.79 | 5.10 | 1,264,209 |
| Ohio | | 95.15 | 71.38 | 67.25 | 66.30 | 4.80 | 30,351,415 |
| Oklahoma | | 92.58 | 70.80 | 48.44 | 57.39 | 3.12 | 3,056,022 |
| Oregon | | 93.57 | 68.58 | 59.86 | 61.59 | 5.60 | 6,336,173 |
| Pennsylvania | | 101.43 | 81.47 | 74.81 | 71.49 | 6.80 | 29,533,145 |
| Puerto Rico | | 90.31 | 64.66 | 52.59 | 52.38 | 5.67 | 3,463,489 |
| Rhode Island | NRP | | 52.34 | 61.76 | 57.16 | 4.63 | 962,198 |
| South Carolina | 78.77 | | 70.73 | 49.22 | 51.33 | 6.32 | 3,928,609 |
| South Dakota | 99.16 | | 94.06 | 67.11 | 69.21 | 7.80 | 1,660,526 |
| Tennessee | | 78.83 | 60.33 | 53.75 | 57.29 | 5.47 | 7,716,005 |
| Texas | | 112.09 | 75.70 | 57.65 | 62.30 | 5.63 | 36,825,204 |
| Utah | | 90.30 | 84.89 | 58.65 | 65.78 | 4.13 | 3,493,011 |
| Vermont | 96.11 | | 87.55 | 65.78 | 69.85 | 3.78 | 1,086,334 |
| Virgin Islands | | 78.63 | 54.93 | 53.07 | 46.20 | 1.84 a/ | 99,488 |
| Virginia | | 82.95 | 82.91 | 59.72 | 57.49 | 6.52 | 11,431,758 |
| Washington | 98.53 | | 91.01 | 64.33 | 68.86 | 4.54 | 14,675,136 |
| West Virginia | | 88.18 | 81.09 | 62.81 | 59.35 | 4.54 | 4,209,015 |
| Wisconsin | 97.92 | | 80.27 | 67.73 | 62.02 | 5.95 | 15,632,872 |
| Wyoming | | 82.30 | 86.50 | 60.86 | 63.18 | 5.57 | 1,163,775 |
| **Total** | **83.82** | **96.21** | **72.27** | **58.04** | **59.84** | **$4.32** | **$461,000,000** |

NR - The State did not meet the 95% federal reliability standard for FY 2003 calculation.
NRP - The State did not meet the 95% federal reliability standard for FY 2002. This is needed in the denominator.
a/ - Did not meet minimum performance level.
b/ - Achieved a 5% increase in performance level compared to last year.

