## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES, et al | ) ) ) | |
| Plaintiffs, | ) ) | 1:05CV2098 (RJL) |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION MEMORANDUMS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

<u>Of Counsel</u>
LINDA GRABEL
Assistant Chief Counsel
Children, Families, and Aging Division
Office of the General Counsel
U.S. Department of
Health and Human Services

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney for the District of Columbia

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch

_/s/_____
ADAM D. KIRSCHNER
Trial Attorney, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C., 20044
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.  Plaintiffs ignore the entire regulatory and statutory scheme in arguing that
their reading of 45 C.F.R. § 305.66 is the only correct reading of the regulation ............. 2

II.  The DAB properly concluded that ACF's auditing methodologies for
determining data reliability were consistent with the statutory and regulatory
guidelines ................................................................................................................. 10

    A.  ACF Used One Definition for Data Reliability ................................................... 10

    B.  Defendants should not be prejudiced by plaintiffs' failure to argue to
the DAB that ACF violated 5 U.S.C. § 552 ........................................................ 15

    C.  Indiana should not be permitted to bootstrap onto the arguments raised
by the other plaintiffs that it did not raise in its separate appeal to the DAB ...... 22

III.  Plaintiffs are attempting to seek a windfall by double counting the fiscal impact of the
penalties imposed upon them ........................................................................................ 25

CONCLUSION .................................................................................................................. 27

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

Bartholdi Cable Co. Inc. v. FCC, 114 F.3d 274 (D.C. Cir. 1997) ............................................... 19

Dean v. Butz., 428 F.Supp. 477 (D. Haw. 1977) ......................................................... 18

Guardian Federal S & L v. Federal S & L Ins. Corp., 589 F.2d 658 (D.C. Cir. 1978) ........ 20, 21

Herron v. Heckler, 576 F.Supp. 218 (N.D. Cal. 1983) ........................................................ 17, 18

Human Resources Management, Inc. v. Weaver, 442 F.Supp. 241 (D.D.C. 1977) ................... 18

McKart v. US, 395 US 185 (1969) ........................................................................ 17

Office of  Communication of the United Church of Christ v. FCC, 779 F.2d 702
        (D.C. Cir. 1985) ....................................................................................... 23

R.R. Yardmasters of America v. Harris, 721 F.2d 1332 (D.C. Cir. 1983) ................................ 17

Sims v. Apfel, 530 U.S. 103 ..................................................................................... 16, 17

State of Ohio, Department of Human Services, 789 F.Supp. 1395 (S.D. Ohio 1992) .............. 18

Thomas Jefferson v. Shalala, 512 U.S. 504 (1994) ...................................................... 2

UDC Chairs Chapter, American Ass'n of Univ. Professors v. Board of Trustees of the
        Univ. of the District of Columbia, 56 F.3d 1469 ........................................... 24

Washington Ass'n for Television & Children [WATCH] v. FCC, 712 F.2d 677
        (D.C. Cir. 1983) .................................................................................... 23

Woodford v. Ngo, ___ S.Ct. ___, 2006 WL 1698937 (June 22, 2006) ...................................... 24

## STATUTES

5 U.S.C. § 552(a)(1)(D)-(E) ................................................................................ passim

42 U.S.C. 603(h) ................................................................................................. 9

42 U.S.C. § 609(a)(12) ......................................................................................... 25, 26

42 U.S.C. § 609(c)(4) ................................................................ 8

42 U.S.C. § 610(b)(2) ................................................................ 4, 18

42 U.S.C. § 610(c)(2) ................................................................ 3, 19

42 U.S.C. § 652(g)(1) ................................................................ 22

42 U.S.C. § 652(g)(2) ................................................................ 22

42 U.S.C. § 652(g)(2)(C) ........................................................... 11

## RULES AND REGULATIONS

45 C.F.R. §§ 262.1 (b)-(e) ......................................................... 6

45 C.F.R. § 262.1(d) ................................................................. 6

45 C.F.R. § 262.1(e) ................................................................. 25

45 C.F.R. § 262.7 ................................................................ <u>passim</u>

45 C.F.R. § 305.1(i) ................................................................. 12

45 C.F.R. § 305.42 ................................................................. 8

45 C.F.R. § 305.60 ................................................................. 6, 9

45 C.F.R. § 305.61 ................................................................. 3, 4, 6

45 C.F.R. § 305.64 ................................................................. 6, 10

45 C.F.R. § 305.66 ................................................................ <u>passim</u>

45 C.F.R. § 305.99 ................................................................. 8, 9

64 Fed. Reg. 55,090 ................................................................ 8

65 Fed. Reg. 82,192 ................................................................ 7

## ADMINISTRATIVE DECISIONS

<u>New Mexico Human Svcs. Dep't</u>, DAB No. 1224 ................................................. 20, 21

## <u>MISCELLANEOUS</u>

<u>Merriam-Webster's Collegiate Dictionary</u> 1243 (11 ed.) (2003) ........................................... 5, 14

<u>The New Shorter Oxford English Dictionary</u> 3686 ...................................................................... 5

## INTRODUCTION

Plaintiffs repeat the same arguments they made in their last brief, but this time using material outside the administrative record. Once again, they ignore the statutory and regulatory regime to argue that 45 C.F.R. § 305.66 can be read only as a warning notice provision as opposed to the more plausible reading that its purpose is to inform the states that they will receive a penalty. Again, they disingenuously argue that the Administration for Children and Families ("ACF") used two different definitions for reliable data. In truth, ACF relied on one definition. Because the statute allows the states to choose between two different data universes to calculate their performance levels, ACF had to use different sampling methodologies for those distinct data universes to ensure that the states met their requirement to submit reliable data.

In their auditing methodology argument, plaintiffs also try again to get around the fact that they forgot to raise the issue of ACF not giving notice pursuant to 5 U.S.C. § 552(a)(1)(D)-(E) before the Departmental Appeals Board ("DAB"). If defendants had had an opportunity to respond to this argument before the DAB, they would have been able to put forth evidence that refutes it. However, because the issue was not raised (and therefore is not addressed in the administrative record), defendants were deprived of that opportunity. Plaintiffs should not be given another bite at the apple, particularly considering that Congress specifically established an administrative adjudicative process for a state appealing a reduction in its Temporary Assistance for Needy Families ("TANF") block grant. Defendants should not be prejudiced by plaintiffs' decision to bypass the administrative process in asserting this claim. Similarly, one of the plaintiffs, Indiana, even admits it never raised the general auditing methodology argument to the DAB but asks this Court to consider it a party for purposes of raising this claim. Again, defendants should not be prejudiced by an attempt to bypass the administrative process. Finally,

plaintiffs use more faulty logic and bad math to make the same argument that the total fiscal impact of their being assessed a penalty is twice the actual amount.

