**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| STATE OF NEVADA, DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF WELFARE AND SUPPORTIVE SERVICES, CHILD SUPPORT ENFORCEMENT PROGRAM, | ) ) ) ) ) ) | 3:05-cv-00697-HDM-VPC<br><br>ORDER |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ADMINISTRATION FOR CHILDREN AND FAMILY SERVICES, and MICHAEL O. LEAVITT, SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Before the court is the plaintiff's motion for summary judgment (#15). Defendants have responded (#17), and plaintiff has replied (#18). Also before the court is the defendants' cross motion for summary judgment (#17). Plaintiff has responded (#18), and defendants have replied (#19).

1

I.

Plaintiff, State of Nevada Department of Health and Human Services ("Nevada"), brings this action for declaratory relief from a determination by defendant United States Department of Health and Human Services ("HHS"), which found that Nevada failed to meet performance standards under the federal child support enforcement program and assessed a statutorily mandated penalty.

The Temporary Assistance for Needy Families ("TANF") grant program, administered under Title IV-A of the Social Security Act ("SSA"), provides eligible states with funds to assist needy families. In order to receive a TANF block grant, the states must meet several requirements, including the operation of a child support program in accordance with Title IV-D of the SSA, 42 U.S.C. §§ 651 et seq. ("IV-D program"). States that fail to properly administer their IV-D programs are subject to the penalty, a percentage reduction in their TANF grant.

The IV-D program contains a number of performance measures. Compliance is determined on the basis of data submitted by the states each federal fiscal year ("FY") on an OCSE-157 form ("OCSE-157"). The data must be reliable; that is, they must be able to pass a data reliability audit. The performance measure of central importance to this action is the paternity establishment percentage ("PEP"), which requires data from line 6 of the current year OCSE-157 and data from line 5 of the previous year OCSE-157.

States are subject to penalty if they fail data reliability and/or performance measures for two or more consecutive years. However, the Secretary of HHS ("Secretary") has discretion to disregard certain failures. *See* 42 U.S.C. § 609(a)(8)©. In

2

addition, states can avoid penalty by taking "corrective action" to fix deficiencies during the "succeeding fiscal year." *Id.* at § 609(a)(8)(A)(ii).

In 1996, 1997, and 1998, Congress enacted several amendments to the child support enforcement and grant programs, which included creation of performance incentives. In response, the Secretary issued new regulations in December 2000, which, among other things, suspended imposition of penalties for performance failures until FY 2001 as the new incentive structure was phased in.[1]

For FY 2000, HHS determined that Nevada's data were unreliable. Nevada received a draft audit report on August 15, 2001, and, after having the opportunity to comment on the findings, a final audit report on August 29, 2001. The report explained why the FY 2000 data were unreliable. On December 19, 2001, Nevada was sent a letter ("2001 letter") waiving the 2000 data failure "in recognition of [the] phase-in" period. The 2001 letter stated that the unreliable FY 2000 data would not be the basis for a penalty and noted that the waiver applied "only to unreliable or incomplete FFY 2000 data and [did] not affect potential data or performance penalties that may result from the states' FFY 2001 or subsequent years' data or performance." With this waiver in hand, Nevada did

---

[1] 45 C.F.R. § 305.42; *see also id.* §305.40. HHS asserts on the basis of these regulations that while performance measure failures could not result in penalties for FY 2000, data reliability failures could. Thus, a waiver for FY 2000 saved the states from a year of failing data reliability, thus pushing back the earliest imposition of penalties from FY 2001 to FY 2002.

not resubmit corrected and reliable FY 2000 data.[2] Internal emails from the Administration for Children and Family Services indicate that Nevada knew of the requirement to resubmit reliable FY 2000 data but decided against doing so because of the potential effect on its FY 2002 performance measures. Admin. R. at 247. Also, the former chief of Nevada's child support enforcement program, Leland Sullivan, stated in his affidavit that he "was concerned why OCSE wanted [them] to resubmit corrected data," indicating that Sullivan of the requirement to resubmit corrected data. Admin. R. at 269. Finally, counsel for the state candidly conceded that issue during oral argument.

For FY 2001, HHS determined that Nevada failed its performance measures; specifically, the PEP could not be calculated because the line 5 data from FY 2000 necessary for the calculation were unreliable. When Nevada failed FY 2002 data reliability (and thus also the performance measures), the consecutive-year failure rule was invoked, and Nevada suffered the penalty.

Nevada was notified of both the deficient performance and the penalty in a November 14, 2003, letter. It appealed to the Departmental Appeals Board ("DAB"), which affirmed on September 23, 2005. Nevada then appealed to this court.

