UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
MAR 23 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

STATE OF ALABAMA )
DEPARTMENT OF HUMAN )
RESOURCES, CHILD SUPPORT )
ENFORCEMENT DIVISION, *et al.,* )
 )
    *Plaintiffs,* )
 )    Civ. No. 05cv2098 (RJL)
v. )
 )
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, *et al.,* )
 )
    *Defendants.* )

MEMORANDUM OPINION
(March 22, 2007)[#19, 20, 22]

The state agencies responsible for administering child support enforcement programs in Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico, Rhode Island, and the District of Columbia have sued the United States Department of Health and Human Services ("HHS") and Michael Leavitt, the Director of HHS, seeking to overturn penalties assessed by HHS against the plaintiffs' Temporary Assistance for Needy Families ("TANF") block grant payments in Fiscal Year ("FY") 2004. Currently before the Court are the parties' cross motions for summary judgment.[1] For the reasons

---

[1] Alabama, Delaware, Hawaii, Indiana, Kansas, Louisiana, New Mexico and Rhode Island have collectively moved for summary judgment; the District of Columbia has moved for summary judgment on its own motion. As the motions are essentially the same, the Court will consider them as a single motion.

1



stated below the plaintiffs' motions for summary judgment will be DENIED and the defendants' motion GRANTED.

## BACKGROUND

In 1996 Congress amended Title IV-A of the Social Security Act to create the Temporary Assistance to Needy Families ("TANF") program, 42 U.S.C. § 601 *et seq.*. A key element of Congress's broader efforts to reform welfare, TANF replaced the Aid to Families with Dependent Children entitlement program with block grants to eligible states that have approved programs for providing assistance to needy families with children. *Id.*

In order to be eligible for TANF grants, states are required to operate child support enforcement programs—programs responsible for locating non-custodial parents, establishing paternity and obtaining child and spousal support—in accordance with Title IV-D of the Social Security Act. 42 U.S.C. § 602(a)(2). Title IV-D, in turn, provides federal funding for state child support enforcement programs, but sets strict performance criteria and reporting requirements. 42 U.S.C. § 651, *et seq.*. States found to be in noncompliance with Title IV-D can be assessed penalties against their TANF grants. 42 U.S.C. § 609.

Among other performance requirements, Title IV-D requires states' child support enforcement programs to achieve a "paternity establishment percentage" ("PEP") of at least 90% for each fiscal year (or, if less than 90%, to show an improvement over the previous year). 42 U.S.C. § 652(g)(1). Under IV-D a state can calculate its PEP either by

determining the percentage of children born out of wedlock statewide for whom paternity is established, or by determining the percentage of children participating in the IV-D program for whom paternity is established. 42 U.S.C. § 652(g)(2).

In order to ensure compliance, HHS requires states to submit annual data "concerning the levels of accomplishment...with respect to applicable performance indicators (including paternity establishment percentages)." 42 U.S.C. § 654(a)(15)(B). HHS, in turn, is required to audit the data to assess the "completeness, reliability and security of the data and the accuracy of the reporting system." 42 U.S.C. § 652(a)(4)(c)(i).

According to HHS regulations promulgated in December 2000, performance data submitted must be 95% error-free. 45 C.F.R. § 305.1. For states calculating their PEP based on the IV-D population, auditors consider inclusion and exclusion errors (i.e. counting a child for whom paternity has not been established or excluding a child for whom paternity has been established). For states calculating their PEP based on the statewide population, only inclusion errors are considered.

States that fail to achieve a 90% PEP or submit data with an error rate greater than 5%, are required to take corrective action in the succeeding year (the "corrective action year"). 42 U.S.C. § 609(a)(8). If a state is not in compliance at the end of that corrective action year, it can be assessed a percentage reduction in its TANF grant award. 45 C.F.R. § 305.61. Prior to assessing a penalty, HHS is required to notify the state in writing,

explaining the deficiency and indicating the amount of the potential penalty. 45 C.F.R. § 305.66.

In November, 2003, HHS informed the plaintiffs that they had failed to meet IV-D performance requirements and/or submitted unreliable data in FY 2001 and 2002 and, therefore, were subject to 1% reductions in their FY 2004 TANF grants. Plaintiffs appealed their penalties to the Departmental Appeals Board ("Board"),[2] arguing that HHS had failed to provide proper notice as required by C.F.R. § 305.66. Plaintiffs argued that the penalty notice was provided *after* the end of the corrective action year and, therefore, was inadequate. Several of the states[3] further argued that HHS's decision to use different error standards in assessing IV-D and statewide data reliability was unreasonable and, therefore, arbitrary and capricious.

In July and October 2005,[4] the Board upheld the penalty awards. In rejecting the states' notice arguments, the Board found that § 305.66 does not provide a specific timeframe or deadline for notification and, therefore, does not require HHS to notify states prior to the end of the corrective action year. Decision of the Departmental

---

[2] Alabama, Delaware, Hawaii, Kansas, Louisiana, New Mexico and Rhode Island jointly appealed their penalties to the Board. Indiana filed a separate appeal.