10/21/2004

# Attachment C

## OFFICE OF CHILD SUPPORT ENFORCEMENT
### Performance Indicator Scores and Incentives Earned
### Fiscal Year 2004

| States | Percent of paternity established | | Percent of support orders established | Percent of current support collected | Percent of arrearage collections | Cost effective-ness ratio | Total incentives earned |
|---|---|---|---|---|---|---|---|
| | IV-D | Statewide | | | | | |
| Alabama | 73.72 | | 73.05 | 51.26 | 50.00 | $3.95 | $3,923,947 |
| Alaska | | 91.82 | 86.82 | 55.49 | 66.63 | 4.50 | 1,934,767 |
| Arizona | 74.75 | | 68.80 | 42.68 | 50.50 | 4.42 | 4,992,036 |
| Arkansas | 88.21 | | 79.87 | 55.34 | 57.40 | 3.88 | 3,361,187 |
| California | | 117.76 | 78.13 | 47.96 | 54.94 | 2.12 | 43,917,140 |
| Colorado | | 108.72 | 84.73 | 55.51 | 64.93 | 3.55 | 4,833,238 |
| Connecticut | NR | | 67.63 | 54.54 | 55.02 | 3.20 | 3,455,259 |
| Delaware | 74.13 | | 72.05 | 60.29 | 64.30 | 3.01 | 1,265,209 |
| Dist. of Col. | | 64.34 | 34.92 a/ | 51.22 | 42.33 | 3.14 | 597,907 |
| Florida | | 92.46 | 70.03 | 56.75 | 65.75 | 4.50 | 25,086,327 |
| Georgia | | 81.64 | 71.13 | 51.88 | 59.12 | 4.67 | 10,574,394 |
| Guam | NR | | 50.11 | 46.66 | 47.52 | 2.26 | 80,188 |
| Hawaii | | 87.90 | 58.66 | 53.09 | 42.84 | 8.70 | 1,566,788 |
| Idaho | 94.87 | | 78.55 | 55.68 | 56.46 | 5.94 | 2,335,547 |
| Illinois | | 106.57 | 51.50 | 49.25 | 58.22 | 3.22 | 8,440,244 |
| Indiana | 79.52 | | 70.54 | 51.04 | 56.19 | 7.04 | 7,080,909 |
| Iowa | | 96.10 | 86.96 | 62.18 | 66.12 | 5.59 | 7,247,439 |
| Kansas | | 86.61 | 73.00 | 54.38 | 62.30 | 3.15 | 3,306,309 |
| Kentucky | 89.45 | | 75.85 | 54.70 | 51.34 | 5.95 | 7,627,918 |
| Louisiana | 78.81 | | 71.29 | 55.93 | 58.53 | 5.04 | 5,878,940 |
| Maine | 101.05 | | 90.31 | 56.57 | 59.75 | 4.35 | 2,339,228 |
| Maryland | | NR | 73.77 | 61.79 | 62.10 | 4.57 | 5,478,845 |
| Massachusetts | | 85.86 | 74.42 | 62.64 | 58.81 | 4.88 | 9,168,115 |
| Michigan | | 86.11 | 74.96 | 60.21 | 55.60 | 5.42 | 29,072,933 |
| Minnesota | 98.78 | | 81.00 | 69.53 | 66.00 | 4.10 | 13,048,434 |
| Mississippi | 74.47 | | 52.13 | 52.79 | 58.22 | 7.96 | 3,246,021 |
| Missouri | | 88.89 | 80.70 | 53.33 | 51.59 | 5.40 | 10,525,886 |
| Montana | 104.98 | | 85.25 | 58.40 | 63.53 | 3.94 | 1,061,120 |
| Nebraska | | 90.56 | 78.92 | 67.37 | 64.62 | 3.63 | 3,635,367 |
| Nevada | NR | | 59.78 | 51.11 | 51.44 | 3.31 | 1,355,443 |
| New Hampshire | 100.04 | | 80.98 | 64.54 | 71.83 | 5.27 | 1,803,991 |
| New Jersey | | 106.27 | 79.63 | 64.92 | 63.34 | 4.89 | 16,335,761 |
| New Mexico | 56.85 | | 53.92 | 49.42 | 61.22 | 1.87 a/ | 970,705 |
| New York | | 90.25 | 80.15 | 64.75 | 59.08 | 4.31 | 26,298,854 |
| North Carolina | 93.32 | | 78.85 | 62.72 | 61.02 | 5.01 | 12,807,092 |
| North Dakota | 100.85 | | 86.59 | 72.02 | 67.35 | 5.37 | 1,542,418 |
| Ohio | | 102.59 | 71.58 | 67.88 | 66.34 | 5.46 | 30,840,835 |
| Oklahoma | | 104.62 | 69.54 | 48.60 | 57.51 | 3.64 | 3,437,279 |
| Oregon | | 84.38 | 67.48 | 59.29 | 61.19 | 6.17 | 5,956,034 |
| Pennsylvania | | 101.38 | 84.05 | 74.37 | 70.97 | 7.01 | 26,532,361 |
| Puerto Rico | | 95.90 | 65.47 | 53.84 | 53.56 | 7.88 | 3,273,456 |
| Rhode Island | 74.75 | | 52.53 | 61.92 | 58.94 | 5.01 | 1,270,822 |
| South Carolina | 82.28 | | 71.17 | 48.39 | 49.21 | 7.00 | 3,605,396 |
| South Dakota | 103.31 | | 93.73 | 68.29 | 68.76 | 7.49 | 1,517,780 |
| Tennessee | | 81.24 | 63.92 | 54.71 | 59.17 | 5.16 | 7,766,731 |
| Texas | | 103.47 | 79.83 | 58.54 | 63.54 | 5.95 | 35,018,030 |
| Utah | | 84.41 | 85.25 | 59.82 | 65.20 | 4.08 | 3,677,929 |
| Vermont | 97.53 | | 88.08 | 66.12 | 70.39 | 4.22 | 1,197,334 |
| Virgin Islands | | 83.91 | 54.85 | 53.24 | 47.93 | 1.83 a/ | 105,718 |
| Virginia | | 86.98 | 83.54 | 60.04 | 57.42 | 6.33 | 10,673,373 |
| Washington | 96.82 | | 89.69 | 62.87 | 67.17 | 4.52 | 13,445,851 |
| West Virginia | | 87.52 | 82.82 | 62.85 | 58.86 | 4.42 | 3,775,411 |
| Wisconsin | 100.15 | | 81.92 | 67.64 | 64.26 | 5.91 | 14,529,242 |
| Wyoming | | 86.89 | 88.33 | 60.79 | 64.11 | 5.16 | 1,180,509 |
| **Total** | **85.65** | **98.91** | **74.37** | **58.99** | **59.87** | **$4.38** | **$454,000,000** |

NR - The State did not meet the 95% federal reliability standard for FY 2004 calculation.
a/ - Did not meet minimum performance level.

10/18/2005