**ARGUMENT**

I.    **Plaintiffs ignore the entire regulatory and statutory scheme in arguing that their reading of 45 C.F.R. § 305.66 is the only correct reading of the regulation**

The Departmental Appeals Board ("DAB") did not contravene the plain meaning of 45 C.F.R. § 305.66 when it ruled that "the regulation <u>did not require</u> ACF to notify the States of their FY 2001 failures prior to or during FY 2002, the corrective action year." <u>See</u> Joint Administrative Record ("JAR") at 12 (emphasis added); <u>see also</u> <u>Thomas Jefferson v. Shalala</u>, 512 U.S. 504, 512 (1994) (a court's "task is not to decide which among several competing interpretations best serves the regulatory purpose") (citation and internal quotation marks omitted).  Plaintiffs rest their entire argument on the arrogant notion that they "have the only sensible reading of § 305.66."  <u>See</u> Plaintiffs's Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment ("Pl Reply") at 3.  ACF's reading of § 305.66 is a more plausible interpretation of the regulation because it is consistent with the relevant regulatory and statutory provisions.  Even if that were not the case, there can be no genuine argument that ACF's interpretation was plainly erroneous -- the standard plaintiffs must meet to overturn the challenged interpretation.  <u>See</u> <u>Thomas Jefferson v. Shalala</u> at 512 ("the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (citation and internal quotation marks omitted).

Plaintiffs are even inconsistent in how they interpret the regulation.  They argue that the regulation is a warning notice but they contradict their previous argument of when such a

-2-

warning should occur.  In their Memorandum in Support of Summary Judgment ("Pl Mem"),

plaintiffs argue that ACF's letter arriving "thirteen months after the corrective action year had

expired" is a "warning in the same way that a punch in the face is a warning to duck."  See Pl

Mem at 18.  They argue that for the warning to "be any use at all, it must arrive before the end of

the corrective action year."  Id.  Plaintiffs now cite to a letter from ACF, which is outside of the

administrative record,[1] to give an example of a proper warning letter.  See Pl Reply at 5 (arguing

that the notice ACF gave in a December 8, 2004 letter "is just such a notice that ACF failed to

provide here").  However, ACF sent this "ideal" letter, addressing the state's failings for 2003, in

December of 2004.  The letter arrived well after the end of the corrective action year, which ran

from October 1, 2003 until September 30, 2004.  Applying plaintiffs' desired outcome to their

own analogy, their "favored" reading allows them to be punched in the face and then told to

duck in the same way as defendants' interpretation.

        ACF was not required to send the notice letter before the end of the corrective action year

because the plain language of the regulation, along with the regulatory and statutory scheme,

does not suggest that 45 C.F.R. § 305.66 is meant to be a warning notice provision.  Section

305.66 does not apply until a state is found "to be subject to a penalty as described in § 305.61."

45 C.F.R. § 305.66(a).  Plaintiffs acknowledge that § 305.61 "describe[s] when a state is 'subject

to a penalty.'"  See Pl Reply at 2.  The definition of "subject to a penalty" in § 305.61 makes it

---

[1]Plaintiffs attach three exhibits to their Opposition and Reply brief that are outside the administrative record.  None of these exhibits should be considered.  The statute explicitly states that in a review of a final decision of the Departmental Appeal Board in the Department of Health and Human Services the district court "shall review the final decision of the Board on the record established in the administrative proceeding. . .  The review shall be on the basis of the documents and supporting data submitted to the Board."  42 U.S.C. § 610(c)(2) (emphasis added).  Plaintiffs' attempt to violate this statutory mandate by asking this Court to review documentation beyond that contemplated by Congress is, therefore, improper.

clear that it does not occur until after the end of the corrective action year.  That provision explains that a state is subject to a penalty, and its TANF grant "will be reduced in accordance with § 305.66," only after a state failed to submit reliable data or meet its performance measures during one fiscal year "**and (2) [w]ith respect to the immediately succeeding fiscal year**, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable." 45 C.F.R. § 305.61(a) (emphasis added).  Plaintiffs reading of the language "subject to" in 45 C.F.R. 305.66 contradicts their own proposition that "a regulation must be read as a whole, in light of its placement and purpose with a regulatory framework."  Pl Reply at 2.  Section 305.66 specifically refers to 45 C.F.R. § 305.61 for the definition of when a state is subject to a penalty and that regulation specifically defines that a state is subject to a penalty only after a state has had data reliability or performance failings during the corrective action year.[2]  Furthermore, the general

---

[2]Plaintiffs attach the ACF letter from December 8, 2004, which is not part of the administrative record and never submitted to the DAB, to argue that ACF understands "subject to" as being conditional.  Because the letter is outside the administrative record and is an attempt to violate the statutory mandate that the district court to "review" the DAB decision only "on the basis of the documents and supporting data submitted to the Board," 42 U.S.C. § 610(b)(2), ACF has never had an opportunity to submit documentation to explain the use of "subject to" in that letter.  ACF should not be prejudiced for attempting to accommodate to the states' demands for form over substance, and to prevent an onslaught of further litigation by states making the same formalistic (and legally baseless) arguments as plaintiffs do here, by sending this pro forma notice letter.  See, infra, at 9-10 (showing that plaintiffs had a duty to monitor their own performance and that ACF already put plaintiffs on notice during the corrective action year, through the issuance of draft and final Data Reliability Audits reports, of any data reliability problems).  Nevertheless, that letter certainly does not suggest that ACF had previously incorrectly interpreted 45 C.F.R. § 305.66.  In fact, both the letters at issue in this case and the letter that plaintiffs attach inform the states that a penalty will be imposed if they had not taken sufficient corrective action or had failed to submit reliable data during the corrective action year.  Compare JAR at 663 ("Alabama failed for a second consecutive year to demonstrate with reliable data the specified minimum level performance in PEP or to improve over the previous year's performance" and, therefore, "Alabama will receive the penalty for the FFY 2001 performance") (emphasis added) with Pl Reply, Attachment 1 ("[t]he penalty will be imposed if, for FFY 2004, the State failed to take sufficient corrective action") (emphasis added).

notice provision concerning any penalty being assessed against a TANF grant has the same

reading of the term. <u>See</u> 45 C.F.R. § 262.7 (HHS will "formally notify the Governor and the

State agency of an <u>adverse action</u> (i.e., the reduction in the SFAG) within five days <u>after we</u>

<u>determine</u> that a State is <u>subject to a penalty</u>") (emphasis added). Section 262.7 obviously

indicates that a state is "subject to a penalty" only after there is <u>definitely</u> an adverse action, as

opposed to when there is just the possibility of an adverse action. There is no definite adverse

action for a state failing to meet its PEP levels, or failing to submit reliable data, until the end of

the corrective action year.