## II.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

---

[2] Nevada asserts that it submitted its original 2000 data in November 2000, and then revised data in December 2000 and February 2001. Only the December 2000 submission is on the record.

4

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. If the parties file cross-motions for summary judgment, the court must consider each party's motion separately and determine whether that party is entitled to a judgment under Rule 56. In making these determinations, the court must evaluate the evidence offered in support of each cross-motion. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136-37 (9th Cir. 2001). The parties concede that there are no genuine issues of material fact to decide, and the court can find none on the record. Therefore, the issues may be decided as a matter of law.

When a court reviews an agency decision on summary judgment, the standard is whether the agency's action was arbitrary, capricious, an abuse of discretion, unsupported by the law, or not supported by substantial evidence. 5 U.S.C. § 706(2). This is a narrow scope of review, and the "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must have "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*

Issues of statutory interpretation are reviewed *de novo*, but the Secretary's interpretation of the governing statutes and regulations is entitled to great deference. *Blackfeet Tribe v. U.S. Dep't of Labor*, 808 F.2d 1355, 1357 (9th Cir. 1987). The court reviews agency regulations using the two-part *Chevron* test, under which the court must ask (1) whether the relevant statute is

5

silent or ambiguous, and, if so, (2) whether the agency's interpretation is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). An agency's interpretation of its own regulation is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

                              III.
**A. Plaintiff's Motion**

In its motion, Nevada alleges several actions of HHS and the DAB, which it contends to be arbitrary and capricious: (1) HHS contravened the statute by applying the waiver for only FY 2000; (2) HHS and DAB arbitrarily and capriciously reinterpreted the plain language in the 2001 letter; (3) HHS and DAB arbitrarily and capriciously disregarded Nevada's reliance on the 2001 letter during the appeal; (4) DAB arbitrarily and capriciously held that HHS cannot be estopped from enforcing the penalty; and (5) DAB arbitrarily and capriciously affirmed HHS's violation of its own notice requirements when it informed Nevada of the failure and the penalty at the same time. Nevada also disagrees with HHS's interpretation of the "corrective action" period.

    **I. HHS's Statutory Interpretation**

Nevada asserts that HHS's interpretation of the statutory waiver provision contained in 42 U.S.C. § 609(a)(8)© is erroneous. Nevada argues the waiver applies to all years for which the data are to be used. HHS argues the waiver applies year by year, depending on the data's effect on the PEP calculation each year. The provision states:

    [A] state determined as a result of an audit –

6

> ... (ii) to have submitted incomplete or unreliable data ... shall be determined to have submitted adequate data only if the Secretary determines that the extent of the incompleteness or unreliability of the data is of a technical nature which does not adversely affect the determination of the level of the State's paternity establishment percentages (as defined under section 652(g)(2)[3] of this title) or other performance measures that may be established by the Secretary.

42 U.S.C § 609(a)(8)(C)(footnote added). Nevada maintains that the plural "percentages," coupled with the fact that data are used for multiple years, shows Congress' intent for a potentially multiple-year waiver. Thus, HHS contravened the statute by interpreting it as, and writing a regulation that makes it, a year-by-year waiver.[4] HHS counters that the plural "percentages" refers to the cross-referenced definition of the two methods for determining PEP, and that the regulation is no different from the statute.

"Percentages" indeed refers to the two defined methods of calculating PEP. HHS's construction of the statute as authorizing a year-by-year waiver is both reasonable and permissible. The regulation is a proper application of the statute.

### ii. Reinterpretation of the Waiver Letter

Nevada argues that HHS was arbitrary and capricious in reinterpreting the 2001 letter. The letter is reasonably susceptible to the interpretation given to it by HHS. The waiver

---

[3] Section 652(g)(2) defines two different methods for determining a state's PEP – the IV-D method and the state method.

[4] The regulation, 45 CFR § 305.62, uses the phrase "paternity establishment or other performance measures percentages."

7

letter states that the waiver applied only to the 2000 data failure and not to the 2000 data. Therefore, the defendants' actions in requiring the state to correct the 2000 data deficiencies in its 2001 report to avoid future penalties were not arbitrary or unreasonable.

### iii. Reliance

Nevada argues that the DAB arbitrarily and capriciously disregarded its reliance on the 2001 letter. HHS argues that Nevada was on notice that it had to resubmit the 2000 data.