[3] These states were: Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island.

[4] The Board's July 2005 opinion addressed the joint appeal of Alabama, Delaware, Hawaii, Louisiana, New Mexico, and Rhode Island. The October 2005 opinion, which adopted the July opinion, addressed Indiana's individual appeal.

Appeals Board, July 28, 2005 ("Board Decision"), p. 12. The Board concluded that under IV-D penalty regime, states are responsible for monitoring their own performance and taking appropriate corrective action. *Id* at p. 13.

The Board further held that HHS's decision to use different auditing methodologies was reasonable given the significant differences in the IV-D and statewide data universes; that plaintiffs had failed to show that they had been prejudiced by the different standards; and that no authority entitled the plaintiffs to prior notice of the differing methodologies. *Id* at p. 38-39. Accordingly, the Board held that HHS's decision to use the different methodologies was neither arbitrary nor capricious.

In January 2006, plaintiffs filed suit in this Court seeking to overturn the Board's decision and demanding payment of withheld funds. In Count I of the Amended Complaint, plaintiffs argue that the Board erred in holding that HHS had provided adequate notice of noncompliance. In Count II, plaintiffs contest the Board's affirmance of HHS's use of different auditing methodologies to assess error rates. The parties have cross moved for summary judgment.

## STANDARD OF REVIEW

Plaintiffs have brought suit pursuant to 42 U.S.C. § 610(c) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*.[5] Accordingly, the Court will uphold the Board's decision unless it finds the decision to be "arbitrary, capricious, an abuse of

---

[5] 42 U.S.C. § 610(c) provides that a state may seek judicial review of a final decision of the Board.

5

discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706; *Back Country Horsemen of America v. Johanns,* 424 F.Supp.2d 89 (D.D.C. 2006); *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121 (D.D.C. 2001). In making that determination, the Court must give "substantial deference" to an agency's interpretation of its own regulations. *Thomas Jefferson University v. Shalala,* 512 U.S. 504 (1994); *Martin v. Occupational Safety and Health Review Commissioner,* 499 U.S. 144 (1991). The task of the Court "is not to decide which among several competing interpretations best serves the regulatory purpose," rather "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson University,* 512 U.S. at 512. For the following reasons, the Board's decision here was neither.

## ANALYSIS

### I. PENALTY NOTICE PROVISION

Plaintiffs argue that HHS violated its own regulations when it failed to provide notice of noncompliance prior to assessing penalties.[6] According to the plaintiffs, the plain language of 45 CFR § 305.66 supports the conclusion that the regulatory regime requires notice *prior* to the end of the corrective action year. The Court disagrees.

First, nothing in the statutory regime requires HHS to notify states of noncompliance prior to the beginning of the corrective action year. In fact, although 42 U.S.C. § 609(c), directs HHS to notify states of certain violations of the TANF program

---

[6] Importantly Plaintiffs do not argue that the substance of the November 2003 notice was inadequate, only that the timing of the notice violated § 305.66.

and allows those states to enter into a "corrective compliance plan" prior to assessing a penalty, Congress explicitly exempted IV-D penalties (the penalties at issue here) from that requirement. 42 U.S.C. § 609(c)(4). Accordingly, this Court must only consider whether HHS violated its own regulatory notice requirement.

The notice requirement, 45 C.F.R. § 305.66, provides that:

(a) If a state is found by the Secretary to be subject to a penalty...[HHS] will notify the State in writing of such a finding.
(b) The notice will:
    (1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the finding; and
    (2) Specify that the penalty will be assessed in accordance with the provisions of 45 C.F.R. 262.1(b) through (e) and 262.7 if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective year.

Although plaintiffs argue that the language of Section 305.66 is conditional, (i.e. "the penalty *will be* assessed...*if* the State is found...") and, therefore, describes a sequence of events in which the corrective action year follows the notice, the plain meaning of the regulation supports the Board's decision.

Section 305.66(a) clearly provides that HHS must provide written notice of a penalty "if a state is found...to be subject to a penalty." Under 45 C.F.R. § 305.61, a state is not subject to a penalty until after the end of the corrective action year which follows immediately and automatically upon a year of noncompliance. 45 C.F.R. § 305.61. Therefore, a penalty cannot be assessed and notice is not required, until after the end of, not prior to, the corrective action year.

Additionally, the preamble to Section 305.66 provides that the states are responsible for monitoring their own compliance and, therefore:

> should not wait or rely upon the Secretary's determination of a data or a performance deficiency in order to begin corrective action. Two consecutive years of failure in the same performance measure criteria will trigger a penalty imposition.

65 Fed. Reg. 82192.

Finally, as a practical matter, the current regulatory regime does not allow for notice to *precede* a full corrective action year. States are not required to submit data for the preceding fiscal year (which ends September 30th) until December 31st of the next fiscal year. As well, HHS is required to conduct audits only every three years, ensuring that an audit, when it is conducted, will examine data that is as much as three years old. Even assuming HHS conducts an audit every year, the December 31st submission deadline and the necessary time it takes HHS to audit the data, ensures that a state could not receive notice of noncompliance until well into, *if not after*, the corrective action year.