Besides relying on selective dictionary definitions for the term "subject to" instead of the

regulation's own definition, plaintiffs also argue that certain phrases in 45 C.F.R. § 305.66

suggest that the term is meant to be conditional. <u>See</u> Pl Reply at 5 (defining "subject to" as

"contingent or "liable to incur or receive") <u>but</u> <u>see</u> <u>Merriam-Webster's Collegiate Dictionary</u>

1243 (11 ed.) (2003) (defining "subject to" in part as "to make liable"). Defendants have already

extensively addressed this argument. <u>See</u> Defendants' Memorandum in Support of Defendants'

Cross-Motion for Summary Judgment ("Defs Mem") at 25-27. Plaintiffs repeat their argument

that the terms "will" and "potential penalty" mean that the notice must be prior to the end of the

corrective action year. <u>See</u> Pl Rely at 2-3; <u>see also</u> Pl Mem at 17-21. As defendants have

explained in detail, the term "will" is intended to refer to actions that are mandatory and is

consistent with the way the word is used throughout the regulations. <u>See</u> Defs Mem at 25-26

(quoting <u>The New Shorter Oxford English Dictionary</u> 3686 (Lesley Brown ed.) (1993) (defining

the word "will in part as "[i]ntention or determination that what one wishes or ordains be done

---

Neither letter gives states any additional time to correct their noncompliance, which is based on
conduct that already occurred in the corrective action year that had ended before the letter was
sent.

by another or others")); <u>see also</u> 45 C.F.R. § 305.60(a) ("OCSE will conduct audits"); 45 C.F.R. § 305.61(a) ("[a] State will be subject to a penalty . . . [i]f on the basis" of data submitted it fails to submit complete and reliable data or meet program requirements); 45 C.F.R. § 305.64(a) ("Federal auditors will hold an exit conference"). With regard to the inclusion of term "potential penalty" in the regulation, the DAB explained that it is "likely attributable to its incorporation" of 45 C.F.R. §§ 262.1 (b)-(e) and 262.7. <u>See</u> Defs Mem at 26-27; <u>see also</u> JAR at 14. The notice of a penalty could refer to a potential penalty because the penalty is conditioned on the other TANF penalty requirements. <u>See</u>, <u>e.g.</u>, 45 C.F.R. § 262.1(d) (mandating that the "total reduction in an affected State's quarterly SFAG amount must not exceed 25 percent"); <u>see also</u> Defs Mem at 26-27.

    Plaintiffs ignore the structure of 45 C.F.R. § 305.66 and then argue that ACF's interpretation of the regulation "writes off subpart (b), and ultimately renders all of § 305.66 superfluous." <u>See</u> Pl Reply at 3. Plaintiffs have avoided addressing defendants' explanation of how each subpart of § 305.66 is part of the regulation's general requirement that ACF must notify a state when that state's child support enforcement program is found to be in noncompliance for two consecutive years, and that in this notice ACF must give the reasons for such a finding. As defendants have already explained, "the regulation merely details what is required of the Secretary to give proper notice to a state that has failed to meet certain program or data requirements and is being assessed a penalty." <u>See</u> Defs Mem at 24-25. The regulation requires the notice to describe the basis for the penalty, the failures that resulted in the penalty, the fact that the penalty is assessed in accordance with the other TANF penalty provisions, and the details of the appeals process. <u>See</u> <u>id.</u>; <u>see also</u> 45 C.F.R. § 305.66(b). The rest of the regulation describes the circumstances in which the Secretary would assess a penalty. <u>See</u> Defs

Mem at 24-25; see also 45 C.F.R. § 305.66(c)-(e).  The notice must be an explanation for the penalty, not a warning that a penalty is to be assessed against a state's TANF grant unless that state meets a certain condition.

The notice requirements of § 305.66 are not redundant to those contained in § 262.7.  Section 305.66 is directed only at the child support enforcement programs but § 262.7 applies to any "reduction in the SFAG."  See Defs Mem at 24 n.17.  One can think of § 305.66 as a subset of § 262.7.  The notice requirements under § 305.66 are very specific to the child support enforcement program so that any description to ACF's findings, specifically the explanation of the areas the state were deficient, is a more detailed version of § 262.7's requirement that the notice must give the "factual and legal basis for taking the penalty."  In addition, § 262.7 is directed at giving a state notice of its appeal rights as opposed to § 305.66's concern that a state be informed of the "deficiency or deficiencies which result in the State being subject to a penalty."  See 45 C.F.R. § 262.7, "How can a State appeal our decision to take a penalty?"; see also 65 Fed. Reg. 82,192 (preamble to 45 C.F.R. § 305.66 describing that the reference in 45 C.F.R. § 305.66 to Part 262 is to indicate that "the imposition of a penalty is subject to certain limitations, appeals and replacement of funds requirements specified in sections 409 and 410 of the [Social Security Act]") (emphasis added).  ACF did not need to send two different notices because it incorporated § 262.7 by reference in the November 14, 2003, letters it sent to the states.  See, e.g., JAR at 663 (ACF's November 14, 2003, notice letter to Alabama informing Alabama that it "may appeal the penalty to the Departmental Appeals Board within 60 days after receiving this letter, in accordance with 45 CFR 262.7").  Therefore, those November 14, 2003, letters met both the detailed requirements of 45 C.F.R. § 305.66, by informing the states of the

reasons ACF was assessing them a penalty, and the general requirements of § 262.7, by notifying the states of their appeal rights.

ACF's obligation under § 305.66 to inform a state of ACF's rationale for finding that state subject to a penalty is consistent with what was required under the previous regulatory regime. The notice under § 305.99, which was replaced by § 305.66, "applied a penalty and [gave] reasons for the Secretary's findings." See 45 C.F.R. § 305.99(b)(1) (1998). Plaintiffs are incorrect that notice under § 305.99 was a warning notice. Instead, § 305.99 gave notice that a penalty was being assessed and informed the state that the penalty would be suspended if the state chose to enter into a corrective compliance plan.[3] See id. at (b)(3) (the notice specified "that the penalty may be suspended if the State meets [certain] conditions"). The main difference between § 305.66 and § 305.99 is that the statutory regime that § 305.66 operates under does not permit a state to enter into a corrective compliance plan for failing to meet its child support enforcement program requirements. See 42 U.S.C. § 609(c)(4) (specifically excluding child support enforcement programs from such plans) ; see also Defs Mem at 22-23; District of Columbia's Opposition to Defendant's Cross Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof ("DC Reply") at 2 (admitting that the "law is clear such a [corrective compliance plan] is not contemplated"). The permissibility of a corrective compliance plan meant that in the previous statutory regime a state had some form of advance notice of its failures before having its TANF funding reduced. That is no longer

---

[3]Plaintiffs cite to 45 C.F.R. § 305.42 and 64 Fed. Reg. 55,090 as support that the current regulatory regime uses the same "suspension framework" as the old regime. See Pl Reply at 4-5. However, 45 C.F.R. § 305.42 applied only to the year when the new penalty regime was being phased in and 64 Fed. Reg. 55,090 was a proposed, not final, rule. There is no language in 45 C.F.R. § 305.66 to indicate that ACF is to give notice of a suspended penalty.

the case because, under the current statute, Congress specifically excluded child support

enforcement programs from such plans. [4]

Plaintiffs admit that the states "have an obligation to monitor their compliance with IV-D

performance measures and reporting requirements." See Pl Reply at 5.  This obligation is

consistent with the idea that the entire system of performance measures is self-implementing.