The administrative decision disregards Nevada's reliance primarily because, it states, Nevada did not argue or establish that it actually relied on the letter but rather argued that it should be entitled to rely on it. Admin. R. at 18. While a question of fact may exist as to whether Nevada relied on the letter to its detriment in compiling the 2001 data, the doctrine of equitable estoppel is not available to Nevada in this case. Even if the court were to hold the DAB's determination on this point was arbitrary and capricious, the outcome would not change. Nevada's reliance goes to the question of estoppel, and even if Nevada relied on the letter, it cannot otherwise show estoppel on the facts of this case.

### iv. Equitable Estoppel

Generally, estoppel requires the plaintiff to show four elements: (1) knowledge of the true facts by the party to be estopped; (2) intent to induce reliance or actions showing such intent; (3) ignorance of the true facts by the relying party; and (4) detrimental reliance. *Bolt v. U.S.*, 944 F.2d 603, 609 (9th Cir. 1991); *see also Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1166

8

(9th Cir. 2005). However, the federal government "may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 60 (1984). Accordingly, the Ninth Circuit requires two additional elements in cases of government estoppel. First, the party must show the government engaged in "'affirmative misconduct going beyond mere negligence.'" Second, the party must show the "'government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability.'" *Rider v. U.S. Postal Serv.*, 862 F.2d 239, 240 (9th Cir. 1988).

There is no single test for affirmative misconduct; each case must be decided on its own facts. *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989). However, the Ninth Circuit has defined affirmative misconduct as a "deliberate lie" or a "pattern of false promises." *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1184 (9th Cir. 2001). "Neither the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). Affirmative misconduct does not require that the government intend to mislead the other party. *Watkins*, 875 F.2d at 707.

Nevada's estoppel argument fails. It is clear, and Nevada admits, that it submitted unreliable FY 2000 data. Nevada received a draft and then a final audit report of its data reliability in August 2001. The report specifically noted problems with its line 5 data – the very data that in 2001 caused Nevada's PEP to be incalculable, according to HHS. Nevada responded to the draft

9

audit report by acknowledging its shortcomings and vowing to fix them. In short, before the 2001 letter appeared, Nevada knew it needed to resubmit reliable data and was working on it. Thus, Nevada's argument can only survive if it relied on the letter to change its course of action, and if it can show the government affirmatively led it down that path.

Nevada's position is that the letter waived the unreliability of the data for all purposes, including their use in subsequent years' calculations. HHS's position is that the letter waived only FY 2000 penalties, and that penalties based on the unreliable data in future years would only be waived if the data did not have a negative effect on performance calculations in that year. At the very least, the 2001 letter is ambiguous. However, even assuming that the letter waived the requirement for reliable 2000 data for all purposes, including the 2001 year, Nevada cannot avail itself of the equitable estoppel doctrine because it has not shown any evidence of affirmative misconduct on the part of HHS. At most the 2001 letter was imprecise. However, Nevada has pointed to no evidence that would establish that HHS acted recklessly or intended to mislead or engaged in affirmative misconduct that went beyond mere negligence.

### v. Notice and the Corrective Action Period

Finally, Nevada raises two separate but related issues. The first is that it should have received notice of a deficiency before a penalty was imposed. The second is that it should have had a full year to take "corrective action" after receiving such notice.

#### a. Notice

The Office of Child Support Enforcement ("OCSE") informed

10

1 Nevada of its consecutive 2001 and 2002 failures and the resulting
2 penalty in a November 14, 2003, letter.  Nevada argues this
3 combined notice of deficiency and penalty was arbitrary and
4 capricious and violated HHS's own regulations, 45 C.F.R. §§ 305.66
5 and 305.61(a)(2).  HHS correctly asserts that neither its
6 regulations nor the statute require prior notice before imposition
7 of penalties for IV-D program failures.

   The regulatory notice provision is found in 45 C.F.R. §
305.66.  It states:

> (a) If a State is found by the Secretary to be
> subject to a penalty as described in § 305.61
> of this part, the OCSE will notify the State in
> writing of such finding.
>
> (b) The notice will:
>
> (1) Explain the deficiency or deficiencies
> which result in the State being subject to a
> penalty, indicate the amount of the potential
> penalty, and give reasons for the finding; and
>
> (2) Specify that the penalty will be
> assessed ... if the State is found to have
> failed to correct the deficiency or
> deficiencies cited in the notice during the
> automatic corrective action year (i.e., the
> succeeding fiscal year following the year with
> respect to which the deficiency occurred).
>
> © The penalty under § 305.61 of this part will
> be assessed if the Secretary determines that
> the State has not corrected the deficiency or
> deficiencies cited in the notice by the end of
> the corrective action year.