In light of this practical reality, and considering the deference with which this Court must treat an agency's interpretation of its own regulations, the Court finds that Section 305.66 does not require HHS to provide the states *prior* notice of noncompliance. Accordingly, the Board's decision to approve, in essence, the notice of the penalties, was neither arbitrary nor capricious.

## II. AUDITING METHODOLOGY

Plaintiffs further argue that the Board erred in upholding HHS's use of two different auditing methodologies. Specifically, plaintiffs argue that the use of different audit methodologies gives the term "reliable" data two different meanings; that HHS failed to provide notice of the different methodologies; and that HHS lacked any rationale for the use of different error assessment methods. Accordingly, plaintiffs argue, HHS's conduct was inconsistent with its own regulations and the Board was thus bound to strike down the agency's conduct. The Court disagrees.

Nothing in the statutory or regulatory framework of the TANF program specifically requires HHS to use a single auditing methodology. Furthermore, there is no reason to find that the use of different methodologies gives the requirement to submit "reliable" data, multiple meanings. States are required to submit "reliable data" regardless of which data set they use to calculate their PEPs and that data must be 95% error free. 42 U.S.C. § 609(a)(8); 42 U.S.C. § 652(g)(2)(C); 45 C.F.R. § 305.1. The fact that HHS uses two different methods for checking the accuracy of two substantially different data sets is neither inconsistent with the letter of the regulation, nor tantamount to writing an alternative definition of "reliability."

Moreover, HHS has offered an entirely reasonable rationale for the use of the different auditing methodologies. For states using IV-D data, the data universe is relatively small and entirely in the hands of the state agencies. As a result, it is relatively

easy for auditors to assess exclusion and inclusion errors. For states using statewide data, however, the data universe is much larger (including, as it does, all children in the state born out of wedlock) and far more dispersed. As the Board pointed out, statewide birth data reflects all births in a state and, therefore, is taken from a multiplicity of sources (i.e. public and private hospitals and birth facilities). Board Decision, p. 37-38. Thus, it would be far more difficult for auditors to assess exclusion errors given that auditors would need to examine the underlying records from each data source in order to determine whether data had erroneously been excluded in the state's PEP submission. Such a requirement would undoubtably place a significant additional burden on states (who would have to compile the records) and HHS auditors. Given this, the Court finds HHS's rationale for employing two different audit methodologies to be entirely reasonable.

Finally, the Court finds that the Board correctly concluded that the states had failed to show that they were "entitled to prior notice of the different sample selection methodologies." Board Decision, p. 39. Plaintiffs argue that under the APA, agencies are required to publish "statements of general policy...adopted by the agency," and that parties cannot be "adversely affected by a matter required to be published" unless the agency has provided actual and timely notice. 5 U.S.C. § 552(a)(1)(D). Plaintiffs have failed to offer, however, support for their position that HHS's auditing methodologies are "statements of general policy." Although the plaintiffs site our Circuit's decision in

*Guardian Federal Savings and Loan Association v. Federal Savings and Loan Insurance Corporation,* in support of that proposition, the Court in *Guardian* held only that provisions of a regulation that "specify the criteria that audits and auditors must fulfill in order to produce an audit report" were "general statements of policy" for the purposes of exempting the regulation from the notice and comment requirement of APA § 553(b). 589 F.2d 658 (D.C. Cir. 1978). The Court in *Guardian* did not address whether the regulation was a "statement of general policy" requiring notice under § 552(a)(D), nor is there any indication that the challenged regulations dealt with specific audit methodology.

Furthermore, plaintiffs have offered no evidence to show that they were prejudiced by the lack of notice. Although plaintiffs argue that their IV-D data submissions would have been judged reliable if HHS had ignored exclusion errors (as HHS does for statewide PEP data), such an argument, even if true, is unavailing. The issue at hand is whether the alleged lack of notice that two different methodologies would be used somehow prejudiced the plaintiffs. Therefore, the fact that the plaintiffs might have passed the audit if a third methodology (IV-D data audited only for exclusion errors) had been used is irrelevant.

Finally, although plaintiffs argue that more IV-D PEP states failed their data reliability audits than statewide PEP states, plaintiffs have not shown that their PEP data would have been judged reliable if they had selected the statewide PEP measure. Without such a showing, plaintiffs cannot establish that the lack of notice was prejudicial.

Accordingly, the Court concurs with the Board's decision that HHS's use of different auditing methodologies was neither erroneous nor inconsistent with the regulation.

## CONCLUSION

For all of the above reasons, the Court finds that HHS's decision to assess penalties against the plaintiffs' TANF grants and the Board's affirmance of those penalties was neither arbitrary nor capricious. Accordingly, plaintiffs' motions for summary judgment will be DENIED and defendants' motion for summary judgment is GRANTED.

                                            _____
                                            RICHARD J. LEON
                                            United States District Judge