See 65 Fed. Reg. 82,192 ("the State should not wait or rely upon the Secretary's determination

of a data or a performance deficiency in order to begin corrective action").  Even though the

entire system is self-implementing, ACF has to conduct audits to verify that the data submitted

by the states are complete and reliable.  See 45 C.F.R. § 305.60.  After ACF identifies that a state

has been deficient for two consecutive years, it has an obligation to inform the state of the reason

that state is subject to a penalty.  See 45 C.F.R. § 305.66.  That obligation does not extend to

ACF having to warn each state at some point during the corrective action year that the state

might receive a penalty if it does not take sufficient corrective action.  That would be highly

formalistic because ACF is already required to send the states Data Reliability Audit (DRA)

reports, which have the effect of notifying the states during the corrective action year of any data

_____

[4]Plaintiffs once again selectively quote from the preamble to make their point that §
305.99 and § 305.66 are supposed to be similar for all aspects.  See Pl Reply at 4 (selectively
quoting 65 Fed. Reg. 82,192 as referencing that 45 C.F.R. § 305.66 is "[s]imilar to the notice
aspects of the former audit process at former § 305.99"); see also Pl Mem at 21 (same).
Unfortunately, defendants have to repeat that the entire language of the preamble reads,
"[s]imilar to the notice aspects of the former audit process at former § 305.99, paragraph (a) [of
§ 305.66] requires that, if the Secretary, on the basis of the results of an audit or review, finds a
State to be subject to a penalty, OCSE will notify the State in writing of such finding."  65 Fed.
Reg. 82,192 (emphasis added); see also Defs Mem at 23 n. 15.  The difference is § 305.66 is
operating in a regime in which a penalty is not assessed until two consecutive years of failure,
but § 305.99 operated in a regime in which a penalty would be assessed for one year of failure
and then "suspended if the State [met] the conditions" of the corrective action plan.  See 45
C.F.R. 305.99(b)(3) (1998); see also 42 U.S.C. 603(h) (1984) (repealed by PRWORA § 103, 110
Stat. at 2112 (1996)); see also Defs Mem at 23 n. 15.  Nevertheless, in both regimes the notice is
not sent until a state has actually met the criteria for imposition of a penalty.

reliability problems.  See 45 C.F.R. § 305.64 (requiring ACF to send the states draft and final

DRA reports); see also Plaintiffs' Statement of Undisputed Facts ¶¶ 8-10 (stating that ACF's

Office of Child Support Enforcement generally provides draft audit reports during the late spring

and final audits reports during the summer of the corrective action year); JAR at 19 (DAB

explaining that plaintiffs "had time periods ranging from four to seven months following release

of the FY 2001 DRA reports, and six to eight months after release of the draft reports, to correct

any problems that may have caused their FY 2001 data to be found unreliable);  Defs Mem at

32-34.

        The DAB properly determined that ACF reasonably interpreted its own regulation.  For

plaintiffs to prevail, form would have to prevail over substance.  Plaintiffs desire that 45 C.F.R. §

305.66 be read as a formal warning notice provision, but that would just mean that the states

receive similar information they receive in the draft and final Data Reliability Audits.  In

contrast to plaintiffs' assertion that their reading of the regulation is the only proper way to read

it, ACF reasonably interpreted the regulation to mean that ACF has to give a state notice that it

has become subject to a penalty for two consecutive performance or data reliability failings.

## II.     The DAB properly concluded that ACF's auditing methodologies for determining data reliability were consistent with the statutory and regulatory guidelines

### A.     ACF Used One Definition for Data Reliability

        Plaintiffs are correct that "Congress provided only one definition of 'reliable data' that

applies to both PEP measures."  See Pl Reply at 8.  However, plaintiffs are incorrect to assert

that ACF used two different definitions.  See id. at 8, 9 (plaintiffs arguing that the "use of

different definitions of 'reliability' is not justified" and that Congress did not "intend to permit

ACF to apply two different definitions of 'reliable data' to statewide and IV-D PEP data").

Instead of using a different definition of reliability for a IV-D state than what it used for a statewide state, ACF employed two different methodologies to "audit data from obviously different universes." JAR at 39 (DAB decision). As the DAB explained, "this is not a situation where an agency applied different interpretations of what constitutes a data error to different states for the same data universe." See JAR at 39; see also Defs Mem at 42.

The differences in the number of different sources of data for the IV-D and statewide universes meant that the auditors were able to use a sampling methodology for the IV-D universe that identified inclusion and exclusion errors as opposed to being able only to use a sampling methodology for the statewide universe that enabled the auditors to identify just the inclusion errors. See Defs Mem at 38-42 (discussing the differences in sampling methodology). This is because the source of data for the IV-D universe is drawn from "the caseload of a state's IV-D agency and thus the underlying records are readily available to that agency" but the source of data for the statewide universe "comes from a multiplicity of sources, rendering it difficult to audit underlying records at the sources." See JAR at 38 (DAB explaining the difference in the sampling methodologies). In addition, the fact that the data for a IV-D universe is drawn from the IV-D caseload "enables the auditors to determine if the state has failed to report any data that should have been reported." Id. This is very different than what would be required for the auditors to identify exclusion errors for statewide data because for that data "the auditors would have to examine a sample of the underlying records from each source not only for the data that were reported on the OCSE-157, but for similar data that were not reported." Id.

The statute gives broad discretion to the agency to determine what constitutes reliable data. See 42 U.S.C. § 652(g)(2)(C) ("the term 'reliable data' means the most recent data

available which are found by the Secretary to be reliable for purposes of this section"). The

regulation's definition of reliable data is a little more specific but, again, it gives the agency

discretion over the determination of whether reliable data had been submitted. See 45 C.F.R. §

305.1(i) ("[t]he term reliable data, means the most recent data available which are found by the

Secretary to be reliable and is a state that exists when data are sufficiently complete and error

free to be convincing for their purpose and context.  State data must meet a 95 percent standard

of reliability").  For both statewide and IV-D data, ACF used a 95 percent standard of reliability.