42 U.S.C. § 305.66(a)-©.  According to Nevada, § 305.66
mandates OCSE to provide prior notice of deficiency before
assessing penalties.  Nevada relies on the regulation's use of the
past tense notice of deficiencies in conjunction with the future
tense notice of penalty.  HHS responds that the statute requires a
combined notice because under § 305.61 a state cannot be "subject

11

to penalty" until it has failed to correct deficiencies during the corrective action period. Moreover, there is no notice provision in the statute (other than actual notice of adverse action in 42 U.S.C. § 610), and Congress explicitly removed child enforcement programs from those entitled to prior notice and opportunity to enter into a corrective action plan before imposition of penalties.[5]

Section 305.61(a) states:

> A State will be subject to a financial penalty and the amounts otherwise payable to the State under title IV-A of the Act will be reduced in accordance with § 305.66:
>
> (1) If on the basis of:
>
> (I) Data submitted by the State or the results of an audit ... the State's program failed to achieve the paternity establishment percentages ...; or
>
> (ii) The results of an audit ... the State did not submit complete and reliable data ...; or
>
> (iii) The results of an audit ... the State failed to substantially comply with one or more of the requirements of the IV-D program ...; and
>
> (2) With respect to the immediately succeeding fiscal year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable.

45 C.F.R. 305.61.

---

[5] 42 U.S.C. § 609(c) provides for notice and an opportunity to enter into a corrective compliance plan when states face a § 609(a) penalty, but subsection (c)(4) exempts violations under the IV-D program from those eligible for such notice and opportunity.

12

Title IV does not contain any prior notice provision, so HHS's regulation need not be analyzed under *Chevron*. HHS's interpretation of the statute and the regulation is reasonable and entitled to deference.

### b. Corrective Action Year

Data are due each December 31, but the states have a period of time after that in which to fix any deficiencies. The statutory provision providing for such a corrective action period is 42 U.S.C. § 609(a)(8)(A); the corresponding regulation is 45 C.F.R. § 305.61. Nevada contends that Congress intended the corrective action period to be close to a full year in which the states could correct problems after receiving notice of a deficiency. HHS contends that the corrective action year is simply the fiscal year following the year in which a failure occurred.

Although under HHS's interpretation the states have significantly less than a year to correct deficiencies,[6] the regulations and the statute support such an interpretation. The preamble warns that states "should be continuously monitoring [their] own performance .... [and they] should not wait or rely upon the Secretary's determination of a data or performance deficiency in order to begin corrective action." 65 Fed. Reg. 82192. The statute also supports HHS's interpretation. Subsection

---

[6] The time between receiving an audit report and the deadline for resubmitting data could be as few as 30 days (if corrected data are due by the end of the fiscal year, September 30) to as many as 120 days (if the deadline is extended to December 31).

13

(8)(A) refers to a "fiscal year."[7] Subsection (8)(A)(I) refers to failures in performance or data reliability discovered through audits or reviews; the subject is the failure, not the finding of a failure. Subsection (8)(A)(ii) gives the states the "succeeding fiscal year" to correct deficiencies or face the penalty. Thus, the succeeding fiscal year is the fiscal year following the year in which a state suffered a data or performance failure, not the year in which a failure is discovered. The regulations echo this interpretation. *See* 45 C.F.R. 305.66(b)(2). Finally, Nevada has not pointed to anything indicating that Congress intended states to have a full year to correct performance deficiencies.

---

[7] In fact, the preamble to the earlier version of the regulations, released in October 1999, provided states a year after the Secretary discovered a failure in which to fix their deficiencies. *See* Pl. Compl., Ex. 6 ("[A] State would have one year following a determination that its data was incomplete or unreliable to submit complete and reliable data ...."). However, the preamble to the Final Rule, which was adopted in December 2000, deleted the earlier language and clearly referred to the fiscal year succeeding any failure in performance or data reliability. *See* 65 Fed. Reg. 82189 ("There is an automatic statutory corrective action period of one fiscal year immediately succeeding the performance year before any penalty will be imposed."); *id.* ("States are on notice, however, that any corrective action which may be necessary to correct either a data or a performance deficiency must be achieved before the end of the fiscal year immediately succeeding the performance year.").

14

IV.

Accordingly, the plaintiff's motion for summary judgment (#15) is **DENIED,** and the defendant's motion for summary judgment (#17) is **GRANTED.**

**IT IS SO ORDERED.**

DATED: This 28th day of December, 2006.

_____
UNITED STATES DISTRICT JUDGE