See JAR at 33 ("ACF calculates reliability based on the findings for the sample using a 95%

confidence interval, and data are deemed reliable if the upper bound of the confidence interval

equals or exceeds 95%, the reliability standard.") (emphasis added).

　　　　To calculate whether each state's data met the 95% reliability standard, ACF had to

devise sampling methodologies that adequately corresponded to each distinct data universe.

Plaintiffs gloss over defendants' explanation for why it was necessary for the auditors to use the

specific sampling methodologies that are used for the statewide data and the IV-D data.  See

Defs Mem at 38-42.  Plaintiffs claim that they are "not arguing that ACF must change its

sampling methodology of statewide PEP data."  Pl Reply at 9.  Instead, they chastise defendants

for not "directly address[ing] any of the States' arguments" for ACF's alleged "differential

treatment of similarly situated entities."  Id at 8-9.  However, as defendants have already

explained, ACF "is not treating two similarly situated entities differently."  See Defs Mem at 42.

A state that chooses to use statewide data to calculate its PEP is not similarly situated to a state

that chooses to use IV-D data.  It is impossible for ACF to use the same sampling methodology

to calculate the reliability of the data because the very definition of what constitutes the data is different.

Plaintiffs mischaracterize the DAB's decision and continue to equate the difference in sampling methodologies with a difference in the definition of data reliability. For example, plaintiffs assert that the "Board mentioned only in passing, in its description of the auditing methodologies for IV-D and statewide PEP data, that ACF's sampling technique for statewide PEP data did not allow it to determine that the State failed" to account for exclusion errors. See Pl Reply at 10 (citing DAB decision, JAR at 34). In fact, the DAB's entire analysis and explanation of why ACF was "reasonable in its choice of audit methodology for assessing the reliability of Statewide PEP data" rested on the difference between the two databases from which the samples were derived. See JAR at 39. The DAB stated, "we conclude that the States that selected the IV-D PEP are not entitled to have their exclusion errors disregarded merely because the audit samples of Statewide PEP data did not permit identification of exclusion errors." JAR at 40; see also JAR at 38 (DAB discussing ACF's "reasonable rationale for choosing a methodology for auditing Statewide PEP data different from its methodology for auditing IV-D PEP data" by comparing the differences in the "source of data" for the two universes).

Defendants have already explained in detail why it was proper for ACF to use the sampling methodologies it used for the IV-D and statewide data universes. See Defs Mem at 39-41. Even plaintiffs admit that "it may be somewhat more onerous" for ACF to count exclusion errors for statewide data. See Pl Reply at 9. As the DAB explained, "the purpose of using sampling is to get a reliable result while keeping the burden on the auditors and the entity being

-13-

audited to a minimum." JAR at 38. Plaintiffs have not shown that it would be even possible, let alone not onerous, for the auditors to check for exclusion errors in statewide data. First, they cite no authority in their briefs to this Court, nor is there any evidence in the administrative record, for the proposition that "all States keep records of registered births (both in-wedlock and out-of-wedlock)." See PL Reply at 9. Second, plaintiffs do not explain how "ACF's auditors could sample the statewide universe to determine exclusion errors." Id. By contrast to the IV-D universe, where supporting or underlying data is maintained by the IV-D agency, the underlying records of statewide data are not readily available to ACF auditors. See JAR at 38.

Even if it were possible to audit the "underlying records" at the "multiplicity of sources" that make up the statewide data, it "would have entailed examination of a substantially larger data universe and either the selection of a correspondingly larger sample or the use of a larger confidence interval to account for the relatively larger universe." See JAR at 38 (DAB decision). This larger sample would be necessary because ACF would have to sample from each of the statewide sources, as opposed to being able to use one sample from the defined IV-D universe. The alternative would be to take small samples from each statewide source, but that would create a larger confidence interval and the greater possibility of finding inaccurate data reliable, especially considering that ACF uses the "upper bound of the 95% confidence interval." See JAR at 38. Plaintiffs assert that "ACF uses similar sample size and the same confidence interval for every State, regardless of the size of its overall IV-D PEP universe." See Pl Reply at 10. It is true that ACF uses a 95 percent confidence level regardless of the size of the overall PEP universe, but the parameters for the confidence interval depends on the size of the sample and the size of the universe. See Merriam-Webster's Collegiate Dictionary 1243 (11 ed.) (2003)

-14-

(defining confidence interval as a range of values "that is used to estimate a statistical parameter

(as a mean or variance) and that tends to include the true value of the parameter a predetermined

proportion of the time if the process of finding the group of values is repeated a number of

times").

Plaintiffs are trying to shirk their responsibility to submit reliable data.  They have never

argued that they have submitted reliable data.  Instead, they argue that ACF should have ignored

the obvious errors it identified for the IV-D states because other states chose a different data

universe to calculate their PEPs.  This difference resulted in the need for ACF to use a different

auditing methodology under which ACF was not able to detect certain errors of exclusion that

may have been made by these other states.

**B.     Defendants should not be prejudiced by plaintiffs' failure to argue to the
        DAB that ACF violated 5 U.S.C. § 552**

Plaintiffs never raised before the DAB the issue of whether ACF violated 5 U.S.C. §

552(a)(1)(D)-(E).  Instead of raising such an argument, plaintiffs made only vague allegations

before the DAB to ACF having acted arbitrary and capriciously by not explaining to the states

that ACF auditors would use different sampling methodologies for different data universes.  <u>See</u>,

<u>e.g.</u>, <u>See</u> JAR at 465 (plaintiffs arguing to the DAB that "the fact that [ACF] never expressly

communicated [the rationale of using different methodologies] to the States would make its

differential treatment arbitrary and capricious"); JAR at 137 (plaintiffs expressing concern that

ACF's alleged "unsupported and unexplained application of differing methodologies undercuts

the very purpose of the data reliability audits, which is to ensure that States are treated fairly");

JAR at 138 (plaintiffs desiring notice of the different auditing methodologies so that the states

would have an opportunity to "opt to use the statewide formula").  These vague general assertions do not present a claim concerning 5 U.S.C. § 552(a).  That statutory provision requires a very specific type of notice; it requires all "statements of general policy or interpretations of general applicability formulated and adopted by the agency" to be published in the Federal Register unless the party affected has "actual and timely notice."  See 5 U.S.C. § 552(a)(1)(D)-(E).

ACF responded to the general assertions by explaining that "[n]o explanation of the differences in methodology was necessary because the differences arise solely from the nature of the audit universe."  See JAR at 255.  The DAB found ACF's arguments persuasive.  As explained above, the DAB found that ACF presented a "reasonable rationale for choosing a methodology for auditing Statewide PEP data different from its methodology for auditing IV-D PEP data."  See JAR at 38.  As for whether ACF needed to give the states prior notice of the differences in the methodology, the DAB pointed out that "[t]he States cite no authority showing a right to prior notice of different sample selection methodologies."  See JAR at 39.  Because plaintiffs never made the argument to the DAB that the use of different methodologies was a "general statement of agency policy," neither ACF nor the DAB had an opportunity to respond to that argument.  ACF could have argued, and the DAB could have found persuasive, that the use of different sampling methodologies is not a general agency policy that requires notice and, in any case, each state actually received notice of the sampling methodology the auditors used for that state.

The policies underlying the doctrine of issue exhaustion demand that plaintiffs' notice argument under  5 U.S.C. § 552(a)(1)(D)-(E) be deemed to have been waived.  See Sims v. Apfel, 530 U.S. 103, 109 ("courts require administrative issue exhaustion as a general rule

-16-

because it is usually appropriate under an agency's practice for contestants in an adversary

proceeding before it to develop fully all issues there").   A party can be exempted from the

requirements of issue exhaustion when the policies underlying this burden would not be served

by its application.  See McKart v. US, 395 US 185, 200 (1969) (exempting a defendant from

requirement of issue exhaustion where "there appears no significant interest to be served in

having the [agency] decide the issue before it reaches the courts").   Chief among these policy

rationales for issue exhaustion -- in addition to allowing the opposing party an opportunity to

address arguments in the first instance administratively -- are that the agency should be allowed

to exercise its discretion, apply its expertise, and develop a factual record.  See R.R. Yardmasters

of America v. Harris, 721 F.2d 1332, 1338 (D.C. Cir. 1983) ("judicial review might be hindered

by the failure of the litigant to allow the agency to make a factual record, exercise its discretion,

or apply its expertise").

Plaintiffs misleadingly cite several cases for the proposition that courts frequently rule on

compliance with the "adequate and timely notice" requirement of the APA without the benefit of

a prior agency ruling.  See Pl Reply at 15.  They first cite Herron v. Heckler, 576 F.Supp. 218

(N.D. Cal. 1983), which involved a dispute over social security benefits.  Such disputes are not

adversarial proceedings and, therefore, the rationale for requiring issue exhaustion is much

weaker.  See Sims v. Apfel, 530 U.S. 103, 110 ("[w]here the parties are expected to develop the

issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring

issue exhaustion is at its greatest. Where, by contrast, an administrative proceeding is not

adversarial, we think the reasons for a court to require issue exhaustion are much weaker.")

(internal citations omitted).  Furthermore, the Herron court ruled on the newly raised notice

argument because the defendant had not raised the "exhaustion element in any of the briefs filed

-17-

in support of her summary judgment motion or in opposition to plaintiff's class certification motion." See Herron, 57 F.Supp. at 227. Plaintiffs also cite Human Resources Management, Inc. v. Weaver, 442 F.Supp. 241 (D.D.C. 1977), but that is similarly misleading. The Court in that case was considering whether to grant a temporary restraining order or preliminary injunction to the Small Business Administration to prevent it from terminating the plaintiffs' participation in one of its programs. Again, there was no adjudicative process from which the plaintiffs were appealing. Furthermore, the Court ordered that the "action be stayed pending exhaustion of plaintiffs' administrative remedies." Id. at 249. The final case plaintiffs cite is Dean v. Butz. 428 F.Supp. 477 (D. Haw. 1977), but that case also did not involve an appeal from an agency adjudicatory proceeding.

The present case is very different from the ones plaintiffs cite. First, it involves an appeal of a decision from an impartial review board, one in which Congress specifically designed to adjudicate matters based on a complete record. See 42 U.S.C. § 610(b)(2) ("[i]n deciding whether to uphold an adverse action or any portion of such an action, the [DAB] shall conduct a through review of the issues and take into account all relevant evidence"). Second, just as in State of Ohio, Department of Human Services, 789 F.Supp. 1395, 1401 (S.D. Ohio 1992), the "appropriate time for plaintiff to have raised its APA rulemaking claim relating to audit methodology was during the extensive proceedings leading to the Board's issuance of [its decision]." See Defs Mem at 44 (discussing State of Ohio, in which the district court found Ohio had not exhausted the issue of whether Office of Child Support Enforcement audits were invalid because the agency had not engaged in informal rulemaking concerning its audit methodology). Finally, the question of whether plaintiffs were entitled to notice under 5 U.S.C.

§ 552(a)(1)(D)-(E), and whether they received such notice, cannot be answered in a vacuum without relying upon the agency's expertise and a development of the factual record. Plaintiffs vague references to the DAB that "ACF did not live up to its partnership with the States when it failed to inform them that its auditors were instructed to use different protocols in assessing data reliability" or that "ACF never explicitly stated anywhere that the auditing methodologies were different" are insufficient to have put the issue before the DAB. See Pl Reply at 14. A "petitioner [] has the burden of clarifying its position before the agency." Cf. Bartholdi Cable Co. Inc. v. FCC, 114 F.3d 274, 280 (D.C. Cir. 1997) (finding an affidavit and a footnote insufficient to having preserved an argument) (citation and internal quotation marks omitted).

If given the opportunity before the DAB, ACF would have had been able to put forth evidence that the states had actual notice of the sampling methodologies the auditors used. ACF should not be prejudiced because ACF is bound by what is in the administrative record. See 42 U.S.C. § 610(c)(2) (the district court shall "review the final decision of the Board on the record established in the administrative proceeding"). This Court should not now go beyond the administrative record (or require the DAB to reopen the record) to allow plaintiffs to raise arguments or claims that were available but not asserted before the DAB. For example, ACF never had an opportunity to present the 2000 Data Reliability Audits reports to the DAB. The DAB could have found that those reports gave each state sufficient notice of the sampling methodology the auditors used for that state's data universe. The DAB may even have found that there was evidence that the states had notice of the difference in the methodologies, although that in itself is not a general agency policy. Even the question of whether the difference in methodologies is a general statement of policy is a matter in which an agency's

expertise would have aided the discussion.  As the DAB once explained, it "consider[s] OCSE's audit methodologies to be a means for gathering evidence about whether a state has achieved substantial compliance."  <u>New Mexico Human Svcs. Dep't</u>, DAB No. 1224.  The agency would be best equipped to decide if a state being aware of how another state's data was being audited would help that state attain  substantial compliance with the regulations and statute.

In their new notice argument, plaintiffs focus solely on the argument that the states were entitled to notice under 5 U.S.C. § 552(a)(1)(D)-(E).  <u>See</u> Pl Reply at 14 ("the States now provide legal authority from the Administrative Procedure Act ( 5 U.S.C. § 552(a)(1)(D)-(E)) in support of their notice argument").  However, even in their latest discussion, they do not explain how the differences in sampling methodology amount to a general statement of policy entitled to such notice.  They cite to the same cases to which defendants had cited for the proposition that plaintiffs were not entitled to notice and comment.  <u>See</u> Pl Reply at 12; Defs Mem at 45-46; <u>see also</u> Guardian Federal S & L v. Federal S & L Ins. Corp., 589 F.2d 658 (D.C. Cir. 1978); <u>New Mexico Human Svcs. Dep't</u>, DAB No. 1224 (1991).  Plaintiffs argue that these cases "support the States' position that these reliability standards were in fact 'statements of policy or interpretations of general applicability.'"  <u>See</u> Pl Reply at 12.  However, plaintiffs admit that no argument was ever raised in those cases over whether the plaintiff had actually received notice of the sampling methodologies.  <u>See</u> Pl Reply at 12 (acknowledging that in both cases "the State did not raise an argument that it had insufficient notice of the sampling methodologies").  Furthermore, those cases addressed the question of whether an agency's auditing methodology was a general statement of policy, not whether an agency using different sampling methodologies for different data universes is itself a general statement of policy.  <u>See Guardian</u>

<u>Federal S & L v. Federal S & L Ins. Corp.</u>, 589 F.2d at 666 ("[w]hat remains of the challenged regulations are the provisions that specify the criteria that audits and auditors must fulfill in order to produce an audit report" in a satisfactory manner); <u>New Mexico Human Svcs. Dep't</u>, DAB No. 1224 (plaintiff raised an argument "that the sampling methodologies were invalid because they had not been promulgated as a rule under the APA"). Plaintiffs do not cite any authority for the proposition that an agency must give one party notice of how a differently situated party is treated so that the original party has an opportunity to circumvent the system.

Plaintiffs cannot even show that they were prejudiced by not receiving notice. First, as the DAB pointed out, plaintiffs have never "argue[d] and have not shown that their PEP data would have met the data reliability standard if they had selected the Statewide PEP measure." <u>See</u> JAR at 39 (DAB decision); Defs Mem at 47 (same). Second, plaintiffs' submission of documentation outside of the administrative record contradicts their argument that "[i]f States had known at the start that ACF counted two types of errors in IV-D PEP data and only one type of error in statewide PEP data, it is possible that they would have chosen to use the statewide PEP measure from the beginning." <u>See</u> Pl Reply at 17. Apart from the factual error in plaintiffs' assertion that ACF declined to even count identified exclusion errors for statewide data, plaintiffs own extra-record evidence shows that of all the states that claim to have been prejudiced by the different methodologies only Hawaii changed its PEP data source once the plaintiffs were concedingly made aware of the difference. <u>See</u> Pl Reply, Attachments 2 and 3 (2003 and 2004 Performance Indicators showing that all the parties to this claim, other than Hawaii, continued to select IV-D rather than statewide universes in 2003 and 2004). States have a choice for which data universe is used to calculate their PEPs, and that choice is obviously

-21-

dependent on much more than whether the sampling methodologies the auditors use can factor in exclusion errors.[5]  See 42 U.S.C. § 652(g)(1) ("[i]n determining compliance under this section, a State may use as its paternity establishment percentage either the State's IV paternity establishment percentage . . . or the State's paternity establishment percentage")

Plaintiffs should not be rewarded for failing to present an argument before the DAB. ACF never had an opportunity to put forth evidence in the record to explain that the states in fact were on notice of the auditing methodologies ACF used.  Furthermore, the DAB never had the opportunity to rely on its expertise to determine whether the difference in methodologies for two different data sources is a general agency policy.  The proper resolution of this argument is to deem it to have been waived.  The regulations make clear that an appeal must be filed "within 60 days after the date it receives notice of the adverse action" and that a state "must submit its brief and supporting documents when it files its appeal."  See 45 C.F.R. § 262.7(b)(1).  Plaintiffs offer no excuse for failing to have raised the 5 U.S.C. § 552(a) argument before the DAB.

C.    **Indiana should not be permitted to bootstrap onto the arguments raised by the other plaintiffs that it did not raise in its separate appeal to the DAB**

Indiana was not a party to the original complaint filed in this case.  See Plaintiffs' Complaint (Docket #1).  The parties to that complaint were the states, and the District of Columbia, that were appealing DAB Decision Number 1989.  See Pl Am Compl at ¶ 3.  Indiana became a party only after the plaintiffs moved to amend their complaint to add Indiana, which is appealing DAB Decision number 2001, as a plaintiff.  See Motion for Leave to File Amended Complaint.  (Docket # 12); See Pl Am Compl at ¶ 3.  In their amended complaint, plaintiffs

---

[5]This includes the fact that the IV-D PEP uses cases from only the IV-D caseload whereas the statewide PEP uses cases from throughout the state and outside the IV-D caseload. See 42 U.S.C. § 652(g)(2) (definitions of IV-D PEP and statewide PEP).

identify the states that had raised certain issues before the DAB. The amended complaint lists all parties, including Indiana, as raising the argument that ACF failed to "satisfy the notice requirement contained in 45 C.F.R. 305.66(b)." See Pl Am Compl at ¶ 38. However, only six states raised the data reliability argument to the DAB. See id. at ¶ 39. Plaintiffs do not identify Indiana as being one of those states. Id. That is because Indiana did not raise the argument in its separate appeal to the DAB. See Indiana Administrative Record ("IAR") at 1-26.

Plaintiffs are now attempting to argue that even though the complaint does not make any reference to Indiana raising the data reliability argument to the DAB (because Indiana, in fact, did not raise the argument), Indiana should be excused from its failure to exhaust. See Pl Reply at 7 n.1 (claiming that if "one party raises arguments before an agency, the exhaustion doctrine does not prevent another party from pressing those same challenges on appeal") (citing Office of Communication of the United Church of Christ v. FCC, 779 F.2d 702, 706 (D.C. Cir. 1985)). Plaintiffs are attempting to rely on a narrow exception of the exhaustion doctrine in which exhaustion is excused if "another party raised the same issue that a petitioner subsequently raises on appeal." Office of Communication of the United Church of Christ, 779 F.2d at 706 (emphasis added) (citing Washington Ass'n for Television & Children [WATCH] v. FCC, 712 F.2d 677, 682 (D.C. Cir. 1983). This doctrine is "a variant of the futility exception, since it would almost surely be futile for a party to raise an objection already made by someone else." See WATCH, 712 F.2d at 682 n.10 & 683 (emphasis added) (finding that it would not have been futile to raise an issue to the Federal Communications Communication because the Commission "has not yet directly spoken" on that issue).

In the D.C. Circuit, the "exhaustion requirement may be waived only in the most

exceptional circumstances." <u>UDC Chairs Chapter, American Ass'n of Univ. Professors v. Board of Trustees of the Univ. of the District of Columbia</u>, 56 F.3d 1469, 1475 (internal quotations marks and citation omitted). One such exception is where it would be futile to have satisfied exhaustion because the "agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider." <u>Id</u>. (internal quotations marks and citation omitted). However, "[t]he mere probability of administrative denial of the relief requested does not excuse failure" to exhaust; "rather plaintiffs must show that it is <u>certain</u> that their claim will be denied." <u>Id</u>. (internal quotations marks and citation omitted) (emphasis added). When Indiana appealed ACF's assessment of a penalty against its TANF grant, it had no way of knowing whether it would be futile to raise the data reliability argument to the DAB. The DAB had "not yet directly spoken" on the issue. <u>See</u> <u>WATCH</u>, 712 F.2d at 683.[6] Indiana notified the DAB of its appeal on January 20, 2004, but DAB Decision Number 1989, which rejected the auditing methodology argument, was not issued until July 28, 2005. <u>See</u> IAR at 27; JAR at 1.

Indiana could not have known a year and a half in advance that the DAB would reject the auditing methodology argument. As the Supreme Court recently stated, "[e]xhaustion of administrative remedies serves two main purposes." <u>Woodford v. Ngo</u>, ___ S.Ct. ___, 2006 WL 1698937 (June 22, 2006). First, it "gives the agency an opportunity to correct its own mistakes . . . before it is haled into federal court." <u>Id</u>. Second, "exhaustion promotes efficiency." <u>Id</u>. It would be very inefficient (as well as unfair) to allow Indiana to be able to bootstrap onto the arguments made by other states, involved in separate litigation, when the DAB had not decided those issues by the time Indiana filed its own appeal. By plaintiffs' logic, Indiana should be

---

[6]Indiana also could not claim any argument under 5 U.S.C. § 552(a) was futile because none of the other plaintiffs raised that issue before the DAB.

excused for failing to have raised an argument, even though the DAB had not yet rejected it, because the other states, fortuitously, ultimately did not succeed on the issue before the DAB. If the states had prevailed, then Indiana would have had no opportunity to rely on that argument because DAB Decision Number 1989 came more than 60 days after Indiana received notice that it would be assessed a penalty. See 45 C.F.R. 262.7(b)(1) (the state "must submit its brief and supporting documents when it files its appeal," which must be "within 60 days after the date it receives notice of the adverse action"). Furthermore, a logical extension of plaintiffs' argument would be that Indiana just had to notify the DAB of its appeal, and did not even have to make any arguments to the DAB, for it to be able join the other states in the current lawsuit. This would completely undermine the exhaustion doctrine.

### III.    Plaintiffs are attempting to seek a windfall by double counting the fiscal impact of the penalties imposed upon them

The statute, and corresponding regulation, which require a state to expend the funds in the immediately succeeding fiscal year for which its TANF grant was reduced, does not result in a state being assessed two penalties. See 42 U.S.C. § 609(a)(12); 45 C.F.R. § 262.1(e). Rather, it simply requires that the intended recipients of aid under the TANF program are not penalized by the state's failures. The state is not giving any extra money to the federal government; it is just making up the difference (i.e. covering the payment the federal government would have otherwise made but for the states' failure) so that program beneficiaries are not penalized for the states' noncompliance. Another simple example demonstrates how plaintiffs are attempting to seek a windfall, by double-counting, their fiscal impact if they were to prevail on the merits of this case. Assume that a total of $150 million is spent on each state's TANF program, with the federal government and the states sharing that financial obligation. Also assume the state is

required to spend $50 million and the federal government contributes $100 million.  The federal

government assesses the state a penalty of $1 million by reducing the state's TANF grant by that

amount for that fiscal year.  The state now must spend $51 million during the succeeding fiscal

year because it received only $99 million from the federal government for the previous fiscal

year.[7]  At first glance, it may seem that the total fiscal impact for the state is $2 million, but that

would be wrong.

   If the state sues the federal government and prevails, the federal government would have

to pay the state $1 million for the state to be in the same position it was before the penalty was

assessed.  If no penalty was assessed, the state's financial obligation would be $100 million, $50

million for both years, and the federal government's financial obligation would be $200 million,

$100 million for both years.  After the penalty was assessed, the state would have a financial

obligation for those two years of $101 million, $50 million during the first year and $51 million

during the succeeding fiscal year, and the federal government's financial obligation would be

$199 million, $99 million for the first year and $100 million during the succeeding fiscal year.

After the federal government pays the state $1 million, the state's financial obligation is back to

where it would be if no penalty was taken, a total of $100 million for both fiscal years, and the

federal government's financial obligation is also back to where it would be if no penalty was

taken, a total of $200 million for both fiscal years.  If plaintiffs' argument were to prevail, the

federal government would have to pay that state $2 million.  If the $2 million were distributed

---

[7]The state is not required to spend any extra amount during the fiscal year for which its
TANF grant is reduced, but rather must spend the extra $1 million during the succeeding fiscal
year.  See 42 U.S.C. § 609(a)(12) ("the State shall, during the immediately succeeding fiscal
year, expend under the State program funded under this part an amount equal to the total amount
of such reductions").

evenly over the two years, the federal government would have paid $100 million for the year in which the state's TANF grant was reduced and $101 million for the succeeding fiscal year. The state, meanwhile, would have paid the equivalent of $49 million for the year in which the state's TANF grant was reduced, because a total of $149 million was spent on the TANF program that year, and $50 million for the succeeding fiscal year, because a total of $151 million was spent on the TANF program during the succeeding fiscal year. The states would have benefitted by $1 million for bringing the lawsuit and, hence, would have received a windfall.

**CONCLUSION**

For the reasons stated, defendants respectfully request this Court to grant their Motion for Summary Judgment and deny plaintiffs' Motions for Summary Judgment.


Dated: July 12, 2006                    Respectfully submitted,
                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        KENNETH L. WAINSTEIN
                                        United States Attorney for the District of Columbia

                                        SHEILA M. LIEBER
                                        Deputy Director, Federal Programs Branch

                                        _/s/_____
Of Counsel                              ADAM D. KIRSCHNER
LINDA GRABEL                            Trial Attorney
Assistant Chief Counsel                 U.S. Department of Justice
Children, Families, and Aging Division  Civil Division, Federal Programs Branch
Office of the General Counsel           Mailing Address

-27-

U.S. Department of

Health and Human Services

P.O. Box 883

Washington, D.C., 20044

<u>Delivery Address</u>

20 Massachusetts Ave., NW., Room 7222

Washington, DC 20001

Telephone: (202) 353-9265

Fax: (202) 616-8470

Adam.Kirschner@usdoj.gov

COUNSEL FOR DEFENDANT

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 12th day of July 2006, I caused this Reply to Plaintiffs'

Opposition Memorandums to Defendants' Motion for Summary Judgment to be served on

Plaintiffs' counsel of record electronically by means of the Court's ECF system.


/s/ _____

Adam D. Kirschner